EAG:NMA/ALC/LKG
F. #2014R00055

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                  Docket No.  <u>14-CR-26 (S-4) (ARR)</u>

VINCENT ASARO,

              Defendant.

– – – – – – – – – – – – – – – – –X


## MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION <u>IN LIMINE</u> TO ADMIT <u>CERTAIN EVIDENCE AGAINST THE DEFENDANT AT TRIAL</u>


KELLY T. CURRIE
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Nicole M. Argentieri
Alicyn L. Cooley
Lindsay K. Gerdes
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in support of its motion in limine to admit at trial evidence of certain acts committed by defendant Vincent Asaro (the "defendant"). As set forth below, the evidence is admissible as direct proof of the structure and organization of the charged racketeering enterprise, the defendant's membership in the enterprise and his ongoing participation in its illegal activities at various times over a 45-year span, the existence, nature and continuity of the charged racketeering conspiracy, and the charged violations of 18 U.S.C. § 894(a)(1). The evidence also completes the story of the crimes charged and provides essential background information on the racketeering conspiracy, including about the development of the criminal relationships among the coconspirators.

In the alternative, the evidence is admissible as "other crimes, wrongs or acts" under Rule 404(b) of the Federal Rules of Evidence because it tends to establish the defendant's knowledge, intent, motive, identity, modus operandi, lack of accident and absence of mistake with respect to the charged crimes, and would be offered for other permissible purposes such as to explain the development of the relationship of trust between the defendant and each cooperating witness and to corroborate the cooperating witnesses.

For the reasons set forth herein, the government respectfully submits that the Court should grant the instant motion.[1]

_____

[1] The government reserves the right to make additional motions in limine at a later date, including motions relating to "other acts" evidence, some of which may become appropriate only following the disclosure of certain witnesses' 18 U.S.C. § 3500 material. The government also may seek to introduce at trial additional "other acts" evidence. Should

2

<u>BACKGROUND</u>

I.      <u>The Charges</u>

      A.      <u>Count One: Racketeering Conspiracy</u>

          1.      <u>The Enterprise</u>

The defendant is charged in Count One of the fourth superseding indictment (the "indictment" or "Ind.") with racketeering conspiracy.  Count One charges that from approximately January 1, 1968 to June 30, 2013, the defendant and others were employed by or associated with the Bonanno organized crime family of La Cosa Nostra (the "Bonanno family" of "LCN") and "conspire[d] to . . . conduct and participate, directly and indirectly, in the conduct of the affairs of [the Bonanno family] through a pattern of racketeering activity." Ind. ¶ 15.

The indictment alleges that the Bonanno family operated through various "crews," which consisted of inducted members of the family (sometimes referred to as "soldiers") and associates.  Ind. ¶¶ 5-7.  Each crew was headed by a "captain," who in turn reported to the family's "administration," which consisted of the "boss," the "underboss" and the "consigliere," and which supervised and protected the family's overall activities.  Ind. ¶¶ 4-5.  The indictment also alleges that members of the family occasionally served as "acting" members of the administration due to another administration member's incarceration or ill health, or to insulate the administration member from law enforcement scrutiny, and that the family was occasionally overseen by a "panel" of members not including the boss, underboss and/or consigliere.  Ind. ¶ 4.

---

it seek to do so, the government will provide the defense with notice of such evidence in accordance with Rule 404(b).

As the indictment alleges, the "principal purpose" of the Bonanno family was "to generate money for its members and associates" through a wide range of criminal activities, "including robbery, extortion, illegal gambling and loansharking." Ind. ¶ 8. To further these criminal moneymaking activities, Bonanno family members and associates engaged in still other crimes, some involving the use and threatened use of physical violence, including murder. Id. In addition, members and associates of the Bonanno family "at times used the resources of the family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the family." Id. ¶ 9. "For those purposes, members and associates of the [Bonanno family] were asked and expected to carry out, among other crimes, acts of violence, including murder, extortion, robbery and assault." Id. In addition, "members and associates of the Bonanno family engaged in conduct designed to prevent government detection[,]" conduct that included "a commitment to murdering persons, particularly members or associates of organized crime families, who were perceived as potential witnesses against members and associates of the enterprise." Id. ¶ 10.

Evidence at trial will establish that the defendant was born into the mafia and passed on that lineage to his own son. Both his father and grandfather were inducted members of the Bonanno family, and later in his life, the defendant sponsored his son and codefendant Jerome Asaro for induction into the crime family. In the 1960s, the defendant was an associate of the Bonanno family assigned to his father Jerome Asaro, who also had close ties to associates of other crime families, including James "Jimmy the Gent" Burke ("James Burke," "Jimmy Burke," or "Burke"), a powerful associate of the Lucchese organized crime family of LCN (the "Lucchese family"). The defendant earned respect

4

from the mafia for being an "earner" through his lucrative participation in robberies ("scores" or "heists"), the sale of stolen goods ("swag") and loansharking, as well as a "tough guy" based on, inter alia, his participation in violence as well as his close association with notorious mafia figure Jimmy Burke.  In the 1960s and 1970s, the defendant often associated with Burke at different mafia hangouts, including Robert's Lounge and Afters, as well as with other powerful organized crime figures, including John Gotti, former boss of the Gambino organized crime family of LCN (the "Gambino family"), and others.  As described below and as charged in Count One, Racketeering Act Two, the defendant and Burke murdered Paul Katz, who had access to a warehouse used to store stolen goods for Burke, the defendant and others, but came to be suspected of cooperating with law enforcement.

The defendant was formally inducted into the Bonanno family in the late 1970s after his father's death.  He was assigned to Mickey Zaffarano for a period and then later to Joseph Massino ("Massino"), then-captain in the Bonanno family who later was elevated to boss.  Throughout his life, the defendant indulged in gambling, both illegal and legal, to an extreme degree.  Evidence at trial will establish that not many years after participating with Burke and others in the infamous Lufthansa Airlines robbery of 1978 (the "Lufthansa Heist"), which netted the defendant close to one million dollars in cash profits and jewelry, he had gambled away a significant portion of his illegal earnings.  For various reasons, including his gambling problems and failure to repay debts to those associated with organized crime, the defendant was demoted to the position of soldier in the 1990s. However, as of late August 2012, the defendant had been promoted to captain again, and by 2013, after a series of high profile Bonanno family members cooperated with law

5

enforcement or were incarcerated, the defendant rose to a position on the "panel" or administration running the Bonanno family.

At trial, the government will prove the existence of the charged enterprise and the defendant's position in and association with the enterprise through, among other evidence: (1) the defendant's statements on recordings; (2) surveillance evidence; (3) cooperating witness testimony; (4) other witness testimony; and (5) photographs and other documentary evidence.  For example, on consensual recordings made by a cooperating witness in recent years, the defendant referenced his position on the Bonanno family "panel" and described his role in resolving LCN disputes through "sit-downs" on behalf of various Bonanno family members and associates.[2]  The defendant has tattooed on his forearm the mafia slogan of "death before dishonor," a testament to the defendant's lifetime commitment to his crime family.

### 2. The Fourteen Racketeering Acts

Count One alleges that the defendant, a longstanding member of the Bonanno family and a member of its administration, agreed that he or a coconspirator would commit fourteen predicate acts as part of the charged racketeering conspiracy: extortionate extension and collection of credit and conspiracy to commit the same (Racketeering Act One); conspiring to murder and the murder of Paul Katz, and serving as an accessory after the fact to that murder (Racketeering Act Two); robbery of U.S. currency and jewelry from one or more employees of Lufthansa Airlines, and conspiracy to commit the same (Racketeering Act Three); arson and conspiracy to commit arson of a building in Ozone Park, New York

---

[2]   All statements of the defendant, his coconspirators, and witnesses described herein are related in sum and substance and in part.

6

(Racketeering Act Four); solicitation to murder John Doe #1 (Racketeering Act Five); conspiracy to rob and attempted robbery of U.S. currency from one or more employees of an armored car business (Racketeering Act Six); conspiracy to rob and robbery of gold salts from an employee of Federal Express (Racketeering Act Seven); conspiracy to extort and extortion of John Doe #2 (Racketeering Act Eight); extortion of and conspiracy to extort John Doe #3 (Racketeering Act Nine); illegal gambling – bookmaking, in or about and between approximately April 1994 and December 2002 (Racketeering Act Ten); extortion of and conspiracy to extort John Doe #4 (Racketeering Act Eleven); illegal gambling – bookmaking, in or about and between September 1, 2007 and March 1, 2008 (Racketeering Act Twelve); extortion of John Doe #5 (Racketeering Act Thirteen); and use of extortionate means to collect and attempt to collect one or more extensions credit from John Doe #6 (Racketeering Act Fourteen).[3]

a.      Racketeering Act One: Loansharking

As alleged in the indictment, between 1968 and 2013, the defendant participated in the use of extortionate means to collect one or more extensions of credit, and conspired to do the same.  At trial, the government will prove this racketeering act through, among other evidence: (1) cooperating witness testimony, (2) other witness testimony, and (3) statements made by the defendant on consensual recordings.  The evidence will establish that, as a loanshark, the defendant often took money from individuals associated with the crime family (or used his own money earned from criminal schemes and otherwise) and

---

[3]      Counts Two and Three – which charge extortionate collection of credit conspiracy and extortionate collection of credit, respectively – are based on the same facts underlying Racketeering Act Fourteen.

made loans to other individuals at a high rate of interest due on a weekly basis. He collected the interest payments on these loans himself and through others whom he directed to do so, using threats of violence and his status and association with the crime family. Through the years, the defendant and his criminal associates met with and collected from the defendant's loanshark customers at the defendant's various social clubs, his restaurant "The Great In-Pasta" and other establishments.

        b.      Racketeering Act Two: Murder and Conspiracy
                to Murder Paul Katz

Racketeering Act Two alleges the defendant agreed that he and others would murder, and conspire to murder Paul Katz in 1969, which will be established at trial through, among other evidence: (1) cooperating witness testimony, (2) statements made by the defendant on consensual recordings, (3) testimony of law enforcement witnesses, and (4) DNA evidence.

A cooperating witness ("CW-1") is expected to testify that in the 1960s, Paul Katz was a criminal associate of Jimmy Burke, who had a warehouse in Richmond Hill that Burke, the defendant and others used to store items stolen during "scores," i.e., robberies.[4] On one occasion, law enforcement raided the warehouse and the defendant and others subsequently were arrested. After the defendant's arrest, the defendant advised CW-1 that he and others, including Burke, believed that Katz was an informant. Burke was known to have

---

[4]      CW-1 pled guilty to racketeering conspiracy, including predicate acts of Hobbs Act robbery and illegal gambling, pursuant to a cooperation agreement in the Eastern District of New York. CW-1's prior crimes include insurance fraud. CW-1 is cooperating in the hope of obtaining leniency in sentencing and entry into the Witness Security program. CW-1's information has been corroborated by surveillances, as well as the testimony of other cooperating witnesses, consensual recordings, phone records and other materials.

corrupt police officers on his criminal payroll who would provide Burke with information about individuals seeking to cooperate with law enforcement.

As of late 1969, CW-1 had access to certain houses that were being built in the vicinity of 102nd Road between 82nd and 84th Streets in Queens, New York. The defendant asked CW-1 to make available one such house for a meeting. Shortly thereafter, the defendant and Burke brought the body of Paul Katz into the basement of the selected house and buried Katz underneath the cement floor. The defendant told CW-1 that he and Burke had killed Katz with a dog chain because they believed he was cooperating with law enforcement, in violation of the rules of organized crime. At the defendant's direction, CW-1 finished covering up the hole containing Katz's body.

In the 1980s, the defendant directed CW-1 and his son Jerome Asaro ("J. Asaro") to exhume and move Katz's body. At that time, Burke was incarcerated and sent word to the defendant to move Katz's body. CW-1 and J. Asaro went to the house and dug up Katz's body. CW-1 recalled finding, inter alia, a human skull, bones, and some clothing material. Together they packaged the remains and then re-cemented the area.

On June 17, 2013, the FBI began to dig for the remains of Paul Katz at the basement location near Liberty Avenue that CW-1 had identified. That morning, CW-1 consensually recorded a meeting with the defendant, during which the following discussion was intercepted:

| | | |
|---|---|---|
| Defendant: | What happened? |
| CW-1: | The feds are all over Liberty Avenue. |
| Defendant: | For what? |

CW-1:            By, you know—

Defendant:       [A Bonanno family associate]?

CW-1:            Yeah.

Defendant:       For what?

CW-1:            I don't know.

Defendant:       How do you know?

CW-1:            I just came from— my doctor is there.

Defendant:       Who they looking for?  John there?

CW-1:            I'm talking about Liberty Avenue where . . . . (silence)[5]

(Defendant puts car in park and sighs).

CW-1:            You know what I mean?

Defendant:       No, I don't know what you mean.  All right, let me go, go ahead, go—

CW-1:            Where do you want me to go?  What, what should I do?

Defendant:       What should you do what?

CW-1:            Nothing.

Defendant:       Nothing, what could you do?

CW-1:            All right, well get in touch with me, let me know.

Defendant:       I'll see you later, [CW-1].  Don't call me!

CW-1:            All right, don't call you!

---

[5]        CW-1 is expected to testify that the vacant house where Katz was buried was located near Liberty Avenue.

