EAG:NMA/ALC/LKG
F. #2014R00055

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                    Docket No.  14-CR-26 (S-4) (ARR)

VINCENT ASARO,

                Defendant.

– – – – – – – – – – – – – – – – –X

MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTION IN LIMINE
TO ADMIT CERTAIN STATEMENTS AGAINST
THE DEFENDANT AT TRIAL

KELLY T. CURRIE
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Nicole M. Argentieri
Alicyn L. Cooley
Lindsay K. Gerdes
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum in support of its second motion in limine[1] to admit certain evidence at the trial in the above-captioned case. Specifically, the government seeks to admit in its case-in-chief several statements of parties other than the defendant Vincent Asaro (the "defendant").  As set forth below, these statements are relevant and admissible.

For the reasons set forth herein, the government respectfully submits that the Court should grant the instant motion.[2]

---

[1]    For ease of reference, this memorandum incorporates the relevant portions of the government's memorandum of May 27, 2015.  See Gov't's Mem. of Law in Support of Its Mot. in Limine, dated May 27, 2015, ECF Docket Entry No. 234.

[2]    The government reserves the right to make additional motions in limine at a later date.

<u>BACKGROUND</u>

The statements the government seeks by this motion to introduce at trial are as follows.

I.    <u>Statements on Consensual Recordings of CW-1 and John Doe #5</u>

The government seeks to introduce at trial certain statements of individuals other than the defendant on consensual recordings made by a cooperating witness ("CW-1")[3] in approximately 2010 through 2012.  Summaries of these statements are set forth below.[4]

In October 2010, CW-1 consensually recorded conversations with an individual referred to in the above-captioned indictment (the "Indictment") as John Doe #5. As alleged in Count One, Racketeering Act Thirteen of the Indictment, the defendant agreed that he and others would extort John Doe #5, on or about and between October 1, 2010 and November 4, 2010.  The object of the extortion was the proceeds of John Doe #5's sale of a property located on Drew Street in Brooklyn, New York (the "Drew Street property").

CW-1 is expected to testify that the Drew Street property once belonged to Thomas Valenti, his late godfather and the late stepfather of John Doe #5.  CW-1 further is

_____

[3]    CW-1 pled guilty to racketeering conspiracy, including predicate acts of Hobbs Act robbery and illegal gambling, pursuant to a cooperation agreement in the Eastern District of New York. CW-1's prior crimes include insurance fraud. CW-1 is cooperating in the hope of obtaining leniency in sentencing and entry into the Witness Security program. CW-1's information has been corroborated by surveillances, as well as the testimony of other cooperating witnesses, consensual recordings, phone records and other materials.

[4]    Draft transcripts of the relevant portions of the recordings are attached hereto as Exhibit A.  All draft transcripts attached to this memorandum are subject to the Draft Transcripts Stipulation executed by the parties on August 1, 2014.  For those transcripts for which only portions of the corresponding recordings relate to the instant motion, the pertinent portions are highlighted in yellow.

expected to testify that, in late 2010, while he was cooperating with the government, the defendant suggested in a consensually recorded conversation with CW-1 that CW-1 and the defendant extort John Doe #5 for money from the proceeds of the sale of the Drew Street property.

A few days later, on October 21, 2010, CW-1 visited John Doe #5 at his place of business.  CW-1 was wearing a recording device, and a draft transcript of his conversation with John Doe #5 that day is attached hereto as part of Exhibit A.  In sum, CW-1 told John Doe #5 that he (John Doe #5) had made a commitment to CW-1 and the defendant and owed them $5,000 from the sale of the Drew Street property, and John Doe #5 denied making any such promise.  During this part of the conversation, John Doe #5 acknowledged, "[o]f course, I know who Vinny is." (10/21/2010 Transcript ("Tr.") at 9.)  CW-1 then said he "didn't want to have to bring up wise guys [LCN members] and what not," that he was "not here to be a wise guy with you, I'm here as a gentleman with you," and "I hope it's going to end that way."  (Id.)  Immediately thereafter, John Doe #5 said that, one or two years prior, the defendant had told him that the defendant had "nothin' to do with any of this stuff."  (Id.; see id. 9-10.)  CW-1 responded, "Vinny wanted this money.  He felt he had the money comin' to him," and then recounted favors the defendant and CW-1 had done for John Doe #5 in the past.  (Id. 10.)  CW-1 asked that the office door be shut, and after it was, put John Doe #5 on the phone with the defendant.  During that call, the defendant told John Doe #5 to give CW-1 $3,000 (as the defendant later recounted to CW-1 in a consensually recorded telephone conversation).  (See id. 12-16.)  While on the phone with the defendant, John Doe #5 asked him, "[s]o how are we going to resolve this?"  (Id. 15.)  After hearing the defendant's

4

response, John Doe #5 immediately said, "[r]ight I I understand. . . . Okay alright if I split it in half you're, you're okay with that?"  (Id. 15.)  At the end of the phone call with the defendant, John Doe #5 got off the phone and, immediately thereafter, agreed to make the payment to CW-1 by check.  While discussing this, CW-1 explained to John Doe #5 that he could rely on him, the defendant and his son Jerry Asaro, and stated that the three of them were "wise guys" and "don't take no bullshit, [John Doe #5], you know that," to which John Doe #5 responded, "I know that and that's why we're, that's why we're here and that's the way we try to resolve these things, right?"  (Id. 17.)  John Doe #5 then said "[r]ight now we gotta settle up" and he and CW-1 then proceeded to set a time and location the following day (7:30 a.m. at Starbuck's) for a meeting at which John Doe #5 would pay CW-1 the $3,000 by check.  (See id. 17-21.)

