UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
:
UNITED STATES,                                                    :   14-CR-26 (ARR)
                                                                  :
    -against-                                                    :   <u>NOT FOR ELECTRONIC</u>
                                                                  :   <u>OR PRINT PUBLICATION</u>
Vincent ASARO,                                                    :
        Defendant.                                                :   <u>OPINION & ORDER</u>
                                                                  :
----------------------------------------------------------------- X

ROSS, United States District Judge:

    Both parties have made in limine motions seeking the admission or exclusion of certain evidence at the trial of the case. Specifically, the government has moved to admit: **(1)** CW-1's covert recordings of conversations with JD-5; **(2)** wiretap recordings of a phone at JD-5's autobody shop; **(3)** statements I-3 made to CW-2 and CW-3, and their ensuing discussion with Phil Rastelli; and **(4)** statements "Fat Andy" Ruggiano made to his son, CW-5.

    The government has also moved to preclude **(5)** cross-examination of cooperating witnesses regarding their sentences and acts of domestic violence.

    Defendant has moved to preclude **(6)** evidence of multiple murders of Lufthansa heist team members, and to admit **(7)** a NYPD file relating to the disappearance of Paul Katz.

    The parties' familiarity with the full record of these motions is presumed. For the reasons discussed below, these motions are granted in part and denied in part.

## DISCUSSION

**1. CW-1's recordings of JD-5 and defendant regarding Drew St. property**

    The government has moved to admit CW-1's covert recordings of his conversations with his godfather's stepson, JD-5, in which CW-1, acting on defendant's orders, pressures JD-5 for a

1

portion of the proceeds from the recent sale of CW-1's godfather's house. The government seeks to admit conversations on October 21, 2010 under the state of mind to the exception hearsay rule. Fed. R. Evid. 803(3). Specifically, the government argues that during the recorded conversation, JD-5 undergoes a marked shift in state-of-mind: at first, he defiantly refuses to pay, but after a telephone conversation with defendant, JD-5 agrees to write a check the next day. The defendant's words to JD-5 are not clearly audible.

The parties debate whether the recording does in fact demonstrate a shift in JD-5's state of mind, but ultimately, that is a question for the jury. JD-5 expresses his attitude in various ways throughout the phone call, and each of these statements demonstrate his state of mind, which is subject to assessment by the jury. The question for the court is whether the impermissible hearsay use of the recordings overwhelms the use of the statements to demonstrate state of mind. There is a particular danger of unfair prejudice because the government's argument impermissibly implies that the defendant's phone call <u>caused</u> JD-5's change of heart, presumably by communicating some extortionate threat.

Were the October 21 conversation between CW-1 and JD-5 the only evidence that defendant extorted JD-5, the recording would plainly be inadmissible, because the high risk of unfair prejudice from the jury's inability to hear what defendant actually said to JD-5, which would inevitably be the subject of jury speculation, substantially outweighs the dubious state-of-mind value of JD-5's statements. Such prejudice is ameliorated, however, because the government will undoubtedly introduce a recording of a conversation between CW-1 and the defendant held immediately after the JD-5 recording. In this follow-up recording, in which statements made by defendant constitute party admissions, defendant tells CW-1 precisely what he said to JD-5 during the call to convince him to pay. This evidence mitigates the risk of

2

prejudice from jury speculation as to the inaudible comments on the initial recording.

CW-1's words on both the initial and follow-up October 21 recordings are necessary to provide context for the statements of JD-5 and defendant, and are therefore admissible merely for the fact that they were said, not for their truth. U.S. v. Dupre, 462 F.3d 131, 136-37 (2d Cir. 2006).

Thus, the initial October 21 recording is admissible, on the understanding that it will be accompanied by the later recording of defendant's admissions. If requested by the defense, I will give a limiting instruction, and counsel is directed to submit a proposed one.

Next, the government seeks to admit several recordings for the purpose of establishing state of mind or intent. First, the government seeks to introduce an October 22 recording in which JD-5 gives CW-1 a check and the two men discuss their families and JD-5's sale of the Drew Street house. JD-5's comments about losing money on that sale are admissible not for their truth, but only for the non-hearsay purpose of expressing JD-5's state of mind regarding the payment to CW-1 and defendant. Second, JD-5's comments on October 27 regarding his intent to meet defendant on October 29 and his confirmation call with CW-1 on the morning of the meeting are also admissible solely for the purpose of demonstrating JD-5's intent to meet defendant. Third and finally, the government seeks to admit the October 27 recording in which CW-1 informs JD-5 that defendant is "blowing his stack with [CW-1]," is "going nuts with [CW-1]," and wants to talk to JD-5. The government correctly argues that CW-1's words are admissible for their effect on the listener, JD-5, rather than for their truth.