10

c.      Racketeering Act Three: Robbery of and Conspiracy to Rob
Lufthansa Airlines

Racketeering Act Three alleges that the defendant agreed that he and others would rob, and conspire to rob, U.S. currency and jewelry from the Lufthansa Airlines terminal at John F. Kennedy Airport in December 1978.  At trial, the government will prove this conduct through, among other evidence: (1) the testimony of cooperating witnesses, (2) other witness testimony, and (3) business records.

For example, CW-1 is expected to testify that he participated in the Lufthansa Heist at the defendant's direction.  Jimmy Burke told CW-1 that he had a score that could net millions of dollars.  CW-1 participated in planning meetings with Burke, the defendant and others, including other members and associates of LCN, including Frank Burke (Jimmy Burke's son), Angelo Sepe, Joseph "Joe Buddha" Manri, Tommy Desimone, Danny Rizzo, Anthony "Snake" Rodriguez and Louis "Fat Louie" Carfora.

On the night of the robbery, the robbery team, brandishing guns, detained the Lufthansa terminal workers and robbed the vault of, among other things: (1) approximately 50 boxes, each containing $125,000 in U.S. currency, (2) a box containing jewelry, and (3) German currency.  Each participant in the robbery was supposed to receive approximately $750,000 in U.S. currency, but most did not live to receive their share (either because they were killed or it was never given to them).[6]  Members of organized crime families including the Bonanno and Lucchese families received proceeds from the robbery.

_____

[6]      As direct evidence of Racketeering Act Three, for the purpose of explaining how the proceeds were divided and the defendant's recorded statements about the Lufthansa Heist, the government intends to adduce limited evidence of the murders of other participants in the Heist that were not committed by the defendant or at his direction.

11

After the robbery, CW-1 and the defendant provided the defendant's captain in the Bonanno family, Joseph Massino, an attaché case filled with gold and jewelry.

A cooperating witness ("CW-2")[7] is expected to testify that he was the defendant's captain after the Lufthansa Heist, that the defendant told him that he and his cousin were involved in the Heist along with Jimmy Burke, and that he received jewelry from the robbery. Another cooperating witness ("CW-3") is expected to testify that he was an associate of the Bonanno family at the time of the Lufthansa Heist and that he went with Massino, the defendant's captain, to see the defendant, who provided Massino with jewelry from the robbery.[8] CW-3 also is expected to testify that the defendant's cousin participated in the actual robbery at the defendant's direction. CW-3 later observed Massino sorting the jewelry he received from the defendant; Massino gave him one gold chain and also told him

---

[7]     CW-2 is a former high-ranking member of the administration of the Bonanno family, who was convicted in the Eastern District of New York of racketeering with predicate acts of murder, among others, and has subsequently pled guilty to murder-in-aid-of-racketeering pursuant to a cooperation agreement in the Eastern District of New York. CW-2's information has been corroborated by, among other things, physical surveillances, consensual recordings and the testimony of other witnesses. CW-2 cooperated in the hopes of obtaining leniency in sentencing, including avoiding a sentence of death, and protection in the Witness Security program. At re-sentencing, the government moved, pursuant to U.S.S.G. § 5K1.1 and Rule 35 of the Rules of Federal Criminal Procedure, for a downward departure based upon the substantial assistance provided by CW-2 to the government; CW-2 was sentenced to approximately twelve years' imprisonment.

[8]     CW-3 is a former high-ranking member of the Bonanno family who pled guilty in the Eastern District of New York to racketeering conspiracy, including multiple predicate acts of murder, as well as extortion and illegal gambling, pursuant to a cooperation agreement. CW-3 cooperated with the government in the hopes of obtaining leniency at sentencing and protection in the Witness Security Program. CW-3's information has been corroborated by other sources of information, including but not limited to consensual recordings, confidential sources, and cooperating witnesses. At sentencing, the government moved, pursuant to U.S.S.G. § 5K1.1, for a downward departure based upon the substantial assistance provided by CW-3 to the government; CW-3 was sentenced to approximately seven years' imprisonment.

he intended to "take care of Phil," which CW-3 understood to mean that Massino was going to "kick up" proceeds from the Lufthansa Heist to then-Bonanno family boss Phil Rastelli. Another cooperating witness ("CW-4")[9] is expected to testify that Frankie Burke ("F. Burke") – Jimmy Burke's son – told him that he participated in the robbery, along with CW-1, and that the defendant later took for himself all of CW-1's share of the proceeds from the Heist.  An additional cooperating witness ("CW-5"),[10] a former associate of the Gambino family, is expected to testify that his father, a powerful soldier in the Gambino family at the time, and others helped the defendant and Burke "fence," or launder, jewelry stolen in the Heist through a jewelry business in Queens, New York.  CW-5's father and others consequently shared in the proceeds of the Heist.  CW-5 also is expected to testify that, following the Heist, he saw the defendant regularly at a local racetrack betting larger amounts than usual and extending extortionate loans.

---

[9]     CW-4 was an associate of the Gambino family who pled guilty pursuant to a cooperation agreement in the Eastern District of New York to two counts of murder in-aid-of racketeering, narcotics distribution conspiracy and money laundering conspiracy.  CW-4's information has been corroborated by, among other things, physical surveillances, consensual recordings and the testimony of other witnesses.  CW-4 cooperated in the hopes of obtaining leniency in sentencing and protection in the Witness Security program.  At sentencing, the government moved, pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), to permit a downward departure and/or below-guidelines sentence based upon the substantial assistance provided by CW-4 to the government; CW-4 was subsequently sentenced to time served plus one year and one day, which equated to approximately 85 months in prison.

[10]     CW-5 was an associate of the Gambino family who pled guilty pursuant to a cooperation agreement in the Eastern District of New York to racketeering conspiracy, including predicate acts of murder and illegal gambling.  CW-5's information has been corroborated by, among other things, physical surveillances and the testimony of other witnesses.  CW-5 cooperated in the hopes of obtaining leniency in sentencing and protection in the Witness Security program.  At sentencing, the government moved, pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), to permit a downward departure and/or below-guidelines sentence based upon the substantial assistance provided by CW-5 to the government; CW-5 was subsequently sentenced to time served.

13

The government will also introduce a consensual recording on which the defendant stated: "We never got our right money, what we were supposed to get, we got fucked all around, got fucked all around, that fucking Jimmy kept everything."  CW-1 is expected to testify that he understood the defendant to be referring to Burke's keeping more than his fair share of the profits from the Heist.  In addition, evidence from Lufthansa Airlines' business records will show that approximately $5 million in U.S. currency was stolen during the robbery, as well as a large amount of valuable jewelry.  Finally, one or more eyewitnesses are expected to testify to their firsthand accounts of the robbery.

      d.     <u>Racketeering Act Four: Arson Conspiracy/Arson</u>

Racketeering Act Four alleges that the defendant agreed that he and others would commit, and conspire to commit, arson of a building in Ozone Park, New York in approximately January 1980 to January 1981.  CW-1 is expected to testify that, at that location in approximately 1981, he and J. Asaro burned down the night club "Afters," a known meeting place of many organized crime members and associates that was named as a reference to "after" the Lufthansa Heist.  The defendant advised CW-1 that Dominic Cataldo, an inducted member of the Genovese organized crime family of LCN (the "Genovese family"), who owned an Italian restaurant across the street from Afters, was upset that the new owners of Afters were going to replace it with a social club that catered to African Americans.  The defendant directed CW-1 and J. Asaro to burn down the club so that the new business could not open, which they did.  Shortly after the arson, CW-1 saw the defendant and Cataldo, both of whom kissed CW-1 on his cheeks to acknowledge CW-1's part in the arson.

Other evidence the government expects to offer at trial as proof of Racketeering Act Four includes: (1) surveillance evidence that the social club was burned down in the charged time period and (2) other witness testimony that the social club was burned down and that at that time, there was an Italian restaurant located across the street. Additionally, other evidence demonstrates that the owner of the property intended to rent the property to individuals of African-American descent.

e.      Racketeering Act Five: Solicitation to Murder John Doe #1

Racketeering Act Five alleges that the defendant agreed that he and others would solicit the murder of John Doe #1, a relative of the defendant, on or about and between January 1, 1983 and December 31, 1985.  The government will prove this racketeering act through, among other evidence: (1) the testimony of a cooperating witness, (2) other witness testimony, and (3) documentary evidence.

CW-1 is expected to testify that he and the Asaros are cousins (in varying degrees) of John Doe #1, and are also related to Bobby Giallanzo ("B. Giallanzo"), an associate of the Bonanno family.  In the 1980s, B. Giallanzo wanted to fraudulently collect insurance money related to a boat he owned.  B. Giallanzo accordingly hid his boat at John Doe #1's mother's house on Long Island and reported it stolen, collecting the insurance money.  When John Doe #1's mother learned of the situation, she reported it to the police and later B. Giallanzo was arrested on federal charges including insurance and mail fraud. John Doe #1 later went to court and testified regarding what had happened with the boat.

CW-1 also is expected to testify that the defendant and J. Asaro approached CW-1 about murdering John Doe #1 because they viewed him as an informant, which

15

violated the rules of organized crime.  At the time that the defendant proposed the idea of

killing John Doe #1, the defendant was an inducted member in the Bonanno family.  A short

time later, the defendant and J. Asaro again raised the murder of John Doe #1.  J. Asaro

stated that he was upset that John Doe #1 had become a "rat."  CW-1 was present on many

occasions where the defendant and J. Asaro discussed murdering John Doe #1.  CW-1

became alarmed and warned John Doe #1 by passing a message through another relative.

CW-1 later learned that John Doe #1 moved outside of New York.

        f.      <u>Racketeering Act Six: Attempted Robbery of Armored Car</u>

Racketeering Act Six alleges that the defendant agreed that he and others

would attempt to rob an armored car in or about and between 1984 and 1986, which he and

his co-conspirators believed to be carrying approximately $1 million in U.S. currency.  The

government's proof of this racketeering act includes, among other evidence: (1) cooperating

witness testimony, and (2) other witness testimony.  CW-1 is expected to testify that, after

receiving direction from the defendant, CW-1, a Gambino family associate, J. Asaro and

another individual attempted to carry out the robbery of the armored car, armed with guns

and wearing masks.  Their attempt was foiled and when they reported their failure to the

defendant, he was angry because the robbery was not executed properly.

        g.      Racketeering Act Seven: Robbery of and Conspiracy to Rob
               <u>Gold Salts from a Federal Express Truck</u>

Racketeering Act Seven alleges that the defendant agreed that he and others

would conspire to rob and rob gold salts from a Federal Express employee in February of

1984.  The government will prove the defendant's participation in these crimes through,

among other evidence: (1) cooperating witness testimony, (2) statements by the defendant on

consensual recordings, (3) photographic evidence, (4) surveillance evidence, (5) business records, and (6) property records.

CW-1 is expected to testify that, after botched robberies and other issues landed CW-1 in disfavor with the defendant, CW-1 temporarily relocated and then returned to the New York City area to carry out the Federal Express robbery.  The robbery was executed by CW-1 and other individuals, including LCN associates.  At the defendant's direction, CW-1 initially involved J. Asaro in the planning of the robbery, but J. Asaro ultimately did not carry out the robbery.  After successfully robbing the gold salts, CW-1 provided several thousands of dollars to the defendant, to whom he was then assigned in the crime family, and gave an additional, smaller sum of several thousand dollars to the defendant, which CW-1 understood was going to be given to Joseph Massino, the defendant's then-captain.

As further proof of this racketeering act, the government will offer at trial a January 7, 2011 consensual recording, during which the defendant had the following exchange with CW-1:

| | |
|---|---|
| CW-1: | Sit on the place and the van comes out.  They got vans that go in and out.  How about that place out there?  You said you remember where it is.  I don't. |
| Defendant: | I don't remember. |
| CW-1: | You know what I'm talking about? |
| Defendant: | In, by Costco.  Where me and you went a couple times out there. |
| CW-1: | No, the gold, with FedEx the FedEx, the gold, the gold. |
| Defendant: | Where? |

17

CW-1:       The gold thing that I did out on the Island?

Defendant:  I don't remember where it is.  I never went there.  You
            went there.

CW-1:       Freeport.  You said you remember where it is, in
            Freeport.  I think it was Freeport, I don't remember.
            That would be (laughing)

Defendant:  Today?

CW-1:       How much?

Defendant:  16.

CW-1:       16, 16 hundred.  My God!  I don't even know.  You
            think I should go look?  I don't remember where.

Defendant:  If you don't remember, what's the sense in going?

The government also will offer at trial documentary evidence confirming the facts of the

robbery, including that valuable gold salts were stolen.

> h.    Racketeering Act Eight: Extortion of and Conspiracy
>        to Extort John Doe #2

Racketeering Act Eight alleges that the defendant agreed that he and others

would extort, and conspire to extort, John Doe #2, related to proceeds from the sale of a

pornography business and related properties.  In support of this racketeering act, at trial the

government will introduce, among other evidence: (1) cooperating witness testimony, (2)

other witness testimony, (3) surveillance evidence and (4) public records.  At trial, witness

testimony is expected to establish that, in the 1980s, Bonanno family captain Mickey

Zaffarano died.  Prior to his death, Zaffarano and his family owned lucrative properties in

Manhattan, certain of which housed peep shows and pornographic businesses.  Zaffarano

was related to CW-1 and the defendant, who referred to him as "Uncle Mickey."  After Zaffarano's death, his son advised the defendant that he was going to sell the Manhattan properties; the defendant told Zaffarano's son to "do the right thing" and take care of him.