The next day, on October 22, 2010, John Doe #5 and CW-1 met in person as previously planned and John Doe #5 gave him a check for $3,000.  A draft transcript of this consensually recorded conversation is included in Exhibit A.  During the meeting, CW-1 acknowledged receipt of the check, John Doe #5 acknowledged giving it to him, and John Doe #5 asked CW-1 to confirm he spelled his name correctly on the check.  (10/22/2010 Tr. 33.)  CW-1 then told John Doe #5 that if he has any problems, "you know you got Vinny and me and Jerry," to which John Doe #5 replied, "I know.  I know. . . . All right, yeah, good." (Id. 33-34.)  Following this meeting, CW-1 brought the check to FBI special agents, who made a copy of it, and CW-1 then cashed the check and brought the $3,000 in cash to the defendant.  The defendant gave CW-1 $500 of that amount, and CW-1 provided that cash to the FBI.

5

Approximately one week later, the defendant discussed attempting to extort more money from John Doe #5.  CW-1 then helped arrange a meeting between John Doe #5 and the defendant in two consensually recorded telephone conversations with John Doe #5.  Draft transcripts of those conversations between CW-1 and John Doe #5, on October 27 and 29, 2010, respectively, are included in Exhibit A.  In the October 27, 2010 call, CW-1 told John Doe #5 that "Vinny's blowing his stack with me, uh, I don't know, he wants to talk to you," to which John Doe #5 replies, "[a]ll right."  (10/27/2010 Tr. 2.)  John Doe #5 told CW-1 that he expected to be able to meet that Friday at 11:00 a.m. at the same Starbuck's, but that CW-1 should call him that morning to confirm.  (Id. 3.)  On the October 29, 2010 call, John Doe #5 asked if the meeting was happening that morning at 11:00 a.m., and CW-1 confirmed that it was.  John Doe #5, apparently under the impression that CW-1 would also be attending the meeting, stated, "[o]kay.  I'll see you then."  (10/29/2010 Tr. 2.)

CW-1 and the defendant spoke again a few days later, at which time the defendant mentioned that John Doe #5 had agreed to give the defendant $2,500 in addition to the $3,000 the defendant already had received.  Shortly thereafter, CW-1 heard from the defendant that he had met with John Doe #5, who had given the defendant an additional $2,500.

II.     Wiretapped Statements of John Doe #3 and Partners in and Employees of His Autobody Business

As alleged in Count One, Racketeering Act Nine of the Indictment, the defendant agreed to extort, and extorted, John Doe #3, an owner of an autobody business, of

the proceeds of that business, on or about and between January 1, 1993 and February 15, 1995.  As part of its proof of this racketeering act, the government seeks to introduce at trial several excerpts of lawfully intercepted telephone calls[5] between, inter alia, John Doe #3 and partners in and employees of his autobody business.  As the government will prove with witness testimony at trial, John Doe #3 ran an autobody business in or about 1993 through 1995.  In that time period, the defendant approached John Doe #3 and, drawing on the defendant's status as an inducted member of LCN, pressured John Doe #3 into paying him "protection money" out of the autobody business's proceeds.  John Doe #3 paid the defendant multiple times, intermittently throughout the charged time period, with most payments amounting to a few hundred dollars, if not more.

As witness testimony will establish at trial, John Doe #3 had a domestic relationship with a woman who was also a business partner in his autobody business ("Vera").  Vera also was a friend of and associated with Ronnie "One Arm" Trucchio, an inducted member of the Gambino organized crime family of La Cosa Nostra (the "Gambino family").  John Doe #3 also received support and guidance in his autobody business from an individual named Lou ("Lou"), and had dealings pursuant to that business with his cousin Sonny ("Sonny").  As the government expects to elicit at trial, John Doe #3's autobody business involved the sale of stolen auto parts after the stolen vehicles were taken apart or "chopped."  In addition to the individuals mentioned above, John Doe #3 consulted with and

---

[5]     These telephone calls were intercepted pursuant to court authorized wiretaps of telephone numbers including two – namely, (516) 887-5978 and (516) 764-1717 – associated with John Doe #3 and his autobody business.  The wiretaps were ordered by New York State judges in Queens in 1994.

employed various other individuals at the business, including Vera's son-in-law Frank ("Frank"), and two male employees ("Frankie," and "Anthony," respectively).  John Doe #3 relied on Frankie and Anthony, inter alia, to pick up cars, deliver the auto parts and run errands.

The relevant statements from the lawfully intercepted telephone calls include: (1) John Doe #3's discussions with Vera at various times in 1994 about his meetings with the defendant, the defendant's demands for money from the autobody business, and John Doe #3's plans for responding to the defendant's demands and extricating himself from the defendant's extortion; (2) John Doe #3's conversations with Frank, Lou and Sonny on the same or related subjects; (3) John Doe #3's conversation with an individual at the defendant's restaurant – the "Great In-Pasta" located in Long Island – attempting to reach the defendant and leaving him messages; and (4) John Doe #3's conversations with Frankie and Anthony instructing them to deliver money to the defendant at his restaurant, and acquainting them with the defendant's relationship with the business and his ability to offer them protection.  In addition, in conversations on June 13, 1994, John Doe #3 discussed with the Vera and Frank, and later, with Frankie, the aftermath of a shooting and robbery of John Doe #3 by individuals including a man named "Darrin" who had ties to Trucchio.  In the June 13, 1994 conversation with Frankie, Frankie told John Doe #3 that he had just spoken with Darrin and that Darrin did not at that time seem threatening.  John Doe #3 replied that if Frankie ever needed protection, he should go straight to the defendant, his "boss," who did not "hesitate" and immediately would resolve whatever problem arose.  (6/13/1994 (Call

8

2588) Tr. 10.)  Draft transcripts of the relevant excerpts of the intercepted telephone calls are attached hereto as Exhibit B.[6]

III.    Statements of Anthony "Fat Andy" Ruggiano to CW-5

A cooperating witness ("CW-5")[7] is expected to testify that in approximately mid- to late 1980, his father, Anthony "Fat Andy" Ruggiano ("Ruggiano"), a powerful soldier in the Gambino family, told him in a series of conversations that he, Ruggiano, had helped the defendant and Burke "fence" jewelry stolen in the Lufthansa Heist through Ruggiano's gold store in Queens and had been compensated for doing so.