Again, all these recordings are admissible for limited non-hearsay purposes only, and should defense counsel seek a limiting instruction, she is directed to submit a proposed one.

3

### 2. Wiretap recordings of JD-3's autobody shop, 1994

The government has moved to introduce recordings from the wiretapped phone at JD-3's autobody shop. The government seeks admission of these conversations under the rationale that, at the time of the recordings in 1994, JD-3 and his fellow car parts dealers were participants in a chop shop conspiracy that included the defendant.

The hearsay exception for statements of coconspirators, Fed. R. Evid. 801(d)(2)(E), derives from the combination of two legal principles: first, that the statements of an agent are attributable to his principals, and second, that the actions of a conspirator are attributable to his coconspirators. Anderson v. United States, 417 U.S. 211, 218 n. 6 (1974). These premises explain the requirements of the coconspirator exception: (1) the declarant and the defendant must be members of the same conspiracy; (2) the statement must be spoken during the conspiracy; and (3) the statement must be in furtherance of the conspiracy.

Even assuming that JD-3 ran an autobody conspiracy dealing in stolen parts, it is a distortion of the facts and circumstances surrounding JD-3's relationship with defendant to say that defendant was a participant in JD-3's scheme. As charged in the indictment and stated in the government's proffer, defendant extorted JD-3. Although the government argues that defendant was "a member of this conspiracy because he wished for the business to succeed and profit so that he…could earn more illegal proceeds," Gov't MIL at 25-6, this loosely expressed, purportedly common goal does not adequately show "the unity of interests stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E) in the first place." U.S. v. Gigante, 166 F.3d 75, 83 (2d Cir. 1999).

A common purpose to achieve a criminal objective is the sine qua non of conspiracy. JD-3's criminal objective was to profit from the black market for stolen car parts, but defendant's

4

criminal objective was to squeeze profits from JD-3. Their goals may have aligned in a shallow economic sense, but they lacked a "unity of interest[]" or a common purpose. As revealed by the transcripts, far from joining in a conspiracy with JD-3 to operate the chop shop, it was defendant's goal to extract cash from JD-3's shop even at the risk of destroying the business. At one point, JD-3 rehearsed his reply to defendant's demands:

> JD-3: No, no, no, no, no. This time when I talk to him tonight and tell him "Vinny, I just, I'm not making it. You wanna send me some customers, send me some work if I can make it, I'll give you. If not, I can't take care of nobody right now. Right now I can't pay my rent this month," which I can't.

Transcript of 94D28190 at 2/3. Defendant's extortion was not at all correlated with the profits of the chop shop conspiracy, because the defendant demanded payment even when the shop could not make ends meet. Transcript of 94D28292 at 2/6 ("so, you still got to send when you're doing bad, too.")

A conspiracy also requires knowing and voluntary agreement, but any assent that JD-3 gave to defendant was, by the government's own theory of the prosecution, the product of coercion. In the excerpt quoted above, JD-3 rehearsed telling the defendant that they could collaborate only if defendant were interested in promoting the business instead of taxing it. Were the government's view of a joint agreement between the defendant and JD-3 correct, JD-3's would have complained about defendant's failure keep his end of the bargain. Instead, he expresses the view that there is no deal at all. In another recording, JD-3 remarks that his superficial agreements with defendant are merely a ploy, recounting to his friend that when defendant offered "why don't you give me two thousand now to get rid of me?" JD-3 craftily avoided this extortion-release fee by responding "no, no I want to be with you." Transcript of 94H30169 at 4/6. The recordings make abundantly clear that JD-3 and his coconspirators bristled

5

at the suggestion of paying defendant, and, far from expressing an eagerness to cooperate with defendant, felt only pressure to pay him.

Defendant's offers to JD-3 to "get you back on your track" and "set you up with fucking guys and all, parts and all," demonstrated no more than an attempt to extort flies with honey; in context, they cannot be interpreted as a genuine promise to support JD-3's chop shop business. Transcript of 92K23494 at 3/4.