Thereafter, Matthew "Matty the Horse" Ianniello, an inducted member of the Genovese family, intervened regarding the sale of the Zaffarano properties.  Ianniello had an interest in a peep show business located in one of those properties, which was to close due to the sale of the properties.  The defendant demanded that Zaffarano's son pay Ianniello and the defendant approximately $1 million each.  After repeated requests for the money, Zaffarano's son paid Ianniello and gave the defendant over $400,000 from the proceeds of the sale of the properties.

The government also will offer at trial property records and other documentary evidence confirming facts underlying this racketeering act.

        i.        Racketeering Act Nine: Extortion of Proceeds
                        of an Autobody Business

Racketeering Act Nine alleges that the defendant agreed to extort, and conspire to extort, John Doe #3, an owner of an autobody business, of the proceeds of that business, in or about and between January 1, 1993 and February 15, 1995.  In support of this racketeering act, at trial the government expects to offer, among other evidence: (1) witness testimony, (2) surveillance evidence, and (3) lawfully intercepted telephone calls, some of which contain statements of the defendant.  This evidence will establish that John Doe #3 opened an autobody business in Queens in early 1993.  Shortly thereafter, the defendant approached John Doe #3 and, drawing on his status as an inducted member of LCN, pressured John Doe #3 into paying him what amounted to protection money out of the

autobody business's proceeds.  John Doe #3 paid the defendant multiple times, intermittently throughout the charged time period, with most payments amounting to a few hundred dollars, if not more.

j.    Racketeering Act Ten: Illegal Gambling – Bookmaking

Racketeering Act Ten alleges that the defendant agreed to commit illegal gambling involving sports betting, in violation of 18 U.S.C. § 1955, in or about and between April 1994 and December 2002.   In support of this racketeering act, at trial the government will elicit, among other evidence: (1) cooperating witness testimony, and (2) public records. CW-3 is expected to testify that, in the late 1980s, Sally Farrugia was a soldier in his crew in the Bonanno family.  After Farrugia died, the defendant advised CW-3 that Farrugia had had a "bookie," i.e., someone who had a sports betting business, around him named "Stretch." CW-3 directed the defendant to service Stretch and split the proceeds from the sports betting business with CW-3.  In approximately 1992, Stretch died and the defendant assumed responsibility for Stretch's sports betting business.  The defendant ran the business with his son, J. Asaro.  The long-running operation was operated by the defendant, J. Asaro, CW-3, as well as more than two others.  CW-3 shared his portion of the proceeds with Massino, then-boss of the Bonanno family, until CW-3's arrest in 2003.

In addition, CW-1 is expected to testify that he placed bets with Stretch, a bookmaker around Sally Farrugia, from the 1980s until CW-1 left New York for Las Vegas in 1991.  At some point after CW-1 relocated to Vegas, he learned that Farrugia had died and that Stretch had been reassigned to the defendant, which meant Stretch was obligated to kick up a percentage of his gambling operation to the defendant.

20

Public records offered at trial will establish that Farrugia died in the early 1990s.

k.      Racketeering Act Eleven:  Extortion Conspiracy/Extortion of John Doe #4

Racketeering Act Eleven alleges that the defendant agreed that he and others would extort, and conspire to extort, John Doe #4 in or about 2006.  In support of this racketeering act, the government will elicit, among other evidence, witness testimony including that of CW-1 and another cooperating witness ("CW-6").[11]

CW-1 is expected to testify that, at the defendant's direction, he and another Bonanno family associate (CW-6) went to collect money on behalf of the defendant's illegitimate daughter (the "daughter") from John Doe #4, a maintenance person in a building the daughter operated.

At that time, CW-1 was assigned within the crime family to the defendant, while CW-6 was formally assigned to the defendant's nephew Ronald Giallanzo, a then-soldier in the Bonanno family.  The defendant directed CW-1 to harm John Doe #4 if John Doe #4 was not cooperative.  CW-1 and CW-6 went to the location as directed in an attempt to find and confront John Doe #4, and despite the knocking and calling his name, John Doe #4 did not answer the door of his apartment.  After CW-1 subsequently told the defendant

---

[11]     CW-6 is a former associate in the Bonanno family who pled guilty in the Eastern District of New York to racketeering, including predicate acts of securities fraud and illegal gambling, pursuant to a cooperation agreement.  CW-6 cooperated with the government in the hopes of obtaining leniency at sentencing and protection in the Witness Security Program.  CW-6's information has been corroborated by other sources of information, including but not limited to consensual recordings and cooperating witnesses.  At sentencing, the government moved, pursuant to U.S.S.G. § 5K1.1, for a downward departure based upon the substantial assistance provided by CW-6 to the government; CW-6 was sentenced to four years' probation.

what had happened, the defendant said that John Doe #4 might have been afraid to come outside.

Later, the defendant asked CW-1 to drive him to see the daughter because John Doe #4 had paid her a portion of what she was owed, and she was going to provide them with some of the money.  CW-1 drove the defendant to a location in Manhattan and the defendant went inside to see the daughter.  The defendant came out shortly thereafter and said they would receive the money later.  CW-1 never received any money.

l.    Racketeering Act Twelve: Illegal Gambling – Bookmaking

Racketeering Act Twelve alleges that the defendant agreed that he and others would commit illegal gambling involving sports betting, in violation of 18 U.S.C. § 1955, in or about and between September 1, 2007 and March 1, 2008.  In support of this racketeering act, at trial the government will elicit, among other evidence including one or more consensual recordings, the testimony of witnesses including but not limited to CW-1.  CW-1 is expected to testify that he was part of a sports gambling operation in approximately 2007 to 2008 with the defendant and Jack Bonventre, an inducted member of the Bonanno family. CW-1 was able to call into the overseas office to check the balances of his customers' sports betting accounts using a code.  CW-1 recalled that multiple different individuals answered the telephone at the office, including males and females.

One of the defendant's and CW-1's bettors was an individual referred to herein as Individual-1.  The defendant knew Individual-1 was gambling through another office and poached him as a customer.  The defendant introduced CW-1 to Individual-1 so the two could meet to settle up when necessary.  CW-1 provided Individual-1 with a code

22

name and telephone number to use to place bets.

Individual-1 placed bets on sports games during the 2007-2008 season. Early in the season, Individual-1 lost and paid the debt in cash to CW-1. The defendant received half of the debt, a small portion of which was given to CW-1, while Bonventre received the other half. Shortly thereafter, Individual-1 lost again, and he paid the debt to CW-1. CW-1 gave the money to the defendant, who kept more than half (giving CW-1 a portion of that amount) and gave the remainder to Bonventre. Later, Individual-1 could not pay a gambling debt and the defendant and CW-1 went to consult Bonventre about the situation. Bonventre suggested that CW-1 set up a payment plan with Individual-1. The defendant told CW-1 instead to visit Individual-1 and be more aggressive with him, with the aim of getting a bulk payment from him or his agreement to pay a substantial amount per month. CW-1 met with Individual-1 and they agreed Individual-1 would pay $1,000 per month. CW-1 then advised the defendant and Bonventre of the agreement. Individual-1 paid $1,000 the first month, which the defendant directed CW-1 to keep for himself, but could not make the second payment. CW-1 told Individual-1 that he needed to pay the money because people would come looking for him.

m.     <u>Racketeering Act Thirteen: Extortion of John Doe #5</u>

Racketeering Act Thirteen alleges that the defendant agreed that he and others would extort John Doe #5, on or about and between October 1, 2010 and November 4, 2010. The object of the extortion was the proceeds of John Doe #5's sale of a property located on Drew Street in Brooklyn, New York (the "Drew Street property"). At trial, the government's proof of this racketeering act will consist of witness testimony, including that of CW-1,

documentary evidence and consensual recordings of the defendant, CW-1 and John Doe #5, from October and November 2010.

CW-1 is expected to testify that the Drew Street property once belonged to Thomas Valenti, his late godfather and the late stepfather of John Doe #5.  CW-1 further is expected to testify that, in late 2010, while he was cooperating with the government, the defendant suggested in a conversation with CW-1 that CW-1 and the defendant extort John Doe #5 for money John Doe #5 had obtained as proceeds of the sale of the Drew Street property.  At that time, CW-1 indicated to the defendant that he would participate in extorting John Doe #5, and the defendant directed CW-1 to get thousands of dollars from John Doe #5.

A few days later, CW-1 visited John Doe #5 at his place of business.  CW-1 was wearing a recording device.  There, CW-1 told John Doe #5 that he (John Doe #5) owed CW-1 $5,000 from the sale of the Drew Street property, and John Doe #5 denied making any such promise.  CW-1 then put John Doe #5 on the phone with the defendant, and the defendant told John Doe #5 to give CW-1 $3,000 (as the defendant later recounted to CW-1).  John Doe #5 then agreed to make the payment to CW-1 by check.

The next day, John Doe #5 and CW-1 met in person again and John Doe #5 gave him a check for $3,000.  CW-1 brought the check to FBI special agents, who made a copy of it, and CW-1 then cashed the check and brought the $3,000 in cash to the defendant.  The defendant gave CW-1 $500 of that amount, and CW-1 provided that cash to the FBI.

Approximately one week later, CW-1 and the defendant discussed attempting to extort more money from John Doe #5.  CW-1 then helped arrange a meeting between John

Doe #5 and the defendant.  CW-1 and the defendant spoke again a few days later, at which time the defendant mentioned that John Doe #5 had agreed to give the defendant $2,500 in addition to what John Doe #5 had already paid CW-1.  Shortly thereafter, CW-1 heard from the defendant that he had met with John Doe #5, who had given the defendant the additional $2,500.

          n.      Racketeering Act Fourteen: Extortion of a Bonanno Family Associate

Racketeering Act Fourteen alleges that the defendant agreed to the use of extortionate means to collect an extension of credit from John Doe #6, a Bonanno family associate, and a conspiracy to commit the same, in or about and between March 1, 2013 and June 30, 2013.  This racketeering act relates to a loan John Doe #6 had extended to an individual (the "car wash employee") affiliated with the Gambino family.  John Doe #6 did not have permission from his superiors in the Bonanno family to make this and other recent loans, and the car wash employee loan was not being paid back.

In a consensually recorded meeting with CW-1 and others on April 26, 2013, the defendant and Bonanno family soldier John Ragano ("Ragano") discussed assaulting John Doe #6 and intimidating him into paying them and their coconspirators money collected on the car wash employee loan.  Ragano asked the defendant soon after arriving at the meeting, "when do we stab this guy [John Doe #6] in the neck?  That's what I want to know," to which the defendant responded, "[s]tab him today. . . . Today! Today!"  The defendant further told Ragano: "I told you to give him a fucking beating.  Give him a fucking beating, I told you that.  Listen, I sent three guys there to give him a beating, already, so it won't be the first time he got a beating from me."  As Ragano also discussed during the April

26, 2013 meeting, Ragano was employed by the associate at the John Doe #6's autobody business in Queens during the charged conspiracy.  Ragano stated, "I try not to abuse him [John Doe #6] in the office like Vin does . . . .You know what I mean . . . .I bring him in the back room at least," to which the defendant responded, "[o]h I abuse him in the fucking office in front of everybody.  I abuse him in front of everybody."

In a later meeting that spring, the defendant told CW-1 that he interceded and participated in a "sit down" on John Doe #6's behalf, i.e., a meeting with members of the Gambino family to resolve any debt-related dispute.  The defendant further indicated that he and others recently had each received thousands of dollars in connection with debt owed to John Doe #6.  The defendant also told CW-1 that although Tommy D (Di Fiore) was supposed to receive $4,000, the defendant had taken Di Fiore's share for himself.

In a consensually recorded meeting on June 11, 2013, the defendant informed CW-1 of money he and others, including Di Fiore, recently had received in connection with John Doe #6's loan, and denounced Di Fiore for collecting a large portion of that amount, saying he wanted to kill Di Fiore.

II.  <u>Overview of the Government's Evidence of the Defendant's Other Acts</u>

At trial, the government will prove that the charged racketeering conspiracy includes as predicate acts many – but certainly not all – of the myriad crimes the defendant personally committed and agreed others would commit as part of his longstanding affiliation with the Bonanno crime family.  The government seeks to offer evidence of his "other acts" primarily through the testimony of cooperating witnesses.  Such testimony will not add materially to the length of any of the cooperating witnesses' direct examinations and in many

cases will constitute impeachment evidence for the cooperating witnesses.  Any additional evidence of the other acts will be brief.

A.     The 1950s – Early 1980s

1.     Drug Use

Many cooperating witnesses and civilian witnesses with personal knowledge of the defendant are expected to testify that the defendant struggled with heroin addiction as a teenager and into his twenties.  For example, CW-5 is expected to testify that the defendant used heroin with an individual from the neighborhood, and that the defendant later traded one addiction for another by transitioning to gambling.  CW-1 is expected to testify that the defendant directed him to store proceeds from the Lufthansa Heist with the brother of that individual, who CW-1 knew used heroin with the defendant when they were teenagers.