Ruggiano made the first of these statements to his son, who was then an associate in the Gambino family, in approximately the summer of 1980 while CW-5 was incarcerated; Ruggiano visited CW-5 in jail at that time, shortly before CW-5's September 1980 release from custody.  During that visit, Ruggiano said to CW-5 that the defendant had

_____

[6]    The government also intends to introduce at trial, as part of its proof of Count One, Racketeering Act Nine, lawfully intercepted conversations of the defendant speaking principally with John Doe #3 and Vera.  The defendant's statements in these conversations are admissible as statements of a party opponent pursuant to Federal Rule of Evidence 801(d)(2)(A).  The statements of the other participants in the conversations, including John Doe #3 and Vera, are admissible non-hearsay because they are necessary to contextualize the defendant's statements and shed light on the defendant's mental state during the conversations.  See, e.g., United States v. Dupre, 462 F.3d 131, 136-37 (2d Cir. 2006).

[7]    CW-5 was an associate of the Gambino family who pled guilty pursuant to a cooperation agreement in the Eastern District of New York to racketeering conspiracy, including predicate acts of murder and illegal gambling.  CW-5's information has been corroborated by, among other things, physical surveillances and the testimony of other witnesses. CW-5 cooperated in the hopes of obtaining leniency in sentencing and protection in the Witness Security program. At sentencing, the government moved, pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), to permit a downward departure and/or below-guidelines sentence based upon the substantial assistance provided by CW-5 to the government; CW-5 was subsequently sentenced to time served.

brought Ruggiano jewelry from Lufthansa.  At that time, CW-5 was aware of the Lufthansa

Heist, which had occurred more than a year earlier while he was serving the same prison

sentence, and understood Ruggiano to be referring to jewelry stolen from the Lufthansa

Airlines Terminal in that robbery.  When CW-5 inquired as to why the defendant had

brought such jewelry to Ruggiano specifically, Ruggiano stated that the defendant and James

Burke ("Burke") did not want everyone, i.e., their superiors in their respective crime

families, to know about the jewelry.  In the conversation that followed, Ruggiano indicated

that the defendant's and Burke's discretion stemmed from their unwillingness to disclose to

their superiors in LCN, and therefore have to share more than they would like, the high value

of the jewelry.

After CW-5's release from jail in September 1980, he began spending time at

Ruggiano's gold store in Queens.  Ruggiano's business involvement in the gold store had

begun in or about 1980, while CW-5 was in prison, and his partners in that business included

Tony Lee Guerreri ("Tony Lee"), also an inducted member of the Gambino family and a

close associate of Ruggiano, and Sal Reale, among others.  During CW-5's regular visits to

the gold store in or about the fall or winter of 1980, CW-5 had additional conversations with

Ruggiano about the Lufthansa jewelry.  Specifically, Ruggiano complained to CW-5 about

the way the proceeds of that jewelry had been divided.  Ruggiano told CW-5 that he had

received $125,000 of those proceeds.  CW-5 also understood from Ruggiano's statements

that the defendant, Burke, Tony Lee, Sal Reale and other partners in the gold store also had

received shares of the proceeds.  Ruggiano expressed to CW-5 that he wished he and Tony

Lee had kept for themselves the entire share apportioned to the gold store owners, rather

than, as Tony Lee had suggested, further dividing it among Reale and the other partners. During one such conversation, CW-5 asked Ruggiano whether he had kept any of the jewelry itself, and Ruggiano replied that he had not but that Reale had kept one necklace and had given it to his girlfriend.  Ruggiano conveyed to CW-5 his frustration that Reale had done this, for which Reale had received permission from Tony Lee.  CW-5 understood that Ruggiano was annoyed about this because he thought it was not smart for any of them to keep items stolen in the Lufthansa Heist.

IV.   Statements of Individual-3 and Others Affiliated with the Bonanno Family Regarding the Defendant's Extortion of Individual-3

The government also will offer at trial, through cooperating witness testimony, statements of Individual-3 and other members or associates of the Bonanno family relating to the defendant's extortion of Individual-3 in the early 1980s.  The facts of this extortion are described more fully in the government's memorandum of law in support of its motion in limine to admit certain evidence at trial, dated May 27, 2015, ECF Docket Entry No. 234 ("Gov't Mem."), at 35-37.  The relevant statements, however, may be summarized as follows.

Individual-3, a Bonanno family associate who was assigned to the defendant, approached Sal Vitale in the early 1980s and asked Vitale if he could speak with him.  At that time, Vitale was an associate of the Bonanno family assigned to Bonanno family captain Joseph Massino, and the defendant was an inducted member in Massino's crew.  Individual-3, who appeared distressed, told Vitale that he believed Vitale was the only person who could help him, and that the defendant was threatening him and "shaking him down" or

11

extorting him.  Vitale thereafter spoke to Massino, then a fugitive, about Individual-3's problem with the defendant.  Massino told Vitale to communicate to the defendant that the defendant should leave Individual-3 alone until Massino came home, and once Massino returned, Individual-3 would be reassigned to Massino.

After Vitale first broached the subject with the defendant and the defendant reacted angrily, Vitale discussed the issue with Phil Rastelli, then the boss of the Bonanno family.  Rastelli advised Vitale to go back to the defendant and tell him to leave it alone until Massino came home.  Rastelli indicated to Vitale that Vitale would soon become an inducted member of the Bonanno family and recommended that Vitale smooth things over with the defendant, himself a member of the family.

ARGUMENT

As explained in detail below, all of the foregoing statements are relevant and admissible under the Federal Rules of Evidence, either pursuant to the hearsay exclusions or exceptions set forth in Federal Rules of Evidence 801(d)(2)(E), 803(3) and 804(b)(3) or as non-hearsay, and do not implicate the Confrontation Clause of the Sixth Amendment. Accordingly, the Court should admit these statements at trial.

I.      Applicable Law

A.      Coconspirator Statements

For out-of-court statements to be admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence, the Court must make two findings by a preponderance of the evidence: "'first, that a conspiracy existed that included the defendant and the declarant; and

second, that the statement was made during the course of and in furtherance of that conspiracy.'" United States v. Desena, 260 F.3d 150, 157-58 (2d Cir. 2001) (quoting United States v. Gigante, 166 F.3d 75, 82 (2d Cir 1999)).