Likewise, JD-3's advice to his employee Frankie that "if god forbid, anybody fucks with ya ... go down the block to see that old guy ... Vinny, you know ... he'll straighten out any problem," does not reflect a criminal agreement between JD-3 and defendant. Transcript of 94C27610 at 9-10/11. At best, this is a statement in furtherance of the objectives of the chop shop conspiracy, or JD-3's attempt to reclaim some value from the money he involuntarily provided to defendant.

Ultimately, defendant interacted with—but was not a member of—the JD-3 conspiracy, so the coconspirator exception cannot permit admission of this recorded hearsay.

Next, JD-3's August 2, 1994 phone call asking for Vinny at the Great-In-Pasta is admissible for the non-hearsay purpose of proving that JD-3 sought to make contact with defendant. JD-3's July 15, 1994 phone call instructing Anthony on how to reach the restaurant is admissible for the same reason. However, JD-3's August 1, 1994 call with Frankie is not admissible as a statement of intent under Rule 803(3) because the two discuss events in the past, and make no reference to future plans.

Finally, the government also argues that "JD-3's statements to Vera, Frank, Lou and Sonny" regarding his future plans for dealing with defendant are admissible as statements of JD-

3's then-existing state of mind or intent under Rule 803(3). Gov't MIL at 26. As I understand it, the statements to which the government refers here encompass all of the statements I have addressed above and found inadmissible under Rule 801(d)(2)(E). I cannot assess the admissibility of any statements under this theory, however, absent identification and specific explanation by the government concerning its rationale for admitting each such statement with line by line citations to the transcripts.

### 3. CW testimony relaying I-3's complaints of defendant's abuse

According to the government, defendant took cars and fuel from Bonanno associate I-3, who was reassigned to another crew after reporting the abuse to Bonanno captains CW-2 and CW-3. The government seeks admission of conversations between CW-2, CW-3, and the Bonanno boss at the time, Phil Rastelli, discussing I-3's reassignment. These conversations are admissible because defendant allegedly had a conspiratorial relationship with his Bonanno superiors, namely, the RICO conspiracy charged in the indictment, and when these superiors sought to resolve disputes involving defendant, their statements were in furtherance of that common criminal purpose. Insofar as this evidence is relevant because it is probative of the decision-making processes of the Bonanno family (a necessary element in proving a RICO enterprise), it is admissible under the coconspirator exception.

The same is not true for I-3's complaints about the defendant. The government argues that I-3's statements were in furtherance of "the broad conspiracy of furthering the goals of the Bonanno family" because I-3 chose to complain "within the framework of the Bonanno family." Gov't MIL at 31. The government's assertion of a common conspiracy linking I-3 and the defendant suffers from an infirmity similar to the one afflicting its argument about JD-3 and

7

defendant, discussed above: there is no true unity of interest. When defendant's Bonanno superiors sought to soothe tensions by reassigning I-3, their objective of harmony was not directly opposed to the defendant's interests. But when I-3 denounced defendant for attempting to extort him, he was not acting as an agent for defendant or speaking for defendant's interests, and therefore the coconspirator exception does not apply. The substance of I-3's accusations against the defendant is unexcused hearsay.

Accordingly, any of I-3's complaints embedded in discussions among the superiors are not admissible for their truth, that is, they cannot be considered as proof that the defendant actually tried to extort I-3. They are admissible only as proof that I-3 lodged a complaint with his superiors, regardless of whether the complaint was true. So limited, the complaint simply sets the scene for an illustration of the dispute resolution process of the Bonanno enterprise. If requested by the defense, this evidence will be admitted with a limiting instruction to that effect. Defense counsel is asked to submit a proposed instruction.

**4. CW-5 testimony relaying "Fat Andy" Ruggiano's statements about Lufthansa jewelry**

The government also invokes the conspiracy exception, Fed. R. Evid. 801(d)(2)(E), to seek admission of statements "Fat Andy" Ruggiano ("Ruggiano") made to his son CW-5 within a year after the Lufthansa heist. The government's rationale for the exception is that defendant and Jimmy Burke conspired with Ruggiano to fence jewelry from the heist. Assuming the existence of the stated conspiracy, the government has not shown that Ruggiano's comments to his son CW-5 were made in furtherance of that conspiracy. Traditional "in furtherance" statements "provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy."