2.     Swag

CW-1 is expected to testify that, in the 1960s, CW-1 lived across the street from the defendant and began committing crimes with him.  At the time and into the early 1970s, the defendant was involved in "heists" or robbing and conspiring to rob stolen goods by hijacking trucks and then fencing the goods contained inside.  The first crimes the CW-1 committed with the defendant involved the defendant asking CW-1 to hold shipments of these stolen goods in his home and help to sell the stolen goods.  Over several years, the defendant directed CW-1 to hold and sell the following categories of goods: (1) boutonnieres, (2) woman's boots, (3) pornography, (4) suits, and (5) Oleg Cassini shirts. With regard to the Oleg Cassini shirts, the defendant asked CW-1 to stop at Robert's Lounge (the defendant's LCN hangout with Jimmy Burke) to pick up shirts to sell.  That incident was

27

the first time the defendant had been inside Robert's Lounge, which became a hang-out and meeting spot for the planning of the Lufthansa Heist, charged in Racketeering Act Three, and other crimes CW-1 committed at the defendant's direction. With regard to the women's boots, the defendant unloaded the stolen boots in CW-1's living room. CW-1 sold them to women that lived in his and the defendant's neighborhood. This was the first major shipment of stolen goods CW-1 "fenced" for the defendant and began a series of criminal ventures CW-1 engaged in with the defendant and others.

In the 1970s, the defendant also directed CW-1 to sell pornography for their uncle, Mickey Zaffarano, an inducted member of the Bonanno family. At the time, CW-1 was an associate of the Bonanno family assigned to the defendant. When the defendant gave directions to CW-1, he explained, in sum and substance, "we have to sell these cases of porn for Uncle Mickey. He's a boss. If you screw this up, you'll end up dead." Over a period of months, CW-1 began picking up the pornography from the defendant's house and selling it to individuals. The defendant told him that Zaffarano was producing the pornography. At different times, Zaffarano and his son borrowed money from the defendant at usurious rates of interest, which the defendant and CW-1 collected from Zaffarano and then from his son, which are one or more of the loans relevant to the charge in Racketeering Act One. Additionally, the extortion of Zaffarano's son related to the sale of the Manhattan properties housing the pornography theaters is the subject of Racketeering Act Eight.

### 3.    Car Theft, Arsons and Insurance Fraud

CW-1 is expected to testify that over the course of his criminal relationship with the defendant, the defendant directed him to steal cars and at certain times, burn cars. In

28

the 1960s, when their criminal association was just beginning, the defendant asked CW-1 to burn numerous cars, which he did with an individual named Junior Berger, who was an associate of the Bonanno family assigned to the defendant, and J. Asaro. At different times, the defendant would give CW-1 a car, have him use it for a week and then burn it. The owner of the car would then report the car stolen and they would share in the insurance proceeds.

Later, after Junior Berger opened a "chop shop," CW-1 will testify that he stole cars and sold them to the chop shop, along with other associates of the defendant's, including J. Asaro and Frankie Burke. Junior Berger would settle up with the defendant on a weekly basis and then CW-1 would receive part of the proceeds.

4.     Robberies

CW-1 is expected to testify that in the 1970s, prior to the Lufthansa Heist, he committed a number of truck hijackings with Junior Berger and provided certain of the proceeds of the robberies to the defendant, as part of CW-1's and Berger's obligations as associates of the Bonanno family. For example, he and Junior Berger robbed a truck near Shea Stadium that contained cigarettes, candy and cigars. They provided goods and proceeds from the hijacking to the defendant. Together, CW-1 and Berger also robbed tools from Aqueduct race track and sold them, giving the defendant some of the proceeds. On another occasion, at the defendant and his father Jerome Asaro's direction, Berger and the defendant robbed an employee of a catering hall. CW-1 dressed as a woman in order to evade suspicion as he and Berger waited for the catering hall employee to deposit money from a wedding. They robbed the employee and split $2,500 between Jerome Asaro, the

29

defendant, CW-1 and Berger.  On another occasion, at Jerome Asaro and the defendant's direction, CW-1 and Berger robbed a craps game on Wyckoff Avenue using BB guns.  They took approximately $1,000, most of which they provided to Jerome Asaro.

Also in the 1970s, the defendant approved CW-1 and Berger's participation in the robbery of a watch manufacturer from Long Island, the idea for which was provided by an associate of the Gambino family.  Using ratchets, they approached the watch manufacturer as he made a phone call from a pay phone and took two suitcases from his car, which contained solid gold watches.  They provided the suitcases to the defendant, who gave Berger and CW-1 one watch each and kept the rest.

### 5.   Murder of Richard Eaton and Attempted Disposal of His Remains

CW-1 is expected to testify that in the late 1970s after the Lufthansa robbery, a man named Eaton was murdered.  CW-1 saw Eaton the night he was murdered at the Afters lounge on Rockaway Boulevard in Queens, where the defendant, Burke, F. Burke and others were also present.  Very early the next morning, CW-1 awoke to the defendant's son, J. Asaro, knocking on CW-1's window at his house in Brooklyn.  J. Asaro told CW-1 that they had to dig a hole.  Although CW-1 and J. Asaro attempted to dig a hole outside of CW-1's house, they were unable to do so because the ground was frozen.  The defendant, Burke and F. Burke also arrived at CW-1's house, with F. Burke driving a vehicle that had Eaton's body in the trunk.  J. Asaro, F. Burke and CW-1 then moved Eaton's body inside of a trailer on CW-1's property, and J. Asaro found a lock that was used to lock the trailer.  CW-1 was directed to try to get a neighbor with a backhoe to dig a hole in which to dispose of the body.

Later that day, children discovered Eaton's body in the trailer and the police responded to the scene.

CW-1 is also expected to testify that the defendant told him Eaton was killed at Burke's house, that Burke participated in murdering Eaton, and that Eaton was murdered because Burke had given Eaton a portion of the proceeds of the Lufthansa robbery in order to purchase narcotics and Eaton still owed Burke that money.  In addition, once CW-1 learned that the police had found Eaton's body and CW-1 notified the defendant of the same, the defendant told CW-1 to stay away from the defendant and Afters for some time until the defendant got in touch with CW-1.  The defendant also conveyed the news to Burke, who was angry.

In addition to the testimony of CW-1, the government expects to call one or more witnesses such as retired New York City Police Department ("NYPD") officers or detectives and a medical examiner, to establish, inter alia, that: (1) Richard Eaton's dead body was found by the NYPD in a trailer on the property of CW-1 at 1483 Blake Avenue in Brooklyn on February 18, 1979; (2) when Eaton's body was found, it was frozen and had, inter alia, a rope tied around the neck that appeared to have caused strangulation; and (3) upon searching Eaton's body, the NYPD found an address book that contained, inter alia, Burke's name and telephone numbers.

6.     Other Violence

a.     Fights, generally

Many of the government's witnesses are expected to testify that the defendant was known as a "tough guy," not based on merely his organized crime status, but because of

his willingness to engage in violence himself, from his youth up until his most recent incarceration.  For example, as CW-1 is expected to testify, in the 1970s, the defendant asked CW-1 to accompany him to a bar where some men had ridiculed Jerome Asaro, the defendant's father.  The defendant told CW-1 to "come dressed," which meant armed with a firearm.  While CW-1 held a crowd at bay with a firearm, the defendant fought all of the men that had abused his father, one at a time.

b.      <u>Wrecking of a Bar on July Fourth</u>

CW-1 is expected to testify that, in the 1970s, after the Lufthansa Heist, the defendant hosted a July Fourth party at his house on Pitkin Avenue.  When the beer ran out, the defendant directed CW-1 to ask the individual who owned the Ozone Bar (Individual-2) for beer.  Later Individual-2 delivered a truckload of beer to the party and asked CW-1 for money to pay for the beer.  When CW-1 told the defendant that Individual-2 had asked for money, the defendant said, "You know what to do.  Go pay him."  CW-1 understood that the defendant meant CW-1 should hit Individual-2 for asking for money, which the defendant considered disrespectful given his status in organized crime.  CW-1 and another co-conspirator went over to Individual-2 and hit him, after which Individual-2 said, "Tell Vinny I'm sorry."  After Individual-2 left, the defendant told a group of men associated with LCN, including CW-1 and Bobby Giallanzo, to "wreck the joint," meaning the Ozone Bar, which they did.  CW-1 is expected to testify that they emptied the bar and broke everything, including the furniture and bottles of liquor.  CW-1 is further expected to testify that he understood the defendant to be sending a message to individuals associated with the defendant in organized crime to be respectful.

32

c.      Shooting Related to Mickey Brown

CW-1 is expected to testify that, in the 1970s, prior to the Lufthansa Heist, the defendant had a sexual relationship with a married woman who worked for him at his fence company.  Her husband (the "husband") was the nephew of an individual named Mickey Brown, who was an associate of Dominick Cataldo, a criminal associate of the defendant's. The husband told the defendant that he planned to visit the defendant at the fence company. The defendant directed CW-1 to get their firearms in case there was a problem.  When the husband and Brown arrived at the fence company, CW-1 and J. Asaro were present with the defendant.  The husband started yelling and cursing at the defendant, who started "shooting up the joint."  The husband was shot.  The defendant then pointed his gun at Brown, who told the defendant that the husband was his nephew.  After Brown and the husband left, the defendant called Jimmy Burke for assistance, who sent a criminal associate to bring more firearms to the fence company.  Burke sent the defendant and J. Asaro to Burke's residence to "lay low" for a couple of days, while Burke and CW-1 waited at the fence company with firearms to see if Brown and his criminal associates would retaliate.  When no one came, the next day, Burke and CW-1 went to see Brown, at which time Burke told Brown that the incident was "over and done with," and there should be no retaliation against the defendant or J. Asaro for the shooting or affair.

d.      Threats of Violence to CW-4

CW-4, a former associate of the Gambino family who is now a cooperating witness, is expected to testify that the defendant sought to kill him after CW-4 participated in killing a dog.  CW-4 is expected to testify that he and Bobby Giallanzo, the defendant's

nephew, co-owned an autobody business.  They had a dog at their shop that they also shared.
One day in the late 1970s, CW-4 entered the shop and the dog attacked him.  CW-4 and his
associate shot and killed the dog.

Shortly thereafter, the defendant and others, including James Burke, Thomas
Desimone and "Stacks," arrived at CW-4's home.  Desimone was armed.  In the ensuing
conversation, the defendant chastised CW-4 for killing the dog and threatened to kill CW-4,
saying he intended to get permission to do so.  The defendant and the others eventually left.

CW-4 subsequently met with Joseph Massino, then a Bonanno family captain,
and the defendant to discuss the dispute.  The defendant had recently been inducted into the
Bonanno family.  During the meeting, the defendant stated that CW-4 had killed the
defendant's dog, CW-4 refuted this, and Massino declined to give the defendant permission
to kill CW-4.

CW-1 and CW-2 also are expected to testify about the dispute between the
defendant and CW-4.   CW-2 is expected to testify that the defendant reported to him at the
time of the incident, the defendant requested his permission to kill CW-4, CW-2 held a sit-
down with the defendant and CW-4 regarding the dispute, and CW-2 did not give the
defendant permission to kill CW-4.

7.    Illegal Gambling/Borrowing Money

Many cooperating witnesses and civilian witnesses with personal knowledge
of the defendant are expected to testify that the defendant is a degenerate gambler and has a
serious gambling addiction.  Throughout his entire life, the defendant has bet exorbitant
amounts of money legally and illegally, whether on poker, horses, football games, ziganet,

craps or otherwise.  In order to fund his gambling, the defendant used proceeds from criminal

activity, but also borrowed money from individuals associated with the Bonanno family and

LCN more broadly and failed to repay it.

CW-1 is expected to testify that in the late 1970s and early 1980s, the

defendant had another club at which he ran a dice game, also referred to as "craps" where the

dice were phony.  The game never became lucrative because the defendant never wanted to

pay anyone when they won.

Additionally, cooperating witnesses are expected to testify that organized

crime members and associates gathered together at social clubs and gambling establishments,

which were part of "the life" and are thus proof of the existence of the racketeering

enterprise.  For example, CW-1 will testify that in the 1980s, his and the defendant's uncle

Mickey Zaffarano, took them to a card game at a Bonanno family club that later became

Café Anita and housed a club operated by the defendant.  At the time, in the 1970s, Sandro

Aiosa, later an inducted member of the Bonanno family, operated a high stakes card game,

which many members of organized crime played in.  CW-1 will testify that the defendant

ruined the game after he lost his temper and beat someone up who "raised" him during the

poker game.

B.     The Early 1980s – the 2000s

1.     Extortions and Collections

a.     Extortion of Individual-3

CW-1 is expected to testify that, in the early 1980s, an individual ("Individual-

3") owned an autobody business in Queens.  Individual-3 was considered to be an associate

35

of, or "around" the defendant for purposes of the Bonanno family.  The defendant was abusive toward Individual-3, successfully pressured Individual-3 to give the defendant a car, and took gas from Individual-3's autobody shop without paying him for it.  Individual-3 complained to Salvatore Vitale about the defendant's abuse.  Vitale then helped ensure that Individual-3 was reassigned to Joseph Massino.  The defendant resented and complained about that decision.

CW-3 also is expected to testify that the defendant extorted Individual-3 in the early 1980s.  On one occasion in the early 1980s, Individual-3 asked CW-3 if he could speak with him.  CW-3 was not an inducted member of the Bonanno family at the time.  Individual-3 told CW-3, in substance, that the defendant was threatening him and "shaking him down" or extorting him.

CW-3 thereafter traveled to visit Joe Massino, who was a captain in the Bonanno family and a fugitive living outside of New York at that time.  One topic CW-3 discussed with Massino, who was the defendant's captain in the Bonanno family, was Individual-3's problem with the defendant.  Massino told CW-3 to tell the defendant to leave Individual-3 alone until Massino came home, and once Massino returned, Individual-3 would be reassigned to Massino.  CW-3 subsequently relayed this message to the defendant, who reacted angrily.  The defendant was angry at CW-3 and yelled, saying that the defendant was the "Goodfella here" – i.e., inducted member of LCN – not CW-3.  When Massino returned to New York, Individual-3 was reassigned to Massino.