### 1.    The Conspiracy Requirement

With respect to the first requirement, "[i]n determining whether a conspiracy existed, the district court may consider the hearsay statement itself, but there must be some independent corroborating evidence of the defendant's participation in the conspiracy." Desena, 260 F.3d at 158 (internal citations and quotation marks omitted).  It is sufficient if the government proves by a preponderance of the evidence that "the defendant and the declarant were involved together in a conspiracy to maintain an organized crime syndicate," such as an organized crime family or crew.  See United States v. Russo, 302 F.3d 37, 46 (2d Cir. 2002) (affirming admission of coconspirator statements made in furtherance of a "conspiracy to maintain" the Colombo organized crime family).  "[T]here is no requirement that the person to whom the statement is made also be a member" of the conspiracy; only that "both the declarant and the party against whom the statement is offered be members." In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 139 (2d Cir. 2008) (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1191 (2d Cir.1989)).  In addition, the conspiracy that serves as the basis for admission of coconspirator statements need not be a conspiracy alleged in the indictment.  Russo, 302 F.3d at 45 (citations omitted).

As the Second Circuit explained in United States v. Orena, 32 F.3d 704, 713 (2d Cir. 1994), a conspiracy under Rule 801(d)(2)(E) "need not be identical to the conspiracy charged in the indictment."  In addition, the objective of the conspiracy need not even be

illegal.  See Russo, 302 F.3d at 45 ("[T]he objective of the joint venture that justifies

deeming the speaker as the agent of the defendant need not be criminal at all.").

2. The "In Furtherance" Requirement

"As to the second requirement, statements made during the course and in

furtherance of a conspiracy must be such as to prompt the listener . . . to respond in a way

that promotes or facilitates the carrying out of a criminal activity."  Gigante, 166 F.3d at 82

(quoting United States v. Maldonado–Rivera, 922 F.2d 934, 958 (2d Cir. 1990)).  "This can

include those statements that provide reassurance, or seek to induce a coconspirator's

assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or

status of the conspiracy."  Gigante, 166 F.3d at 82.  For example, statements that "inform . . .

[coconspirators] of the status of the conspiracy are in furtherance of the conspiracy within the

meaning of 801(d)(2)(E)."  Russo, 302 F.3d at 46 (2d Cir. 2002).  This is because criminal

organizations such as organized crime syndicates "cannot function properly unless its

members and persons who do business with it understand its membership, leadership and

structure," and "[t]he operation of such a syndicate requires that information be passed

among interested persons, advising them of the membership and the hierarchy."  Id.

Even "statements relating past events meet the in-furtherance test if they serve some current

purpose in the conspiracy, such as to promote cohesiveness . . . or to provide reassurance to a

coconspirator."  United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994) (internal quotations

and citations omitted).  "This can include those statements that provide reassurance, or seek

to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform

each other as to the progress or status of the conspiracy."  Gigante, 166 F.3d at 82; see also

<u>United States v. Diaz</u>, 176 F.3d 52, 85 (2d Cir. 1999) (coconspirator's statements concerning murder he had participated in with the defendant, made to fellow gang member not involved in the murder, were in furtherance of the gang's racketeering conspiracy, and were therefore admissible).

      B.    <u>Statements Against Penal Interest</u>

      Rule 804(b)(3) of the Federal Rules of Evidence provides that, if a declarant is unavailable, his statement against his penal interest is admissible.  Specifically, the rule provides that the statement must be one that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Ev. Rule 804(b)(3).

      Admission of such a statement "hinges on whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."  <u>United States v. Williams</u>, 506 F.3d 151, 155 (2d Cir. 2007) (quoting <u>Williamson v. United States</u>, 512 U.S. 594, 603-04 (1994) (quoting Rule 804(b)(3))) (quotation marks omitted).  "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context" and "[t]hus, this determination must be made on a case-by-case basis."  <u>Id.</u> (citations omitted).  A statement against penal interest is not considered "testimonial" for

15

Confrontation Clause purposes.  United States v. Saget, 377 F.3d 223, 224-25 (2d Cir. 2004)

(distinguishing Crawford v. Washington, 541 U.S. 36 (2004)).

      C.      Statements of Then-Existing State of Mind or Intent

      Federal Rule of Evidence 803(3) provides that the following type of statement

does not constitute hearsay, regardless of the out-of-court declarant's availability:

> [a] statement of the declarant's then-existing state of mind (such
> as motive, intent, or plan) or emotional, sensory, or physical
> condition (such as mental feeling, pain, or bodily health) . . . .

Fed. R. Evid. 803(3).

      Rule 803(3) also permits the admission of out-of-court statements "reflecting a

declarant's intentions or future plans" and allows such statements to be introduced, where

relevant, "to prove subsequent acts."  United States v. Cicale, 691 F.2d 95, 103 (2d Cir.

1982); see also Fed. R. Evid. 803(3) (excluded from definition of hearsay are statements "of

the declarant's then-existing state of mind (such as motive, intent, or plan)" or of his

emotional condition).  Under Rule 803(3), "if relevant, a declarant's statement of his intent

may be introduced to prove that the declarant thereafter acted in accordance with the stated

intent."  United States v. Persico, 645 F.3d 85, 100 (2d Cir. 2011) (internal quotation marks

and alterations omitted); see also Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 299-300

(1892.  "A declarant's statement of intent may . . . be admitted against a non-declarant when

there is independent evidence which connects the declarant's statement with the non-

declarant's activities."  United States v. Delvecchio, 816 F.2d 859, 863 (2d Cir.1987); see

also Persico, 645 F.3d at 100-01; United States v. Best, 219 F.3d 192, 198 (2d Cir. 2000)

(collecting cases upholding the admission of statements of intent regarding future illegal

transactions, where corroborated by circumstantial evidence, as evidence of the defendant's participation in such transactions); <u>United States v. Sperling</u>, 726 F.2d 69, 73-74 (2d Cir. 1984); <u>Cicale</u>, 691 F.2d at 103-04.