8

Gigante, 166 F.3d at 82. But here, because CW-5 was not a participant in the Asaro-Burke-Ruggiano conspiracy, Ruggiano's updates to CW-5—without any requests or demands for assistance—served no purpose in furthering the fencing conspiracy. The updates may have been helpful to CW-5's association with his father in a Gambino organized crime conspiracy, but tutoring CW-5 was separate and distinct from the criminal objective shared by defendant, Burke, and Ruggiano, in fencing proceeds from the Lufthansa heist.

Although Ruggiano's statements are inadmissible under the coconspirator exception, some of them qualify as Fed. R. Evid. 804(3) declarations against penal interest. Ruggiano is deceased and therefore unavailable, so the exception applies to any of his statements that directly implicate him—and not solely others—in criminal conduct, so long as corroborating circumstances clearly indicate their trustworthiness. See United States v. Wexler, 522 F.3d 194, 202 (2d Cir. 2008).

As an initial matter, it is unclear from the current record whether the government intends to adduce additional evidence corroborating Ruggiano's hearsay. Although the defense argues that conversations between organized crime associates and members are often larded with falsehoods, the context of these statements, a father speaking with his son in private conversation, together with the absence of evidence suggesting that Ruggiano had a motivation to distort the truth, establish that the statements are trustworthy. See, e.g., U.S. v. Matthews, 20 F.3d 538, 545 (2d Cir. 1994).

The government proffers several distinct statements that Ruggiano made to his son. First, the government alleges that Ruggiano told CW-5 that defendant and Burke had brought him "jewelry from Lufthansa." For the owner of a gold store to say this, only seven or eight months after the Lufthansa heist, when it had been widely reported that a large quantity of jewelry had

9

been stolen, certainly exposed him to criminal liability. Because a reasonable person would not have made the statement without believing it to be true, it is admissible as a statement against Ruggiano's penal interest. Next, the government alleges that Ruggiano told CW-5 that the defendant and Burke brought him the jewelry to avoid sharing the criminal profits with their Bonanno and Lucchese superiors. This statement implicates the defendant and Burke in organized crime conspiracies but it does not directly inculpate Ruggiano beyond the already-admitted fact that he dealt in stolen jewelry. Because the statement is not against Ruggiano's penal interest, it is not admissible. See Wexler, 522 F.3d at 202. Finally, the government proffers that Ruggiano discussed the division of the jewelry proceeds with CW-5, complained about the apportionment, and worried that his gold store partner Sal Reale had kept one of the stolen necklaces for his girlfriend. These statements necessarily inculpate Ruggiano because he thought himself entitled to even more criminal profits (in other words, he maximized rather than minimized his own role), and because his frustration with Reale indicates his fear of detection, and by logical implication, his participation in the jewelry fencing scheme. Again, a reasonable person would not have made these statements if not believing them to be true, and the corroborating circumstances indicate that the statements were trustworthy. The hearsay statements are admissible as Rule 804(3) statements against penal interest.

**5. Cross-examination of cooperating witnesses regarding their sentences**

The government has also moved to preclude cross-examination regarding the sentences imposed on cooperating witnesses and their acts of domestic violence. Defendant does not intend to elicit evidence of domestic violence, but argues that a witness's sentence is partly a function of cooperation, and proper cross-examination to expose witness bias or self-interest requires

asking cooperating witnesses about the length of their sentences.

The government argues that it does not determine a cooperator's sentence, and that examination implying as much will either mislead the jury or require a lengthy, time-consuming and confusing introduction of otherwise extraneous evidence concerning the various inputs and rubrics of the federal sentencing process. Such restraints on cross-examination lie within the "broad discretion" of the trial court. See U. S. v. Maldonado-Rivera, 922 F.2d 934, 956 (2d Cir. 1990).

It is important to note that courts admit or exclude evidence of cooperators' sentences for case-specific reasons. For example, questioning of cooperators charged with the same crimes as the defendant may improperly reveal the mandatory minimum punishments. See, e.g., U.S. v. Reid, 300 F. App'x 50, 52 (2d Cir. 2008); U.S. v. Graziano, 558 F. Supp. 2d 304, 327 (E.D.N.Y. 2008) ("[revealing minimums]…creates a substantial danger that the jury will consciously or subconsciously allow knowledge of such punishment to impact on their deliberations…").