CW-2 is also expected to testify about the defendant's extortion of Individual-3. After Sal Vitale, then an associate assigned to CW-2, reported that the defendant was

36

shaking down Individual-3, he directed Vitale to tell the defendant to stay away from Individual-3 and leave it alone.  CW-2 further advised Vitale that when he came back to New York, Individual-3 would formally be assigned to him (CW-2).

   b. <u>Attempted Extortion of Pornographic Star</u>

     CW-1 is expected to testify that, in the 1980s, after Mickey Zaffarano's death but before Zaffarano's son sold the Manhattan properties and relocated, the defendant sent CW-1 to California to demand that an actress under contract to appear in pornographic films return to New York and fulfill her contract.  The defendant told CW-1 that an actress was under contract to perform for the Zaffaranos, but was working in California for another producer.  He directed CW-1 to meet with the producer, who was around the Gambino family, and two Gambino soldiers to demand the actress return to New York, which CW-1 did.  The defendant told CW-1, in sum and substance, that he was representing the defendant and should speak for him with the other "wiseguys," which was unusual.  At the end of the meeting, everyone agreed that the actress would return to New York to fulfull her contract.

   c. <u>Collections for a Check Casher</u>

     When CW-1 returned to New York City and resumed his relationship with the defendant in approximately 2006, the defendant told him that he was using his organized crime status to collect debts owed to a check casher in Queens, New York.  When the check casher needed to collect money, he asked the defendant to collect it, and the defendant kept the money.  On one occasion, the defendant sent CW-1 to collect money from an individual who had cashed a check with the check casher that later bounced.  CW-1 met with the person

who had bounced the check, who said, in sum and substance, "are you with Vin?  Tell him I'll pay him the money."

The defendant also was captured on consensual recordings discussing his collections for the check casher. During a 2011 recording, the defendant had the following exchange with CW-1 about the check casher:

| | |
|---|---|
| Defendant: | Oh, he was there, [the check casher]?  What a weasel. Cocksucker.  Can't even beat him anymore- (talking over each other) |
| CW-1: | No.  I was there.  I got gas. |
| Defendant: | Why, he don't own the joint no more. |
| CW-1: | You said you wanted to do something there. |
| Defendant: | What? |
| CW-1: | You said you wanted to do something there. |
| Defendant: | Do where? |
| CW-1: | [The check casher]. |
| Defendant: | I was supposed to.  He backed out.  He sold it to a big company, a big corporation. |
| CW-1: | Why the fuck. |
| Defendant: | I don't know why the fuck. |
| CW-1: | Oh, I got no coat. |
| Defendant: | You hear me? |
| CW-1: | Yeah. |
| Defendant: | He's got a big corporation there.  A, a guy who owns 500 places bought that place.  Promised me all kinds of money. |

| CW-1: | Oh he doesn't own it? |
|---|---|
| Defendant: | No.  You kidding me?  I would have killed him already if he owned it.  Can't get a quarter off him no more.  You know how much money I kept on him that I collected?  I kept fucking $7,000, I kept $5,000, I kept $2,800. |
| CW-1: | You don't trust him, right? |
| Defendant: | No, trust him, yeah!  From here to the corner.  What could you do with him? |
| CW-1: | Go in there. |
| Defendant: | And what?  Heist the joint? |
| CW-1: | Yeah. |
| Defendant: | Nah.  He'll give you up in a minute.  He wanted to turn Jackie and Jerry in.  They gave him a bad check. |

2.     Robbery

Finally, CW-1 advised that approximately six months after he and J. Asaro

attempted to rob an armored van on Halloween (alleged in Racketeering Act Seven), he, J.

Asaro and others participated in the attempted robbery of payroll funds from an individual in

Nassau County.  An individual CW-1 knew as "Billy Bud Santos" approached CW-1 about

the robbery, advising CW-1 that he had a "payroll score," involving a man that would be

carrying approximately $25,000 in a bag when leaving a bank in Nassau County, New York.

CW-1 told Santos that he would speak to the defendant about it; after CW-1 told the

defendant about the score, the defendant directed CW-1 to bring J. Asaro with him.

Within a week, CW-1 and J. Asaro attempted to carry out the robbery.  CW-1

approached the target as he tried to enter his car, putting a gun to his side and directing him

to get in the car and get down.  CW-1 then waved J. Asaro over, who entered the passenger

side of the vehicle.  CW-1 told the target that they did not intend to harm him, they just

wanted the money, at which time the target asked, "what money?"  CW-1 responded, "the

payroll money."  The target responded that he did not know what they were talking about, he

did not have payroll.  He showed CW-1 and J. Asaro the contents of the bag he was carrying,

which consisted of papers.  CW-1 and J. Asaro then searched the target and his glove

compartment.  They did not find money.  After freeing the target and getting rid of the car

they used, CW-1 and J. Asaro took a cab back to a social club in Queens, New York, where

they knew they would find the defendant.  Once there, they advised the defendant of the fact

that the robbery failed.  The defendant became angry and began verbally abusing CW-1, who

eventually left and did not communicate with the defendant for a significant period of time.

### 3.    Conspiracy to Murder Russell Mauro

CW-3 is expected to testify that in the early 1990s, Bonanno family

consigliere Anthony Spero determined that Bonanno family soldier Russell Mauro should be

killed.  CW-3 discussed Mauro's murder with Spero, who directed him to give the murder to

the defendant.  CW-3 called the defendant and told him the crime family needed him to

murder someone, that they were going to bring the victim to him and that the defendant

needed to take care of it.  The defendant told CW-3 that the defendant had his own shooters,

asked CW-3 to tell him who the victim was, and said that he (the defendant) and his son

would take care of it.  CW-3 refused to tell the defendant the identity of the victim so far in

advance and told him that the defendant would need to participate in the murder as planned.

The defendant refused, saying that he wanted to use his own trusted people.  When CW-3

reported the defendant's statements to Spero, Spero told CW-3 not to give the murder to the defendant.  Instead, the contract to kill Mauro was given to other members of the Bonanno family, who eventually was killed inside a Bonanno social club.

4.      Fights

In approximately 2005 or 2006, at the defendant's direction, both CW-1 and CW-6, along with a number of other individuals associated with the Bonanno family including the defendant and his nephew and inducted Bonanno family soldier Ronald Giallanzo, participated in or were summoned by the defendant to a physical fight with a group of teenagers instigated by the defendant because he essentially was angry at the teenagers for being disrespectful.  In 2013, during a consensually recording meeting, the defendant admitted beating up a neighborhood "muscle" guy in Ragano's office related to a dispute at an autobody business on record with the Bonanno family.

During another recording, the defendant made statements to CW-1 about an individual ("Individual-4") who was an individual around the defendant's nephew Ronald Giallanzo.  CW-1 is expected to testify that Individual-4 owned a local business and had borrowed money from Bonanno family members Jack Bonventre and Sandro Aoisa.  While Giallanzo was incarcerated, he asked the defendant to "service" Individual-4.  In the 2000s, the defendant assaulted Individual-4 on more than occasion for his failure to repay Bonventre and also for failing to pay rent on his business to an associate of the Gambino family.

As set forth below, these assaults are proof of the defendant's position as a well-respected and feared leader in the enterprise as well as proof of the charged crimes, e.g., the use of extortionate means to collect one or more extensions of credit charged in

41

Racketeering Acts One and Fourteen and Counts Two and Three.  They also establish the relationship of trust and the development of the criminal relationship between the defendant and the cooperating witnesses, who engaged in violence at the defendant's direction.

### 5.    Illegal Gambling/Borrowing Money

Between 2009 and 2013, the defendant was intercepted on numerous consensual recordings discussing his gambling and his dependence on loans from friends and LCN associates to fund his gambling.  During many of these conversations, he made the relevant statements while bemoaning his loss of profits from his prior criminal conduct.  For example, during a February 17, 2011 recording, the defendant and CW-1 saw Danny Rizzo (a fellow participant and coconspirator in the Lufthansa Heist) on the street and had the following discussion:

| | |
|---|---|
| Defendant: | [Yelling to Rizzo who is outside car:] Let me ask you, did you commit yourself to the fucking to the hospital 'cause you're fucking nuts. |
| Rizzo: | Where you going?  Up there? |
| Defendant: | Yeah. |
| CW-1: | We were just talking about him, right? |
| Defendant: | It's life, we did it to ourselves, it's a curse with this fucking gambling.  We never got our right money, what we were supposed to get, we got fucked all around, got fucked all around, that fucking Jimmy kept everything. |
| CW-1: | We had it. |
| Defendant: | What? |
| CW-1: | We didn't have it? |
| Defendant: | What? |

42

> CW-1:        What are you talking about?  We had it, gambled it Vin.
>              He kept the money from the other things, the other guys.
>              We had ours, we gambled it, it's sick in the fucking
>              brain.  That's what.  A sickness!

Later in the same recording, as the defendant, Rizzo, CW-1 and another individual discussed

the state of the economy and the number of neighborhood businesses that are closing, they

had the following exchange:

> Rizzo:       They got money, but they're not spending it.  From your
>              lips to God's ears.  That's my problem.  I spent money.
>
> Defendant:   You got no problems, Dan, what'd you do, bet a number
>              once in a fucking while?  You should have all your
>              fucking money.
>
> Rizzo:       Yeah once in a while I bet the number. . . .

As set forth in more detail below, these statements of the defendant and

his coconspirators in the Lufthansa Heist, among other crimes, are important proof of

the charged enterprise, are integral to completing the story of the charged crimes, and

demonstrate the criminal relationships of trust among the defendant and his

coconspirators.

## ARGUMENT

All of the foregoing evidence is direct proof of the offenses charged in the

indictment, completes the story of those crimes and provides essential background to the

charged racketeering conspiracy.  As such, the evidence is not "crime[s], wrong[s], or other

act[s]" subject to Federal Rule of Evidence 404(b).

Nevertheless, even assuming arguendo that it constitutes such evidence, the

"other act" evidence is admissible under Rule 404(b) to show knowledge, intent, motive,

identity, modus operandi, absence of mistake, and lack of accident, and for other permissible

purposes, including to explain the relationship of trust between the defendant and

coconspirators including the cooperating witnesses, and to corroborate the testimony of

government witnesses at trial.  Finally, all of the evidence identified above passes Rule 403's

balancing test.

I.      The Proffered Evidence Is Admissible Because It Is Direct Proof of, Completes the
        Story of and Provides Essential Background to the Charged Crimes, Including About
        the Development of the Relationships of Trust Among the Coconspirators

        A.      Legal Standard

                It is well established that where an event arises "out of the same transaction or

series of transactions as the charged offense, [] it is inextricably intertwined with the

evidence regarding the charged offense, or [] it is necessary to complete the story of the

crime on trial," that event is admissible subject to the balancing test of Federal Rule of

Evidence 403 and is not considered "other crimes" evidence under Rule 404(b).  See United

States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); United States v. Towne, 870 F.2d 880, 886

(2d Cir. 1989).  The Second Circuit has interpreted this category of evidence to include acts

that provide necessary background or context for the charged crimes.  See United States v.

Gonzalez, 110 F.3d 936, 941-42 (2d Cir. 1997) (uncharged burglary admissible in trial for

felon in possession of a firearm because, inter alia, it provided "crucial background evidence

that gave coherence to the basic sequence of events that occurred on the night" of

defendants' arrest); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that

evidence of other "bad acts" may be admitted "to provide the jury with the complete story of

the crimes charged by demonstrating the context of certain events relevant to the charged

offense"); <u>United States v. Langford</u>, 990 F.2d 65 (2d Cir. 1993) ("It is within the court's

discretion to admit evidence of acts committed prior to the time charged in the indictment to

prove the existence of the alleged conspiracy as well as to show its background and

history."); <u>United States v. Coonan</u>, 938 F.2d 1553, 1561 (2d Cir. 1991) ("The trial court

may admit evidence that does not directly establish an element of the offense charged, in

order to provide background for the events alleged in the indictment.  Background evidence

may be admitted to show, for example, the circumstances surrounding the events or to

furnish an explanation of the understanding or intent with which certain acts were

performed." (quoting <u>United States v. Daly</u>, 842 F.2d 1380, 1388 (2d Cir. 1988)).

   In accordance with this principle, the Second Circuit repeatedly has upheld the

admission of evidence of "other" or "uncharged" crimes in RICO prosecutions as direct

proof of the elements of the charged RICO offenses without regard to Rule 404(b).  <u>See</u>, <u>e.g.</u>,

<u>United States v. Coppola</u>, 671 F.3d 220, 244-45 (2d Cir. 2012) ("Insofar as Coppola

challenges the admission of evidence of conduct distinct from the charged predicates and not

directly involving Coppola, the district court reasonably found such evidence relevant to

prove both the enterprise and pattern elements of the charged racketeering crimes."); <u>United

States v. Matera</u>, 489 F.3d 115, 120 (2d Cir. 2007) (upholding admission of uncharged

murders to prove "an essential element of the RICO crimes charged—the existence of a

criminal enterprise [the Gambino family] in which the defendants participated"); <u>United

States v. Mejia</u>, 545 F.3d 179, 206-07 (2d Cir. 2008) (reiterating <u>Matera</u> and upholding

admission of evidence of prior uncharged shooting because it demonstrated the existence of

the charged RICO enterprise and the existence of a conspiracy with which the defendants

45

were charged); United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) (upholding admission

of sixteen uncharged robberies, noting that "[i]t is well settled that in prosecutions for

racketeering offenses, the government may introduce evidence of uncharged offenses to

establish the existence of the criminal enterprise"); United States v. Wong, 40 F.3d 1347 (2d

Cir. 1994) (upholding admission of evidence of uncharged shootout between rival gangs to

prove the existence and nature of the charged enterprise and the participation of the

defendants therein, and observing that "this evidence was probative of the existence,

organization and nature of the RICO enterprise, a central allegation in the indictment");

United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992) (evidence of uncharged murders

admissible in case charging RICO and RICO conspiracy in order to prove "(i) the existence

and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of

each defendant by providing the requisite relationship and continuity of illegal activities").