Pursuant to Rule 803, for this hearsay exclusion to apply, the declarant need not be unavailable to testify.  Fed. R. Evid. 803.

D.     <u>Statements Offered for Non-Hearsay Purposes</u>

An out-of-court statement offered other than for its truth is not hearsay and "has no special evidentiary hurdle to overcome."  <u>United States v. Costello</u>, 352 F.2d 848, 854 (2d Cir. 1965); <u>see also</u> Fed. R. Evid. 801(c)(2).  While Rule 803(3) may be "invoked when the statement is offered for the truth of the matter asserted," statements of the declarant's state of mind or future intent may also be offered for the non-hearsay purpose of "indicat[ing] circumstantially the state of mind . . . of the declarant."  <u>Smith v. Duncan</u>, 411 F.3d 340, 347 n.4 (2d Cir. 2005) (quotations omitted); <u>see also</u> <u>United States v. Detrich</u>, 865 F.2d 17, 21 (2d Cir. 1988).   In other words, the Second Circuit has deemed out-of-court statements admissible non-hearsay when offered to demonstrate, for example, merely that such statements were made or that someone who heard those statements believed them to be true.  <u>See, e.g.</u>, <u>United States v. Kohan</u>, 806 F.2d 18, 21-22 (2d Cir. 1986) (in bank fraud case, holding that trial court improperly excluded witness's testimony about statements of an acquaintance to the defendant regarding the nature of checks the acquaintance was giving the defendant, because such statements properly could have been offered not for their truth but for the fact that they were made to the defendant and to establish his belief that the checks were legitimate).

Indeed, "[i]t is well established . . . that statements offered for their effect on the listener are non-hearsay." Smith v. City of New York, 388 F. Supp. 2d 179, 182 n.2 (S.D.N.Y. 2005) (citing United States v. Garcia, 900 F.2d 571, 576 (2d Cir. 1990)); see also United States v. Certified Envtl. Servs., Inc., 753 F.3d 72, 89 (2d Cir. 2014) (holding that the statements were not hearsay since they were offered, not for their truth, but for their effect on defendants' state of mind, which was very much in dispute," and observing that "[a]n out-of-court statement offered for some other purpose, such as to show that a statement was made, to demonstrate the statement's effect on the listener, or to show the circumstances under which subsequent events occurred, is not hearsay" (citations omitted)); United States v. Song, 436 F.3d 137, 139 (2d Cir. 2006) ("[W]e agree that much or all of the excluded testimony was not in fact hearsay, inasmuch as the challenged statements were offered not for the truth of the matters asserted, but rather, to demonstrate the motivation behind Song's actions . . . ."); Slue v. N.Y. Univ. Med. Ctr., 409 F. Supp. 2d 349, 366 (S.D.N.Y. 2006) (statements were not offered to prove the truth of the matter asserted "but rather for the fact that they were made and conveyed a defamatory implication to the listeners"). In extortion cases specifically, the Second Circuit has upheld the admission of a declarant's statements to an extortion victim that the defendant wanted "money to keep the peace" as non-hearsay evidence of the victim's state of mind, because the proffered statement "help[ed] explain why [the victim] provided the money—namely, out of fear, rather than because [the defendant] was legally entitled to the money." United States v. Scala, 266 Fed. App'x 41, 43 (2d Cir. 2008).

18

For similar reasons, courts have admitted back-and-forth exchanges between a defendant and a third party who is not a witness at trial.  While the defendant's out-of-court statements may be introduced by the government to prove the truth of the facts stated therein, see Fed. R. Evid. 801(d)(2)(A), the third party's statements made in response to the defendant are admissible non-hearsay to the extent that they are necessary to contextualize the defendant's statements and shed light on the defendant's mental state.  See United States v. Dupre, 462 F.3d 131, 136-37 (2d Cir. 2006) (upholding the admission of email messages sent by third parties to provide context for email messages sent by the defendants in response); United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990) (holding that a tape-recorded conversation between the defendant and a government informant, who did not testify at trial, was admissible "to establish a context for the recorded statements of the accused" and did not violate the Confrontation Clause); Garcia, 900 F.2d at 576 (holding that a co-defendant's statement that the defendant sold "good crack" was not hearsay because it "was offered not to prove the truth of the matter asserted, but to help the jury understand the context of the transaction"); see also United States v. Davis, 890 F.2d 1373, 1380 (7th Cir. 1989) (collecting cases from different circuits that "have embraced the evidentiary rule that the entirety of tape recorded conversations between a defendant and a third party informant are admissible where the defendant's statements are offered as verbal acts or admissions and the third party's statements are necessary to place the defendant's statements in a proper context").

II.     Analysis

    A.     The Consensually Recorded Statements of CW-1 and John Doe #5

All of the statements of John Doe #5 relating to the defendant's and CW-1's demand of money from John Doe #5 from the proceeds of his sale of the Drew Street property are admissible either as statements of John Doe #5's then-existing state of mind or his intent, plan or motive under Rule 803(3), or as non-hearsay offered not for their truth but as evidence of John Doe #5's state of mind.[8]  The statements on the October 21, 2010 recording demonstrate, at the outset of John Doe #5's conversation with CW-1, his insistence that he neither promised in the past nor currently owes CW-1 or the defendant any money from the sale of the property.  Those statements thus demonstrate his state of mind at the beginning of the conversation: opposition to paying CW-1 any such money.  However, his statements following CW-1's first mention of involving the defendant in the matter, which reveal his nervousness, as well as his statements at the time of and directly after speaking to the defendant on the phone, which evince his sudden willingness to resolve the matter and pay CW-1 and the defendant $3,000, reflect the effect of the defendant's intervention and John Doe #5's instant change of heart with respect to paying CW-1 and the defendant in connection with the sale of the property .  See, e.g., United States v. Quinones, 511 F.3d 289,

---

[8]     As the Second Circuit held in United States v. Quinones, "the mere utterance of a statement, without regard to its truth, may circumstantially evidence the state of mind of the declarant" and may be admitted as non-hearsay.  511 F.3d 289, 312 (2d Cir. 2007) (internal quotation marks and citation omitted).  In Quinones, the court upheld the admission of a declarant's statements indicating his fearful mental state with respect to the defendant's likely knowing the declarant was an informant not for their truth but as circumstantial evidence of the declarant's state of mind.  Id.  However, the court noted that the Second Circuit has observed, "'[w]hen a declaration is admitted only to prove a relevant state of mind, it does not appear to matter . . . whether admissibility is predicated on the declaration not being hearsay . . . or under the [Rule 803(3)] hearsay exception for declaration of states of mind . . . [because u]nder either theory, a state of mind can be proved circumstantially by statements which are not intended to assert the truth of the fact being proved.'"  Id. (quoting United States v. Southland Corp., 760 F.2d , 1376 (2d Cir. )).