Courts have found it appropriate to bar questioning about specific sentences while permitting inquiries into the witness's rewards for cooperation. See U. S. v. Rosa, 11 F.3d 315, 336 (2d Cir. 1993) (approving "cross-examination of [cooperating] witnesses as to their plea agreements, the statutory maximum sentences they faced, and the benefits they hoped to gain from cooperation," while excluding "the vagaries of Guidelines calculations."); U.S. v. Dambruck, 270 F. App'x 30, 33 (2d Cir. 2008) (although government prematurely elicited testimony regarding truth-telling requirements of a cooperation agreement, no prejudice to defendant when he "was able to inquire in detail into the truth-telling requirements, including the benefits that [the witness] hoped to receive for cooperating.").

Thus, I find that questions about the length of a cooperator's sentence pose a substantial

danger of unduly prolonging the trial, confusing the issues, and misleading the jury. The need to expose a cooperator's bias can be fully accomplished by searching questioning that does not reveal the length of the sentence ultimately imposed on the cooperator by the court. Fed. R. Evid. 403. This limitation on cross-examination does not in any way interfere with a full exploration of a cooperator's biased and self-interested motivations. It simply eliminates the inaccurate implication that a witness's self-interest is driven by the government's unilateral ability to determine the length of a sentence.

**6. Post-Lufthansa murders**

The defendant has moved to preclude the government from eliciting CW-1's testimony regarding the demise of alleged participants in the Lufthansa conspiracy, including the murders of Marty (Krugman), Joe "Buddha" Manri and Robert "Frenchy" McMahon, and the disappearance of Tommy DeSimone. Defendant contends that evidence of these murders is improper propensity evidence, irrelevant, and raises the likelihood of issue confusion or undue prejudice to the defendant.

Marty (Krugman)

The fact that Marty provided plans of the Lufthansa terminal to the heist coconspirators and that Burke complained to CW-1 that "Marty was busting his chops about when they were going to carry out the robbery," Gov't Opp. at 3, is probative of the existence of the Lufthansa robbery conspiracy charged in Racketeering Act Three, and raises no likelihood of undue prejudice or issue confusion. It is therefore admissible.

By contrast, the government's proffer that after the heist, Burke implied to CW-1 that

Marty was killed for complaining about the division of the loot implicates altogether different considerations. Although Marty's complaints regarding the heist may be probative of the Lufthansa robbery conspiracy, the killing of Marty was hardly an integral part of that conspiracy. At some point, the collapse of relationships and murder of coconspirators after the heist ceases to be an epilogue to the heist, and begins to tell the story of a whole new set of crimes. Marty's murder does not mend "a break in the natural sequence of the narrative evidence" about the Lufthansa heist. Nor is it required to show trust between Burke and CW-1. The government has cited to other evidence it will adduce to establish the close relationship between defendant, CW-1, and Burke, rendering the evidence of Marty's death unnecessary for this purpose. Thus, the probative value is minimal.

As for the risk of prejudice and jury confusion, references to a murder possibly ordered or executed by the defendant's associate, even limited by an instruction that the defendant was not involved in the killing, nonetheless casts defendant against a backdrop of violence that might impermissibly trigger the emotions of the jury, thus indirectly prejudicing the defendant. On balance, I find that the admission of evidence of Marty's murder would generate unfair prejudice and risk of confusion that would substantially outweigh its minimal probative value on any material issue the government must establish. Thus, I preclude the government from eliciting testimony regarding Marty's death.

Tommy DeSimone

According to the government, DeSimone was not killed for any reasons relating to the Lufthansa heist. Thus, defendant and CW-1's appeals to their Bonanno captain uncle to protect DeSimone from repercussions of friction with the Gambino family are probative only of the trust

13

between the DeSimone, CW-1, and defendant. The government has substantial evidence to show strong bonds between the coconspirators, as proffered in its May 27, 2015 motion in limine. (Dkt. #234). With each extra piece of evidence adduced for this same purpose, the marginal probative value decreases and every additional story told to illustrate trust risks unnecessary prejudice and confusion under Rule 403. CW-1 can testify directly to his closeness with DeSimone without confusing the jury by telling a story about himself, DeSimone, defendant and Zaffarano that involves a murder having no bearing on the planning and execution of the Lufthansa heist. Thus, I find that the probative value of testimony regarding DeSimone's death is substantially outweighed by the risk of confusing the jury with extraneous events and the risk of unfair prejudice from the implication that defendant's associates tended to meet violent deaths.