     As the Second Circuit explained in United States v. Basciano, both a

defendant's uncharged conduct and that of his coconspirators is admissible to prove the

existence of the enterprise and a pattern of racketeering in a RICO case:

> [P]roof of the enterprise and pattern elements of racketeering
> "may well entail evidence of numerous criminal acts by a
> variety of persons."  A single pattern of racketeering may be
> common to a number of defendants and, in such circumstances,
> even though individual defendants "may reasonably claim no
> direct participation" in the acts of others, "evidence of those acts
> is relevant to the RICO charges against each defendant." Id.
> Specifically, the "various criminal activities" of racketeering
> confederates are admissible against each defendant "to prove:
> (i) the existence and nature of the RICO enterprise and (ii) a
> pattern of racketeering activity on the part of each defendant by
> providing the requisite relationship and continuity of illegal
> activities."

46

599 F.3d 184, 207 (2d Cir. 2010) (quoting DiNome, 954 F.2d at 843-44); see id. at 207 n.17 ("[W]here racketeering is the charge, the jury is entitled to rely not only on evidence of the defendant's own crimes, but also on evidence of the crimes of those with whom he is alleged to have thrown in his lot because the judgment required is not simply what acts the defendant committed at particular moments, but whether those acts were parts of a pattern, i.e., committed as part of [the] defendant[s'] association with a subculture of crime." (internal quotation marks and citations omitted)); Coppola, 671 F.3d at 244-45 ("Evidence of numerous criminal acts by a variety of persons may be relevant to prove the enterprise and pattern elements of racketeering . . . . Such conduct is not 'other' crime evidence subject to Fed. R. Evid. 404(b)." (alteration and internal quotation marks omitted)).

Evidence of "other" or "uncharged" crimes is particularly relevant in this case, where the defendant is charged with racketeering conspiracy. As an initial matter, it is "well settled in the Second Circuit that where an indictment contains a conspiracy charge, '[a]n act that is alleged to have been done in furtherance of the alleged conspiracy' is considered to be 'part of the very act charged.'" United States v. Barret, No. 10-CR-809 (S-3) KAM, 2011 WL 6704862, at *4 (E.D.N.Y. Dec. 21, 2011) (quoting United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999)); see United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) (stating that, in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Such acts are therefore inextricably intertwined with and direct evidence of the charged conspiracy and not subject to Rule 404(b). See Barret, 2011 WL 6704862, at *4, *6-*7 (concluding that evidence of, inter alia, uncharged attempted murder and contract for murder was "direct evidence" of drug distribution conspiracy).

47

In addition, for the same reasons articulated above in connection with RICO offenses generally, evidence of uncharged crimes is admissible in racketeering conspiracy cases as direct proof of the charged enterprise and pattern of racketeering activity.  In proving a racketeering conspiracy, the government is not restricted to the predicate acts alleged in the indictment.  As the Second Circuit has explained:

> a RICO conspiracy is never simply an agreement to commit specified predicate acts that allegedly form a pattern of racketeering. Nor is it merely an agreement to join in a particular enterprise. Rather, it is an agreement to conduct or to participate in the conduct of a charged enterprise's affairs <u>through</u> a pattern of racketeering. . . . Although no less than two predicate acts must be . . . agreed to, to demonstrate a pattern of racketeering, in the end, it is not the number of predicates proved but, rather, the relationship that they bear to each other or to some external organizing principle that indicates whether they manifest the continuity required to prove a pattern[.]

<u>United States v. Pizzonia</u>, 577 F.3d 455, 464-65 (2d Cir. 2009) (citations omitted).  The Second Circuit accordingly has upheld the admission of uncharged crimes or bad acts as direct proof of racketeering conspiracy charges.  <u>See</u>, <u>e.g.</u>, <u>United States v. Coiro</u>, 922 F.2d 1008, 1016 (2d Cir. 1991) (upholding admission in RICO conspiracy case of evidence regarding drug-trafficking arrest of members of enterprise, <u>inter</u> <u>alia</u>, for the purpose of "show[ing] the existence of the narcotics enterprise charged in the indictment," of which the defendant was alleged to be a member); <u>id.</u> (evidence of defendant's bribery of public employee admissible because it was "directly probative of a central allegation in the indictment," <u>viz.</u>, an allegation in the RICO count that the enterprise engaged in "conduct designed to prevent Government detection of the illegal activities of the members of the enterprise" (internal quotation marks omitted)).

The Second Circuit also has repeatedly upheld the admission of evidence of uncharged crimes where it completes the story of the charged offenses or provides helpful background information or context to those offenses.  See United States v. Williams, 205 F.3d 23 (2d Cir. 2000); United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed.").

Finally, where, as here, a defendant is charged with extortion or extortion conspiracy in violation of 18 U.S.C. § 894 (Counts Two and Three of the indictment), evidence of the defendant's reputation is considered direct evidence of the charged crime and is admissible on that basis.   "Extortion" for purposes of § 894 "includes any act or statement which constitutes a threat if it instills fear in the person to whom [the threat is] directed or [is] reasonably calculated to do so in light of the surrounding circumstances."  United States v. Pacione, 738 F.2d 567, 572 (2d Cir. 1984) (internal quotation marks and modification omitted); see also 18 U.S.C. § 891(7); United States v. Natale, 526 F.2d 1160, 1168 (2d Cir. 1975); United States v. Curcio, 310 F. Supp. 351, 357 (D. Conn. 1970).  As the Second Circuit has observed, the rationale behind this broad definition of extortion under 18 U.S.C. §§ 892 and 894 is best understood against the backdrop of Congress's efforts to combat organized crime.  Pacione, 738 F.2d at 570.  Due to the nature of LCN families, "loan sharks

connected with organized crime rarely used force, or even made explicit threats to do so, because they found it unnecessary.  A loan shark's victim knew all too well that if he did not pay, a likely result would be bodily harm to him or his family."  Id.

Accordingly, to evaluate whether conduct comprises an extortionate threat, all of the surrounding circumstances must be considered.  Significantly, "it is the conduct of the defendant, not the victim's individual state of mind, to which the thrust of the statute is directed."  Natale, 526 F.2d at 1168; see also United States v. Polizzi, 801 F.2d 1543, 1548 (9th Cir. 1986) (observing that it is the defendant's actions, "not the mental state produced in the debtor" that is the focus for the jury).

As is relevant to the instant analysis, evidence of a defendant's reputation "may be used to show the state of mind of both the defendant and the victim."  United States v. Dennis, 625 F.2d 782, 800 (8th Cir. 1980).  As the Dennis court explained:

> If a man makes vaguely menacing statements, aware that he is commonly known as a violent man, then it is a reasonable inference that he intends to instill fear. . . . It is unlikely that the defendant is unaware of his own reputation for violence; reputation, by definition, reflects general knowledge in the community, and, if anyone is a member of the relevant community, it is the defendant himself.

Id. at 800 (quoting Goldstock & Coenen, "Controlling the Contemporary Loanshark: The Law of Illicit Lending and the Problem of Witness Fear," 65 Cornell L. Rev. 127, 200-01 (1980)); see also Pacione, 738 F.2d at 572 (citing Dennis and Goldstock & Coenen). Similarly, in the context of an extortion under the Hobbs Act – alleged here in Racketeering Acts Eight and Nine – the Second Circuit has held that where one of the elements that the government must prove is the instillation of fear, "bad reputation" evidence may be admitted as "such a reputation frequently conveys a tacit threat of violence."  United States v. Mulder,

273 F.3d 91, 103 (2d Cir. 2001) (quoting United States v. Tropiano, 418 F.2d 1069, 1081 (2d Cir. 1969)).  The reasoning of these cases applies with equal force here.

    B.    Analysis

        As set forth below, evidence of the acts described supra is direct proof of the existence of the charged racketeering enterprise and the defendant's role therein, as well as the enterprise's structure and activities and their impact on commerce, and of the charged racketeering conspiracy, including the charged "pattern of racketeering activity" through which the defendant agreed to conduct and participate in the enterprise's affairs.  Further, such evidence is admissible because it is inextricably intertwined with and provides crucial background to the charged crimes, in that it is probative of, among other things, the development of the criminal relationships of trust between the defendant and his coconspirators, including cooperating witnesses.

        1.    Other Acts Between the 1950s and Early 1980s

          a.    Evidence of Robberies, Extortions, Arsons, Insurance Fraud, Car Thefts and Sale of Swag

        Evidence of the defendant's involvement, together with coconspirators including cooperating witnesses, in truck heists, other robberies, extortion, car thefts, and sale of "swag," is probative of the nature and existence of the Bonanno crime family and its primary purpose, i.e., to make money through crime.  Evidence of these "rackets" committed by the defendant and his coconspirators, including CW-1, his son J. Asaro, Jimmy Burke, Bobby Giallanzo and others, is particularly probative of the Bonanno family's methods and means to profit from crime, and its continuing and extensive pattern of racketeering activity. See Pizzonia, 577 F.3d at 465 ("[T]he threat of continued criminal activity over an open

period can be established where discrete predicates can be attributed to a defendant operating as part of a long-term association that exists for a criminal purpose.").  Additionally, this evidence directly proves a central allegation in the indictment: the coordination of criminal activity among different LCN crime families to achieve a common goal.  See Ind. ¶ 11.

Evidence of the defendant's participation in other crimes with Burke in particular, including truck hijackings, heists and the unloading of swag, is probative of the murder and robbery conspiracies alleged in Racketeering Acts Two and Three, in which Burke, the defendant and others from various LCN families worked together to reach shared criminal ends.  With respect to Racketeering Act Two, which alleges the murder of, conspiracy to murder, and accessory after the fact to the murder of Paul Katz, the other crimes evidence from the 1950s through the early 1980s is critical background information that provides context for the Katz murder and explains the high degree of trust between the defendant and Burke and the commonality of their criminal goals and concerns.  As detailed above, the defendant and Burke participated in Katz's murder because they believed he was cooperating with law enforcement, which posed threats of incarceration and financial loss given that Katz's warehouse was used to store valuable goods stolen by LCN associates.

Evidence of the hijackings, swag, arsons, insurance fraud and car thefts also will be essential to the jury's understanding of the development of the conspiratorial relationships between the defendant, CW-1 and their coconspirators in the charged racketeering conspiracy and the many conspiracies alleged as racketeering acts.[12]  For

---

[12]     For example, Bobby Giallanzo's participation in the wrecking of the Ozone Bar is direct evidence of his status as a Bonanno family associate and important proof

example, it was while CW-1 was selling swag for the defendant in the 1960s that CW-1 first visited the defendant at Robert's Lounge, his criminal venture and hangout spot with Jimmy Burke.  In this time period, CW-1 routinely saw the defendant, Burke and other LCN associates at Robert's Lounge, and became closer to this group of individuals, with whom he and the defendant would commit the charged Lufthansa Heist several years later.  Through the swag sales and hijackings, CW-1 learned of Paul Katz and visited the warehouse that the defendant, Burke and others used to store their stolen goods.  By following the defendant's criminal orders and demonstrating loyalty and secrecy – traits valued highly by the mafia – CW-1 proved himself a successful LCN associate capable of earning for the defendant and for the crime family.  Additionally, by aiding the defendant in the use of violence, including in wrecking the Ozone bar and participating in armed robberies, CW-1 proved himself to be a "tough" guy upon whom the defendant and his coconspirators could depend in difficult situations.

Perhaps most significantly, all of the foregoing other acts evidence demonstrates how the defendant ran his "crew" of associates, including CW-1, J. Asaro, Junior Berger and others in the 1970s and 1980s.  For example, in almost all of the relevant acts, e.g., the wrecking of Ozone Bar, the robberies and the insurance fraud schemes, the defendant directed the criminal conduct of others (specifically CW-1) and substantially profited from those crimes despite undertaking very little risk himself.  Similarly, in almost all of the charged crimes, the defendant occupied a leadership role, directing his underlings to carry out the crime and bear all of the risk while the defendant reaped all of the rewards.

underlying Racketeering Act Five, in which the defendant is alleged to have solicited the murder of a cousin who testified against Bobby Giallanzo in a federal trial.