311-12 (2d Cir. 2007) (district court properly admitted declarant's statement about defendant's knowledge that declarant was an informant "because it established [informant's] then-fearful state of mind, which explained [his] future actions and, in turn, those of the defendants").  Finally, John Doe #5's statements to the defendant at the end of their phone call and to CW-1 thereafter are admissible pursuant to Rule 803(3) because they express his intent to pay CW-1 $3,000 by check the following day, as he had promised the defendant on the call.  Indeed, these statements are corroborated by other evidence including consensual recordings following October 21, 2010, law enforcement testimony relating to surveillance conducted of the meetings that followed between John Doe #5, CW-1 and/or the defendant, and a photocopy of the physical check for $3,000 that John Doe #5 gave to CW-1 on October 22, 2010.

Given that Racketeering Act Thirteen alleges the defendant's participation in the extortion of John Doe #5, the state of mind of John Doe #5 – as being influenced by the defendant's extortionate conduct, including the pressure he exerted on John Doe #5 himself and through CW-1, and the intimidating effect of their reputation as being powerful and dangerous "wise guys" in the Bonanno family – John Doe #5's state of mind is not only relevant but also indispensable to the government's proof of that racketeering act, and there is every indication that John Doe #5's state of mind with respect to the defendant's alleged conduct in October and November 2010 remains in dispute.[9]

_____

[9]      The defendant's statements relating to the money John Doe #5 was to pay him and CW-1 that can be heard on the October 21, 2010 consensual recording are of course admissible for their truth pursuant to Federal Rule of Evidence 801(d)(2)(A).  CW-1's and John Doe #5's statements directly before and after these statements by the defendant are

The government seeks to offer CW-1's statements to John Doe #5 on the October 21, 2010 recording for the same purpose – to demonstrate what was in John Doe #5's mind over the course of the October 21, 2010 meeting with CW-1 and the contemporaneous telephone conversation with the defendant.  CW-1's statements on that recording accordingly will not be offered for the truth of the matters they assert – including, for example, that John Doe #5 previously promised CW-1 and the defendant money from the sale of the Drew Street property and that CW-1 and the defendant are affiliated with LCN – but rather for their effect on the listener: John Doe #5.  As such, these statements of CW-1 do not qualify as hearsay and are relevant and admissible.

John Doe #5's statements on the October 22, 2010 recording are admissible for the same reason: they reflect his docility after his conversation with the defendant and his eagerness to placate both him and CW-1 by providing CW-1 with the check he had promised him.  The intent of John Doe #5 as conveyed in these recordings is corroborated by other evidence the government will offer at trial, including a consensual recording between the defendant and CW-1 following the October 22, 2010 meeting at which the defendant acknowledged receiving the cash from John Doe #5's check, a photocopy of the check CW-1 obtained from John Doe #5 and provided to special agents of the FBI prior to cashing it and meeting with the defendant that day, and surveillance evidence proving the occurrence of the foregoing meetings.

---

admissible for the independent reason that they give context for and are inextricably linked to the defendant's admissions on that recording.  In addition, during the proffered conversations between John Doe #5 and CW-1 alone, CW-1's statements are admissible to provide necessary context for John Doe #5's statements.  United States v. Dupre, 462 F.3d 131, 136-37 (2d Cir. 2006).

John Doe #5's statements to CW-1 after giving him the check about the circumstances of the sale of the Drew Street property and the financial loss John Doe #5 sustained as a result of his disposition of the property, are admissible pursuant to Rule 803(3) as statements of his motive for paying CW-1 and the defendant the $3,000 he just gave to CW-1 and as indicative of his then-existing emotional condition.  John Doe #5's statements regarding the financial strain he experienced as a result of selling the property and being required to divide up the proceeds among multiple demanding recipients, (see 10/22/2010 Tr. 34-35; id. at 35 ("It cost me twenty thousand dollars out of my own pocket.  Ya know, it sucks.")), prove that his motive for paying the $3,000 to CW-1 was not magnanimity, but rather, the pressure and LCN-backed influence the defendant and CW-1 wielded over him, and also indicate his exasperated emotional condition.

Finally, John Doe #5's statements on the October 27 and 29, 2010 consensually recorded telephone calls are admissible as statements of his then-existing state of mind and intent to attend future meetings regarding the money John Doe #5 gave to CW-1.  His statements relating to scheduling and his statement that he would attend the "Friday" meeting at Starbuck's at 11:00 a.m., reflect their intent for the defendant and John Doe #5 to meet at that date, time and location.  These statements are admissible to show the defendant's and John Doe #5's action in conformity with them, insofar as they indeed met in person following those calls in late October, as will be corroborated by surveillance evidence and the defendant's own consensually recorded statements to CW-1 in a late October 2010 telephone call and a November 4, 2010 meeting.  CW-1's statements in the October 27 recording about how the defendant was "blowing his stack with me, uh, I don't know, he

wants to talk to you [John Doe #5]," and that the defendant was "going nuts with [CW-1]" and wondering why CW-1 "[did] that" with the $3,000, (10/27/2010 Tr. 2), likewise are admissible not for the truth of the matters they assert, but, for their effect on John Doe #5. They suggested to John Doe #5 in that moment that the defendant, whom John Doe #5 knew was a powerful inducted member of LCN, had become animated over what transpired between CW-1 and John Doe #5, had unfinished business with and wanted to talk to John Doe #5 in connection with that matter, and that, accordingly, it was incumbent upon John Doe #5 to meet with the defendant.  These statements of CW-1 therefore are relevant to Racketeering Act Thirteen and are admissible as non-hearsay.[10]

Accordingly, all of the proffered statements relating to Racketeering Act Thirteen should be admitted.