### Joe "Buddha" Manri and Robert "Frenchy" McMahon

According to the government, CW-1 knew that Manri and McMahon had been killed by Anthony Stabile on Burke's orders. The government seeks admission of testimony regarding these murders solely as background to explain why, when CW-1 was summoned to meet Stabile, CW-1 feared assassination and sought defendant's advice on how best to protect himself. This encounter may be probative of the status of trust between CW-1 and defendant, but it is clear that the government will adduce considerable other evidence of this trust, including the murder and attempted burial of Richard Eaton within two months of the Lufthansa heist. I find that CW-1's request for defendant's advice is of low probative value given the other evidence available in this case, and the admission of evidence of two murders is not justified by any need to provide context for CW-1's request for advice. Admitting these two murders would contribute to an unfairly prejudicial aura of extreme violence surrounding the defendant, which cannot be cured

by the government's acknowledgement that defendant was not involved in these killings. Thus, I find that the probative value of admitting evidence of Manri and McMahon's deaths is substantially outweighed by the danger of unfair prejudice.

### "Fat Louie" Carfora

Finally, the government argues that to link the Lufthansa heist to the Bonanno enterprise, it requires admission of evidence of a meeting between defendant, CW-1 and Zaffarano, during which Zaffarano told defendant to tell Burke and Stabile that CW-1 would not help them murder "Fat Louie" Carfora. Although testimony relating to this meeting may show that Bonanno members consult with their superiors before committing a murder, it does not demonstrate any connection between the enterprise and the heist. Thus, the probative value of the evidence for the government's stated purpose is limited, and the government has more probative, less prejudicial evidence at its disposal. The fact that defendant shared a portion of the Lufthansa proceeds with his captain, Zaffarano, Gov't Opp at 5, is more probative of the link between the heist and the enterprise than the much more prejudicial meeting regarding the plan to kill Carfora. Although the danger of unfair prejudice is tempered by the fact that the Bonanno members declined to commit the murder, the incident is still prejudicial for the reasons discussed above, and is not admissible.

### 7. Paul Katz NYPD reports

Defendant seeks admission of a six-page New York Police Department file concerning the disappearance of Paul Katz. The file consists of a Missing Persons Report, a Complaint Report, and four Supplementary Reports from the winter of 1969-1970. The government

acknowledges that the Missing Persons Report and the Complaint Report, both prepared contemporaneously with Mrs. Katz's December 7, 1969 report to the police that her husband had been missing since 6:30 the previous evening, are admissible under a combination of hearsay exceptions – specifically, the exceptions for business records, 803(6), state of mind or intent, 803(3), and excited utterances, 803(2). The government also implicitly acknowledges the admissibility under established hearsay exceptions of paragraph 1 of the first Supplementary Report, dated December 12, 1969.

Although the defendant initially alleges that all of the Supplementary Reports are admissible, including those dated January 10, 1970, January 22, 1970, and February 2, 1970, he acknowledges in his Reply Memorandum that "[t]o the extent [these reports] are not relevant, the defendant does not seek to admit such pages at trial," specifically citing the last three reports. Because there is nothing in any of the last three Supplementary Reports that could possibly advance the defendant's case at trial, nor is there anything in paragraphs 3 and 4 of the first Supplementary Report that could do so, I assume that the only statement genuinely at issue on this motion is contained in paragraph 2 of the first Supplementary Report, dated December 12, 1969. Further, both parties focus all of their arguments on the admissibility of this paragraph. The four paragraphs of the first Supplementary Report are as follows:

> 1— Subject Paul C. Katz, was reported missing to Det. Sal Petix, D.A. Detective Task Force Queens, by subjects [sic] wife Dolores Katz. Det. Petix informed the assigned that subject is one of five perpetrators who was arrested for taking a shipment of gold in the Bronx on October 17, 1969.
>
> 2—Subject [Katz] left home to meet Joseph Allegro, one the five persons that were arrested, at a Drug Store located at [unreadable] Horace Harding Blvd., Queens, N.Y.
>
> 3—When subject failed to return from the meeting, subjects [sic] wife notified Police, investigation to be continued by the

16

> Queens D.A. Detectives Task Force.
>
> 4—In view of the above mentioned facts, request this case remain ACTIVE.

The government argues that it is impossible to determine both the source of the information contained in paragraph 2 and the time when it was communicated to police. Thus, according to the government, no hearsay exception can be identified rendering admissible the statement embedded in that paragraph of the report.