Such evidence is therefore direct evidence of the charged crimes, not only because it amounts to acts in furtherance of the charged racketeering conspiracy, but also because it explains the evolution of the defendant's leadership role in the charged enterprise and the nature and structure of the charged racketeering conspiracy and the conspiracies alleged as predicate acts.

      b.    <u>Evidence Relating to the Murder of Richard Eaton</u>

Evidence of the defendant's assistance to Burke in disposing of Richard Eaton's body likewise is direct evidence of the charged crimes, including the racketeering conspiracy and Racketeering Acts Two and Three, which include the Katz murder, the Lufthansa Heist and the conspiracies to commit those offenses. The evidence of Eaton's murder approximately two months after the Lufthansa Heist is inextricably intertwined with Racketeering Act Three not only because of its proximity in time to the Heist, but also because of the nexus between the Heist and the motive for killing Eaton: his failure to repay Burke's investment of Heist proceeds in a narcotics deal. Moreover, the Eaton evidence is extremely probative of the development of the close criminal relationship between the defendant and Burke, J. Asaro and CW-1– coconspirators who trusted each other sufficiently to successfully execute and cover up the most risky and violent offenses, including the Katz murder and the Lufthansa Heist – and the status of those conspiratorial relationships at and around the time of the offenses charged in Racketeering Acts Two and Three. Further, the efforts of the defendant and other LCN associates – Burke, J. Asaro, F. Burke and CW-1 – to hide Eaton's body with the ultimate purpose of destroying evidence of a murder is direct proof of the allegation in the indictment that LCN operates by evading detection by law

enforcement.  Ind. ¶ 10 ("The members and associates of the Bonanno crime family engaged in conducted designed to prevent government detection of . . . their illegal activities and the location of . . . evidence of those activities.").  Evidence that Eaton was murdered because he lost Burke's money – specifically, proceeds of the Lufthansa Heist – invested in a joint criminal venture proves the additional allegations in the indictment that "members and associates of the Bonanno crime family . . . furthered the enterprise's criminal activities by . . . using and threatening to use physical violence, including murder," that they "used the resources of the family to settle personal grievances and vendettas," and that, "[f]or those purposes, . . . [they] were asked and expected to carry out . . . acts of violence, including murder."  Ind. ¶¶ 9-10.

        c.    <u>Evidence of Other Violence and Threats of Violence</u>

Evidence of the defendant's decision to call upon Burke in the aftermath of the shooting of Mickey Brown's nephew will aid the jury in understanding the ongoing and close nature of the defendant's criminal relationship with Burke, the strength of their bond and their loyalty to one another over the course of decades.  Such evidence also explains Burke's decision to involve the defendant and CW-1 in the Lufthansa Heist, which carried both extraordinary risks and the potential for extremely lucrative rewards.

In addition, evidence of the defendant's threats of violence to CW-4, which included his uninvited visit to CW-4's home with the backing of other coconspirators in the Lufthansa Heist, including an armed Thomas Desimone, is admissible as further proof of the charged racketeering conspiracy and predicate acts including the Lufthansa Heist.

        d.    <u>Evidence of Drug Use, Illegal Gambling and Borrowing Money</u>

Evidence of the defendant's heroin use, illegal gambling and borrowing money are necessary to complete the story of the charged crimes at trial, <u>Carboni</u>, 204 F.3d 44, because such evidence demonstrates how the defendant evolved from a teenage heroin addict to a mastermind of the Lufthansa Heist, one of the most lucrative robberies in U.S. history, to, as of 2013, a powerful but broke mafia leader scheming to make money.  As the government's evidence at trial will demonstrate, the defendant's story is one of redemption and loss.  Cooperating witnesses are expected to testify regarding the defendant's drug addiction and how he apparently beat it "cold turkey" so that he could join the Asaros' ranks of mafia soldiers.  In addition, cooperating witnesses are expected to testify that the defendant at one point was demoted from the rank of captain due to, among other things, his repeated appropriation of money from the individuals assigned to him in order to feed his gambling addiction, but that the defendant re-emerged years later, in the 2000s, as a leader in the Bonanno family.

Evidence of the defendant's gambling losses and addiction are likewise essential to complete the story of the lucrative criminal schemes charged, including what befell the millions in profits from the Lufthansa Heist and the robbery of gold salts.  For example, the defendant on consensual recordings explains repeatedly that he cannot help himself when it comes to gambling, stating, "[i]f I got a winning ticket and I go to the window, I bet the next race, whatever I won in that race, I bet the whole ticket.  I bet the whole ticket!"  Such evidence will also be necessary to rebut an anticipated defense that the defendant's lack of demonstrable wealth in recent years proves he could not have

participated in, e.g., the Lufthansa Heist and received a cut of its proceeds, among other substantial ill-gotten gains.

2.     Other Acts Between the Early 1980s and the 2000s

Evidence of acts between the early 1980s and 2000s set forth above is also important direct proof of the continuity of the racketeering enterprise, the enterprise and pattern elements of the charged racketeering conspiracy, and the defendant's role in the enterprise.  Such evidence similarly will provide crucial background information to the jury regarding the criminal relationships of trust between the defendant and his coconspirators, including cooperating witnesses, as well as context for the charged crimes.

a.     Evidence Relating to a Murder Conspiracy, Fights, Extortions and Collections

Evidence of the defendant's fights, extortions and collections in this time period should be admitted as proof of the defendant's insistence on receiving the respect accorded made members of LCN, and his commitment to preserving and reinforcing his stature in the crime family by instilling fear in others and directing and profiting from the criminal activity of his subordinates.  For example, the defendant's participation in the extortion of Individual-3 in the early 1980s is direct evidence of his position as an inducted member of the charged enterprise at that time and constitutes an act in furtherance of the charged racketeering conspiracy.  Evidence of the Individual-3 extortion is further admissible because it provides important background information on the relationship of trust between the defendant and CW-2 and CW-3, two coconspirators in the charged racketeering who played significant roles in mediating the defendant's extortion of Individual-3 and resolving Individual-3's complaints about the defendant in a manner that best served the interests of

the enterprise.  The foregoing evidence, along with other proffered evidence – including threats of violence, assaults, and other acts of violence including robberies, spanning the 1960s through 2013 – that illustrates the defendant's and his associates' feared reputation in the communities they frequented as violent, criminally oriented men affiliated with LCN, is also admissible as direct evidence of the extortion-related offenses charged in Counts Two and Three of the indictment, as it tends to show the defendant's and his coconspirators' state of mind and that the statements made to John Doe #6 as part of those charged crimes were designed to instill fear.

With respect to the conspiracy to murder Russell Mauro in the 1990s, CW-3 is expected to testify that he asked the defendant to take part in the murder of Mauro, a Bonanno family soldier, but when the defendant balked at using individuals not specifically chosen by the defendant, the crime family's "work" was assigned elsewhere.  Such evidence also will provide critical context for CW-3's testimony about his dealings with and knowledge of the defendant, whom he knew as paranoid and insistent on working with his own crew of trusted criminal associates, and therefore is admissible as background to the charged crimes and criminal conspiracies.

Similarly, the defendant's directive to CW-1 to "sit down" with members of the Gambino family on behalf of Mickey Zaffarano's son is inextricably intertwined with and important background to Racketeering Act Eight, which alleges the extortion of Zaffarano's son related to the sale of the Manhattan properties.  Such evidence also will serve to educate the jury regarding the profitable association of businesses with organized

58

crime generally – a staple of LCN – and the basis of the defendant's expectation of and sense of entitlement to this specific business's proceeds.

b.    Evidence of Attempted Robbery and Assaults

The other acts evidence of attempted robbery and assaults from this time period is particularly important to complete the story of the racketeering conspiracy and explain the evolution of the defendant's relationship with CW-1, a coconspirator who, after failing to successfully execute two attempted robberies in the 1980s (one of which is alleged as Racketeering Act Six and the other of which is the attempted robbery of a payroll business described above) and to repay debts, left the New York City area and had limited contact with the defendant for a decade.  When CW-1 returned to New York in approximately 2004 or 2005, he and the defendant resumed their criminal relationship.  At that time, CW-1 regained the defendant's trust by engaging in the affairs of the enterprise at the defendant's direction, including by helping to collect on checks for the check casher described above and engaging in physical violence with other associates and members of the Bonanno family.[13] The neighborhood assault from the mid-2000s in which the defendant participated with multiple cooperating witnesses and younger members and associates of the Bonanno family is also particularly probative of the nature and evolution of the charged enterprise and the defendant's leadership role therein, in that it demonstrates the defendant's ability to draw on the resources of the Bonanno family, including younger generations of members and associates, at a moment's notice to support him with physical violence.

---

[13]    Similarly, CW-6's participation in the assault of teenagers with CW-1 and other members and associates of the Bonanno family, at the defendant's direction, is direct proof of his association with the charged enterprise and relationship of trust with the defendant.

c.      Evidence of Other Acts the Defendant Discussed on Consensual
        <u>Recordings</u>

Evidence of the defendant's statements on consensual recordings about his

continued participation in gambling, legal and otherwise, assaults and borrowing money

from individuals associated with LCN is also direct evidence of the defendant's role in the

charged enterprise and proof of the charged racketeering conspiracy itself.  The defendant

made certain of these statements in the context of a discussion about his lost profits from

charged and other crimes and/or a conversation about the defendant's and others' status

within LCN.  Such evidence is crucial to the government's proof of the crimes on trial.

II.     <u>The Proffered Evidence Is Also Admissible Pursuant to Rule 404(b)</u>

In the alternative, to the extent the Court finds that the evidence described

above constitutes "other acts" under Federal Rule of Evidence 404(b), all of the evidence is

admissible pursuant to that Rule for several permissible, non-propensity purposes.

A.      <u>Legal Standard</u>

Evidence of uncharged crimes or "other acts" may be admitted pursuant to

Rule 404(b) for permissible purposes, including to prove motive, opportunity, intent,

preparation, plan, knowledge, identity or absence of mistake or accident.  Fed. R. Evid.

404(b)(2); <u>see</u> <u>United States v. Ortiz</u>, 857 F.2d 900, 903 (2d Cir. 1988).

The Second Circuit has emphasized that Rule 404(b) is a rule of broad reach

and liberal application, and applies an "inclusionary or positive approach" to admitting

"other acts" evidence.  <u>See</u> <u>United States v. Garcia</u>, 291 F.3d 127, 136 (2d Cir. 2002) (citing

<u>Pitre</u>, 960 F.2d at 1118); <u>see also</u> <u>Levy</u>, 731 F.2d at 1002 ("We have adopted the inclusionary

or positive approach to [404(b)]; as long as the evidence is not offered to prove propensity, it

is admissible.").  A party must satisfy three requirements in order for evidence of "other crimes, wrongs or acts" to be admitted under the rule.  First, the evidence must be offered for a purpose other than to prove a defendant's bad character or criminal propensity.  United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991); United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989).  Second, the evidence must be relevant under Rules 401 and 402 and not run afoul of Rule 403.  See Mickens, 926 F.2d at 1328; Ortiz, 857 F.2d at 903; United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984).  Third, if the defendant requests that the jury be instructed as to the limited purpose for which the government's evidence is being admitted, the court must furnish such an instruction.  See Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002.

The Second Circuit repeatedly has held that evidence of uncharged crimes may be admitted at trial to establish the existence and evolution of a relationship of trust between coconspirators.  See, e.g., Williams, 205 F.3d at 33-34 (upholding admission of evidence relating to the defendant's prior criminal activities with coconspirators in charged drug conspiracy as relevant evidence to inform jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed); United States v. Pipola, 83 F.3d 556, 565-66 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.");[14] United States v. Rosa, 11 F.3d

_____

[14]     Several Second Circuit decisions appear to analyze other acts evidence pertaining to the relationship of trust among coconspirators under the rubric of Rule 404(b). Others, however, have suggested that relationship of trust evidence, at least in conspiracy

315, 333-34 (2d Cir. 1993) (holding that co-defendants' relationship over a 14-year period, during which stolen property and narcotics crimes were committed, "was properly admitted to explain how the illegal relationship between the two [defendants] developed and to explain why [one defendant] . . . appointed [the other defendant] . . . to a leading position in the Organization"); United States v. Harris, 733 F.2d 994, 1006-07 (2d Cir. 1984) (upholding admission of evidence of defendant's previous narcotics transactions with informant who posed as prospective narcotics customer in connection with charged conspiracy, even though informant was not a member of the charged conspiracy, because the evidence "tended to show the basis for Harris's trust of [the informant]").

Additional bases for admitting other acts evidence under Rule 404(b) include "corroborat[ing] crucial prosecution testimony," such as the testimony of cooperating witnesses, if the corroboration is "direct and the matter corroborated is significant," United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (internal quotation marks omitted), and, where extensive cross-examination into a government witness's criminal history for

---

cases, is synonymous with direct proof of a charged conspiracy or evidence that completes the story of or provides crucial background to the charged offenses, and thus may be admitted without regard to Rule 404(b).  See, e.g., United States v. Moten, 564 F.2d 620, 628 (2d Cir. 1977) ("[P]roof of prior drug dealing by individual defendants with Brown at a time previous to commencement of the conspiracy charged was clearly admissible to show the basis for the existence of the conspiracy charged and the mutual trust which existed between Brown and his customers.  It was therefore admissible against all the defendants to show the nature and existence of the conspiracy charged."); United States v. Morillo-Vidal, 547 Fed. App'x 29, 30-31 (2d Cir. 2013) (testimony regarding other crimes was admissible because it was "relevant background information" that, inter alia, "explained [a co-conspirator's] relationship to his co-conspirator [] and his knowledge of [the co-conspirator's] role in a national drug conspiracy," evidence that qualifies as "highly probative when the charged conduct covers a conspiracy") (unpublished decision).  Under either analysis, an important basis for admitting the evidence discussed herein is that it proves the existence and development of the relationships of trust among the defendant and his coconspirators in the charged conspiracies.

impeachment purposes is anticipated, allowing the government to elicit the witness's

testimony about such acts on direct examination so as to avoid the appearance that the

government is concealing such purported impeachment evidence from the jury, see, e.g.,

United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011).