B.   The Wiretapped Statements of John Doe #3 and His Partners and Employees in His Autobody Business

All of the proffered statements of John Doe #3 in his conversations with Vera, Frank, Lou, Sonny, Anthony and Frankie, and the others' statements in those conversations, are admissible as coconspirator statements pursuant to Rule 801(d)(2)(E).  All of these

---

[10]   After the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), holding that the Confrontation Clause of the Sixth Amendment prohibits the admission of out-of-court "testimonial" statements against a criminal defendant, the Second Circuit confirmed that a "declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of Crawford" and are admissible "so long as the statements fall within a firmly rooted hearsay exception or contain particularized guarantees of trustworthiness."  United States v. Saget, 377 F.3d 223, 227 (2d Cir. 2004).  Statements of then-existing state of mind or intent under Federal Rule of Evidence 803(3) fall within a "firmly rooted hearsay exception," and accordingly, John Doe #5's statements recited herein are admissible and do not implicate the Confrontation Clause.

individuals were coconspirators in John Doe #3's autobody/"chop shop" business and sought, in their conversations, to maintain the daily activities of that business and ensure that it continued to survive and turn a profit. The defendant was also a member of this conspiracy because he wished for the business to succeed and profit so that he – the LCN member who had "claimed" the business and John Doe #3 – could earn more illegal proceeds and thereby line his and the Bonanno family's pockets with the business's proceeds. Further, this conspiracy lasted through the end of 1994 and therefore all of the proffered statements were made during the conspiracy.

John Doe #3's discussions with Vera, Frank, Lou and Sonny regarding the defendant and his demands for regular payments from the business's earnings likewise were in furtherance of the conspiracy because the defendant had imposed himself on the business for the foreseeable future, and the defendant's parasitic relationship with the business had to be borne and managed by John Doe #3, Vera and their coconspirators. John Doe #3 and his coconspirators were, in the proffered conversations, keeping one another apprised of the status of the conspiracy and seeking each other's support and reassurance in maintaining it. The statements of John Doe #3 and his coconspirators regarding the protection the defendant afforded the business likewise were in furtherance of the conspiracy given that the defendant's status in LCN and association with the business – while a burden on the business's finances – lent the business and its owners and employees protection from others in the neighborhood including LCN associates and members from other crime families.

In addition to being coconspirator statements, John Doe #3's statements to Vera, Frank, Lou and Sonny regarding his plan to pay or discontinue paying the defendant,

25

and his and their strategies for dealing with the defendant in the future, likewise are admissible as statements of then-existing state of mind and intent under Rule 803(3). The same is true of Anthony's statements to John Doe #3 regarding his intent to travel to the Great In-Pasta and make a delivery (of cash) on John Doe #3's behalf. The government will offer corroboration that the declarants of the foregoing statements acted in accordance with their stated intent, and that the defendant received visits from John Doe #3, Vera and Anthony at the Great In-Pasta as forecasted by the proffered statements, in the form of surveillance evidence and witness testimony.

Finally, the statements of John Doe #3 during his conversations with the defendant's employees at the Great In-Pasta are admissible as non-hearsay because they are not being offered for the truth of the matters they assert, but rather, purely to demonstrate that they were made and in fact John Doe #3 remained obligated to and in contact with the defendant for the better part of 1994. The fact that John Doe #3 made such phone calls is relevant evidence of the extortion charged in Racketeering Act Nine because it shows the pressure John Doe #3 felt, as a result of the defendant's words, actions and status in LCN, to be in regular contact with the defendant and appease him by demonstrating that he intended to continue paying him the protection money the defendant expected from him. See Scala, 266 Fed. App'x at 43. This basis of admissibility also applies to the statements of John Doe #3 and Anthony in their conversation leading up to Anthony's visit to the Great In-Pasta; in addition to falling within the hearsay exclusions and exceptions referenced above, such statements are admissible for the non-hearsay purpose of proving that they were made, in the

26

sense that John Doe #3 asked his employee Anthony to stop at the defendant's restaurant on John Doe #3's behalf.

For these reasons, all of the proffered statements relating to Racketeering Act Nine should be admitted.

C.   <u>The Statements of Anthony "Fat Andy" Ruggiano to CW-5</u>

The statements of Ruggiano to his son, CW-5, regarding Ruggiano's fencing of jewelry stolen in the Lufthansa Heist at the behest of the defendant and Jimmy Burke are admissible as coconspirator statements pursuant to Rule 801(d)(2)(E).  The first requirement of this hearsay exclusion – that a conspiracy existed that included the defendant and Ruggiano – is satisfied because of the existence of the conspiracy to dispose of, launder and profit from selling the stolen jewelry.

The second requirement of Rule 801(d)(2)(E)'s hearsay exclusion likewise is satisfied because Ruggiano's statements to CW-5, who was an associate of the Gambino family and not cooperating with law enforcement at the time, were made during and in furtherance of the foregoing conspiracy, which cooperating witness testimony is expected to establish was ongoing in 1980.  Indeed, it was important for CW-5, an associate in a crime family of which his father was an inducted member, to understand the arrangements that his father had made with their criminal partners with regard to payouts from the Lufthansa Heist jewelry and further, the identities of those in LCN who were aware of the payouts and the amounts of the payouts.