The report itself belies the government's argument about the source. First, the format and phrasing of the report suggests that it relates separate items of information obtained by the police at the same time from the same source. Further, the report's repeated reference to the "subject's wife" combined with the conspicuous absence of a reference to any other source clearly implies that Mrs. Katz was the source for the unattributed paragraph 2 statement, and that it was she who related her husband's statements of his intent to attend the meeting that night. This inference is also supported by the fact that the statement related to matters that are typically domestic in nature.

Moreover, I find that the third Supplementary Report confirms that Mrs. Katz related her husband's statement about his intent at the same time that she initially reported him missing on December 7. In the third report, the investigating officer notes that Mrs. Katz was interviewed by police on December 8 and 15, 1969, and on January 15, 1970, but "could offer nothing new to aid in this investigation."[1] Information about Katz's intended destination would certainly qualify as "something new" to aid a missing-person investigation, so Mrs. Katz's communication of her husband's statement to police could only have occurred on December 7.

---

[1] The NYPD file at 5, Bates 1020, states "complainant interviewed on 12-8-15-19 and 1-15-70." It is evident that the author made a typographical error, and intended to write 12-8-15-69, indicating interviews on December 8 and December 15.

17

Having found that Mrs. Katz was the source of the statement and December 7 was the time it was communicated to the police, I now turn to the two levels of hearsay contained in paragraph 2, which both require a hearsay exception to render the statement admissible.

Katz to Mrs. Katz

Katz's own hearsay, as told to his wife, who repeated it to the police, is admissible as an 803(3) statement of his then-existing intent to meet Joey Allegro at the drug store. It is admissible to show that he acted in conformity with that intent by going to a location expecting to meet Allegro. It is not admissible, however, to prove the actions of any individual other than Katz, the declarant; specifically, it is not admissible to prove that Allegro intended to or actually met with Katz that evening, much less that Allegro had any involvement in Katz's disappearance. U.S. v. Persico, 645 F.3d 85, 100 (2d Cir. 2011). I request that the government submit a proposed limiting instruction specifying the purposes for which the statement in paragraph 2 may and may not be used.

Mrs. Katz to police

Mrs. Katz's excited utterance provides the exception for the key statement in paragraph 2. The Fed. R. Evid. 803(2) excited utterance hearsay exception requires a "startling event," such as the disappearance of one's husband, and the exception does not expire after a fixed time, so long as the declarant remained "under the stress of excitement." United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002). According to the Missing Persons Report, page one of the file, Mrs. Katz reported her husband missing at 3:45 p.m., only twenty-one hours and fifteen minutes after she last saw him. Some time must have passed after his departure before Mrs. Katz expected him

to return, and more time must have passed before she first realized something was wrong, which is the relevant "startling event." Conservatively, Mrs. Katz probably reported Katz missing—and told the police that he had intended to meet Allegro—only twenty hours after his disappearance had become apparent.

Although Mrs. Katz is no longer alive and we can only speculate as to her level of stress twenty hours after realizing that her husband was missing, there is no reason to think she used that time to concoct a false statement, which is the dispositive question in excited utterance analysis. Id. In reporting her husband's disappearance, Mrs. Katz had no motive to misdirect the investigation, and the exception therefore applies.

Because I have found that Mrs. Katz reported the statement in paragraph 2 and that she did so at or around the same time she stated that Katz was missing, the stress of her excitement at the startling realization of her husband's disappearance extends to both statements, and renders paragraph 2 admissible under Rule 803(2).[2]

## CONCLUSION

The government's motion to admit hearsay statements (Dkt. #254) is granted in part and denied in part. The government's motion to preclude cross-examination concerning the length of cooperator sentences (Dkt. #257) is granted.

Defendant's motion to admit the first three pages of the NYPD file (Dkt. #256) is granted. Defendant's motion to preclude evidence relating to the post-Lufthansa murders (Dkt. #270) is granted.

---

[2] The admission of hearsay in the report poses no confrontation clause problems, because it is the defendant who seeks admission, not the government.

I ask that the parties submit any proposed limiting instructions, and any other information that bears on this opinion's decisions to admit and exclude evidence, by October 9, 2015.

SO ORDERED.

_____
Allyne R. Ross
United States District Judge

Dated: October 7, 2015
       Brooklyn, New York