      B.     <u>Analysis</u>

          1.     The Other Acts Evidence Is Admissible to Establish the Development
               <u>of the Criminal Relationships of Trust Among the Coconspirators</u>

As described in detail above, the uncharged acts that the government seeks to

admit are critical to establishing "how the illegal relationship" between the defendant and

other members and associates of LCN, including the cooperating witnesses, developed.

Many of these acts – including the hijackings, unloading of swag, and the disposal of the

body of Richard Eaton– provide important background information to the conspiracy and

explain the critical relationship of trust among the defendant and his coconspirators.  This is

particularly true given the long criminal associations of many of the cooperating witnesses

with the defendant.  CW-1 has known the defendant – and known of his criminal history –

for virtually the entire span of the charged 45-year racketeering conspiracy.  The criminal

associations of CW-2, CW-3, CW-4, CW-5 and CW-6 with the defendant each span several

years and in most cases, more than a decade.  The stories of how the cooperating witnesses

came to know the defendant, commit crimes with him and earn his trust such that the

defendant would confide in them about his own crimes – and how the cooperating witnesses

came to know and commit crimes with other members and associates of the Bonanno crime

family who, too, would confide in them about criminal matters regarding the family,

including the defendant's crimes – would be incomplete without testimony about the

defendant's uncharged crimes and other acts over many years and involving a variety of coconspirators and accomplices.

This evidence will be essential not only to completing the story of the crimes charged, but also to the jury's assessment of the cooperating witnesses' credibility, expected to be a key issue at trial, given that the defendant's participation with those witnesses in the most serious crimes is plausible only if the defendant's high degree of trust of those witnesses is established.  It can be inferred, based on common sense, that an individual would not undertake behavior so risky as to expose himself to criminal penalties without having some basis for trusting those who participate in the crimes with him.  The fact that the defendant committed crimes with the cooperating witnesses, including crimes so serious as murder and disposing of the victims' bodies, and confided in the cooperating witnesses about his past criminal activities shows the level and degree of trust the defendant placed in his coconspirators.

Accordingly, even if the evidence of uncharged acts is not admitted as direct evidence of the racketeering conspiracy, such evidence should be admitted pursuant to Rule 404(b) as probative of the defendant's relationship of trust with his coconspirators, including the cooperating witnesses discussed herein.  See, e.g., Pipola, 83 F.3d at 565-66 (evidence that the defendant and his coconspirators made usurious loans, as well as other uncharged crimes of armed robbery, burglary and using stolen and counterfeit credit cards, admissible to explain the evolution of the defendant's relationship with his coconspirators in robbery conspiracy trial); United States v. Palermo, 291 F. App'x 418, 420 (2d Cir. 2008) (evidence concerning uncharged 1960 murder was relevant to explain, inter alia, defendant's

64

"relationship of trust with the government's principal cooperating witness" in the

racketeering enterprise under Rule 404(b)) (unpublished decision).

2. Evidence of Certain of the Other Acts Evidences Knowledge, Intent,
Identity, Motive, Modus Operandi, Lack of Accident and Absence of
Mistake

a. The Other Acts Evidence Is Probative of the Defendant's Intent
and Knowledge with Respect to the Charged Racketeering
Offenses

The evidence of uncharged crimes and other acts will tend to prove that the

defendant possessed the requisite intent and knowledge during his participation in the entire

racketeering conspiracy, and that he knowingly and intentionally joined the charged

conspiracies.  See United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993); United

States v. Zapata, 139 F.3d 1355, 1358 (11th Cir. 1998) (stating that where the state of mind

required for both the "other crime" and the instant offense is the same, the "other crime" is

relevant to the charged offense under Rule 404(b)).  At trial, the defendant can be expected to

assert a defense that, although he knew and spent time with several of his alleged

coconspirators in the racketeering conspiracy, the defendant did not knowingly and

intentionally join the charged racketeering conspiracy and did not agree to the commission of

the charged racketeering acts.  In addition, for those allegations that the defendant cannot

reasonably deny, and racketeering acts and charges (including Counts Two and Three) from

which he cannot wholly distance himself because of evidence including, inter alia, his own

admissions on consensual recordings and his appearance in surveillance photographs, the

other acts evidence will be crucial to establishing that his conduct and association with

members and associates of LCN was criminal in nature, was related to the charged enterprise

and was in furtherance of its activities.  The other acts evidence therefore undercuts the anticipated defense that the defendant did not possess the requisite intent and knowledge, or had some other state of mind consistent with innocent association, during his participation in the 45-year-long racketeering conspiracy.  See, e.g., Zackson, 12 F.3d at 1182 (holding that evidence that the defendant had previously engaged in narcotics trafficking with his coconspirator was admissible to rebut the defendant's defense of innocent association); Inserra, 34 F.3d at 89 (prior conviction admissible under Rule 404(b) because it was relevant to prove defendant had requisite state of mind in committing charged crime, where prior conviction "provided a reasonable basis for inferring knowledge or intent in contradiction of [defendant's] innocent explanation for his conduct").  Because the defendant's knowledge and intent are elements of the charged offense, remain in dispute and thus will be facts of "consequence" at trial, see Fed. R. Evid. 401, the government should be given the opportunity to prove those elements with relevant evidence in its case-in-chief, including the evidence of the other acts.

> b.  The Other Acts Evidence Is Probative of Identity, Motive, Modus Operandi, Absence of Mistake and Lack of Accident with Respect to Certain of the Charged Crimes

Evidence of the defendant's uncharged illegal activities is also probative of the absence of mistake and lack of accident, among other things, with respect to certain of the charged crimes.  For example, the defendant's participation in uncharged assaults demonstrates his knowledge and intent with respect to using violence and threats of violence to carry out his and his crime family's criminal purposes, and such evidence is thus probative of the absence of mistake and lack of accident with respect to the defendant's participation in

loansharking, extortions, attempted extortions and related conspiracies alleged in Racketeering Acts One, Eight, Nine, Eleven, Thirteen and Fourteen and Counts Two and Three.  Similarly, evidence of the uncharged acts of extortion, loansharking and robberies demonstrates the defendant's knowledge of the core money-making purposes of the Bonanno family and his intent to participate in them.  Accordingly, evidence of these uncharged acts is not being offered to prove the defendant's bad character or criminal propensity; rather, the government offers it for the permissible purpose of proving that the defendant knowingly and intentionally conspired to participate in the conduct of the affairs of the charged enterprise through the pattern of racketeering activity alleged in the indictment.

With respect to the murder of Richard Eaton specifically, this evidence is admissible for the additional purposes of proving identity, motive and modus operandi with respect to the offenses alleged in Racketeering Act Two relating to the murder of Paul Katz. The evidence elicited of the Eaton murder at trial is expected to establish that Eaton was murdered by strangulation of the neck, the same modus operandi employed by Burke and the defendant when they killed Katz several years earlier.  See, e.g., United States v. Mills, 895 F.2d 897, 907 (2d Cir. 1990) ("[E]ven where intent is not in issue, Rule 404(b) permits evidence of similar acts to prove a signature crime, i.e., a modus operandi where the crimes are so nearly identical in method as to ear-mark them as the handiwork of the accused. . . . Such evidence may be admitted to show that a defendant was in fact the perpetrator of the conduct at issue." (internal quotation marks omitted)).  Moreover, CW-1's expected testimony regarding his, the defendant's, Burke's and J. Asaro's respective roles in attempting to dispose of Eaton's body, and the fact that Burke expressed anger to the

defendant over the police's discovering Eaton's body in the trailer, will be extremely

probative of the identity and motive of the individuals responsible for disinterring and

disposing of Katz's remains in the 1980s: the defendant, Burke, J. Asaro and CW-1.  See,

e.g., United States v. LaFlam, 369 F.3d 153, 156 (2d Cir. 2004) (evidence of defendant's

drug use admissible under Rule 4040(b) to demonstrate motive – to pay off drug debts – for

committing charged bank robbery).  The evidence relating to the Eaton murder will help

explain why Burke, then in prison, was paranoid that his and his associates' other murder

victims would be discovered by law enforcement and they would face criminal penalties for

those murders; why he accordingly directed the defendant to take action to move and dispose

of Katz's body; and why the defendant heeded Burke's advice and in turn directed CW-1 and

J. Asaro – who had participated years earlier in attempting to dispose of Eaton's body – to

move and dispose of Katz's remains.

> 3.     Evidence of Certain of Other Acts is Admissible to Corroborate Crucial
>        Cooperating Witness Testimony

Evidence of certain other acts evidence, such as the extortion of Individual-3,

the defendant's excessive gambling losses and borrowing of money, and the assault outside

of a social club in the mid-2000s, is admissible for the additional purpose as corroboration of

important cooperating witness testimony establishing the elements of the charged crimes.

See, e.g., United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987); United States v. Mejia-

Velez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994); United States v. Basciano, No. 03-CR-929

(NGG), 2006 WL 385325, at *4 (E.D.N.Y. Feb. 17, 2006) (admitting evidence of uncharged

crimes – including, gambling, loansharking/extortion, murder, conspiracy/attempted murder,

and solicitation to murder – to corroborate the testimony of cooperating witnesses)

(unpublished decision).  For example, three cooperating witnesses are expected to testify about the extortion of Individual-3, which, as described more fully above, will establish the defendant's position within the crime family in the 1980s and one of his preferred methods of making money for himself and the crime family, i.e., by extorting the owner of an autobody business.  Additionally, all of the cooperating witnesses and certain of the civilian witnesses will testify that throughout his life, the defendant has been a "degenerate gambler" who borrows money and does not repay his debts, which is direct evidence of his rise, fall and subsequent rise in the crime family, as well as the dissolution of the profits from the very lucrative crimes charged in the indictment.  Similarly, evidence of the defendant's willingness to direct violence, as well as participate in it himself, is direct evidence of the charged crimes, including the extortion charged as Racketeering Act Fourteen and Counts Two and Three, in which the defendant discussed assaulting the victim and a coconspirator, Bonanno soldier John Ragano, discussed stabbing the victim.  Accordingly, testimony as to these acts is direct and important corroboration of key evidence of the charged crimes and should be admitted on this basis as well.

Moreover, for the uncharged conduct about which more than one cooperating witness is expected to testify, including the defendant's participation in assaults and his history of drug and gambling addiction, the evidence elicited from each cooperating witness will serve to corroborate the testimony of the others.

For these reasons, the "other acts" evidence discussed herein would not be offered to establish the defendant's criminal propensity and is admissible for various permissible purposes under Rule 404(b).

69

III.        The Probative Value of the "Other Crimes" Evidence Far Outweighs Any
            Prejudicial Effect

      Finally, the proffered evidence is highly relevant and probative of the charges

in the indictment, and the defendant will not be unfairly prejudiced by the admission of such

evidence.  There is accordingly no basis to exclude the evidence under Federal Rule of

Evidence 403.

      Evidence of other crimes must also be analyzed under Rule 403, but it is

admissible so long as the evidence "'[does] not involve conduct any more sensational or

disturbing than the crime[] with which [the defendant has been] charged.'"  Pitre, 960 F.2d at

1120 (quoting United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)).  Where the

uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is

generally admissible under the Rule 403 balancing test.  United States v. Livoti, 196 F.3d

322, 326 (2d Cir. 1999) (upholding admissibility of evidence that the defendant, a police

officer charged with engaging in excessive use of force with an arrestee, choked another

arrestee, on the basis that "the evidence did not involve conduct more inflammatory than the

charged crime, and the district court gave a careful limiting instruction"); Paulino, 445 F.3d

at 223 (prior cocaine convictions admissible as proof that the defendant was aware that

substance in his closet was cocaine; observing that evidence admissible pursuant to Rule

404(b) should not be excluded on grounds of unfair prejudice where the evidence does not

"involve conduct more inflammatory than the charged crime[s]").  Even where there is a risk

of undue prejudice, such risk can be mitigated effectively by a cautionary instruction limiting

the jury's consideration of the evidence to the purposes for which it is offered.  See Mickens,

926 F.2d at 1329.

As explained above, much of the proof is highly probative because it is inextricably intertwined with the participation of the defendant and his coconspirators in the charged offenses, and is necessary to explain the background of the charged acts and the relationships among the coconspirators.  Much of the proffered evidence is, in fact, direct proof of the charged offenses.  Given the fact that these and similar acts were part and parcel of the defendant's participation in the charged conduct with his coconspirators, admission of the evidence would not result in any unfair prejudice, let alone unfair prejudice that substantially outweighs the probative value of the evidence.  Moreover, because a murder and murder conspiracy, in addition to other serious crimes including robberies, arson and extortions, are charged in the indictment, the proffered evidence is no more sensational than the charged offenses and passes the balancing test of Rule 403.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that the Court rule that the proffered evidence (i) is admissible because it is direct evidence of and inextricably intertwined with the charged offenses and (ii) in the alternative, is admissible pursuant to Federal Rule of Evidence 404(b).

Dated:     Brooklyn, New York
          May 27, 2015

                          Respectfully submitted,

                          KELLY T. CURRIE
                          Acting United States Attorney
                          Eastern District of New York
                          271 Cadman Plaza East
                          Brooklyn, New York 11201

          By:     /s/_____
                          Nicole M. Argentieri
                          Alicyn L. Cooley
                          Lindsay K. Gerdes
                          Assistant United States Attorneys
                          (718) 254-6232/6389/6155