The statements of Ruggiano to CW-5 are also admissible as statements against Ruggiano's penal interest pursuant to Rule 804(b)(3).  In this case, the requirements of unavailability, reliability and corroborating circumstances are satisfied.  First, Ruggiano is unavailable as a witness because he is deceased.  Second, the statements are sufficiently reliable because they are so contrary to Ruggiano's and the defendant's penal interest – when Ruggiano made them, they exposed him, at a minimum, to prosecution for obstruction of justice, possession, receipt and transportation of stolen property and possibly also money laundering for assisting the defendant and Burke in disposing of and laundering jewelry stolen in the infamous Lufthansa Heist.  As the Supreme Court has explained, "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true."  <u>Williamson</u>, 512 U.S. at 604.  A statement is generally considered against penal interest if "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." <u>Saget</u>, 377 F.3d at 231.  Whether a statement is sufficiently self-inculpatory can only be answered by viewing the statement in context and on a case-by-case basis.  <u>Williamson</u>, 512 U.S. at 604.  The rule does not require that the declarant be aware that the incriminating statement could subject him to immediate criminal prosecution, only that it tended to subject him to criminal liability. <u>United States v. Lang</u>, 589 F.2d 92, 97 (2d Cir. 1978).  In this case, Ruggiano's foregoing admissions to CW-5 are surely self-inculpatory, and are thus reliable.

Third, corroborating circumstances indicate the trustworthiness of Ruggiano's statements.  In analyzing the trustworthiness of a statement that inculpates a defendant as

28

well as the declarant, the Second Circuit has found a statement to be adequately reliable "if (a) the statement was made to a person whom the declarant believes is an ally, not a law enforcement official, and (b) the circumstances surrounding the portion of the statement that inculpates the defendant provide no reason to suspect that that portion is any less reliable than the part that directly incriminates the declarant." United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995); see also United States v. Gupta, 747 F.3d 111, 127 (2d Cir. 2014) (same); United States v. Matthews, 20 F.3d 538, 545 (2d Cir. 1994) (trustworthiness indicated by fact that statements were made to declarant's girlfriend, "an intimate confidante, in the private recesses of their home," and because "[t]here were no coercive pressures, and there was no attempt to curry favor with authorities"); United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987) (trustworthiness indicated in part by the fact that the portion of the statement that inculpated the defendant was against the declarant's penal interest); United States v. Katsougrakis, 715 F.2d 769, 775 (2d Cir. 1983) (trustworthiness indicated by lack of any "persuasive showing that [the declarant] had an ulterior motive when conversing with his friend"). In this case, Ruggiano was speaking to a trusted confidante – his son. The trust he placed in him surpassed that of a normal bond between father and son – it also encompassed the closeness between criminal confederates – specifically, in the LCN context, a made member and associate of the Gambino family. Ruggiano faced no coercive pressure from his son and, if anything, sought him out by visiting him in prison regularly to discuss LCN and his own criminal matters. In addition, Ruggiano's statements implicated himself in laundering the Lufthansa jewelry, as well as implicating the defendant, and he did not attempt to suggest that he was not involved in such criminal activity.

29

The statements are therefore admissible against the defendant as coconspirator statements and statements against Ruggiano's penal interest and should be admitted in their entirety.

D.  Statements of Individual-3 and Other Bonanno Family Members Relating to the Extortion of Individual-3

The proffered statements[11] relating to the defendant's extortion of Individual-3 are admissible both as coconspirator statements pursuant to Rule 801(d)(2)(E) and as non-hearsay for their effect on the respective listeners.  Cooperating witness testimony elicited at trial will establish that Individual-3 was a Bonanno family associate assigned to the defendant who participated in lucrative criminal activities of the crime family including loansharking.  Cooperating witness testimony further will establish that, in requesting the help of Vitale, a prominent Bonanno family associate close to Massino – rather than that of law enforcement – Individual-3 opted to resolve his problem within the framework of the Bonanno family.  In so doing, he furthered the criminal purposes of the Bonanno family rather than ending his association with that enterprise – and thus was a participant in the broad conspiracy of furthering the goals of the Bonanno family, in which the defendant also took part.  That is, at the time of Individual-3's statements, Individual-3, Vitale and the defendant were all participants in a Bonanno family racketeering conspiracy, insofar as Individual-3 wished to maintain the protection the crime family offered him, and the Bonanno family's members and associates wished to maintain their claim to the proceeds of

---

[11]     None of these statements implicates the Confrontation Clause because the listeners were not cooperating with law enforcement and the declarants did not believe them to be, and furthermore, the listeners were trusted by the declarants as associates and members of the same criminal enterprise with which the declarants were affiliated.

Individual-3's autobody business.  Individual-3's statements to Vitale – in which he sought to resolve his problem with the defendant without disassociating himself from the broader Bonanno family – furthered both his, the defendant's and the remainder of the Bonanno family's goals, and accordingly, were made during and in furtherance of the Bonanno family racketeering conspiracy.

    The same can be said of the statements of Vitale, Massino and Rastelli relating to Individual-3's problem with the defendant.  These statements, all of which were motivated by a desire to preserve Individual-3's profitable relationship with the Bonanno family and end problematic strife within the family, furthered the goals of the racketeering conspiracy of which they and the defendant were members.   This is all the more true given that the defendant reported to Massino at the time.  The statements of Rastelli, too, "provide[d] reassurance" to Vitale, were meant to "induce [his] assistance," and "serve[d] to foster trust and cohesiveness" within the conspiracy, especially because Rastelli anticipated Vitale's upcoming induction into the Bonanno family and wished to repair Vitale's relationship with the defendant.  Gigante, 166 F.3d at 82.  Accordingly, all of these statements should be admitted pursuant to Rule 801(d)(2)(E).

    For the foregoing reasons, the proffered statements relating to the defendant's extortion of Individual-3 should be admitted.

31

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that the

Court grant the instant motion <u>in</u> <u>limine</u> in its entirety and rule that the statements described

herein are admissible.

Dated:      Brooklyn, New York
            September 11, 2015

                                        Respectfully submitted,

                                        KELLY T. CURRIE
                                        Acting United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                          By:      /s/_____
                                   Nicole M. Argentieri
                                   Alicyn L. Cooley
                                   Lindsay K. Gerdes
                                   Assistant United States Attorneys
                                   (718) 254-6232/6389/6155