3653

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - - -   X

4    UNITED STATES OF AMERICA,   :   14 CR 026

5                                :

6        -against-               :

7                                    United States Courthouse
                                     Brooklyn, New York
8    VINCENT ASARO,              :

9                                    November 9, 2015
             Defendant.          :   9:30 o'clock a.m.
10

     - - - - - - - - - - - - -   X
11

12              TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE ALLYNE R. ROSS
13         SENIOR UNITED STATES DISTRICT JUDGE, and a jury.

14

15   APPEARANCES:

16   For the Government:       ROBERT L. CAPERS
                               United States Attorney
17                             BY: NICOLE ARGENTIERI
                                   ALICYN COOLEY
18                                 LINDSAY GERDES
                               Assistant United States Attorneys
19                             271 Cadman Plaza East
                               Brooklyn, New York
20

21   For the Defendant:       ELIZABETH MACEDONIO, ESQ.
                               DIANE FERRONE, ESQ.
22
     Court Reporter:          Gene Rudolph
23                             225 Cadman Plaza East
                               Brooklyn, New York
24                             (718) 613-2538

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

GR      OCR      CM      CRR      CSR

3654

1          (The following occurred in the absence of the jury.)

2          THE COURT:  Please sit down.

3          MS. ARGENTIERI:  Judge, I know the defendant is not

4  here.  One issue that came up on Friday with the defendant's

5  objections regarding one of the slides, nothing was filed over

6  the weekend.

7          THE COURT:  I am assuming that that was dropped.  Is

8  that correct?

9          MS. ARGENTIERI:  Is --

10         MS. MACEDONIO:  We haven't filed anything, no.

11         THE COURT:  Nothing was filed.  I said if they

12  wanted to pursue it, to file something.

13         MS. ARGENTIERI:  Okay.

14         THE COURT:  I am assuming that they have not pursued

15  it.

16         MS. ARGENTIERI:  Okay.

17         MS. MACEDONIO:  During the course of my summations,

18  Ms. Ferrone is going to put things on the Elmo for me.

19         Okay?

20         THE COURT:  That's fine.

21         MS. MACEDONIO:  Thank you.

22         (Pause).

23         (The defendant is present.)

24         THE COURT:  Shall we get the jury?

25         MS. MACEDONIO:  Yes, please.

GR      OCR      CM      CRR      CSR

1            (Jury present.)

2            THE COURT:  Good morning, ladies and gentlemen.

3       Please be seated.

4       We are now going to proceed with the summation.

5       Ms. Macedonio.

6            MS. MACEDONIO:  Thank you, Your Honor.

7       Good morning, ladies and gentleman.

8            First, we would like to thank you for your undivided

9  attention in what has been a very long trial for all of us.

10            As the end is near, I remind you as he sits here now

11  Mr. Asaro is still presumed to be innocent.  As Ms. Ferrone

12  told you in her opening statement, that presumption stays with

13  him.  It stays with him forever, unless 12 of you find beyond

14  a reasonable doubt that the charges contained in the

15  indictment have been proven by the government.

16            Since the law presumes Mr. Asaro to be innocent, the

17  burden of proving that he is guilty rests solely with the

18  government.  Mr. Asaro never has the burden of proving his

19  innocence or producing any evidence at all.  If you find that

20  the government has not met its burden, then you must, you must

21  render a verdict of not guilty.

22            Now, what does proof beyond a reasonable doubt mean?

23  Reasonable doubt is a doubt based upon reason and common

24  sense, the kind of doubt that a reasonable person would

25  hesitate to act with.  Proof beyond a reasonable doubt must

1    therefore be proof of such a convincing nature that a

2    reasonable person would not hesitate to rely on it in making

3    important decisions in his or her own life.

4           What it means here is that in order to find

5    Mr. Asaro guilty, 12 of you must be prepared to rely upon the

6    testimony of the cooperators in this case, to not hesitate in

7    believing what they testified to here in court.

8           Put differently, if you would hesitate to rely on

9    the testimony of the cooperators in this case concerning

10   important issues in your own lives, then you should not rely

11   upon them in this most important decision in Mr. Asaro's life.

12          So, for example, let's suppose that Gasper Valenti

13   knocked on your door and he said, good morning, juror number

14   three.  Guess what?  I have a job at a brokerage firm and I

15   would like to manage your retirement account.  Would you let

16   him do that?  Of course you wouldn't.  None of you would.

17          Therefore, you shouldn't rely on him when deciding

18   Mr. Asaro's guilt or innocence.  After all, by his own

19   admission, Gasper Valenti is an experienced liar.

20          He is a person who is able to lie to everyone around

21   him, everyone, including his family members for years.  He did

22   it without any sort of detection, making everyone around him

23   believe he was the same old Gasper when indeed he was

24   recording the words of everyone that was closest to him.

25          So let's talk about the evidence in this case, the

Summation - Macedonio                    3657

1    evidence that the government has preserved.

2              I am going to be putting some things on the

3    especially mow.  If you want to take your screen out?

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3658

1          MS. MACEDONIO:  (Continuing)  First, you had to

2     listen to several days, several days of surveillance testimony

3     and the result are all of those charts that sit next to you,

4     dozens and dozens of charts.  All of them contain photos of

5     men doing absolutely nothing wrong.  The FBI spent thousands

6     of hours conducting surveillance.  They photographed hundreds

7     of people.  In total, you heard from 33, 33 surveillance

8     witnesses, a lot of them retired.

9          There was surveillance dating from the 1970s to

10     2013.  Here are the names of some of the surveillance

11     witnesses you heard from:  John Keenan, John Sheehan, James

12     Parker, all sorts of surveillance witnesses that came in,

13     Fernando Fernandez.  A week of this.  A week of pictures.

14     Agent Metts testified that for a period of time, all he did

15     was sit in a bank and take pictures of people walking in and

16     out of a building.  John Carillo, his specialty was taking

17     picture of people arriving at and leaving public wakes.

18          Surveillance over decades and never once did they

19     photograph Mr. Asaro doing anything illegal.  But what did you

20     get?  There's Mr. Asaro, walking down the street with a coffee

21     pot in his hand.  Yes, they got him.  Presumably he's bringing

22     somebody a cup of coffee.

23          What else do you have?  There he is.  That's Vincent

24     Asaro talking to some random woman on the street.  Apparently

25     Mr. Asaro was quite a popular guy.  There he is being greeted

Summation - Macedonio                                  3659

1   by somebody with a kiss on the cheek.

2           And there he is with Gasper Valenti, the very man

3   that's recording him, recording his every move.  And what is

4   he getting from Gasper Valenti?  A kiss on the cheek.

5           This one is not so clear, but here he is at a deli

6   with Ronnie Giallanzo.  Mr. Giallanzo has his four year old

7   son with him.  They're leaving the deli after getting

8   something to eat.

9           Now, is it any wonder to you that after all this

10  time, after all this surveillance, that Mr. Asaro knew he was

11  being surveilled?  He knew it.  Of course he knew it.  They

12  were like the paparazzi.  They never went away.  It had been

13  going on for decades.  So when Eileen Roemer testified that

14  Mr. Asaro waived at her in January of 1989, that's really

15  surprising.  He was constantly being surveilled but he didn't

16  run and he didn't hide.  Instead, he sat out on the sidewalk

17  just like that:  Smiling, talking to people who passed by in

18  front of a building with an open door and open windows.

19          You heard about surveillance, you heard surveillance

20  testimony about surveillance that was conducted on certain

21  nights because that's the night that organized crime members

22  had meetings.  Really?  Look at these photographs.

23          This is the secret society.  All of these men are

24  having a big secret meeting and there they are talking to each

25  other, walking up and down the street, walking back and forth.

1   That's the secret society.  They came and went as they saw

2   fit.  Does any of that make sense to you?

3              There are a few pictures, however, that the

4   government claims was when there was actually a Bonanno

5   meeting going on.  And guess what?  Mr. Asaro wasn't there.

6              This is the big FBI raid of the Bonanno social club.

7   The FBI goes in, they take some photographs and what do they

8   find?  There's a group of men sitting around a table having a

9   meal and drinking Diet Pepsi.  Another coup for the FBI.

10              The government claims that Mr. Asaro was captured on

11   surveillance shortly before this photo was taken.  Do we have

12   that one?  Clearly, he's not at the table when the FBI went

13   into the club.  If there were a meeting of the secret society

14   and it was captured by the FBI and if Mr. Asaro was such an

15   important part of this society, why isn't he there?  It's not

16   as if he knew the FBI was going to be joining him for dinner

17   and he opted out.  He's not there because he wasn't a part of

18   it, plain and simple.

19              Now, in addition to photos of people, you also heard

20   testimony about the agents taking down plate numbers they saw

21   during their surveillance, all sorts of plate numbers.  And as

22   pointed out during the cross-examination of Fernando

23   Fernandez, often he just took down plate numbers of people who

24   lived in Ozone Park while they were shopping in Ozone Park.

25              You also heard testimony about the surveillance of

1   nine wakes and Special Agent John Carillo testified, well,

2   wakes, in particular, are very important.  They're very

3   important tools for the investigation into organized crime.

4   It should be of no surprise to you that Mr. Asaro was at his

5   uncle Mickey's wake.  It was of course his uncle.  It should

6   also be of no surprise to you that Cathy Burke attended her

7   father's wake.  It was her father.  Mr. Asaro also went to

8   wakes of several other individuals of Italian-American

9   heritage, people he knew his entire life, family members,

10  folks from the neighborhood.  What is the crime there?  There

11  simply is none.

12          The government claims these wakes were important

13  Bonanno family and broader mafia events.  That's absurd.

14  Surveillance photo after surveillance photo, trying to make it

15  appear as if something nefarious was going on at a public

16  wake.

17          You also heard a great deal of testimony about

18  social clubs, places where Mr. Asaro would frequent and play

19  cards.  John Tagliaferro said it best.  You remember John

20  Tagliaferro was the elderly man who came and testified.  He

21  said, Well, we generally played cards.  It's a game called

22  Ramino and that's how we passed the time.  I went with my

23  next-door neighbor.

24          They play cards at the social clubs.  Sometimes they

25  have food there.  In the club across the street from the bank

Summation - Macedonio                    3662

 1   on 101st Avenue, Agent Metts told you there was a couch with a

 2   pillow inside.  It's not so clear on that shot.

 3          The government asserted that only organized crime

 4   people were allowed to enter these clubs.  Well, what about

 5   John Tagliaferro?  He wasn't a member of organized crime.  He

 6   was a milkman.  And you also heard testimony that on occasion,

 7   there were women in the social clubs.  Decades of surveillance

 8   and this was the best they could give you.

 9          The most damming picture was a picture of Mr. Asaro

10   with a bat in his hand, but if Mr. Asaro actually used that

11   bat, you would have heard testimony about that.  You would

12   have heard that loud and clear.  Instead, you heard testimony

13   about Mr. Asaro protecting the integrity of the women in the

14   neighborhood.

15          There was also surveillance of Mr. Asaro's fence

16   company, a legitimate company where trucks were coming and

17   going.  That's a picture of Astro Fence Company.  You also

18   heard testimony about his restaurant, The Great Im-pasta,

19   catchy name, a legitimate business that Mr. Asaro owned.

20   Then, of course, you had to hear surveillance testimony about

21   where Mr. Asaro's son worked.  This case wouldn't be complete

22   if we didn't have this photograph.  Again, a legitimate

23   business of a company that was clearly doing business.

24          In addition to surveillance, you also heard evidence

25   that related to phonebooks and phone records.  The fact that

Summation - Macedonio                                3663

1   Mr. Asaro's phone number appeared in certain phonebooks isn't

2   evidence of a crime.  It's not a crime to have your name and

3   your phone number in somebody's phonebook, but the government

4   asserted during its summation that it was concrete proof.

5   Really, that's concrete proof?  That's ridiculous.  It simply

6   shows these people know each other and that's it.  There were

7   hundreds of names in these books.  Are all of these people

8   members of organized crime?  It's just not practical.

9            Further, as Judge Ross will instruct you, there is

10  no such thing in this country as guilt by association.  You

11  can't be convicted because of who you know.  Did he speak to

12  certain people, people who the government asserts are members

13  of organized crime?  Yes, he did.  But without knowing the

14  content of these conversations, the records themselves are

15  meaningless.  What's more, your job here is only to decide if

16  Mr. Asaro was acting in furtherance of the Bonanno crime

17  family.  It's not to determine what anybody else was doing.

18  He's the only person on trial here.

19           The government also tried to make some leap with

20  regard to Mr. Asaro's contacts with his son but, again, you

21  were given limited information, limited data.  There's no way

22  to tell if there were different phones that were being used,

23  what the conversations were or they weren't.  I mean, what

24  difference did it make?  They're father and son.  They can

25  call each other whenever they want or never if they want.

Summation - Macedonio                    3664

1    That's entirely up to them.

2         Other meaningless information you heard about was

3    wedding lists and confirmation records.  Simply filler in an

4    effort to support and bolster the testimony of the

5    cooperators.

6         Now, the heart of this case is a racketeering

7    conspiracy.  The indictment alleges that Mr. Asaro is a member

8    of the Bonanno crime family and that he was committing crimes

9    in furtherance of the Bonanno crime family.  Indeed, to find

10   him guilty of the racketeering conspiracy, the government must

11   prove to twelve of you beyond a reasonable doubt that

12   Mr. Asaro knew and intended that his actions would have some

13   meaningful connection to the Bonanno crime family or that the

14   racketeering acts would benefit the Bonanno crime family.  The

15   problem is the government simply has not established this.

16   They simply haven't established that Mr. Asaro's actions were

17   connected to the Bonanno crime family.

18        The most you can take away from the evidence in this

19   case is that Mr. Asaro operated with his own set of rules,

20   without regard to the rules of any group of people or any

21   organization.

22        Now, you heard a recording of Mr. Asaro complaining.

23   I'm going to get my badge taken away.  I'm getting my badge

24   taken away.  He seems to be frantic talking to Gasper Valenti

25   about this.  What does this mean?  What can you take away from

 1   this particular conversation?  It means that everyone

 2   understood that Vincent Asaro wasn't acting in furtherance of

 3   the Bonanno crime family; that he did his own thing and he

 4   never operated in a manner that would further the family.

 5          The fact that Mr. Asaro continued to associate with

 6   people who the government claims are members of organized

 7   crime means nothing.  Again, it's not a crime to associate

 8   with people.  That's not the crime he's charged with.  In

 9   fact, that's a theory that's repugnant in our nation.

10          The recordings made by Gasper Valenti made clear

11   that Mr. Asaro fought with everybody.  He didn't just fight

12   with Gasper Valenti.  For example, you heard testimony of

13   Mr. Asaro stating that people in Skinny Dom's place hate him.

14   They hate him because he doesn't pay his dues.  He's not

15   following their rules.

16          You also heard a recording in which Mr. Asaro

17   stated, The old man -- referring to himself -- the old man

18   takes care of himself.  You also learned that Mr. Asaro took

19   out loans, loans from people like Mike Padavona knowing that

20   he was never going to pay them back.  That's not operating in

21   furtherance of the Bonanno crime family.  That's operating in

22   furtherance of Vincent Asaro.  You heard him say, They think

23   they're using me.  I'm using them.  All of his actions were

24   without regard to the rules.  He did things behind everyone's

25   back and he told Gasper Valenti not to say a word.

Summation - Macedonio                                3666

1          For example, he got money from Bam.  You heard a lot

2     about Bam.  His name is Robert Cotrone.  And he told Valenti

3     don't say anything to Jerry.  He told Glen to keep his

4     actions, meaning Mr. Asaro's actions, on the down low, don't

5     tell anybody, don't tell anybody what I'm up to.  The reason

6     for this is because he always has and he always will do his

7     own thing.  Vincent Asaro has never taken direction from

8     anyone.

9          And look at how the other people in the Bonanno

10    crime family, or at least the members, the people that the

11    government claims are members of the Bonanno crime family

12    treated Mr. Asaro.  And with Bonventre, he asked him for

13    money, Mr. Asaro asked him for money.  The answer was no.

14    Jack Bonventre, he refused to give him money.  And even his

15    own son Jerry, Jerry wouldn't give him any money and that was

16    money that the government asserted was money that belonged to

17    the Bonanno crime family.  And when he went and asked for a

18    loan, you know what he was told?  Get lost, you're not getting

19    anything.  And that's what resulted in all of that harsh talk

20    that you heard with Mr. Asaro complaining about his son.

21         Take a look at the way Mr. Asaro treated the person

22    who was alleged to be the boss of the Bonanno crime family,

23    Thomas DiFiore.  All he did with Thomas DiFiore is fight with

24    him.  That was the man, the government claimed, who was the

25    boss at the time.  Mr. Asaro refused to give DiFiore money

1  that, according to the rules, should have gone to him.  This

2  is a prime example of how Vincent Asaro's actions were not in

3  furtherance of the Bonanno crime family.  You heard from when

4  Sal Vitale sat in that witness stand that the boss is God.  He

5  said it over and over again.  The boss is God.  The boss is

6  God.  The boss is God.  Well, I'll tell you what, if the boss

7  is God, he's practicing a different religion.

8          Now, there was some testimony about Mr. Asaro being

9  put out of commission but there was never any evidence that he

10  actually was on such a commission.  For example, there's a

11  recording in which Mr. Asaro related that a murder had

12  happened in Canada and when Gasper Valenti pressed him for the

13  details, do you know what he shot back?  He says, Canada, I

14  don't even know what's going on in Ozone Park, how the heck do

15  I know what's going on in Canada.  Does that sound like

16  somebody who's really in the know?

17          Then there were conversations where people clearly

18  expressed that they just didn't want him around.  Jack

19  Bonventre explained that he didn't want Mr. Asaro coming in

20  his shop shooting things from 40 years ago.  Mr. Asaro

21  complained that there were guys raising their hands to him and

22  that nothing was being done about it.  Hardly the powerful,

23  organized crime figure that the government alleges him to be.

24  Rather, what you heard was that Vincent Asaro rolled around

25  all day with Gasper Valenti fantasizing about things,

Summation - Macedonio                    3668

1   fantasizing about ways that they might make money.

2           He even told Gasper, I don't come out anymore.

3   Where am I going to go?  You know, it's kind of like nobody

4   wants me around so I, I don't come out anymore.  And then he

5   also talked about getting some money.  You know what for?  So

6   he and Gasper could go fishing.

7           Interestingly enough, you heard a lot of testimony

8   about the arrest of Nicholas Santora and that was in January

9   of 2012 and the government alleged that at some point,

10  Mr. Asaro was recording Mr. Santora and the agents in this

11  case got on the stand and they said that Mr. Santora had been

12  arrested with a group of people after a long-term

13  investigation into the Bonanno crime family.  Now, if that was

14  true, why wasn't Mr. Asaro arrested until 2014?  I mean,

15  Gasper had been cooperating since 2008.  There it was, 2012,

16  long term investigation into the Bonanno crime family, is he

17  arrested?  Nope.

18          Let's take some time to discuss the cooperators in

19  this case.  First of all, the government has spent hundreds of

20  thousands, if not millions of dollars on the cooperators that

21  testified in this case.  Government money going to career

22  criminals responsible for dozens and dozens of deaths,

23  assaults, drug sales, extortions and the list goes on and on.

24  Every single one of these cooperators has been released from

25  jail.  They're on the street and they're free to do whatever

Summation - Macedonio                          3669

1   they want.  They negotiate sweetheart deals and then they reap

2   the benefits.

3          Now, the government got up here in summations and

4   said it's not whether or not you like them, it's whether you

5   believe them.  The fact is they're despicable people and

6   they're all very accomplished liars.  They make careers out of

7   lying to people.  How can you believe them?  Let's talk about

8   Gasper Valenti first, the star witness.

9          First, you should know that when Gasper Valenti

10  decided to cooperate, cooperation wasn't a new concept.  It

11  wasn't as if he just created it.  Cooperation has been around

12  for a long time and he knew what he was getting himself into.

13  There were scores and scores of organized crime figures who

14  had cooperated with the government and ended up with, you

15  know, deals where they had killed dozens of people and then

16  ended up on the street.  In fact, the government has become

17  the pension plan for organized crime figures.  When you're

18  down and out, yes, the FBI will always take you and support

19  you.

20         Here's Gasper Valenti's motto in life:  The more you

21  tell them things, you make up stories, you know, they'll give

22  you more money.  That's pretty telling, isn't it?

23         He actually continues.  He's talking about lying to

24  an FBI agent and he says I made up this story to show them I

25  was deeply involved in organized crime.  He was puffing

1   himself.  Gasper Valenti had years to work out the terms of

2   his cooperation.  He had thought about it for years before he

3   went in.  He was a degenerate gambler who had absolutely

4   nothing to lose.  He knew before he went in, the story he was

5   going to tell or the stories, I should say, he was going to

6   tell.

7            He also knew that because he was discussing crimes

8   that were decades old, that nearly everybody that was involved

9   in them had passed.  Jimmy Burke passed.  Mickey Zaffarano,

10  gone.  Dominick Cataldo, gone.  Junior Berger, passed.  Jimmy

11  Santos, no longer with us.  Tommy DeSimone, passed.  Angelo

12  Sepe, Anthony Spero, Jerome Asaro, Mr. Asaro's father, Paul

13  Vario, all of them, all of them had passed long before Gasper

14  Valenti went in and talked about Mr. Asaro.  So when he went

15  into the FBI, he had a well thought-out plan, but before he

16  started to provide too many details, he told them that he had

17  to be paid for his information.  In fact, he told them that

18  when he first went in.  And before he made a single recording,

19  not one, he started getting $3,000 a month from the Federal

20  Government.

21           Then for two years, he produced absolutely nothing,

22  but every month he was getting that $3,000 check and he

23  conceded it paid for all of his expenses.  Of course, on top

24  of that, he was collecting Social Security and food stamps,

25  but we won't even go there.

1          At first, he was trying to set up his cousin, Tommy

2   Ferreri in Las Vegas and made a series of phone calls for a

3   year, all year.  What did they talk about?  Baby seals, what's

4   the weather like, nothing.  It's nothing.  But when that

5   didn't work out, he went to Sandro Aiosa and Jack Bonventre.

6   Nobody was interesting in dealing with Gasper Valenti.  He was

7   far, far from the earner that he thought himself to be when he

8   sat in that witness stand.  And then finally, two years after

9   he began cooperating, he made a recording with Mr. Asaro.

10          Now, Gasper Valenti maintained throughout his

11   testimony that he did this for his family.  He maintained the

12   money wasn't for me, it was for my family.  That's ridiculous.

13   You heard his history and when he starts cooperating, his wife

14   is not even living with him.  This is all about him.  He told

15   you from the witness stand that he hasn't spoken to his family

16   in years.  This has nothing to do with Gasper Valenti's

17   family.

18          Gasper Valenti has never spent a single day in jail

19   and despite his testimony, you can be sure he doesn't expect

20   to.  Gasper told you over and over again that he lied when it

21   came to money.  And he also told you that if he had money, he

22   wouldn't be in this courtroom.  It was always all about the

23   money.  I was asking him questions about prizefighters and if

24   he had prize fighters in Vegas and then he blurted out, Well,

25   if I had two prizefighters, I wouldn't be here.  Does that

Summation - Macedonio                          3672

1   sound like a guy who has remorse?  That's what he told you.  I

2   was feeling so bad about the things I had done and needed to

3   do this for my family, but if he had two prizefighters in

4   Vegas, you wouldn't have never heard from him.

5            So, is it any kind of stretch to think that Gasper

6   Valenti couldn't sit on that stand a couple of days and lie to

7   you?  No, not at all.  He did it for years.  It was his whole

8   life.  Think about Gasper's standard method of operation.  He

9   used it over and over again:  Use up all your chips, play out

10  all your cards, borrow money from anybody when they give it to

11  you, and then just leave, leave and recreate yourself.

12           In the mid '80s, after borrowing money from anybody

13  here in New York who would give it to him, he took off for

14  Vegas and Gasper, the family man, oh, he left his wife and

15  kids behind.  And when I say borrowed money, I'm using that

16  term very liberally.  He was stealing the money.  He never

17  worked.  He had no way to pay these people back.  He told them

18  it was a loan and then he would gamble the money away and took

19  off to Vegas, of all places, because that's where you go if

20  you had a gambling problem so he wouldn't have to pay him

21  back.

22           He came back to New York, back from Vegas the first

23  time, and what did he do?  He made his mother take a mortgage

24  out on her house.  And then he claims he did the gold score

25  because he was going to pay back all of his debts but, of

1   course, he didn't.  And although he claimed that originally he

2   left New York because he was afraid of Mr. Asaro, when he came

3   back, he was welcomed with open arms.  So which one was it?

4           Then in 1990, again, owing everyone money, he took

5   off for Vegas once again, leaving his wife and children

6   behind, but this time, his plan, you know, you have to delve a

7   little bit with Gasper.  It wasn't just getting on a plane.

8   He knew he had to figure something out.  So his thought

9   process was developing.  So when he got to Vegas this time, he

10  had a story and he had a story about killing two people.

11  Remember this story that he had devised, it was he, you know,

12  inadvertently got involved in a drug deal and there was two

13  people shot and killed and he had to burn the car and that's

14  why he was out in Vegas and he was able to convince everyone

15  around him that that was true.  He stuck to his story.  He was

16  living a lie and everybody around him believed it.  That's how

17  convincing he was.  His story was so good that he convinced an

18  FBI agent that he was a big time wise guy.  Sound familiar?

19          Then, he had the nerve to testify that after a

20  lifetime of crime here in New York, when he arrived in Las

21  Vegas, he wasn't going to commit any crimes but he was enticed

22  to.  He was enticed to because the money was so easy.  Really?

23          (Continued on next page.)

24

25

Summation - Macedonio                    3674

1    SUMMATION

2    BY MS. MACEDONIO:   (Continuing)

3              MS. MACEDONIO:   Really?  Was he enticed to hit that

4    man in the face with a brick so he could take his wallet?  Was

5    he enticed when he was cashing in fraudulent chips?  How about

6    when he was dealing in stolen credit cards or promoting

7    prostitution?  Was all of that because the FBI enticed him to

8    do it?  While he was there, he even managed to lie in a court

9    proceeding.

10             Now, the agent's notes are pretty clear on this and

11   although Mr. Valenti testified here in court that he didn't

12   lie, take a look at this chart.

13             My question to him:  Did you tell the agents that

14   you lied in court?

15             ANSWER:  I didn't lie.

16             QUESTION:  So, you didn't tell the agents that?

17             ANSWER:  That I lied?  No.

18             Now, when Special Agent Mininni was on the stand I

19   asked him some questions about his notes that he carefully

20   took down when he was interviewing Gasper Valenti.

21             QUESTION:  Then what did it say down here, the

22   highlighted part?

23             ANSWER:  CW, meaning Gasper Valenti, lied in court

24   and tried to help midge Defense.

25             There's a big difference there.  Big difference.

1   You can't make that up.  He lied in court, originally in Vegas

2   and then came in here and lied to you about it again.

3           In or about 2005 it was time for Gasper Valenti to

4   re-create himself once again.  He had used up all his chips in

5   Vegas, laid out all his cards, so he came back to New York.

6   Now, originally, he left New York and he left his wife and

7   kids behind.

8           This time he comes back with a new family, a new

9   baby, and leaving another trail of people behind in Vegas --

10  of course, he owed them all money -- Gasper arrived in

11  New York already thinking about his retirement plan with the

12  FBI and soon thereafter, he began meeting with the FBI and

13  receiving $3,000 a month.  He had yet again re-created himself

14  and all those loans that he took out in Vegas, all the loans

15  that he took out everywhere, he didn't have to worry about

16  paying them back anymore.  Gone.

17          Imagine if you could live your life like Gasper

18  Valenti.  Just keep re-creating yourself, with layer after

19  layer of lies and then, you can have all of your living

20  expenses taken care of.

21          With regard to Mr. Asaro, Gasper Valenti claimed

22  that every crime he committed in New York, every single crime

23  he committed was with Mr. Asaro.  And he claimed, despite the

24  fact that he just lived a life of crime, he never really had a

25  job, that he never received any of the money.  Is that

1   practical?  You spend every day of your life committing crimes

2   and every dime you make you give to someone else?  Or is this

3   just a guy who's piling it on, piling it on?  You know,

4   Mr. Asaro told me to do it.  Mr. Asaro told me to do it.

5            Everything is Mr. Asaro.  Time after time Gasper

6   Valenti just threw Mr. Asaro's name into the mix by saying he

7   approved the crimes that Gasper was committing.  That Vincent

8   Asaro authorized Gasper Valenti's life of crime.  In any way

9   that Gasper Valenti could involve Vincent Asaro, he did.

10  After all, if he was not cooperating against Vincent Asaro,

11  what else do he have?

12           There is one thing that you learned about

13  cooperation and that it's that you have to provide substantial

14  assistance.  In other words, you can't just go in there and

15  talk, you have to put some point on the board.  So, Gasper

16  Valenti rode around for years trying to get Vinny Asaro to

17  commit a crime.  And it didn't happen.  Even when the FBI made

18  up stories about Joker-Poker machines and they have Gasper

19  Valenti saying oh, I've got a guy in Jersey, Ive got a guy in

20  Vegas, I've got these machines.  Nothing ever happens.

21  Nothing.  Nothing ever happens.  They even give him TVs and

22  electronic equipment to give away hoping that he can conjure

23  up some people.  Nothing ever happens.  They just give

24  Mr. Asaro a TV.

25           Gasper Valenti spent years recording people and he

1  was able to turn that recording device on and off by himself.

2  And what did that mean?  It means that he was able to capture

3  what he wanted to and able to eliminate what he didn't want

4  captured.  He came up with nothing.  Let's look at what you

5  can take away from the recordings.

6          First, Mr. Asaro has a temper.  We've all heard it.

7  But as quickly as his temper erupts, it flames out.  They even

8  joke about it.  There's one conversation where I think it's

9  Mr. Asaro and Gasper Valenti and Danny Rizzo and Mr. Asaro

10 says something to the effect of oh, I'm wonderful.  And Danny

11 Rizzo says oh, yeah, it flows from you.  They're laughing at

12 him.  They're joking around.  Everybody understands he has a

13 temper.  But again, as quickly as it's on, it's off.  In one

14 ear and out the other.

15         You heard Mr. Asaro yelling at Gasper Valenti.  They

16 were cousins, they had spent their whole life together.  But

17 you also heard really nice things that Mr. Asaro did for

18 Mr. Valenti.  I cross-examined Mr. Valenti about a ring that

19 Mr. Asaro had made for him.  It was a custom-made ring that

20 was a replica of cufflinks that Mr. Asaro's father had and

21 when Mr. Asaro's father died, he took it upon himself to have

22 a ring made so that Gasper Valenti could have that memory;

23 that memory of his father, Gasper Valenti's uncle.  What did

24 Gasper Valenti tell you he did with that ring?  He hocked it.

25 Almost immediately.

Summation - Macedonio                              3678

1          When Mr. Asaro's father died, Gasper Valenti was

2    given the elder Mr. Asaro's car.  That's a nice tribute;

3    right?  He didn't have a car, they gave him a car.  What did

4    he do?  Never made a single payment.  Lost the car.

5          Despite the harsh words you hear Mr. Asaro using

6    when he speaks to Gasper Valenti, there are also several

7    recordings where you can hear them expressing their love for

8    one another.  They openly say it.  You hear him say Ga, I love

9    you Ga.  That's what he calls him, Ga.  I love you, too.  What

10   they talk about, it's more than love, it's family.  They have

11   a deep affection for each other.  But only what Mr. Asaro

12   didn't understand was, it was only going one way.

13         He tells him constantly, be careful.  Stay out of

14   trouble.  You can hear Gasper coughing and Mr. Asaro is saying

15   things like go ahead, keep smoking.  He cared for him.  And in

16   their moments of time alone, Mr. Asaro constantly confronted

17   Gasper Valenti about being a liar.  Although Mr. Asaro clearly

18   didn't appreciate the extent of Gasper's lies, he knew that

19   Gasper was a liar at heart and that's a personality trait that

20   doesn't change.  If you're a liar, you're a liar.

21         You also heard a great deal of stress over money.

22   Mr. Asaro was constantly complaining that he was broke.  That

23   he had borrowed money from everyone and was in danger of

24   losing his jewelry.  At one point Gasper Valenti was coaching

25   Mr. Asaro on how to get the maximum benefits from Social

Summation - Macedonio                           3679

1   Security.  It's interesting because the Government claimed

2   that the higher-ups in the Bonanno crime family, those people

3   who are captains or on a commission or whatever, they didn't

4   have to do any dirty work.  People just came to them and gave

5   them money.  Is that what you heard on those tapes?  Is that

6   what you heard about this man?  This man who they were

7   claiming was so powerful.

8           Another constant thing was Gasper Valenti trying to

9   coax Mr. Asaro into committing a crime.  Gasper stated over

10  and over and over again, I need to earn, I have to earn, I

11  have to earn, how we going to earn, let's earn.  He baited

12  Mr. Asaro with lines that the FBI gave him, but to no avail.

13          It's clear from the recordings that there was a

14  certain lack of respect for Mr. Asaro.  He was complaining

15  that people were putting their hands up to him, nothing was

16  being done about it.  That Bam or Robert Catrone told

17  Mr. Asaro he wasn't even allowed on the block.  And even the

18  truck drivers, remember that phone call?  He seemed to be very

19  irate, he's yelling at the truck drivers because they were

20  blocking the car wash.  He's screaming at them, tell them

21  Vinny Asaro lives here.  What did the truck drivers do?

22  They're like, yeah, okay buddy, you're the one yelling.

23  Nothing ever happens.

24          Can you imagine yourself spending years of your life

25  sitting in a car with your cousin, just trying to set him up,

1   just riding around trying to set him up with a crime so that

2   you could collect money?  That really takes a certain type of

3   individual.  And if you think that Gasper Valenti wasn't

4   capable of getting on that stand and lying to you after lying

5   for years to this man who was so close to him, this man who

6   loved him, I submit that you're wrong.

7           Gasper Valenti spent hundreds of hours recording

8   Vincent Asaro.  And then he spent hundreds of hours with the

9   Government perfecting his story.  Once again, Gasper Valenti

10  has re-created himself, this time as a Government cooperator

11  who now has an FBI pension plan.  But Gasper Valenti is no

12  more believable now than he was before he became a Government

13  cooperator and his testimony should be flatly rejected.

14          So, now let's talk about what I call the window

15  dressing cooperators.  The one thing the cooperators uniformly

16  said was the fact that the Bonanno crime family had no rules.

17  Excuse me -- the fact that despite the fact that the Bonanno

18  crime family had rules, no one paid any attention to them.  No

19  one followed the rules from the boss on down.

20          Can you put up Sal Vitale.

21          MS. FERRONE:  Sure.

22          MS. MACEDONIO:  That's "Good-Looking Sal."  Not

23  quite sure where he got that name from but that's Good-Looking

24  Sal.  Good Looking Sal pled guilty to eleven murders and he

25  was responsible for many, many more.  He testified in numerous

1   proceedings, including against his brother-in-law.  Vitale

2   made millions of dollars as a criminal.  Millions of dollars.

3   And he was allowed to keep a significant amount of it.  He was

4   involved in all sorts of extortions, murder, and he was a big

5   money man.  But one of the things that was very interesting

6   was that Sal Vitale was the first witness for the Government

7   and he was clearly, clearly annoyed that he had to be here.

8   That's really kind of surprising since he had recently been

9   given a $250,000 check for his continued cooperation.  This

10  was in addition to the $900,000 that he got to keep and the

11  hundreds of thousands of dollars that they spent on him.

12          Now, look at what he said about authorizing the

13  death of a young kid.  Me and Anthony Spero could care less

14  what was going on in Pete Rosa's life with his nephew.  I

15  never met the kid.  Don't know the kid.

16          Now, that statement was taken in context to his

17  authorization to kill the kid.  He just didn't care.  It

18  doesn't make a difference to me, kill him if you want.  Sal

19  Vitale was and is a callous and calculated killer.  He killed

20  his friends and he killed his associates.  It didn't matter to

21  him.  His status as a Government cooperator doesn't change

22  those facts.

23          But Good Looking Sal, oh, he constantly tried to

24  assert that he had no choice but to kill these people.  Come

25  on, ladies and gentlemen, does that really sound like somebody

1   who's accepted responsibility for his actions?  He always had

2   a choice, but it wasn't until he knew he was going to spend

3   the rest of his life in jail that he decided to take a

4   different path.  It was at this point that he, too, elected to

5   take out the FBI pension plan.

6           He told you there was no way out but to kill.  Well,

7   he found a way out.  He found it.  And he's been paid

8   handsomely for it.  And what did he add to this case?  Well,

9   he told you about the rules, told you about the rules of the

10  Bonnano crime family and how everybody broke them.  And he

11  told you about how everybody from the boss on down lied all

12  day long.  In fact, he went so far to say that Joe Massino was

13  a capable liar.

14          Sal Vitale, too, was a capable liar.  He lied

15  repeatedly to law enforcement, from little things like alcohol

16  problems to much bigger things, like making sure no one

17  discovered Joe Massino when he was on the lam.  And Sal Vitale

18  was very resourceful.  He was a man who knew how to create

19  intricate plans and then lay in wait to execute them.  And in

20  Sal Vitale's world, everybody's expendable.  From your family

21  on down.

22          He had no relationship with Vinny Asaro.  He had no

23  problem coming in here and testifying for a day.  If it's

24  going keep that money coming, sign me up.  Sal Vitale began

25  cooperating in 2003.  If his information about Mr. Asaro was

1    so reliable, how come he's not arrested until 2014,

2    eleven years later.  Like the rest of the cooperators, Sal

3    Vitale's testimony should be rejected as it was bought and

4    paid for by the FBI.

5              The next cooperator you have is Peter Zuccaro.  You

6    must remember Peter Zuccaro.  He was eager and excited to tell

7    you all about is his criminal ventures.  He testified in

8    multiple proceedings.  Peter Zuccaro, he didn't stalk his

9    murder victims, that would have been creepy.  He clocked them

10   instead.

11             What does he tell us?  Well, about cooperation he

12   says:  Self-preservation.  I couldn't have put it any better

13   myself.  Wow, that's what cooperation is about.

14             And when you're talking about The Mob he says, and

15   then I think greed, greed pretty much took over.  That was a

16   statement about the Mob in general.  Really nobody's acting on

17   behalf of any organized crime family, it's all about greed.

18   And, of course, he tells you like Vitale, everybody broke the

19   rules.

20             Zuccaro conspired to and did kill people.  He hunted

21   down a man and killed him in his driveway because of an

22   insult.  Left him there for his family to find him.  He shot

23   another man and killed him while he was hiding under a pool

24   table in a public place.  He planned and executed these

25   murders without hesitation.

Summation - Macedonio                    3684

1        Then, when Peter Zuccaro was facing a 24-year

2   mandatory minimum sentence, he opted out.  Now, he claimed it

3   was because he wasn't getting any respect, but is that even

4   remotely believable?  Peter Zuccaro was a heroin addict who

5   participated firsthand in beatings, murders and kidnappings.

6   He was usually armed with two guns while he walked around the

7   neighborhood high on heroin and he employed his own form of

8   justice, beating people when he saw fit, killing them or

9   attempting to kill them, with his own sense of right and

10  wrong.

11       You know Zuccaro is a capable liar and you know that

12  he's capable of getting in that box, holding up his hand and

13  taking the oath and then lying to the jurors because he told

14  you he had done it before.  He told you he had done it before.

15  He told you specifically that he had done it in John Gotti's

16  trial.  And why did he do it in that trial?  Because it

17  benefitted him, why else.  Same is true here.  A cold and

18  calculated criminal, Zuccaro only added decades-old

19  information about Lufthansa, reportedly relayed to him by his

20  dead friend Frank Burke.  So, he himself had no firsthand

21  knowledge.

22       Now, Sal Vitale began cooperating in 2003.  Peter

23  Zuccaro in 2005.  And still, he's not arrested until 2014.

24  What does that tell you?  That their information is either not

25  reliable or it was only recently conjured up.  Like the rest

Summation - Macedonio                    3685

1    of the cooperators, Peter Zuccaro's testimony should be

2    rejected as it was bought and paid for by the FBI.

3            Let's look at Anthony Ruggiano.  What do we know

4    about Anthony Ruggiano.  Like Vitale and Zuccaro, he's a

5    career criminal who devoted himself to a life of crime.  He is

6    a murderer who is capable of anything.  And like Vitale and

7    Zuccaro, Ruggiano had testified in multiple proceedings before

8    his testimony in this case.  They're good at it.  They know

9    how to do it.  It's not hard for them.  They've done it over

10   and over and over again.

11           So what, does he say?  And he's talking about

12   killing his brother-in-law.  He says the plan was to wait for

13   the christening and then kill him, because we didn't want to

14   mess up the christening.  Now, this is his sister's husband.

15   The father of her child.  And this is the rationale he gave

16   you with regard to his brother-in-law's death.

17           And after he killed his brother-in-law, he let his

18   sister hook for her dead husband for years.  For years.  How

19   do you know you can't trust Anthony Ruggiano?  Because guess

20   what?  His brother-in-law trusted him and that's what got him

21   killed.  This is a question that was posed to Anthony

22   Ruggiano.  Why were you the person who had the role of getting

23   your brother-in-law to the club?  That was the club where he

24   was executed.  And his answer?  Because he trusted me.

25           Anthony Ruggiano is a career criminal who went so

Summation - Macedonio                           3686

1    low as to hock his son's jewelry and steal money from his

2    grandmother's funeral to support his drug habit.  After being

3    arrested close to 20 times, Ruggiano negotiated a deal with

4    the Government when he was facing life in prison.  In

5    exchange, he didn't have to forfeit any money, he got to keep

6    his house, and the marshals gave him a car.

7              And now, 35 years after Lufthansa, Ruggiano came

8    into this courtroom to offer testimony about the heist.

9    What's curious about that?  Well, Ruggiano's been cooperating

10   since 2006.  So, let's recap.

11             You have Sal Vitale in 2003.  Peter Zuccaro 2005.

12   Anthony Ruggiano 2006.  Gasper Valenti 2008.  Nicholas Santora

13   arrested 2012 and still, Mr. Asaro's not arrested until 2014.

14   Again, their information's either not reliable or it's

15   recently conjured up.  Therefore, all of the testimony

16   regarding Vincent Asaro should be flatly rejected.

17             Now, let's turn to the specific Racketeering Acts

18   charged in the indictment.

19             Judge, work this be a good time to break?

20             THE COURT:  If you would like.

21             MS. MACEDONIO:  Okay, thank you.

22             THE COURT:  Short break.  Five minutes.

23             THE COURTROOM DEPUTY:  All rise.

24             (Jury exits.)

25             (In open court; outside the presence of the jury.)

Summation - Macedonio                    3687

1              MS. ARGENTIERI:  Judge?

2              THE COURT:  Yes.

3              MS. ARGENTIERI:  I didn't want to interrupt during

4     Ms. Macedonio's summation, but I would like to see what

5     slides, what these Exhibits are that they're showing the jury

6     because some of these things aren't in evidence.  For example,

7     they put up a picture of Peter Zuccaro.  We didn't introduce

8     it at trial, there's no evidence that that's actually a

9     picture of Peter Zuccaro and I would just like to see sort of

10    what the rest of everything else is.

11             MS. MACEDONIO:  Absolutely.

12             (Recess taken.)     (In open court.)

13             (Judge ALLYNE R. ROSS enters the courtroom.)

14             THE COURT:  We can get the jury.

15             (Jury enters.)

16             THE COURT:  Please, be seated.

17             Ms. Macedonio.

18             MS. MACEDONIO:  Thank you, Judge.

19    SUMMATION

20    BY MS. MACEDONIO:  (Continuing )

21             MS. MACEDONIO:  I'd like to turn your attention to

22    the specific Racketeering Acts that are charged in the

23    indictment and I'm going to start with the murder of Paul

24    Katz.

25             It's clear that Mr. Katz's remains were found in the

VB      OCR      CRR

Summation - Macedonio                    3688

1    basement of his home, but what's entirely unclear is who

2    killed him and why.

3           Now, Mr. Asaro is charged in several ways with this

4    count.  He's charged as conspireing to kill Mr. Katz, he's

5    charged with Katz's actual murder and he's charged as an

6    accessory after the fact.  In order to convict Mr. Asaro of

7    Mr. Katz's actual homicides you have to believe Gasper Valenti

8    100 percent.  And that's because there's absolutely no other

9    evidence that Mr. Asaro was involved in Mr. Katz's homicide.

10          The Government asserts that Katz was killed because

11   it was believed that Katz was cooperating and therefore, Katz

12   was responsible for Mr. Asaro's arrest on November 12th, 1969.

13   The Government claims that Mr. Asaro was in a warehouse that

14   was associated with Katz, but we didn't hear anything about

15   that warehouse from anybody else other than Gasper Valenti.

16   Not even Katz's son.

17          Now, you don't have anyone at all who's able to

18   support Gasper Valenti's story and that's because prior to

19   Gasper Valenti's cooperation, all of the people that he claims

20   were involved in this homicide had passed away.  Jimmy Burke,

21   Joe Allegro, Paul Vario, Jerome Asaro.  So, he knew he could

22   tell whatever story he wanted.  He was free to say whatever he

23   wanted.

24          Let's talk a little bit about that we know about

25   Paul Katz.  Here's what we know.  Katz was arrested during an

Summation - Macedonio                          3689

1   armed hi-jacking and kidnapping along with four other

2   individuals.  One of them was Joe Allegro.  They were arrested

3   on October 17th of 1969.  According to Lawrence Katz, Mr. Katz

4   did indeed start speaking with the police, at least over the

5   telephone and then, on December 6th of 1969, Katz left his

6   home and told his wife he was going to meet with Joe Allegro,

7   his co-defendant, and he was never seen again.

8           This is Defendant's Exhibit J in evidence, which is

9   the missing person's report that Mrs. Katz filed with regard

10  to Paul Katz.  It shows you that Mrs. Katz told the police

11  that her husband had left to go meet Joe Allegro, who was one

12  of the five people arrested with Mr. Katz.

13

14          (Continued on following page.)

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2            MR. MADIGAN:  This document shows that at the time

3    of his disappearance, Paul Katz was a truck driver.  The

4    government chose to rely upon Lawrence Katz's birth

5    certificate, which was issued some five years earlier in

6    trying to establish to you that Paul Katz was a warehouseman.

7            Now, Gasper Valenti claims that Vincent Asaro told

8    him:  Jimmy Burke and I killed Katz because he was

9    cooperating.  That's the only evidence you have that Mr. Asaro

10   participated in Mr. Katz's death.  So now let's take a look at

11   Gasper Valenti's story.

12           Gasper claims that Vincent Asaro called him and

13   said:  I need a place to meet privately with Jimmy Burke, and

14   that Gasper had access to homes that his father had been

15   building and that his father had died in September of 1969 and

16   at the time of his father's death that these homes were

17   95 percent complete.

18           Okay, so what's wrong with the picture?  Let's take

19   a deeper look into Gasper Valenti's details.  If the homes

20   were 95 percent complete in September of 1969, then why was

21   this Certificate of Occupancy not issued until March of 1970,

22   nearly six months later?  For homes that they had to sell.

23   Homes that Gasper claims he, himself, was showing to

24   prospective purchasers.  It doesn't make sense.  It doesn't

25   add up.  Gasper claims he was responsible for showing these

Summation - Macedonio                    3691

1    homes to prospective buyers, yet he claims he made this home

2    available on a Sunday, prime time for showing homes to

3    purchasers, and that he didn't let anybody in the house all

4    day long and that, indeed, nobody even tried to get into the

5    house.  Doesn't make sense.

6           Katz left his home going to see Joe Allegro, a man

7    he had been indicted with.  There is no evidence that Vincent

8    Asaro even knew Joe Allegro, never mind that he conspired with

9    Joe Allegro to lure Katz out of his home and kill him.  Also,

10   take a look at how Gasper Valenti changed his story with

11   regard to the statement, Vincent Asaro's statement about the

12   homicide.

13          Can do we have that?

14          MS. FERRONE:  I'm sorry.

15          MS. MACEDONIO:  No.

16          During his testimony Gasper asserted the following:

17          He says that when he and Mr. Asaro were driving to

18   get a truck, that Mr. Asaro just blurted out:  Jimmy Burke and

19   I killed Katz.  That he just blurted out the name Paul Katz.

20   However, when he was debriefed on this issue, the notes from

21   Agent Mininni, that Agent Mininni took made it very clear

22   Gasper was sent to go get the truck, not that Vincent Asaro

23   ever went with him.  This is a major change because it's that

24   ride that Gasper -- it's during that ride that Gasper Valenti

25   claims that Mr. Asaro told him that he had murdered someone,

1   but that's not what he told the agents.  That's not what he

2   told the agents.

3           So just to be clear, the only evidence you have that

4   Vincent Asaro participated in the actual homicide of Katz is

5   that statement, that statement by Gasper Valenti that has

6   changed.  And while we're very sympathetic to the Katz family,

7   they don't have any idea who killed Paul Katz.  After the

8   burial Gasper Valenti claims he was given an apology, an

9   apology from his uncle, his Uncle Jerome, Vincent's father.

10  This is the same tough guy uncle the government claims brought

11  Gasper Valenti into the life, a life that Gasper Valenti was

12  already participating in.  They described the Bonanno crime

13  family, and particularly the Asaros as long-term members.

14  People who would do anything, kill, steal, rob.  And Gasper

15  Valenti, he gets an apology from Jerome Asaro?  Is this just a

16  way for him to distance himself from this?

17          With regard to Vincent Asaro being an accessory

18  after-the-fact, including the moving of the body; again, all

19  you have to go on is Gasper Valenti.  Gasper Valenti testified

20  that after he and Jerry Asaro removed Katz's remains, that the

21  remains were to be put in paint cans and taken to an upstate

22  property owned by Jerry Asaro and Frank Lapetina.  That's it.

23  That's all you have.  Well, the government knows if there's a

24  property or not.  They're certainly capable of getting a

25  search warrant.  Where is that evidence?  You don't have it.

1   So all you have is Gasper.  Now, clearly Gasper Valenti takes

2   the FBI to the body of Paul Katz, but whether or not he

3   participated in it, how he learned that information is

4   anybody's guess.  For all we know he was there and he hid the

5   body with Joe Allegro.

6           Let's take a look at the tape that the government

7   claims is all telling.  So this is the final tape that Gasper

8   Valenti makes, and during the course of this day he had called

9   Mr. Valenti several times:  I have to meet with you.  I have

10  to meet with you.  This is the day that the FBI is going to do

11  the search for Paul Katz's remains.  And finally they meet up,

12  and since I can't see it up there, I have to come over here,

13  and so Gasper gets -- you saw the video surveillance, Gasper

14  actually gets into Mr. Asaro's car and they start talking.

15  Gasper immediately says:  The Feds are all over Liberty

16  Avenue.

17          And Asaro says:  For what?

18          He says:  By, you know?

19          He says:  Bam?

20          Yeah.

21          For what?

22          I don't know.

23          How do you know?

24          I just came from my doctor there, Valenti says.

25          Asaro who has absolutely no idea what Gasper is

1    talking about says:  Who are they looking for?  John there?

2            And he says:  I'm talking about Liberty Avenue

3    where --

4            And then there's a silence.  And according to the

5    transcript, Asaro puts his car in park and sighs.  Now, the

6    government claims at this moment Vincent Asaro realizes that

7    this crime that he committed all these decades ago is about to

8    be unearthed.

9            Let's finish the conversation.

10           He says:  You know what I mean?

11           And Asaro says:  No, I don't know what you mean.

12   All right, let me go.  Go ahead.

13           Valenti says:  Where do you want me to go?  What

14   should I do?

15           He says:  What should you do?

16           Valenti says:  Nothing.

17           And Asaro says:  What can you do?

18           Now, there is no conversation here where Valenti is

19   saying to Mr. Asaro, what are we gonna do?  What are we gonna

20   do next, Vin?  Instead he said:  What should I do?

21           He says, I don't know, what can you do?

22           What's done is done.  He's essentially telling

23   Gasper, you know, you're in trouble, but it has nothing to do

24   with me.

25           And then knowing that Mr. Asaro has been followed

1   for years, he knows about surveillance, what does he say to

2   Gasper?  Don't call me.

3            And why does he say that?  He says, you're in a heap

4   of trouble, don't be calling me anymore.  And that's it, but

5   there's not one reference to:  Vin, what are we gonna do?

6   Gasper simply says to him:  What am I gonna do?  What should I

7   do?

8            He says:  I don't know what to tell you.

9            The government claims that at this very moment they

10  can read Mr. Asaro's mind, that at this moment he understood,

11  he knew Gasper was cooperating.  Really?  Did he yell at him?

12  I mean we know Mr. Asaro is capable of yelling, right?  Did he

13  yell at the guy?  Did he smack the guy?  Did he tell him off?

14  Did he curse at him?  No, he says:  Don't call me, get out of

15  my car.

16           And then you have the surveillance.  You got to

17  watch the surveillance, and what did Mr. Asaro do?  He just

18  simply pulled out of that diner and pulled away.  Did he speed

19  away?  Nope, just pulled out of the diner, just drove away.

20           What did he do next?  Well, the surveillance

21  continued and Mr. Asaro went down Liberty Avenue to Bam's

22  place of business.  Nothing shocking in this at all.  He had

23  gone there often, but in an effort to make this all sound

24  mysterious, the government asserted that Mr. Asaro got into

25  the car with an unknown male.  Well, he clearly knew whose car

Summation - Macedonio                              3696

1    he was getting into.  The fact that they didn't is of no

2    consequence.  And what did he do?  Let's take a look at what

3    he did.

4           So now, Asaro, who, as we know, is aware of

5    surveillance, right?  He understands that the FBI has been

6    surveilling him for years.  He travels down Liberty Avenue in

7    a car, right?  The car is going this way (indicating), so he

8    is in the passenger's seat.  So he's directly on the side of

9    the house.  He's not crouching.  He's not hiding.  He's not

10   disguised.  He comes down here, he sees the FBI's truck set

11   up.  One pass isn't good enough.  He doesn't go up 101st

12   Avenue and around; nope, he turns around comes back down.

13   Does that sound like the actions of a man who just realized

14   that a murder victim, someone he killed had been discovered?

15   Doesn't it sound like somebody is:  Hmm, let's see what's

16   going on down there.  I don't have anything to do with it.

17          Two hours later he went to see his son.  They got

18   some pictures of that, too.  Then at 3:30 in the afternoon he

19   has a fender-bender.  Now, they had been surveilling him all

20   day, if that really was, you know, like a big accident because

21   he was so upset, you would have seen it, but you didn't.  He's

22   an 80-year old man, he backed into a pole.  It was a

23   fender-bender, he got out, he looked at it, that's the end of

24   it.  The government asserts that that's the tell-all sign that

25   Mr. Asaro was so upset that he got into a car accident at 3:30

1    in the afternoon.

2          What does he do next?  Does he run?  Does he hide?

3    Does he go on the lam?  Does he try and skip town?

4          Nope, he just goes about his business and he's not

5    arrested for the next seven months.

6          Again, to prove Mr. Asaro guilty of any part of the

7    Katz homicide you are forced to rely upon Gasper Valenti

8    100 percent; and that, ladies and gentlemen, is simply not

9    proof beyond a reasonable doubt of Mr. Asaro's guilt in the

10   Katz homicide.

11         So let's talk about Lufthansa.  We know that

12   Lufthansa was robbed on December 11th, 1978, and clearly Rolf

13   Rebmann and Kerry Whalen were victims in this robbery.  There

14   is no dispute about that.  Gasper Valenti claims he was there.

15   Kerry Whalen, the only witness who could identify any of the

16   participants, says Valenti wasn't there.  He identified Angelo

17   Sepe and Tommy DeSimone as the people who assaulted him and

18   threw him in the van.  Whalen further testified that he got a

19   very clear view of Sepe as his high beams were shining

20   directly into their van.

21         Now, Kerry Whalen doesn't know these people from

22   Adam, right?  He's not a guy from Ozone Park.  He's just an

23   employee at Lufthansa.  And he identifies Tommy DeSimone and

24   Angelo Sepe.  Was that an accident?  How could it possibly be?

25   Of course, it's not an accident.  Those are the people he saw.

1   And what incentive does Kerry Whalen have to lie in this case?

2   Well, it's certainly not going to get him his $5 or his shoes

3   back.  I mean he was just here to tell the truth.  He doesn't

4   know Vincent Asaro.  He has no affiliation with him.  He was a

5   victim in a serious crime.  He was pistol-whipped and he had a

6   gun shoved in his eye.

7           The government treated him as if he was insane,  as

8   if he wasn't even there.  And why?  Why did they treat him

9   that way?  Because his testimony didn't match Gasper

10  Valenti's.  And then after treating Mr. Whalen as if he were

11  insane, they wanted to use him.  They wanted to confirm the

12  details of the inside of Lufthansa that Rolf Rebmann had given

13  you.

14          Is Whalen upset with the government?  You bet he is.

15  Of course, he is.  Why?  Why is he so upset?  Because two days

16  after he was viciously beaten his name appeared in the

17  newspapers.  He was outed.  He was outed by the federal

18  government, the very government he had relied upon to protect

19  him.  The government then tried to make a big deal as to

20  whether or not he had ever described his assailant as having a

21  mustache.  During Mr. Whalen's cross-examination, Ms. Gerdes

22  read from notes that Mr. Whalen had never seen before, notes

23  that he was never asked to confirm.  But yet when he was asked

24  to identify his assailants in a 1979 lineup, all the people

25  who participated in that lineup had mustaches.  And why?

Summation - Macedonio                            3699

1   Because that's what he told them.  Why else would everybody in

2   the lineup have a mustache?

3           What else did Kerry Whalen tell you?

4           Well, Gasper Valenti clearly boasted that he had

5   stolen Whalen's badge and wore it around the Lufthansa

6   terminal, but Whalen told you nobody ever took his badge.

7   That he had it the next time he reported to work.

8           How does Gasper Valenti involve Vincent Asaro in the

9   Lufthansa heist?  Just like he does with so many of the other

10  crimes, he simply says:  Mr. Asaro approved my participation

11  in it and he was waiting in the crash car.  Yep, Gasper

12  Valenti claims that Jimmy Burke and Vincent Asaro were waiting

13  in a crash car.  Okay, well, it's 1978, so we know they don't

14  have cell phones.  Nobody testified about a walkie-talkie.

15  There are over several highways, right?  So here's the

16  Lufthansa terminal (indicating) and here is allegedly where a

17  crash car is (indicating), so they'd have to cross over all of

18  these streets (indicating) to get to the site to ward off the

19  police at precisely the right moment -- when you didn't know

20  if the police were there or not.  Does that make any sense?

21  Absolutely no sense at all, but that's how Vincent Asaro was

22  involved in Lufthansa.  He's in a crash car a mile away,

23  completely in communicado with any of the people at Lufthansa.

24          According to Gasper Valenti, after the greatest

25  airport heist in history the crew had no getaway plan, so they

SAM      OCR      RMR      CRR      RPR

Summation - Macedonio                    3700

1    decided to go back to Gasper's mama's house.  And, of course,

2    this was all Vincent Asaro's idea.  Who else?  A house with

3    nine children in it, three adults and a sickly dog who slept

4    on the porch.  Without waking a soul, those men formed an

5    assembly line and began parading their loot into the basement

6    of Gasper's mother's house at four in the morning.  Really?

7            It's an unbelievable plan and Gasper's lies don't

8    get any better, but his inconsistencies do.  He testified that

9    everybody counted the money, but Mr. Asaro left.  That he left

10   with Tommy DeSimone and Jimmy Burke because they had to go

11   back to a halfway house.  And that after that, Mr. Asaro went

12   to Fat Andy's club.  Yet, you might recall that Special Agent

13   Mininni told you that Gasper told him that he, meaning Gasper,

14   Vincent Asaro, and Angelo Sepe stayed with the money all

15   night.

16           Take a look at the transcript, it's at Page 3025:

17           Answer:  The night the individual -- meaning

18   Valenti -- along with Vincent Asaro and Angelo Sepe stayed

19   with the money.

20           Question:  So that's Gasper's house, correct?

21           Answer:  Yes.

22           It just can't be both ways.  He was either there or

23   he wasn't, but the story, again, is changing.  Then, according

24   to Valenti, he suddenly realized that having millions of

25   dollars in his house might endanger the 13 people that were

SAM      OCR      RMR      CRR      RPR

1   living there, so he had to get rid of most of the money; not

2   before keeping some for himself.

3          So what did he tell you about where he hid the

4   money?  Well, he concocted this crazy story about taking the

5   door jambs off so that he could put money in the door jambs.

6   Now, how does that make any sense?  What, every time he needed

7   a few dollars he was going to rip the door jambs off again and

8   nobody was going to notice this constant construction in his

9   bedroom?

10          And then my favorite part is Gasper claims that he

11  had $6 million in his house, $6 million, but Mr. Asaro tells

12  him:  Oh, go get some Christmas trees and pretend like, you

13  know, you're having a fire and then you can get rid of all of

14  the boxes and materials from Lufthansa.  So according to

15  Gasper, Mr. Asaro, who never gave him any money ever before,

16  ever, for any other crimes they committed, gives him money to

17  go get Christmas trees when Gasper Valenti has $6 million in

18  his house.  Come on, really?  You can ask yourself, well, how

19  would Gasper Valenti know so much about Lufthansa if he wasn't

20  there?  Well, he testified repeatedly, he knew Tommy DeSimone,

21  he knew Angelo Sepe, he knew the rest of the characters,

22  that's how.  The people who were on the government's board

23  that was up here during the course of the trial as being the

24  participants, people that Kerry Whalen identified as being the

25  participants, the people that assaulted him.  Could Gasper

1   Valenti have been there?  Maybe, I guess.  But the

2   inconsistencies in his testimony make him unreliable in

3   determining Mr. Asaro's guilt or innocence.

4           I want to comment briefly about the recordings that

5   the government claims prove Lufthansa.  The government's

6   asking you to interpret certain conversations in a way that

7   comports with their theory.  So, for example, there's a

8   conversation where Gasper Valenti just blurts out the name

9   Henry Hill.  Okay, I'm not really sure what that means, but

10  they say it's a reference to Lufthansa.

11          Then there's a conversation in which they are

12  discussing the fact that Danny Rizzo has no money.  Well, so

13  what, none of them had any money.  They're making it sound as

14  if, you know, that's it, that's the conversation.

15          And then there's a conversation in which Mr. Asaro

16  asserted that they never got their right money and he mentions

17  the name Jimmy.  It could be Jimmy anybody.  It could be Jimmy

18  Burke.  It could be Jimmy Santos.  Who knows?  It could be

19  from anything.  I submit to you that these recordings are not

20  conclusive of anything.  And, once again , your left to rely

21  on Gasper Valenti.

22          So desperate is the government that Ms. Cooley

23  asserted in her summation, when the defendant says nothing,

24  that's proof, that's proof he participated.  Okay, so now

25  silence is proof beyond a reasonable doubt.  Now, even though

Summation - Macedonio                              3703

1    they wanted to make Kerry Whalen look as though he was insane,

2    look at who the agents surveilled immediately after Lufthansa.

3    Who were the agents looking at in 1978 and 1979?

4           Well, John Keenan got on the stand and he testified

5    that on December 26th of 1978, a few days after the Lufthansa

6    heist, that he was surveilling Angelo Sepe and Tommy DeSimone.

7    Robert Joyce testified that on January 31st of 1979 he was

8    surveilling Angelo Sepe.  There is no surveillance of Gasper

9    Valenti.

10          Sal Vitale, Peter Zuccaro and Anthony Ruggiano also

11   testified to some details that they have regarding Lufthansa;

12   however, these men have been cooperating for years and the

13   details that they add, they really don't help.  So, for

14   example, Sal Vitale says that he met with Mr. Asaro near Joe

15   Marsala's shop and that Mr. Asaro gave Joe Massino a bag that

16   contained jewelry and that it was from the Lufthansa heist.

17   The problem is Gasper says Joe Massino came to his house,

18   meaning Gasper's house, to collect that bag.  You can't have

19   it both ways, which is it?

20          Peter Zuccaro testified that he -- that Gasper

21   Valenti never received his money from Lufthansa.  Gasper says:

22   Yeah, I did.  Can't have it both ways.

23          Anthony Ruggiano says that after Lufthansa, Vincent

24   Asaro was at the track and he was making big bets and lending

25   out money, larger than usual.

1          There's only so much you can do with this money,

2     right?  So what does Gasper Valenti tell you?  Well, first he

3     says that Mr. Asaro bought a house.  Okay, so you have some

4     documents with regard to the house.

5               (Exhibit published.)

6          This is a deed that indicates that Theresa Asaro

7     bought a house in Moriches two years after Lufthansa.  We

8     don't know how much that house cost.  We don't know where the

9     money came from.  They just put this document in there like,

10    there it is, gotcha, two years later he bought a house.

11         He also tells you that Mr. Asaro bought a car, that

12    he had a Lincoln Continental after Lufthansa.

13              (Exhibit published.)

14         Well, in all the surveillance we see lots of cars,

15    right?  So in 1980 we see that Mr. Asaro's driving a 1977

16    Lincoln Continental that was registered before Lufthansa.  And

17    then there is a whole series of cars, a Suburban, another

18    Lincoln, some Mercedes, and the list goes on and on.  Proves

19    nothing.  We heard about a boat, that Mr. Asaro bought a boat.

20    What kind of boat?  When?  A new boat?  A used boat?  A

21    sailboat?  A powerboat?  We don't know.

22         Gasper also claims that Mr. Asaro gave a

23    hundred-thousand dollars to his Uncle Mickey, then he lent him

24    another hundred-thousand dollars.  It was just -- it doesn't

25    make any sense.  There is not -- there is just not that much

Summation - Macedonio                        3705

1   money, and yet this is what you get.

2           Now, the government actually asserted that the

3   surveillance photos of Vincent Asaro at Jimmy Burke's wake in

4   1996, 20 years later, was proof that Vincent Asaro was part of

5   Lufthansa.  Come on.

6           With regard to John Tagliaferro, he had no idea

7   where that money came from.  And Ronnie Cecchini, he didn't

8   even have any idea what was in the package, but both men, both

9   men described small packages, not a package that had millions

10  of dollars in it.

11          Then, of course, there is Afters.  Gasper Valenti

12  insisted that that club was named Afters after Lufthansa.

13          (Exhibit published.)

14          Now, isn't it crazy for a group of individuals who

15  were so surveillance conscious, who had just committed the

16  biggest heist in history to name a club after the biggest

17  heist in history?  Does that make any sense to you at all?

18  It's just not true.  And the government claims that Afters got

19  its liquor license on December 22nd, 1978.  How do you get a

20  liquor license 11 days after the heist?  Could this be After

21  Hours?  Could it be after anything?  Yeah, but it's not after

22  Lufthansa.  Practical experience tells you nobody is getting a

23  liquor license in 11 days.  It's not happening.  And then, of

24  course, we had to hear about Blondie and Gladys Knight and the

25  Pips.  This is just another example of Gasper going too far.

Summation - Macedonio                                    3706

1   Taking all of this evidence into consideration, including

2   Kerry Whalen's testimony, all of it, the government has simply

3   failed to prove that Mr. Asaro had any participation in the

4   Lufthansa heist.

5            (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. MACEDONIO:   (Continuing)  You also heard

2    testimony about the murder of Richard Eaton.  First, it's

3    important for you to understand that Mr. Asaro has never been

4    charged with Eaton's murder.  It was merely filler to make you

5    believe that Mr. Asaro was actually capable of murdering Paul

6    Katz, a crime that had been committed a decade before.

7          Let's look at what you heard.  Gasper Valenti

8    testified at this trial that Jerry Asaro knocked on his

9    window, that they tried to dig a hole but it was too cold.

10   Gasper Valenti had no idea whose idea it was to put the body

11   in the trailer, but Jerry Asaro and Frank Burke put Eaton in

12   the trailer and then Jerry Asaro went down to the fence

13   company to get a lock.  Okay.  Well, in his prior discussions

14   with the agents, Gasper told them that Jimmy Burke, Frankie

15   Burke and Mr. Asaro knocked on the window.  Very, very

16   different.  Very different.  That it was Mr. Asaro who

17   suggested putting Eaton in the trailer and that Gasper Valenti

18   unlocked the trailer, then put the body in and Gasper locked

19   it again.

20         See, it's these details where he gets tripped up.

21   It's two completely different stories.  He knows there's a

22   body in the trailer, but at different times, he's blaming it

23   on different people.  It's just another example of how the

24   story is constantly changing.

25         Let's talk a little bit about loansharking and this

1    is contained primarily in Racketeering Act Number One.  The

2    time frame that you have to consider is from 1968 to 1990.

3    So, again, in order to find him guilty, who do you have to

4    believe?  Gasper Valenti, because he's the only one who

5    offered testimony about this.  There's no victims presented to

6    you.  Not a single one.

7            At one point, Gasper talked about people in the

8    neighborhood like Bobby Marshal, they constantly talked about

9    him the drunk guy whose debt was $100 that they collected over

10   and over again.  Then in his next breath, he's talking about

11   borrowing money from Jimmy Burke.  He, he was having to borrow

12   money from Jimmy Burke.  Later, Gasper told you that he was

13   collecting 4 to $5,000 a week at the Great Im-pasta.  Then he

14   told you that the restaurant had to close down because

15   Mr. Asaro had gotten himself into trouble.  Does that make any

16   sense to you?

17           During his testimony, he identified John Zaffarano

18   as a victim or a customer, but you didn't have the opportunity

19   to witness John Zaffarano yourself.  Right?  The government

20   called him as a witness.  And what did he tell you?  He told

21   you he wasn't a victim of loansharking or extortion.  Take a

22   good hard look at John Zaffarano's testimony.  It's not what

23   the government presented to you and it was their witness.

24   John Zaffarano didn't move to Florida to get away from Vincent

25   Asaro.  There was no testimony of that.  He just got up there

1  and said that.

2          Where is the testimony about any of this

3  loansharking money getting kicked up?  Did this loansharking

4  business, this so-called loansharking business in furtherance

5  of the Bonanno crime family, why is there no testimony about

6  money going up?  Remember, this is a racketeering case so you

7  have to find, in order to find Mr. Asaro guilty, you have to

8  find that he was operating in furtherance of the Bonanno crime

9  family.  Where is the evidence of that?

10         And then we have an extortion of John Zaffarano and

11 this is about John Zaffarano having to pay back money that he

12 claims Mr. Asaro told him -- excuse me.  Let me start over.

13         This is John Zaffarano claiming that he had to pay

14 back money that Mr. Asaro told him that his father,

15 Mr. Asaro's uncle Mickey, had borrowed.  Let's take a look at

16 what he said.  I have a little bit more than what's on the

17 chart.

18         Question:  Now, when you lent the money to

19 Mr. Asaro, did you do that because he threatened you?

20         Answer, by John Zaffarano:  Oh, no, he never did

21 that.

22         Question:  Did you do it because you were scared?

23         Answer:  No.

24         Question:  Did he threaten you that you had to give

25 him the money?

1           Answer:  No.

2           Question:  Did he scare you that you had to give him

3     the money?

4           Answer:  No.

5           Question:  Did he force you to give him the money?

6           Answer:  No.

7           And there was one other question:  The money that

8     you paid back, it was your father's debt, and you did that

9     willingly, right?  And his answer was, Yes.

10          As to the proceeds of his father's properties in

11    Manhattan, John Zaffarano's testimony makes clear that he gave

12    Mr. Asaro a portion of the proceeds because he wanted to.  He

13    told you he did all sorts of things for family members.  The

14    guy who came into $19 million didn't know what to do with it.

15          The bigger picture here, quite frankly, is that the

16    government took anything that they could that had to do with

17    money and through Gasper Valenti, made it sound like Mr. Asaro

18    was extorting everybody, but that's simply not the case.  John

19    Zaffarano wasn't extorted.  John Zaffarano is his cousin and

20    he came in here and told you that.

21          The government elicited testimony from Gasper

22    Valenti about a porn star.  Gasper testifies about this whole

23    meeting where he was in California with John Zaffarano and

24    there was a porn star who wasn't living up to the contract so

25    they had a big sit-down with some other organized crime people

1   and, yada, yada, yada.  They didn't ask John Zaffarano a

2   single question about that.  Not a single question.  Why do

3   you think that is?  Because he just wasn't going to support

4   Gasper.  It was a lie.  They gave John Zaffarano immunity.

5   They could have asked him whatever they wanted to and they

6   just opted not to.

7         You also heard from Jose Estrella.  He was the

8   person who was betting with Gasper Valenti.  He is the only

9   betting customer that you heard from.  And you might recall

10  Gasper Valenti told the agents that his name was Joe Aquella.

11  Well, Mr. Estrella met Mr. Asaro when he was having a problem

12  getting paid for his betting with Mike Palmaccio.  And

13  according to Mr. Estrella, Mr. Asaro tried to resolve that for

14  him.  And guess what?  He didn't.  Mike Palmaccio just paid

15  him no mind, put him on the pay-no-mind list.

16        And so what happens next?  Well, Estrella comes

17  back.  He wants to do some bets and Mr. Asaro tells him that

18  he knows somebody else he could bet with but that he, himself,

19  Mr. Asaro, had nothing to do with it.  All of Mr. Estrella's

20  dealings thereafter are with, guess who?  Gasper Valenti.

21        For a little over two months, Estrella places bets

22  online and when it was time to pay up, according to Valenti,

23  Estrella went on the lam.  When Valenti was finally able to

24  collect the money, he told Mr. Asaro, I come up with some

25  money and what did Mr. Asaro say to him?  Gasper, that's your

Summation - Macedonio                      3712

1   money, keep your money, I don't have anything to do with that.

2   How is that a gambling operation between all of them?  It's

3   hardly a bookmaking enterprise.  I mean, you just knew that.

4          So what did they do?  Years later, in 2012, the

5   agents send Gasper Valenti back to Jose Estrella, years after

6   he had last seen him, a man they knew had a gambling problem

7   and here is my question.

8          So, is this another example of Gasper Valenti going

9   to someone who has no affiliation with organized crime at the

10   direction of the FBI asking him for money?

11          Answer:  Yes.

12          And this is years after the gambling issue with

13   Mr. Estrella that he testified about in court, correct?

14          Answer:  Correct.

15          Now, I think it's very clear that the evidence is

16   simply that there was no bookmaking operation, but when you

17   sit back and you look at the elements of the offense, because

18   the Judge will charge you and you will understand what you

19   have to find for each of these crimes, you are going to find

20   that the government has failed entirely with respect to the

21   number of participants and the amounts.  There is absolutely

22   no testimony as to what the amounts of gambling was going on.

23   And Gasper Valenti, by his own admission, has one customer so

24   I don't know how you find him guilty of this racketeering.

25          That brings me to Carmine Muscarella.  This is

1   perhaps the most telling part of the government's case and of

2   Mr. Valenti's cooperation.  After recording, making recordings

3   for two years and coming up with nothing, he gets a phone

4   call, there's a phone call between Mr. Asaro and Mr. Valenti.

5   They're talking about a piece of property and this has really

6   nothing to do with Mr. Asaro.  He tells him go get some money,

7   you know, go get the money, but the actual money itself and

8   why, why there was money coming had nothing to do with

9   Mr. Asaro.  This is simply because Gasper Valenti had asserted

10  a claim with Carmine Muscarella that he was entitled to some

11  proceeds of a house because it was his godfather who died.

12          Okay.  There's Carmine Muscarella.  An everyday

13  working man.  You saw him.  He testified at the trial.  He

14  works for an electrical construction company.  He's got no

15  ties to organized crime, yet the FBI took Gasper Valenti in

16  his office demanding $5,000 and Gasper Valenti knew there was

17  no such agreement.  The government simply set Carmine

18  Muscarella up by sending Gasper Valenti in to see him and then

19  when Carmine refused to attack Vincent Asaro at this trial,

20  they attacked him on the witness stand.  I encourage you to

21  review the Muscarella recordings, especially 204 and 205 in

22  which he adamantly denies making an agreement with Gasper.

23          Had you only been able to rely on Mr. Valenti's

24  testimony, you might have believed that Mr. Muscarella paid

25  Gasper because he was afraid of Mr. Asaro but, luckily, you

1    didn't have to rely on Gasper this time.  You heard from

2    Carmine Muscarella.  When asked if there was another reason

3    besides the fact that Gasper was his stepfather's godchild,

4    why he paid the $3,000, do you remember what he said?  The

5    government was asking him, Was there any other reason?  He

6    said, Other than the fact that he was an irritant on my anus,

7    no, that was it.  That was his testimony.

8            Carmine Muscarella told both Gasper Valenti and

9    Vincent Asaro, he didn't want to hear from them again, this is

10   it.  That's very clear on the recording.  He was going to

11   settle this.  He was going to give him a few thousand dollars,

12   he had given thousands of dollars to all sorts of other family

13   members for this property and he didn't want to hear from

14   Gasper anymore.  The reason why he is saying this is Gasper

15   just kept calling him, calling him, calling him, calling him,

16   but you don't have any of those recordings.  You don't have

17   recordings of Gasper calling Muscarella saying, Where's my

18   money, where's my money, where's my money.

19           Carmine Muscarella also testified about the money he

20   gave Vincent Asaro a few weeks later.  He said he felt sorry

21   for Mr. Asaro.  How humbling it must have been for Mr. Asaro

22   to come to him for money because Mr. Asaro was such a proud

23   man.  Does that sound like the testimony of somebody who's

24   scared and extorted?

25           Despite an attempt by the government to bully him

Summation - Macedonio                    3715

1   into answering differently and shamelessly incorrectly trying

2   to connect his brother to organized crime, Mr. Muscarella's

3   testimony never wavered.  He wasn't extorted into paying

4   Gasper Valenti, but he was set up by the FBI.

5           Racketeering Act Number Fourteen is an alleged

6   extortion of Robert Cotrone, Bam.  While you may have heard

7   that name throughout the trial, you certainly didn't see or

8   hear from him here, did you?  Where is Bam?  Not a witness at

9   this trial.  But take a look at the recordings when you're

10  deliberating about this event, about the Bam extortion.

11          So, for example, recording number 242.  Vincent

12  Asaro says, Frankie told us to come up to the accountant,

13  understand?  And that Anthony Gurino, understand, where is the

14  books?  He's supposed to show us the books.  And then John

15  Ragano says, All he has to do is call his accountant.  His

16  accountant will call the guy up and take care of it.  They'll

17  take care of it.  Recording 243.  They don't want to show us

18  the books.

19          What kind of extortion is going on where there's an

20  accountant involved?  It just doesn't make sense.  Something's

21  not adding up.  And this is particularly true when you start

22  to look at the money.  In recording 241, they're talking about

23  $70,000 and then they're talking about $30,000 and they're

24  talking about $136,000.  You just don't know what they're

25  talking about and Gasper admits to you, I don't know the

CMH      OCR      RMR      CRR      FCRR

Summation - Macedonio                            3716

1   details of it but I just don't know, they wouldn't share

2   anything.

3              Now, the worst part about these conversations is

4   John Ragano says, Let's go stab him in the neck.  You know

5   that didn't happen.  You know this is these guys sitting in

6   the dining room eating eggs, just yakking at each other.

7   Nobody got stabbed in the neck.  You would have heard about

8   that.

9              And who's the victim here?  Right?  You've heard

10  over and over and over again Bam's part of this, Bam's an

11  associate, Bam's this.  Well, you're either in or you're out,

12  right?  I mean, you can't be in and be a victim.  You've got

13  to be out to be a victim.  If you're in and you're wanting all

14  of this, then how are you the victim?  I don't understand the

15  theory.  You heard testimony, you saw some surveillance about

16  Mr. Asaro talking to Bam on the street and the government

17  claims that he showed signs of physical distress.  I didn't

18  see that.  This is also the same Bam that told Mr. Asaro he

19  wasn't allowed on the block.

20             You heard some testimony about an arson that

21  occurred, I don't know, maybe in 1980, maybe 1981.  That's how

22  it's charged in the indictment.  And what does Gasper say

23  about this arson?  Well, once again, he says, Vincent Asaro

24  told me to do it.  And what did he get for that?  He got

25  kisses and hugs.  That's what Gasper says.  Oh, they kissed me

Summation - Macedonio                3717

1    to let me know how happy they were with me.

2           Gasper claims that he went to this club, Afters,

3    that he poured gasoline all over the floor and then he doused

4    a ball with gasoline, put the ball in his hand, lit it on fire

5    and threw it into the club.  Okay.  That doesn't make any

6    sense.  That, to me, that sounds quite painful.  I don't know

7    who would come up with that plan, but you're not holding a

8    ball doused with gasoline and throwing it through anything.

9           Now, he claims here that he threw the ball, the ball

10   that he had doused in gasoline, lit on fire in his hand,

11   through a door.  Right?  But previously, he talked about

12   throwing it through a window.  That had to be corrected and

13   here's why.  That's Afters.  There's no windows.  No windows

14   at Afters.  It had to go through a door.  So this was cleared

15   up before his testimony here.

16          Now, you might be asking yourself, well, why would

17   anybody say they did an arson if it wasn't accurate?  It was

18   1980.  He knew there had been a fire and the only thing he had

19   to say about this is that my client authorized it and suddenly

20   there's a charge in an indictment.

21          You also heard testimony about a murder

22   solicitation.  This is one of my favorites.  Once again, you

23   have to rely on Gasper Valenti and look what he says.

24          Question:  After Bobby went to jail, did you

25   continue to discuss Gary Ferreri with Vinny?

1              Answer:  Off and on.

2              Question:  And who else?

3              Answer:  Jerry.

4              Question:  What were those discussions?

5              Answer:  Jerry wanted to, Jerry wanted to kill him.

6   Vinny said take it easy, you know, you're getting ahead of

7   yourself.  He's a rat.  He's a stool pigeon.  He's your

8   cousin.  Let's see what's going to happen with this.

9              Let's go to the next page.

10             Question:  Who brought it up?

11             Answer:  Jerry brought it up.

12             Question:  What did Vinny say?

13             Answer:  He said we'll do something.  Just relax.

14  Take it easy.  Relax.  Stop pumping it up.

15             That doesn't sound like a murder solicitation.

16  Where is the solicitation?  And then there's no follow-up.

17  Where is the would-be victim?  So desperate is the government

18  on this act that they claim that an unrelated arrest of Bobby

19  Giallanzo shows their criminal association in this.  How?

20  Vincent Asaro is his uncle.  At the end of the day, nothing

21  ever happens here.  There is no murder solicitation.

22             You heard about the Halloween capers, I like to call

23  them, which is Racketeering Act Number Six and that charges

24  sometime between 1984 and 1986, a two-year period, and

25  according to Gasper Valenti, this is where four grown men put

1   on masks and gloves, take guns and walk up to an armored car

2   in a supermarket parking lot because they thought they would

3   go undetected.  Again, it's, it's fantasy and there's not a

4   police report, there's nothing.  All you have is Gasper

5   Valenti saying, This is what happened.  He told us to do it.

6   This is what happened.  He told us it would be okay.  This is

7   what happened.  If we would have succeeded, we would have

8   given him all the money.

9           Same thing, over and over again.

10          You also heard about the gold salts robbery which is

11  kind of an interesting thing because probably most of you, I

12  hadn't heard of gold salts before any of this so it's kind of

13  an interesting thought that gold would actually be turned into

14  liquid, but the players in this really, really don't make

15  sense.  They don't add up.

16          When Gasper Valenti testified in court here, he said

17  that Jerry was taken out of the picture and a guy named Funzi

18  was put in.  But take a look at this chart.  What did he tell

19  the agents?  Well, Agent Mininni's testimony about his notes

20  from meeting with Gasper Valenti regarding the gold salts.

21          Answer:  Individual along -- individual means Gasper

22  Valenti -- along with Bobby, last name unknown, Jimmy, Santos

23  and Jerry Asaro hijacked and robbed a Federal Express truck.

24          Question:  That was the gold salts robbery that we

25  heard so much about?

Summation - Macedonio                    3720

1          Answer:  Yes.

2          But when he testified here, Jerry is not there.

3   What happened?

4          Answer:  Jerry was supposed to go with us, but later

5   on Jimmy came and he says he had to let Jerry go because Funzi

6   was in trouble.  Funzi was a made member of the Colombo crime

7   family also.

8          You know, I mean this is a score where he claims he

9   got almost $200,000.  He doesn't know who went with him?

10         This is a transcript.  This is 217, recording 217

11  which is in evidence and this is page ten of that.  Now,

12  they're talking just generally about, What are we gonna do.

13  And this and that.  I mean, really, Gasper could have been

14  talking about people landing on Mars.  Mr. Asaro is just

15  passing the time with him and it's nonsense.

16         I mean, he's talking about, taking to Danny Rizzo

17  and getting the address.  That never happened.  He can't get

18  the players straight.  He can't tell you what's been going on.

19  And on then on page two, he is really trying to bait

20  Mr. Asaro.  So he says, so he's talking about, you know,

21  should he go there and Mr. Asaro says, I don't remember where

22  it was.  I never went there.  You went there.  And he

23  continues.  He goes on and on about maybe it's in Freeport and

24  finally Asaro says, If you don't remember, what's the sense in

25  going?

Summation - Macedonio                                3721

1           This is just like idle chatter.  You know, they're

2    not talking about actually doing something.  This is just a

3    back and forth with one another.  But not getting the players

4    straight?  Not knowing who was with you?  That's real.  When

5    you testify in court, when you're talking to agents as

6    compared to sitting in Sapienza's deli, that's different.

7           You also heard testimony from Guy Gralto.  Like

8    other cooperators, Gralto was a criminal who escaped the

9    consequences of his criminal activity by negotiating a deal

10   with the State authorities.  This is true, that Gralto had

11   committed crimes while on bail.  But like the many other

12   racketeering acts and I bring you back to this constantly, you

13   have to ask yourself was this done in furtherance of the

14   Bonanno crime family?  Was Vincent Asaro just doing this on

15   his own?  Because they're racketeering acts.  They're not

16   things that are charged independently.  All of these

17   racketeering acts have to be done in furtherance of the

18   Bonanno crime family.

19          Racketeering Act Number Ten charges bookmaking from

20   1994 until 2002 and on this, really all you have is Sal

21   Vitale's word.  It's kind of like what he throws in for

22   Mr. Asaro.  It's a time filler within the chart for the

23   government.  I'm not going to go back over Sal Vitale's

24   murderous past.  You know it.  You know he can't be trusted.

25          There's also an extortion that's charged with regard

1    to Mr. Asaro's daughter.  It's Racketeering Act Number Eleven,

2    his daughter Tonya.  And this is very interesting because

3    Gasper claims that he went to a building, that he knocked on

4    somebody's door, nobody answered, they called somebody's name,

5    they don't even know if anybody was home, and then after 10 or

6    15 minutes, they left and nothing happened.

7            So here's what he says.  We called out his name and

8    said, you know, We're friends of Tonya, we want to speak to

9    you.  Nobody answered.  There were bicycles and Big Wheels in

10   the hallway so we banged on the door, knocked on the door, and

11   no one answered.  We waited about 10, 15 minutes.  Nothing

12   happened and then we left.

13           That's it.  That's what you get.  And then he claims

14   he went back and he told Mr. Asaro that there was nobody

15   there.  So what did Mr. Asaro say?  He said, Okay.  There's no

16   set amount.  I don't know if anybody is home.  We don't know

17   if this is true.  He can't remember the guy's name.  We don't

18   hear from Vincent Risotto, the guy he claims went with him.

19   We don't hear from Tonya.  We don't have a victim.  You have

20   nothing.  You certainly don't have proof beyond a reasonable

21   doubt.

22           Ladies and gentlemen, simply because someone is

23   indicted with a crime doesn't mean that they've actually

24   committed it.  Your job now is to determine whether or not

25   Mr. Asaro committed the crimes contained in the indictment and

1   whether the crimes that are contained in the indictment were

2   in furtherance of the racketeering acts.  Sometimes the

3   government gets it wrong and you heard that in this case.  You

4   heard some of the cooperators say that they had been charged

5   with things that they hadn't actually done.  We submit to you

6   that when you're left to rely on only the words of Gasper

7   Valenti, that you have a reasonable doubt.

8           For some of the alleged racketeering acts, Mr. Asaro

9   is not even deemed to be a participant.  The arson at Afters,

10  the botched attempt of robbery on the armored car on

11  Halloween, the gold salts robbery, these are all things that

12  Gasper Valenti did and then he attempts to implicate Mr. Asaro

13  by telling you that he passed it by Mr. Asaro and that it was

14  done at Mr. Asaro's direction, but these are just more lies.

15          As Sal Vitale told you, guys in this life lie all

16  the time and Peter Zuccaro told you guys in this life take

17  credit for things they didn't even actually do.  If you are

18  going to believe Gasper Valenti, he never received a dime, not

19  a dime from most of the crimes he committed.

20          Question:  And you testified that all the money you

21  made, essentially all the money you made from these crimes,

22  you gave to Mr. Asaro, right?

23          Answer:  Yes.

24          Question:  How did you support your family?

25          Answer:  From the money that he would give me, very

1    little, and from the crimes, and I borrowed a lot of money.

2           Well, Gasper Valenti told you that he got money from

3    Lufthansa and he got money from the gold salts robbery but he

4    gambled it all away and that he borrowed money from countless

5    people which he never gave back.  So he led a life of

6    committing crimes.  Doesn't make sense.  It just doesn't make

7    sense that Gasper Valenti didn't receive any money.

8           There he is one more time because Gasper Valenti

9    above anything, was about the money.  And so what does he tell

10   you?  The more you tell them things, the more you make up

11   stories, you know, they'll give you more money.

12           (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Summation - Macedonio                    3725

1    BY MS. MACEDONIO:   (Continuing)

2         MS. MACEDONIO:   What's worse; making up stories to

3    get money, selling your soul or death before dishonor?  We're

4    not running from what Vincent Asaro is.  He's a man who

5    marches to the beat of his own drum.  He always has and he

6    always will.  But that does not make him guilty of the crimes

7    charged in the indictment.  You might not like the language he

8    uses.  You might not appreciate the way his temper flares, but

9    that's not guilt beyond a reasonable doubt.  Don't be

10   distracted by his prior incarceration.  You're not asked to

11   consider the facts of that case.

12        At the end of day, the recordings of Vincent Asaro

13   depict a man who spoke his own mind, no matter who he

14   offended.  A man who always did what he wanted.  Those two

15   attributes eliminate him from being the man that the

16   Government describes as a loyal soldier to the Bonanno crime

17   family.  When you look at this case through that lens, when

18   you listen to the recordings with that mind, it is impossible

19   for you to conclude that Vincent Asaro is guilty of

20   participating in the affairs of the Bonanno crime family and

21   acting in furtherance of it.

22        During your deliberations, you should ask yourselves

23   two questions.  One, what did Mr. Asaro do.  I submit to you

24   that once you eliminate Gasper Valenti as a reliable person,

25   one that you would not trust in your own life, a person who

VB        OCR        CRR

Summation - Macedonio                          3726

1   you wouldn't trust in your own life, then you won't be able to

2   find guilt beyond a reasonable doubt with regard to the crimes

3   alleged against Mr. Asaro.

4            And then you need to ask yourself a second question.

5   Why was Vincent Asaro doing things?  Was it for himself?  Was

6   it for his own personal gain?  Or for the Bonanno crime

7   family?  After conducting this analysis, I suggest you will

8   come to the one and only true verdict and that's a verdict of

9   not guilty.

10           I thank you very much for your attention this

11  morning.

12           THE COURT:  Would you like a break?

13           MS. ARGENTIERI:  Just two minutes, Judge, if you

14  wouldn't mind.

15           THE COURT:  That's fine.

16           THE COURTROOM DEPUTY:  All rise.

17           (Jury exits.)

18           (In open court; outside the presence of the jury.)

19           (Recess taken.)     (In open court.)

20           (Judge ALLYNE R. ROSS enters the courtroom.)

21           THE COURT:  Everything's ready.

22           MS. ARGENTIERI:  Yes, Judge.

23           (Jury enters.)

24           THE COURT:  Please, be seated.

25           Ms. Argentieri.

Rebuttal - Argentieri                    3727

1          MS. ARGENTIERI:  Thank you, Judge.

2    REBUTTAL

3    BY MS. ARGENTIERI:

4          MS. ARGENTIERI:  Good afternoon.

5          THE JURY:  Good afternoon.

6          MS. ARGENTIERI:  I know this has been a long time

7    coming and I just want to thank you for your time and your

8    attention, and for the careful way that you have listened to

9    all of the testimony and all of the arguments.  It's a lot of

10   information and I'm just going to beg your indulgence for you

11   to listen to me just a little bit longer and then, you will

12   get the case and it will be up to you to do justice in this

13   case and to hold this defendant accountable.

14          Now, what is evidence?  It's not the argument of

15   lawyers, it's not what I say, it's not what Ms. Macedonio

16   says.  It's the over seventy witnesses that you heard from,

17   their testimony in the last four weeks.  It's the recordings.

18   It's the photographs.  Lawyers can get it wrong even if

19   they're trying to get it right, so when you go back there to

20   deliberate, ask for the evidence.  Ask for the transcripts.

21   Ask for the recordings.  Ask for Gasper Valenti's testimony

22   about the recordings.  Look at it and test it yourselves, and

23   when you do, you will find that we have proven each of the

24   charged crimes beyond a reasonable doubt.

25          Now, it's a little unclear to me, I have to admit,

Rebuttal - Argentieri                3728

1    exactly what the Defense is admitting at this point.  They

2    seem to have mocked all the surveillance witnesses that we put

3    on the stand.  It seems one thing, they might be conceding the

4    Bonanno crime family exists, but if I was listening correctly,

5    I think that they may have said that the defendant wasn't a

6    pat of it.  Or maybe he was a part of it.  Really?

7            You heard the defendant talking about the Bonanno

8    crime family and his intimate involvement with it on tape.

9    They say to you, this defendant, he beats to his own drum.

10   That may be, but he's in the marching band, and that's the

11   Bonanno crime family private.  Let's just look, just for a

12   second, just to get this out of the way, about what the

13   defendant says on tape.  This defendant knows the Mafia life.

14   He knows it better than anyone, and he operates within it, and

15   he commits crimes to further his own interests and the crime

16   family's interests.

17           This is Government's Exhibit 212 in evidence.  The

18   defendant talks about a beef he's having with another crew.

19   He says, what do you guys think, you're the only crew in this

20   neighborhood?  And he starts talking about all the other

21   incidents these guys have gotten into and he says, Vinny

22   Asaro's name, zero.  Your name, this incident, that incident,

23   and it's a beef by Skinny Dom's club.  And who's winning?

24   It's this defendant.  No one knows the life better than him.

25           Government's Exhibit 216-T.  Had a beef with this

Rebuttal - Argentieri                      3729

1  guy, with the Luccheses.  He was a skipper.  The guy told him

2  you can't talk to me like that.  He said I'm talking to you

3  like that.

4         He tells Gary Valenti all about this beef with the

5  Luccheses and he says, you know, we got to make an appointment

6  with the guy's Captain.  Ga, I smothered him.  I abused the

7  fuck out of him.  Then he says the guy said to him, oh, you

8  can't talk to me like that.  And he says, I'm a friend.

9  Meaning the guy said to him I'm a wiseguy, don't talk to me

10  like that.  Because you're supposed to treat each other with

11  some modicum of respect.  This defendant is right, he beats to

12  his own drum, he didn't do that.

13         He says you ain't my friend, you gotta learn the

14  rules.  That's out of this defendant's mouth.  I'm here

15  35 years.  This is the defendant saying that he has been

16  straightened out for 35 years.  He says the only thing I got

17  is my age and you're not going to bust my chops.  No one knows

18  the life better than this defendant.  And there are countless

19  examples of it.

20         Government's Exhibit 219.  He's settling a beef.

21  The end of this he says the Gambino crew is destroyed, it's

22  destroyed.  You want to know something?  I'm like only wiseguy

23  left in the neighborhood.  And Gary starts listing the names

24  of otherwise guys.  You know what I'm saying?  People of

25  substance.  Out of the defendant's own mouth.  He's a wiseguy

Rebuttal - Argentieri                    3730

1    that matters.

2          Government's Exhibit 221.  This is when the

3    defendant is, his star is on the rise.  Nicky Santora's been

4    arrested.  Tommy DiFiore, you know that he knows because he's

5    known for 30 years because we've shown you pictures of he and

6    Tommy DiFiore together at the same places for years.  Tommy

7    DiFiore is the acting boss.  Things are looking good for Vinny

8    Asaro.  He says, I do all the running around.  Jackie's on

9    parole, Jerry's on parole.  If someone's got a beef, I take

10   care of it.  They don't go there.

11         There was also some suggestion that the crimes the

12   defendant is charged with had nothing to do with the crime

13   family.  That's absurd.  It's ridiculous.  He's committing

14   loansharking and he has his crew picking up the money.  He's

15   got Gasper Valenti picking up the money.  He's got Bobby

16   Giallanzo, who you will remember opened the auto body shop,

17   collecting loanshark payments for him.  Those are crimes

18   committed in furtherance of the enterprise.  He's using the

19   means of the enterprise to carry out the crime.

20         They also, there was some suggestion made that

21   there's nothing wrong with associating with other people, with

22   spending time with other people.  That's certainly true.  But

23   in all of these pictures at these social clubs -- oh, and this

24   was a big thing with all the surveillance agents testified --

25   did you see him committing a crime that day?  No.  Did you see

```
                        Rebuttal - Argentieri                3731
```

1   him murder someone in the street?  No.  It's a secret society.

2   They're not committing their crimes out in the open.

3         Did you ever see in one of these surveillance photos

4   anyone doing any legitimate day's work?  No.  Because you know

5   what they're doing.  They're talking about committing crimes

6   inside the social club.  That's where the gold salt robbery

7   was planned.  These where the attempted Halloween robbery was

8   discussed.  They're getting together and they're planning and

9   committing crimes.  And there's nothing funny about it.  These

10  FBI agents are not paparazzi.  It's insulting.  They're taking

11  photos of these individuals, individuals who you know engaged

12  in murder, shakedowns.  They're following them because it's

13  their job.

14        John Carillo who, by the way, is not an FBI Special

15  Agent contrary to the slide that was put up there, he worked

16  with the NYPD and is now an investigator.  They said, oh, he's

17  an expert in wakes, it doesn't mean anything that all these

18  people went to wakes.  But you know from John Zaffarano

19  himself that right after his father died, the defendant used

20  that opportunity to shake him down.  To collect money from him

21  on a loan the man did not even believe he owed.  You heard

22  from Anthony Ruggiano that at a baptism he planned a murder.

23        The Defense says that Gary Valenti had a plan.  He

24  had years to think about it.  He was going to walk in and he

25  was going to tell the Government stories that he had been

Rebuttal - Argentieri                          3732

1   thinking of.  Did that make sense?  Didn't you hear that Gary

2   Valenti came in to cooperate?  He wasn't facing any charges

3   and as a result of the information that he provided, he pled

4   guilty to serious crimes?  He faces a guidelines range of

5   imprisonment of 168 to 210 months.  So far, it doesn't seem

6   that that good a plan.  You also know that if he lies, his

7   cooperation gets ripped up.

8           And then the Defense says his plan was that he was

9   going to implicate dead people and they list a whole bunch of

10  people that have died.  Jimmy Burke, and Nicky John Zaffarano,

11  and Junior Berger, and Dominick Cataldo and Paulie Vario and

12  Anthony Spero.  What about all the people who committed these

13  crimes with the defendant, including moving the body at his

14  direction, who are still alive?  Some of whom you've heard

15  from at this trial.  What about Jerry Asaro, the defendant's

16  son?  Danny Rizzo, who Gary Valenti recorded.  Mike Palmaccio,

17  Jack Bonaventure, John Zaffarano, who you heard from.  Johnny

18  Tags, who you heard from.  Ron Ceresani, who you heard from.

19          In the face of the overwhelming evidence of the

20  defendant's participation in the Lufthansa heist and other

21  crimes, this is their response.  It defies all logic.  How is

22  it going to work exactly?  He was going to record the

23  defendant talking about criminal activity and just like, cross

24  his fingers and hope that Vinny didn't get wise and say no, I

25  didn't do that?  You listened to the recordings, that is not

Rebuttal - Argentieri                          3733

1   their relationship.

2          The first time the Lufthansa heist comes up, it's

3   the defendant that brings it up.  He and Gary Valenti are

4   talking about Danny Rizzo, another participant in the heist,

5   this is Government's Exhibit 216, and the defendant says

6   unprompted, we never got our right money, what we were

7   supposed to get.  We got fucked all around.  Jimmy kept

8   everything.  And Gary says back to him, what are you talking

9   about?  We got our end.  Jimmy kept the money from the other

10  thing, from the other guys.  Do you hear the defendant say

11  what are you talking about, Jimmy who?  No.  They know what

12  they're talking about.  You know what they're talking about.

13  The Defense could not even come up with an explanation for

14  that because it speaks for itself.

15         Another time when they discuss the Lufthansa heist

16  they're alone in the defendant's house.  Gary Valenti says did

17  you go for Henry?  This is Government's Exhibit 238.  Take it.

18  Listen to it.  He says, did you go for Henry?  He says that's

19  one last -- it's hard tore me to say -- that's one less left

20  of Lufthansa.  The defendant says, fuck him.  Gary Valenti

21  says, he made it like he was there with us.  What else could

22  they be talking about?  Nothing.  It speaks for itself.

23         And you don't hear the defendant on that recording

24  say what do you mean, they're with who?  Or if you believe the

25  Defense, who may now be crediting that Gary Valenti went on

Rebuttal - Argentieri                    3734

1   the heist, I'm still a little unclear on the summation but he
2   could have been there maybe.  Does he say what do you mean
3   there, Gar, he was there with you?  No.  These recordings are,
4   they're just devastating evidence of this defendant's guilt.
5   But you would only know if Henry Hill dying means there's one
6   less left of Lufthansa if you were there and you know who else
7   was there.

8           The cooperating witnesses were all asked why they
9   cooperated.  Gary Valenti told you, and I think you saw his
10  testimony, you evaluate it for yourself.  He told you that
11  there were a couple reasons.  He had remorse, he was having
12  nightmares and he needed help for his family.  All of the
13  cooperating witnesses told you that when they come in, they
14  are all in.  They have to tell everything.

15          You know from the testimony of special agent Adam
16  Mininni, and this is at page 2942 of the transcript, when Gary
17  Valenti came in, his very first meeting, what did he say?  The
18  first thing he told us is that he was an associate and he's
19  been around Vinny Asaro for 42 years.  It's the first sentence
20  out of the man's mouth.

21          And then during the course of that first briefing,
22  what crimes did he tell you about?  All crimes he testified
23  about here today.  Murders, beatings, the murder of Paul Katz,
24  gambling, book-making shylocking, an armed car payroll heist.
25  He talked about the robbery of Lufthansa, other crimes,

Rebuttal - Argentieri                    3735

1   murders involving Vincent Asaro, murder not involving Vincent

2   Asaro.

3           Vitale told you much the same thing.  He came in,

4   remember he was being debriefed on an Air Force base and the

5   prosecutor started asking him questions about the body of

6   the -- a more recent murder.  Vitale said why start there,

7   let's start at the beginning, let's start in 1975 and get it

8   out of the way.

9           The cooperators, all they can do is come in and tell

10  the truth because they don't know what other people are

11  telling us or what other information we have.  How dumb would

12  that be; to put your entire life in jeopardy by deciding to

13  cooperate, losing the support of organized crime, literally

14  putting the life of you and your family in jeopardy and then,

15  coming in and lying.  It's not happening.  You should believe

16  these cooperating witnesses, let me be clear, because they are

17  corroborated by all of the other evidence in this case.

18          Gasper Valenti told you that when he last saw

19  Richard Eaton at After's he was eating shrimp scampi.  He

20  didn't, by the way, say this defendant murdered Richard Eaton,

21  so if Gary is here to make Vincent Asaro look bad, very easy

22  to say that he committed the murder.  But he doesn't because

23  he's telling you the truth.  So, he says to you, I only met

24  him once, I saw him at After's he was eating shrimp scampi.

25  He had no way of knowing that we would be able to find, 40

Rebuttal - Argentieri                    3736

1  some-odd years later, an autopsy report in which the medical

2  examiner, who has since died, said that Richard Eaton had

3  shrimp in his stomach he had eaten one hours before dying.

4  That is incredible cooperation.

5          And in the face of that, what does the Defense say?

6  They say well, the FBI didn't arrest Vincent Asaro in 2002 and

7  they didn't arrest him in 2007 and they didn't arrest him in

8  2012.  It's a distraction.  It's a distraction from all of the

9  other evidence in this case.

10          And the fact that the FBI built this case over

11  years, it's not just one cooperator Sal Vitale, it's not just

12  two cooperators Peter Zuccaro, it's not three cooperators.

13  It's all these cooperating witnesses and all the other lay

14  witnesses you heard from.  That's evidence.

15          There's also this notion that we're somehow buying

16  their testimony, that there's an FBI pension plan.  There's no

17  evidence of that.  It's just not true.  As to Sal Vitale and

18  the $250,000, that's a lot of money.  That's a lot of money.

19  He got it after he was cooperating for years and years and

20  years and had provided a lot of information.

21          He told you for the first seven or eight years of

22  his cooperation he was in jail and he received no money from

23  the FBI.  He told you he got out, he went into Witness

24  Security.  He told you it was awful.  He couldn't get a job.

25  He tried every place that he could and finally the Marshals

Rebuttal - Argentieri                    3737

1    Service cut him off and he got that money because other money

2    had been forfeited as a result of his cooperation.  It wasn't

3    a payment, a reward for his cooperation.  But they say that to

4    you because they're trying to distract you, to make you angry

5    by throwing out the amounts of money because they don't want

6    you to look at this evidence.

7           Gary Valenti got $178,000.  That's the evidence at

8    this trial, over seven years.  That's a lot of money, too.  No

9    one's saying it's not.  But if you break that down it's

10   something like 22, $23,000 a year.  That's not enough money,

11   it's not enough money to put your family in danger, to put

12   your life on the line, to risk it all by coming and making up

13   stories, to uproot your whole life.

14          Now, the Defense described Valenti, they said that

15   he was a liar, he's awful.  You may not like him.  He's

16   cheated and he's stolen and he's done bad things.  But the

17   Government did not pick him.  The defendant made him the star

18   of this trial by being his closest criminal associate for over

19   40 years.

20          Look at these pictures.  They were together.  Do you

21   remember the testimony of Agent Metts.  It went on forever.

22   The man surveilled Gary Valenti and Vincent Asaro together,

23   day in and day out, over months.  And I know that testimony

24   was hard to listen to and as it was happening, maybe you were

25   thinking we get the point, but that was the point we wanted

Rebuttal - Argentieri                    3738

1   you to get, is that Gary Valenti knows this defendant best.

2   That's why the defendant hand-picked him to help him bury a

3   body and to carry out the Lufthansa score.  And in none of

4   these pictures do you see these two men putting up fences,

5   working an honest day's pay.  No.  They're hanging out at the

6   social club discussing criminal activity.

7        The Defense also made much about all of these

8   inconsistencies in Gary Valenti's testimony.  Look at the

9   testimony.  It's just simply not true.  It's a distraction.

10  There's no other evidence.  They told you about Valenti's

11  denial he previously lied under oath at the trial of someone

12  named Midge.  There is no evidence about this other than two

13  sentences in Agent Mininni's testimony.  Valenti was asked

14  about it, he told you he testified in Midge's trial to help

15  Midge.  That's something that he told the agents about.  There

16  is no transcript or not one piece of other evidence which

17  shows that he lied at that trial.

18       Now, when Ms. Macedonio was talking about Cary

19  Whalen's testimony and the fact that he never described the

20  robbers as having a moustache, she stood up here at this exact

21  spot, less than an than an hour ago and said he never reviewed

22  those notes for accuracy, he didn't know if those notes were

23  right.  But two sentences out of notes from Gary Valenti's

24  testimony, and that he must be lying.  It's simply not true.

25  It's a distraction.

VB        OCR        CRR

1           About the arson.  He told you, they lit a ball and

2     they threw it into the club to set the club on fire.  He also

3     told you straight out that After's didn't have a window.  Now,

4     there is some report that says that maybe he said he threw it

5     through a window.  Doesn't that sound to you like a

6     miscommunication?  The man clearly testified that there was no

7     window.  It's a distraction.

8           The same thing with FedEx.  This FedEx, they make a

9     lot of one sentence out of a report that says that Gary

10    Valenti was involved in a Federal Express heist with Jimmy

11    Santos, Bobby Lino and Jerry Asaro.  How is that inconsistent

12    when he testified before you, you read his testimony.  He said

13    all of these people were involved in planning the heist.  But

14    Jerry Asaro, in fact, once went and looked at the heist, but

15    didn't end up going on it.  It's just, they're picking out

16    literally five sentences out of eight years of debriefings,

17    about 40 years of criminal activity.

18          They also say that this is an example of Gary piling

19    on.  He says that with the attempted payroll robbery and he's

20    just putting him in things that he wasn't involved in.

21    Really?  Is that the best that Gary Valenti can do is say that

22    he went to Vincent Asaro and said hey, I'm going to do this

23    robbery of this payroll truck, what do you think?  And Vinny

24    says yeah, take my son.  If he was just piling on, right,

25    wouldn't he have said -- there's no police report about this,

Rebuttal - Argentieri                3740

1   right, which they pointed out because no robbery happened.

2          That's why it's charged as an attempted robbery.

3   The door was being locked.  Nobody says these guys were

4   geniuses, their plan was to hope that the door to the truck

5   was unlocked and then open it and rob the truck.  The door was

6   locked, the plan was foiled, okay?  It's not really the crime

7   of the century.  But if he was just piling on, why wouldn't he

8   have said Vincent Asaro was in the car with them or in a car

9   nearby?  He's telling you the truth about what happened.  And

10  the truth is, by giving him permission to go do the robbery,

11  by telling him to take his son with him, he is aiding and

12  abetting that robbery and guilty of it just as if were sitting

13  in the car.

14          The same thing with the illegal gambling.  They said

15  to you there's no evidence of the amount of money.  That's not

16  true.  Look at the testimony of Jose Estrella.  I don't want

17  to belabor this, but it's in there.  He said he had a limit of

18  $45,000 a week, he said it went on for over 30 days.  Those

19  are the elements of that offense and they have been met.

20

21          (Continued on following page.)

22

23

24

25

VB        OCR        CRR

Summation - Argentieri                3741

1    (Continuing)

2         MS. ARGENTIERI:  In light of the overwhelming

3    evidence of this trial that the defendant is guilty of the

4    Lufthansa heist, the defense asked you to believe that he is

5    not; and to do that they called Kerry Whalen, who identified

6    Angelo Sepe and Tommy DeSimone as the participants in the

7    robbery who were outside in the van.  As interesting as Kerry

8    Whalen's testimony was, most of it was simply not credible.

9    If you look at his testimony he says he pulled up to a

10   building, he said he saw a dark van.  He was a little

11   suspicious.  He pulled in front with his high beams on, he got

12   a good look at the passenger, a so-so look at the driver.

13   This is straight out of his testimony from the trial at 3361.

14        He then proceeded to identify the passenger by a

15   photo and said:  That's Angelo Sepe.  He then told you that he

16   saw the photo and a description of the person in Newsweek.

17   That's the trial transcript at 3364 to 3365.  He told you he

18   was reading all of the newspaper reports in the aftermath of

19   the heist, and that in sometime in March, the following year,

20   he saw that picture.  Then he identified the driver as Tommy

21   DeSimone, who was a man who had a very prominent mustache.

22        We didn't treat him as if he were insane.  We did

23   not.  We asked questions, he answered them.  If the defense

24   felt that he looked insane, that's up to them.  The question

25   is what did you think of him?  Did you find him credible?

Summation - Argentieri                    3742

1          He was not credible.  Think about his testimony,

2    compare it to the testimony of Rolf Rebmann, who arguably

3    interacted more with the men outside the van who told you that

4    he simply couldn't identify anyone.  It's clear that Kerry

5    Whalen is using information he read from the newspaper.  It

6    was dark.  He was looking into a windshield.  There would have

7    been a glare with high beams on.  He was wearing glasses.

8    Glasses that were later knocked off.  He had a hat pulled over

9    his head.  He was shoved down.  There was no way that he could

10   then pick out pictures of two men he had never met before.

11   From his own testimony you know that he is an individual who

12   is prone to exaggeration.  This is his testimony:  The driver

13   stuck a pistol way deep into my brain, my left eye; and with

14   my right eye I could see two bullets the size of submarine

15   torpedoes.  I think that's enough said about that.

16          And on cross-examination he acknowledged he never

17   described the driver as someone being -- someone having a

18   mustache in the days after when he was interviewed.  He

19   acknowledged that he tried not to look at the two men when he

20   interacted with them.  And that he was not called to testify

21   at the prior trial of the inside man.  He told you that when

22   Special Agent Mininni called him to ask him about his

23   experience as a victim of the Lufthansa robbery, he refused to

24   speak to him.  Yet, when he took the stand here he told you he

25   was eager to be here and that it was an honor.

1              He had been waiting 35 years, in his own words, to

2     make his statement, but you know why.  You know that his ax,

3     he has an ax to grind and it is with the U.S. Attorney's

4     office, the FBI and even the Court.  He told you that he was

5     mistreated by the FBI.  He felt like a suspect and that didn't

6     feel good.  And since then, he has gone on a public relations

7     campaign about the heist and about all of the different people

8     he feels have wronged him, including Loretta Lynch, including

9     Judge Ross.  He routinely demonstrates outside the FBI, this

10    courthouse and the U.S. Attorney's house, wearing a sandwich

11    board.

12             In contrast to that, you have the testimony of

13    Gasper Valenti who is corroborated in every respect about the

14    details of the heist, details he could not have known unless

15    he was there.  And I am not going to go through them because

16    Ms. Cooley really went through them in detail.  But the yellow

17    Styrofoam he told you about that was in the boxes.  Special

18    Agent Iannuzzi told you he found that Styrofoam in the van

19    when it was recovered.  He told you that in order to get into

20    the terminal a door had to be rolled up and then he walked up

21    metal steps.  That's exactly what Rolf Rebmann told you, he

22    rolled up the door and they walked up metal steps.  Those are

23    details you would only know if you were there.

24             But just for a moment, just for a moment, put aside

25    the testimony of Gasper Valenti.  Even without his testimony

Summation - Argentieri                   3744

1   you can still convict the defendant of the Lufthansa heist.

2   You have the testimony of Sal Vitale who told you he drove Joe

3   Massino to meet this defendant.  Massino went for a walk, he

4   saw the defendant hand him a case, and then when he got back

5   in the car Massino opened the case, there were gold chains

6   inside, and he said:  This is from the Lufthansa heist.  And

7   you know from Government Exhibit 403a that there was gold

8   jewelry.

9           You also have the testimony of Peter Zuccaro, right

10  after the robbery he's interacting with Frankie Burke.

11  They're criminals together, they commit crimes together.  What

12  does Frankie Burke say?  He says:  I stole the van and I went

13  on the robbery and I drove it.  He says:  Gasper went for

14  Vinny.

15          You have the testimony of Anthony Ruggiano.  His

16  father told him that he fenced jewelry that Vinny Asaro and

17  Jimmy Burke brought him from the Lufthansa heist right out of

18  their jewelry store.

19          The defendant is guilty.  You have it from the

20  defendant, himself.  I didn't even understand what was

21  happening when they were talking about the doorjambs and

22  construction.  Gasper Valenti told you he hid some of the

23  money in his house on Blake Street where his mother also lived

24  around the doorjambs.  That's not a construction job, you

25  remove a little wood, you stick something in there.  You have

1   the defendant acknowledging that that happened on tape,

2   Government Exhibit 250, it's a June 30th, 2012 recording.  He

3   tells Gasper:  You're a liar.  You lied with the money with

4   your mother's house.  You robbed the that money.  And he

5   starts talking about Frankie Roder, and you know Frankie Roder

6   is someone else who held money after the Lufthansa heist.  He

7   acknowledges it on tape.  In the face of all of this evidence,

8   the defendant is asking you to believe that Gary Valenti is

9   just making this up, that he took the on persona of Angelo

10  Sepe.  It just doesn't make any sense.  If he were making it

11  up, why wouldn't he say he was one of the guys wearing the

12  masks inside?  If everyone is dead and he can just say

13  whatever he wants, why isn't he saying that?

14          Why not just -- and why is he putting Vinny in the

15  crash car?  There have been a bunch of arguments about the

16  fact that it didn't make sense that Vincent Asaro was in this

17  crash car with Jimmy Burke far away.  First of all, if you

18  look at the map he's on a main thoroughfare, where I submit to

19  you the police would need to drive by if they were going to

20  get there, so they would be able to see the sirens.

21          Second of all, no one asked you to check your common

22  sense at the door.  Okay, these guys are undertaking a very

23  risky robbery.  Where are the two senior guys who helped plan

24  the robbery?  Are they there?  Are they putting their necks on

25  the line?  No.  They're nearby waiting and watching because

 1   they want their end.  It makes complete sense that they were

 2   waiting there.

 3          There is also other evidence that corroborates the

 4   testimony of Gary Valenti that really also went unaddressed.

 5   The testimony of Johnny Tags, the testimony of Ron Cecchini,

 6   they came here and they told you that they both held packages

 7   in the time period after the Lufthansa heist.  Johnny Tags

 8   told you that he'd been in the defendant's club, that he had

 9   gambled there, that he saw the defendant with Jimmy Burke

10   inside the club.  And he told you that it was the defendant

11   who came and picked up the package from him.  And he also told

12   you that Gary came to the house.  I mean is this

13   quintessential Gary Valenti; he goes to the house to take

14   money out of the package and he gives Johnny Tags some money

15   from it, and that Johnny Tags's understanding was that

16   probably he didn't want the defendant to know about that.

17   That is compelling, compelling evidence that Gary Valenti is

18   telling the truth, that this defendant is guilty.

19          Hold him accountable.  Let's talk about the murder

20   of Paul Katz.  After three weeks of trial, 70 witnesses, now

21   we're hearing that it was not actually the defendant who

22   killed Paul Katz, but maybe it was Joey Allegro, maybe it was

23   Gary Valenti and Joey Allegro, we're not sure.  What is the

24   evidence of that?  In the face of a mountain of evidence about

25   the defendant's participation in the murder of Paul Katz, what

Summation - Argentieri                    3747

1   do they ask you to rely on?

2            One moment.

3            (Pause.)

4            This is Defense Exhibit J.

5            (Exhibit published.)

6            They ask you to rely on the fact that Paul Katz was

7   going to meet someone named Joey Allegro on the night that he

8   went missing.  Now, the judge has given you a limiting

9   instruction on this report, and it basically says that you

10  can't rely on this report in finding that Joey Allegro went to

11  meet Paul Katz that night.  This is a complete distraction.

12  It is just a distraction.  There is no evidence about who Joey

13  Allegro is.  When Gasper Valenti was asked who was Joey

14  Allegro, he said:  I don't know.  No one else came forward to

15  prove that he was lying when he said that.  There was

16  literally no other evidence at the trial who Joey Allegro was.

17  And this report does not refute any of the evidence presented

18  by the government about how Paul Katz died and why.  It's not

19  important to the charges, which do not allege that it was the

20  defendant that got him out of his apartment, but instead

21  charge him with murdering Paul Katz in cold blood and hiding

22  his body away from the world and from his family.  And to the

23  extent that Joey Allegro was a criminal associate of Paul

24  Katz's, you have heard plenty of testimony at this trial about

25  how organized crime uses people who are close to the victim to

Summation - Argentieri                              3748

1    lure them out of their house.  Sal Vitale testified about

2    that.  Anthony Ruggiano testified about how he lured his

3    brother-in-law to meet with people who killed him.

4              In contrast to all of the speculation, the

5    government presented compelling and significant evidence of

6    the defendant's guilt and his role in the murder of Paul Katz

7    and the coverup.  Gary Valenti testified that he had never met

8    Paul Katz, but he had been to the warehouse, which was in

9    South Ozone Park, and that Jimmy Burke's crew, Tommy DeSimone,

10   Carl from Robert's Lounge, he saw them all there and they

11   would go there and unload stolen goods from trucks.  Trucks

12   much like Larry Katz, Paul Katz's son, testified about.  And

13   you saw in Government Exhibit 407 that when the defendant was

14   arrested Carl was there and Tommy DeSimone was there.  And

15   this is shortly before Paul Katz disappears.

16             (Exhibit published.)

17             Then the defendant tells them:  I need a place to

18   have a meeting.  He's got these houses on 102nd Road.  They

19   are almost complete.  And the defendant shows up with Jimmy

20   Burke and he hears banging and pounding in the basement.  They

21   are breaking up the concrete, and that later he's asked to

22   cover the hole and the defendant tells him that he and Jimmy

23   Burke killed Paul Katz because he was a rat, because he was

24   cooperating.

25             And Gary Valenti told you things that are completely

Summation - Argentieri                    3749

1    corroborated.  He told you that the concrete in the basement

2    was set with some type of metal or rebar.  He told you that

3    when at this defendant's direction he moved the body with the

4    defendant's son Jerry, he saw bones, he saw hair, he saw

5    pieces of concrete, he saw a material like corduroy, and he

6    saw rebar.

7         How do you know that he is telling the truth?  If

8    you look at the missing person's report.

9         (Exhibit published.)

10        Paul Katz was reported missing last seen wearing a

11   green corduroy jacket.  You know that when the hole was

12   excavated by the FBI they found pieces of fabric, dark fabric.

13   And Gary Valenti also told you that he saw a material like

14   corduroy.  You know also that also found in the hole by the

15   FBI were pieces of flooring that would be consistent with the

16   body being dug up.  This is Government Exhibit 710(d),

17   Government Exhibit 710h, pieces of concrete, just like Gary

18   Valenti said he saw.

19        You heard from Special Agent Mike Byrnes.  This is

20   142k, that what the concrete looked like was consistent with

21   what Gasper Valenti described.

22        (Exhibit published.)

23        You know that 142r, what was found at the base of

24   the hole was a hand as if a body had been laid in it sort of

25   turned over.

Summation - Argentieri                    3750

1            (Exhibit published.)

2            And what was right beneath that hand?  142u.  See

3    this, this is a dark fabric (indicating).

4            (Exhibit published.)

5            You also heard from an expert, from Brad Adams who

6    told you that it was his testimony, he believed a body had

7    been in that hole and had been removed and they weren't able

8    to get all of the pieces out.  And so that naturally small

9    parts had been left over and left behind.  You also saw --

10   Gary Valenti told you the defendant said:  I dented a pipe, a

11   water pipe.  142g, the FBI was able to find the exact dented

12   water pipe.

13           You heard from Frances Rue, the DNA expert, that the

14   remains found in that hole were 1,000 percent -- to be clear

15   for the record she said 99.95 percent -- the remains of Paul

16   Katz.  You know that the defendant is guilty of this murder.

17   You heard that last recording where Valenti told the

18   defendant:  The Feds are all over Liberty Avenue.  And most

19   respectfully, while Ms. Macedonio's reading of the transcript

20   was interesting, you listened to it yourself.  This is

21   Government Exhibit 244.

22           (Exhibit published.)

23           I am talking about Liberty Avenue?  Where?  Silence.

24           You listen to yourself, that silence is deafening.

25           You know what I mean?

Summation - Argentieri                    3751

1        And then the defendant doesn't say:  No, I don't

2   know what you mean.  He says:  No, I don't know what you mean.

3   And when he says it, it is very clear that he does, in fact,

4   know exactly what Gasper Valenti means.  Don't take my word

5   for it.

6        By the way, what did Gary Valenti say the

7   defendant's face looked like in that moment; a look of hatred,

8   a look of disgust.  You'd have to be with someone to know that

9   look.  How could you do this to me?  That was the look.  You

10  listen to that recording, you can feel that energy in the car.

11       Then what does the defendant do?  He leaves the

12  diner where he's meeting with Gary Valenti, he changes cars,

13  and less than ten minutes later he is driving by the FBI

14  search location.  And the defendant says he wasn't crouched

15  down in the -- I mean he wasn't crouched down in the car, he

16  wasn't hiding.  He was in someone else's car being driven.

17  That's pretty disguised.  He doesn't just go once, he circles

18  back to take a second look.  And that, ladies and gentlemen,

19  is exactly what you would do if you found out that the jig was

20  up, that your cousin was cooperating and that your most

21  serious crime was about to be discovered.  The FBI is

22  searching for a body where you buried it.

23       And Ms. Macedonio is right, we're not mind-readers,

24  but that day a good number of FBI agents were following

25  Mr. Asaro, so we don't need to be mind-readers because you

1  know where he went next?  He went to see his son, Jerry Asaro,

2  still very much alive.  The only person alive who would be

3  affected if the FBI found Paul Katz's remains.  The only other

4  person alive who had been involved in concealing the body.

5          You should find the defendant guilty of the murder

6  of Paul Katz and of the coverup.  The government has

7  absolutely met its burden.

8          Now, in an attempt to distract you from this other

9  evidence, the defendant argues that certain of these crimes

10  are just family business.  They're just his cousins, it's just

11  money in between cousins.  That is absurd.  It flies in the

12  face of reason and common sense.  You are jurors and you come

13  here with your everyday experiences and your everyday lives

14  and common sense.  You don't have to put that aside when

15  you're deliberating.

16          They say to you that Zaffarano, John Zaffarano, he's

17  not a loanshark.  This isn't a loansharking victim.  It's not

18  an extortion, no one forced him.  He wasn't afraid, he told

19  you that.  Ask yourselves, why would he pay that money?  Why

20  would he give the defendant and Matty the Horse Ianniello over

21  a million dollars out of his pocket?  You saw him testify.  He

22  didn't want to be here.  He told you that.  He didn't want to

23  hurt this defendant.  But despite that, he completely

24  corroborated what Gary Valenti told you, that after his father

25  died the defendant came to him and said that his father owed

1  money.  He even reluctantly, very reluctantly admitted to you

2  that he didn't believe that his father actually still owed the

3  money, but he paid it.  He paid it back long after it was due,

4  over $250,000 on a 250,000-dollar loan that does not exist.

5  And he told you when the defendant couldn't pay, he would call

6  him, he would jump up and down and he would yell.  And then he

7  borrowed additional money from him.  He told you that he was

8  called to a meeting with Matty the Horse, who you know is a

9  Genovese captain, because Matty the Horse was unhappy with the

10  money that he was getting from the sale of the properties.

11  And that after that meeting, he paid him $750,000.  And why

12  did he pay it?  Because the defendant told him this isn't

13  something you mess around with, organized crime, Matty the

14  Horse.  And that the defendant got $400,000 for negotiating

15  that settlement.  And another 250 after he moved to Florida.

16          What is the defendant's response to that testimony?

17  Oh, you did it willingly, right?  And you and the defendant

18  just lent money back and forth and nobody kept score?

19  Somebody kept score.  This defendant.  It's incredible that

20  you would pay back that much money on a debt you did not

21  believe existed.  It's not true.  You know who Johnny

22  Zaffarano's father was, he was Mickey Zaffarano.  His father's

23  a captain in the crime family.  He knew of how it worked.

24  This was crime family business, not some other business.  And

25  in the moments when John Zaffarano was no longer protected in

Summation - Argentieri                     3754

1   the moments after his father's death, this defendant took

2   advantage and now he is trying to hide behind those family

3   relationships.  The defendant is guilty of making these --

4   collecting on the extortion extension of credit, that's

5   Racketeering Act One, that's part of the loansharking, and

6   he's guilty of Racketeering Act Eight, which is the money that

7   he paid John Zaffarano and the defendant from the sale of

8   those properties.  It's a shakedown plain and simple.  It's a

9   crime even if they are related and even if the victim denies

10  it.  You know the truth.

11          You also heard from other victims of this defendant.

12  Victims who were not related to him or beholden to him

13  emotionally.  Remember Guy Gralto?  His testimony went

14  unchallenged.  Unchallenged.  He came here and he told you he

15  paid protection money from his auto body business to the

16  defendant.  He told you just like Zaffarano, he made payments

17  at Asaro's club.  He told you he was afraid Vinny Asaro would

18  hurt him.  He told you one time Asaro drove his car through

19  his fence, another time he smacked him, and he told you at one

20  meeting the defendant said that when he was done with him his

21  own mother wouldn't recognize his body.

22          And in the face of that testimony, which went

23  unchallenged, they say this had nothing to do with the crime

24  family.  It had everything to do with the crime family.  It is

25  the definition of crime family business.  The what was Gralto

Summation - Argentieri                3755

1  paying for?  Protection.  Protection from what?  Protection

2  from organized crime.  He's previously been robbed by another

3  crime family crew.  It is -- this is the very essence of how

4  organized crime makes money.  The defendant used his status in

5  the crime family to provide Gralto with protection.

6           Now, during this trial you heard from Carmine

7  Muscarella.  Remember Mr. Muscarella?  Skippy.  He was caught

8  on tape negotiating with the defendant about how much money he

9  had to pay up.  He was called by the defense.  He came here

10  and he was prepared to tell you that it was Gary Valenti who

11  wanted all this money from him.  But you know more than him.

12  You do.  You listened to the recordings that led Gary Valenti

13  to go see Carmine Muscarella.  You know that it's this

14  defendant who told him to go see him and how to go see him.

15  Remember, he said:  Just go walk in on him, don't call ahead.

16  Skippy took that stand, he was trying to help the defendant

17  and he did what he could.  He did what he could, but he was

18  caught on tape.  And when he was confronted with the recording

19  on which the defendant told him to pay Valenti, he tried to

20  explain that when he got on the phone with the defendant, the

21  defendant told him:  Gary's Dearie's Godson and that somehow

22  changed everything.  That is not credible; and more than that,

23  it's not true.  How do you know it's not true?  Because you

24  have the benefit of the recordings.

25           This is Government Exhibit 205.  This is after the

Summation - Argentieri                3756

1   meeting at Carmine Muscarella's place of business.  And the

2   defendant tells him what he said to him on the phone.  He

3   says:

4           You know, he didn't want to do nothing and I told

5   him, I said, that's between you and him.  You promised it to

6   him.

7           (Exhibit published.)

8           He, basically, said pay the money.  There's nothing

9   about him being Dearie's Godson.  It's incredible that he

10  wouldn't have known about that before that.

11          What was most -- Carmine Muscarella testified that

12  for years, for years Gary Valenti attempted to get money from

13  that house, but after a 30-second conversation with this

14  defendant he agreed to pay.  What is most compelling about his

15  testimony is that he refused to acknowledge on the stand under

16  oath, even when faced with the recording, that it was the

17  defendant who told him how much money he had to pay.  Remember

18  that?  Remember when I asked him and he's like:  Uh, I don't

19  remember the whole conversation.  Lucky for us, it's on tape.

20  This is Government Exhibit 204, page 15.  This is Carmine,

21  he's on the phone with Vincent Asaro:

22          (Exhibit published.)

23          Okay , all right.  If I split it in half, you're

24  okay, you're okay with that?

25          It was the defendant who decided how much money he

Summation - Argentieri                    3757

1    had to pay, and then he paid it.  And that tells you

2    everything you need to know about Carmine Muscarella who, as

3    he sat here, had no idea that it was this defendant that kept

4    $2500 of the $3,000 he initially gave him.  And then less than

5    two weeks later had the audacity to reach back into his pocket

6    for another 2500.  You know more than him.  And you know what,

7    you don't need Carmine Muscarella to tell you that he was

8    afraid of this defendant.  He acknowledged to you that he knew

9    about the defendant's organized crime ties.  The defendant

10   said to you, he was -- he humbled himself to go to Carmine

11   Muscarella and ask for that money.  That wasn't being humble,

12   it was hubris, to take that money from a hard-working man and

13   a relative.  Look at Government Exhibit 212, what does the

14   defendant say about Carmine Muscarella?  This is page 3.

15            (Exhibit published.)

16            You think it looks promising with this kid?  You

17   know, he's really timid with me, right?

18            (Continued on the following page.)

19

20

21

22

23

24

25

Summation - rebuttal - Argentieri                    3758

1          MS. ARGENTIERI:  (Continuing)  It's the defendant

2    admitting he knew he was intimidating Carmine Muscarella and

3    that's why Carmine Muscarella paid this money.  There can be

4    no dispute about it.  It was a shakedown and the defendant is

5    guilty of it.

6          And just as you're deliberating, the defendant asked

7    you to keep a couple of things in mind.  A couple of things I

8    want you to keep in mind.  Think of how this defendant treated

9    other wiseguys.  He yelled and screamed at them.  Remember?

10   Remember, the defense said remember when he said he was going

11   to lose his button?  That's how he treated other people in the

12   life.  So you know that he treated people who didn't have that

13   protection even worse.  You also know about his reputation.

14         Government Exhibit 234.  There's a recording where

15   someone is parked in the neighborhood in the wrong spot.  And

16   he, the defendant, and Gasper Valenti are, like, listening to

17   Adele in the car and all of the sudden, the defendant goes

18   completely crazy.  What does he yell?  He tells these two

19   random men out in the street.  You tell them Vincent Asaro

20   said it.  That's because his name means something in the

21   neighborhood.  And it means organized crime.  It means he's a

22   tough guy and it means people are afraid of him.

23         This is a simple case in many ways.  I know what

24   you're thinking.  After all this evidence, you are going to

25   get up here and say it's a simple case but in many ways, it

1   is.  It's a tale as old as time.  This is a story about

2   fathers and sons.  It's about tradition.  It's about family.

3   But for this defendant and his father and his son, family

4   traditions go beyond how to string a fishing line and watching

5   football on Sunday.  The crime family is their family.  And

6   it's traditions and even more strongly held.  Omerta.  Death

7   before dishonor.  The mafia life.  The family motto is quite

8   literally inked into their skin.  You saw the photos.  On

9   Vincent Asaro's arm, death before dishonor.  On his son's leg.

10           Death before dishonor.  Think about what those words

11   mean.  Death before dishonor in yourself, the life, the mafia.

12   The defendant has that inked on his skin.  He will go to his

13   grave marked with those words.  So closely held is that

14   belief.  And because of that motto, because of that creed,

15   there is a father missing here today.

16           You heard from a son, now a man who was forced to

17   make his own traditions after his father disappeared, after

18   his father was murdered for cooperating.  The defendant

19   strangled Paul Katz to death with Jimmy Burke for cooperating

20   and violating his sacred code.  You heard the testimony of the

21   experts that recovered the pieces of Paul Katz that remained

22   decades after his disappearance, that he was found in a hole

23   in a house in Queens which was where Burke and defendant met

24   Valenti after killing him, a house that was still owned by

25   Burke, by Burke's family at the time, the remains were found

Summation - rebuttal - Argentieri          3760

1    and after 44 years, Paul Katz was returned to his family in

2    pieces.

3            The mafia is a treacherous life.  It is a dangerous

4    life.  No one knows what it requires more than this defendant.

5    You have to be ruthless.  You have to take what you want from

6    whoever you need to.  Blood family, friend, none of it

7    matters.  It's money and the mafia and that's what counts.  In

8    the defendant's own words, he spoke about another wiseguy, a

9    guy he felt didn't live the life.

10           This is Government Exhibit 236.  This tells you all

11   you need to know about this defendant.

12           Never did a fucking piece of work in his entire

13   life.  Never did nothing.  He was in this life, and that was

14   it, by name only.  Never did a thing, never stole, never had

15   to steal.  A lot of guys like that, God bless them.  My whole

16   life I had to steal.  I had to do everything.  I had to do

17   everything.  He never cracked an egg in his life.  He never

18   did nothing illegitimate in his life.  Never, in his whole

19   miserable life.

20           What is he saying here?  Never did a fucking piece

21   of work in his life.  That means never killed someone, not

22   like me.  Never did nothing.  He was in this life by name

23   only, not like me.  He never stole, he never had to steal, not

24   like me.  I had to do everything.  He never cracked an egg in

25   his life, not like me.

Side Bar                    3761

1           The defendant sits here for the choices he has made

2    throughout his whole life.  Hold him accountable for his

3    lifetime of crime, of victimizing others, of taking what was

4    not his to take, money, property, Paul Katz's life, his

5    future.  He took those things from people who could not defend

6    themselves, everyday people who feared them.

7           Find the defendant guilty of the charged crimes

8    because the government has proven his guilt beyond a

9    reasonable doubt and because the time has come for him to be

10   accountable.  Thank you.

11          THE COURT:  Ladies and gentlemen, your lunch is

12   here.  Enjoy it.  If we could resume in a half hour at about

13   quarter of 2:00, then I will charge you on the law.

14          (Jury exits.)

15          THE COURT:  I am about to ask Dennis to duplicate

16   the charge for the jurors so before we do that, are there any

17   last minute changes?

18          MS. MACEDONIO:  May we approach?  Can we approach?

19          THE COURT:  Yes.

20          (The following occurred at side bar.)

21          MS. FERRONE:  Judge, in an earlier version and

22   consistent with the request by the defense, we had asked for

23   inconsistent statement charge and I guess a version or two

24   ago, we were notified that it was taken out.  In the course

25   of -- it was removed from the current draft.

Side Bar                              3762

1          THE COURT:  Right.  I discussed it before I removed

2     it.

3          MS. MACEDONIO:  You did.

4          MS. FERRONE:  Absolutely.  But in the course of, I

5     think, preparing the closing argument and reviewing the

6     transcripts, we feel that the instruction is indeed

7     appropriate.

8          Ms. Macedonio highlighted a few examples in her

9     closing where Mr. Valenti had testified to one thing and then

10    through the agents' notes, we showed there was a prior

11    inconsistent statement so we simply reiterate the request for

12    the instruction which I have right here, two paragraphs to be

13    placed back.  I made it yellow.

14         THE COURT:  Well, we have it in our computer but

15    does the government have any objection?

16         MS. ARGENTIERI:  I just want to see it.

17         (Pause.)

18         MS. ARGENTIERI:  That's fine.

19         THE COURT:  Okay.  We'll put it back in.

20         MS. MACEDONIO:  Did you send an e-mail this morning?

21         MS. ARGENTIERI:  Give me one second.  I'm sorry.

22         I think this morning, we found a couple of typos in

23    the verdict sheet which I e-mailed to Petey which I think he

24    got.  It was just in the verdict sheet.

25         MS. MACEDONIO:  I didn't see it.

Side Bar                                    3763

1           THE COURT:  This is the typos.

2           MS. ARGENTIERI:  It said "extortionate."

3           THE COURT:  I saw that too.

4           MS. ARGENTIERI:  And then instead of the way we

5    identified it, it said --

6           THE COURT:  Okay.  They're fixed.

7           MS. ARGENTIERI:  They're both fixed?

8           THE COURT:  Well, look at the current version.

9           MS. ARGENTIERI:  I will.

10          THE COURT:  I mean this is the end because once he

11   duplicates it --

12          MS. ARGENTIERI:  I trust Petey more than I trust

13   myself right now so if he says it's fixed, that's good enough

14   for me.

15          MS. MACEDONIO:  Thank you, Judge.

16          THE COURT:  Okay.

17          MS. MACEDONIO:  A quarter to?

18          THE COURT:  Yes.

19          (In open court; side bar ends.)

20          THE COURT:  Let me ask this.  Dennis has already

21   duplicated them.  Would you have any problem if I read it in

22   my charge to the jury but if it's not in the written version?

23          MS. MACEDONIO:  Are they getting the charge?

24          THE COURT:  I'm sorry?

25          MS. MACEDONIO:  Are they getting the charge?

3764

1          THE COURT:  Yes.  It's just too much.

2          MS. MACEDONIO:  Can we just insert a page and let

3    them understand.

4          THE COURT:  All right.  We will insert it.  Okay.

5          MS. MACEDONIO:  Thank you.

6          MS. ARGENTIERI:  Judge, what time?

7          THE COURT:  A quarter of 2:00.

8          MS. ARGENTIERI:  Great.

9          (Luncheon recess.)

10         (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Are we all ready?

2          MS. GERDES:  We are, Judge.

3          (Jury entering.)

4          THE COURT:  Please be seated.

5          Ladies and gentlemen, I'm going to try to do this

6     without a microphone, if you can hear me.

7          Can you hear me?

8          JURORS:  Yes.

9          THE COURT:  If at any point, you have any

10    difficulty, raise your hand, and I will use the mic, okay.

11         Now, that the evidence in the case has been

12    presented and the attorneys for the government and the

13    defendant have concluded their closing arguments, it is my

14    responsibility to instruct you as to the law that governs this

15    case.  My instructions will be in three parts.

16         First, I will instruct you regarding the general

17    rules that define and govern the duties of a jury in a

18    criminal case.

19         Second, I will instruct you as to the legal elements

20    of the crimes charged in the indictment, that is, the specific

21    elements that the government must prove beyond a reasonable

22    doubt for you to find the defendant guilty.

23         Third, I will instruct you as to some general rules

24    regarding your deliberations following these instructions.

25         To begin with, it is your duty to find the facts

- Charge -                                    3766

1   from all of the evidence in this case.  You are the sole

2   Judges of the facts.  It is, therefore, for you and you alone

3   to pass upon the weight of the evidence, to resolve such

4   conflicts as may have appeared in the evidence, and to draw

5   such inferences as you deem to be reasonable and warranted

6   from the evidence.  With respect to any question concerning

7   the facts, it is your recollection of the evidence that

8   controls.

9         You must apply the law in accordance with my

10  instructions to the facts as you find them.  While the lawyers

11  may have commented on some rules of law, you must be guided

12  only by what I instruct you about them.  You must follow all

13  the rules as I explain them to you.  You may not follow some

14  and ignore others.  Even if you disagree or do not understand

15  the reasons for some of the rules, you are bound to follow

16  them.

17        The fact that this prosecution is brought in the

18  name of the United States government does not entitle the

19  government to any greater consideration than the defendant.

20  By the same token, the government is entitled to no lesser

21  consideration.  The parties, the government and the defendant,

22  are equal before this Court, and they are entitled to your

23  equal consideration.  Neither the government nor the defendant

24  is entitled to any sympathy or favor.

25        The indictment filed against the defendant is the

1    means by which the government gave notice to the defendant of

2    the charges against him and brought him before the Court.  The

3    indictment is an accusation and nothing more.  The indictment

4    is not evidence, and you are to give it no weight in arriving

5    at your verdict.  The defendant, in response to the

6    indictment, pleaded, "not guilty".  The defendant is presumed

7    to be innocent unless the government proves his guilt beyond a

8    reasonable doubt.  That presumption alone, unless overcome, is

9    sufficient to acquit the defendant.  That presumption is

10   overcome only if you, the jury, decide unanimously that the

11   government has proven the defendant to be guilty beyond a

12   reasonable doubt.

13          Since the law presumes a defendant to be innocent,

14   the burden of proving the defendant's guilt beyond a

15   reasonable doubt is on the government throughout the trial.

16   The defendant never has the burden of proving his innocence,

17   or producing any evidence at all.  If the government does not

18   meet its burden of proving beyond a reasonable doubt that the

19   defendant is guilty, you must find the defendant not guilty.

20          Proof "beyond a reasonable doubt" does not mean

21   proof beyond all doubt.  It is not necessary for the

22   government to prove the guilt of the defendant beyond all

23   possible doubt.  The test is one of reasonable doubt.

24          A reasonable doubt is a doubt based upon reason and

25   common sense, the kind of doubt that would make a reasonable

- Charge -                                                    3768

1   person hesitate to act.  Proof beyond a reasonable doubt must,

2   therefore, be proof of such a convincing character, that a

3   reasonable person would not hesitate to rely and act upon it

4   in the most important of his or her own affairs.

5            A reasonable doubt, however, is not a doubt that

6   arises out of whim or speculation.  A reasonable doubt is not

7   an excuse to avoid the performance of an unpleasant duty.

8            If, after a fair and impartial consideration of all

9   the evidence in the case, you can honestly say that you have

10  such a doubt, based on all the evidence or lack of evidence in

11  the case, as would cause prudent persons to hesitate to act in

12  matters of importance in their lives, then you have a

13  reasonable doubt.  In that event, it is your duty to acquit

14  the defendant.

15           If on the other hand, after a fair and impartial

16  consideration of the evidence, you can honestly say that you

17  have such an abiding belief in the guilt of the defendant that

18  you would be willing to act upon a similarly strong conviction

19  in the most important matters in your own lives, then you have

20  no reasonable doubt, and, in that circumstance, you should

21  convict.

22           I will now instruct you as to what evidence is and

23  how you should consider it.  The evidence which you are to

24  consider in deciding the facts in this case comes in several

25  forms:

- Charge -                                      3769

1          Sworn testimony of witnesses, both on direct and

2     cross examination, regardless of who called the witness, is

3     evidence.

4          Exhibits, including physical items, that have been

5     received into evidence by the Court, are evidence.

6          Facts to which the lawyers have agreed or stipulated

7     are evidence.  When the attorneys on both sides "stipulate",

8     that is, agree to the existence of a fact, you the jury may

9     accept the stipulation and consider the fact as proven.

10         Certain things are not evidence, and are to be

11    disregarded by you in deciding the facts:

12         Arguments or statements by lawyers are not evidence.

13         Questions put to the witnesses are not evidence.

14         Objections to questions or to offered exhibits are

15    not evidence.  In this regard, I instruct you that attorneys

16    have a duty to their clients to object when they believe

17    evidence should not be received.  Therefore, you should not be

18    influenced by the objection or by the Court's ruling on it.

19    If the objection was sustained, ignore the question and any

20    answer that followed.  If the objection was overruled, treat

21    the answer like any other answer.

22         Testimony that has been excluded, stricken, or that

23    you have been instructed to disregard is not evidence and must

24    be disregarded.

25         Some of the evidence in this case was admitted only

- Charge -                                              3770

1    for a limited purpose.  You must follow my limiting

2    instructions that I gave you.  If evidence was admitted for a

3    limited purpose, you must consider it only for that purpose

4    and not for any other purpose.

5              Some of the exhibits that have been admitted as

6    evidence contain dark blocks indicating that information that

7    had been on the document has been deleted.  We call such a

8    deletion from a document a redaction.  All of these redactions

9    have been done at the Court's direction.  You are not to

10   consider what the redacted portions of the documents might

11   have said or attach any significance at all to the redaction.

12   Most importantly, you are not to draw any inferences for or

13   against any party from the fact that I have ordered that a

14   document be redacted.

15             Obviously, anything you may have seen or heard

16   outside the courtroom is not evidence.

17             Nothing I have said or done should be used by you in

18   inferring innocence or guilt.  I have no view of the guilt or

19   innocence of the defendant.

20             There are, generally speaking, two types of evidence

21   from which you may properly find the truth as to the facts.

22   One is direct evidence, such as the testimony of an eye

23   witness to an event.  The other is indirect or circumstantial

24   evidence.  This is the proof of a chain of circumstances

25   pointing to the existence or nonexistence of certain facts.

1       A simple example of circumstantial evidence would be

2   the following:  If you were to come to court on a bright sunny

3   day and then, after several hours in this courtroom, with the

4   window shades drawn, you were to see people entering from the

5   rear, one wearing a wet rain coat and the next shaking a wet

6   umbrella, you might infer from these circumstances, without

7   yourselves every going outside or even looking out a window,

8   that it had rained while you were here in court.

9       So, in a trial, you are permitted to draw, from

10  facts that you find have been proven such reasonable

11  inferences or conclusions as seem justified in light of your

12  experience and common sense.  The law makes no distinction

13  between direct and circumstantial evidence.  You may consider

14  both.  What the law does require is that, before a defendant

15  is convicted of a crime, a jury be satisfied of his guilt

16  beyond a reasonable doubt based on its assessment of all of

17  the evidence in the case.

18      Your verdict must be based solely upon the evidence

19  developed at trial, or the lack of evidence.  It would be

20  improper for you to consider, in reaching your decision as to

21  whether the government sustained its burden of proof, any

22  sympathy or favor for one side or the other, or any personal

23  feelings that you may have about the defendant's race,

24  religion, national origin, ethnic background, gender or age.

25  All persons are entitled to the presumption of innocence.

1          It would be equally improper for you to allow any

2     feelings that you might have about the nature of the crimes

3     charged to interfere with your decision making process.  To

4     repeat, your verdict must be based exclusively upon the

5     evidence or the lack of evidence relating to the crimes

6     charged in this case.  The question of possible punishment is

7     also of no concern to the jury, and it should not, in any

8     sense, enter into or influence your deliberations.  The duty

9     of imposing sentence rests exclusively upon the Court.  Your

10    function is to weigh the evidence in the case and to

11    determine, solely upon the basis of the evidence, whether or

12    not the defendant is guilty beyond a reasonable doubt of each

13    crime charged in the indictment.

14          You have heard testimony of several witnesses and

15    watched the introduction of other evidence.  The fact that one

16    party called more witnesses and introduced more evidence than

17    the other, does not mean that you should necessarily find the

18    facts in favor of the side offering the most witnesses.  You

19    are tasked with looking at all the evidence, and you have to

20    decide which witnesses to believe and which facts are true.

21    You should keep in mind that the burden of proof is always on

22    the government and the defendant is not required to call any

23    witnesses or offer any evidence, since the defendant is

24    presumed innocent.

25          Although the government bears the burden of proof,

- Charge -                                           3773

1  and although a reasonable doubt can arise from lack of

2  evidence, I instruct you that the law does not require the

3  government to call as witnesses all persons who may appear to

4  have some knowledge of the matters at issue in this trial.

5  Nor does the law require that all things mentioned during the

6  course of the trial be are produced as exhibits.

7          The law further does not require that any particular

8  investigative techniques be used by law enforcement

9  authorities to uncover or prosecute crime.  You have heard

10 evidence in the form of video and audio recordings of

11 conversations that were obtained without knowledge of some or

12 all of the parties to those conversations.  You also have seen

13 and heard evidence obtained pursuant to court-authorized

14 search warrants and court-authorized wiretap warrants.  All of

15 this evidence was obtained lawfully.  The use of these

16 procedures to gather evidence is lawful and the government has

17 the right to use such evidence in this case.  Law enforcement

18 techniques are not your concern.

19         Your concern is to determine whether or not, based

20 upon all the evidence presented in the case, the government

21 has proven that the defendant is guilty beyond a reasonable

22 doubt.

23         The defendant has elected not to testify in this

24 case.  Under our constitution, a defendant in a criminal case

25 has no obligation to testify or to present any evidence

- Charge -                                                3774

1   because, as I have discussed, it is the government's burden to

2   prove guilt beyond a reasonable doubt.  The defendant is never

3   required to prove his innocence nor is he required to produce

4   any evidence at all.  No adverse inference may be drawn

5   against the defendant because he did not take the witness

6   stand, and you must not consider this fact against the

7   defendant in any way during the course of your deliberations.

8          As I mentioned earlier, you are the sole Judges of

9   the credibility of the witnesses and the weight that their

10  testimony deserves.  In determining whether a witness speaks

11  the truth, you may consider the appearances and conduct of the

12  witness, the manner in which the witness testified, the

13  character of the testimony given, and any evidence contrary to

14  the testimony given.

15         You should carefully scrutinize all of the testimony

16  given, the circumstances under which each witness has

17  testified, and any other matter in evidence which tends to

18  indicate whether to believe a witness.  Consider each witness'

19  bias, prejudice, hostility, interest and partisanship with

20  respect to the prosecution or defense of the case, and the

21  witness' demeanor while on the stand.

22         Inconsistencies or discrepancies in the testimony of

23  a witness, or between the testimony of different witnesses,

24  may or may not cause you to discredit a witness' testimony.

25  Two or more persons witnessing an incident or transaction may

- Charge -                                                    3775

1   see or hear it differently, and innocent mis-recollection like

2   failure of recollection, is not uncommon.  In weighing the

3   effect of a discrepancy, consider whether it pertains to a

4   matter of importance or to an unimportant detail, and whether

5   it results from innocent error on one hand, or intentional

6   falsehood on the other hand.

7           The testimony of a witness may be discredited or

8   impeached by showing that the witness previously made

9   statements which are inconsistent with the witness' present

10  testimony.  It is your job to determine the weight, if any, to

11  be given to all or part of the witness-- all or part of the

12  testimony of a witness who has been impeached by prior

13  inconsistent statements.

14          If you find that a witness made such a statement,

15  you may consider that fact in your assessment of the witness'

16  credibility.  In other words, you may consider whether or not

17  you believe the witness or accept his or her testimony in

18  light of the prior inconsistent statement.  In making this

19  determination, you should consider the importance of the

20  matter to which the statement related.  If you find that the

21  matter is relatively trivial, you may decide not to attach

22  much significance to the inconsistency.  On the other hand, if

23  you find that the matter to which the prior inconsistent

24  statement related is important, you may decide that it casts

25  substantial doubt on the witness' credibility.

- Charge -                                    3776

1        In this case, you have heard the testimony of law

2   enforcement agents and government employees.  The testimony of

3   these witnesses should be evaluated in the same manner as the

4   testimony of any other witness.  The fact that a witness is a

5   law enforcement officer or government employee does not

6   justify according that witness' testimony more or less

7   credence than the testimony of any other person.  You should

8   evaluate the testimony of law enforcement witnesses and of

9   government employee witnesses in the same manner as you would

10  the testimony of any other witness, using all of the tests of

11  credibility that I have discussed with you.  It is your

12  decision, after reviewing all of the evidence, whether to

13  accept the testimony of a witness, and to give it whatever

14  weight, if any, it deserves.

15        In this case, you have also heard expert witness

16  testimony.  An expert is a witness allowed to express an

17  opinion on matters about which he or she has special

18  knowledge, and training.  Expert testimony is presented to you

19  on the theory that someone who is experienced in a particular

20  field may assist you in understanding the evidence or in

21  reaching an independent decision about the facts.  In weighing

22  expert testimony, you may consider the expert's

23  qualifications, the opinion given, the witness' reasons for

24  testifying, as well as the other considerations that

25  ordinarily apply when you are deciding whether or not to

- Charge -                                          3777

1  believe a witness.  You may give expert testimony whatever

2  weight, if any, you find it deserves in light of all the other

3  evidence before you.  You should not, however, accept a

4  witness' testimony merely because he is an expert in a field.

5  Nor should you substitute it for your own reason, judgement

6  and common sense.  The determination of the facts in this case

7  rests solely with you.

8          You have also heard testimony from witnesses who

9  testified that they were actually involved in criminal conduct

10  charged, or related to the charges in the indictment.  These

11  witnesses are testifying here pursuant to agreements with the

12  government which provide, in part, that their cooperation will

13  be brought to the attention of the sentencing Judge.  The

14  government is permitted to enter into such agreements with

15  witnesses such as Salvatore Vitale, Gasper Valenti, Peter

16  Zuccaro, Anthony Ruggiano, Junior, and to make such promises,

17  and the law allows the use of testimony from such witnesses.

18  In fact, the testimony of such a witness may be enough, by

19  itself, for a jury to convict a defendant, if the jury finds

20  that the testimony establishes a defendant's guilt beyond a

21  reasonable doubt.

22          You should bear in mind that a witness who has

23  entered into a cooperation agreement has an interest in this

24  case different from that of an ordinary witness.  Because of

25  the nature of a cooperating witness' testimony and the

- Charge -                                                    3778

1    possible interest of a cooperating witness may have in

2    testifying, the testimony of such a witness must be

3    scrutinized with greater care than the testimony of an

4    ordinary witness.  It should be viewed with particular caution

5    when you decide how much, if any, of such testimony should be

6    believed and what weight it should be given.  You should, for

7    example, ask yourselves whether the accomplice witness would

8    benefit more by lying or telling the truth.  Was the testimony

9    of the accomplice made up in any way because he believed or

10   hoped that he would receive favorable treatment from the

11   government or a favorable outcome by testifying falsely?  Or

12   did he believe that his interests would be best served by

13   testifying truthfully?  If you believe that the witness was

14   motivated by hopes of personal gain, was the motivation one

15   that would cause him to lie, or was it would be that would

16   cause him to tell the truth?  Did his motivation color the

17   witness' testimony?  In sum, you should look at all the

18   evidence in deciding whether you believe the cooperating

19   witness and what weight, if any, to give his testimony.

20          I caution you, however, that you may not draw any

21   conclusions or inferences of any kind about the guilt of the

22   defendant from the fact that a witness for the government has

23   pleaded guilty to a criminal charge.  A witness' decision to

24   plead guilty is a personal decision about his own guilt.  It

25   may not be used by you as evidence of the defendant's guilt.

- Charge -                                          3779

1      You have heard testimony from witness John

2  Zaffarano, whose testimony was compelled by the Court after he

3  received a grant of immunity.  You are instructed that the

4  government is entitled to call, as a witness, a person who has

5  been granted immunity.  This testimony alone, if believed by

6  the jury beyond a reasonable doubt, may be of sufficient

7  weight to sustain a verdict of guilt even though it is not

8  corroborated by or supported by other evidence.  You should

9  consider testimony given under a grant of immunity with

10  greater care and caution than the testimony of an ordinary

11  witness.  You should consider whether testimony under a grant

12  of immunity has been affected by the witness' own interest in

13  the outcome of the case or by prejudice against the defendant.

14      On the other hand, you should also consider that an

15  immunized witness can be prosecuted for perjury for making a

16  false statement under oath.  After considering these things,

17  you may give testimony given under a grant of immunity such

18  weight as you feel it deserves.

19      You have heard evidence during the trial that

20  witnesses have discussed the facts of the case and their

21  testimony with the lawyers before the witnesses appeared in

22  court.  Although you may consider the fact when you are

23  evaluating a witness' credibility, I should tell you that

24  there is nothing either unusual or improper about a witness

25  meeting with lawyers before testifying so that the witness can

- Charge -                                              3780

1   be aware of the subjects he will be questioned about, focus on

2   those subjects, and have the opportunity to review relevant

3   exhibits before being questioned about them.  Such

4   consultation helps conserve your time and the Court's time.

5   In fact, it would be unusual for a lawyer to call a witness

6   without such consultations.

7            The weight you give to the fact or the nature of the

8   witness' preparation for his or her testimony and what

9   inferences you draw from such preparation, are matters

10  completely within your discretion.

11           You have heard evidence about the involvement of

12  certain other people in the offenses referred to in the

13  indictment.  You may not draw any inference, favorable or

14  unfavorable, towards the government or the defendant from the

15  fact that certain persons are not on trial before you.  That

16  these individuals are not on trial before you is not your

17  concern.  You also should not speculate as to the reason these

18  people are not on trial before you, nor should you allow their

19  absence as parties to influence in any way your deliberations

20  in this case.  You should not draw any inference from the fact

21  that any other person is not present at this trial.  Your

22  concern is solely the defendant on trial before you.

23           I will now turn to the second part of this charge,

24  and I instruct you as to the legal elements of the crimes

25  charged in the indictment.  I am first going to discuss some

- Charge -                                          3781

1   general principles that apply to multiple charges.  Then I

2   will go through the specific charges and instruct you

3   regarding the elements that the government must prove beyond a

4   reasonable doubt for each charge.

5           The defendant is formally charged in an indictment.

6   As I instructed you at the outset, an indictment is merely a

7   charge or accusation.

8           The in this case contains three counts and fourteen

9   racketeering acts.  You must consider each count of the

10  indictment separately and you must return a separate verdict

11  for each count.  I prepared a verdict sheet on which you must

12  record each of your determinations.

13          If the indictment charges that a specific act

14  occurred on a certain date or time, and the evidence indicates

15  that it may have occurred on another date or time, the law

16  only requires a substantial similarity between the dates and

17  times alleged in the indictment, and the dates and times

18  established by testimony or exhibits.

19          For all of the charges and racketeering acts, you

20  will be asked to decide whether the defendant acted

21  "knowingly" and "intentionally".

22          A person acts "knowingly", when he acts purposely

23  and voluntarily, and not because of ignorance, mistake,

24  accident, or carelessness.  Whether a defendant acted

25  knowingly may be proven by his conduct and by all of the facts

- Charge -                                          3782

1    and circumstances surrounding the case.

2           A person acts "intentionally" when he acts

3    deliberately and purposefully.  That is, a defendant's act

4    must have been the product of his conscious, objective

5    decision.  The defendant need not be aware of the specific law

6    or rule that his conduct may have violated, but his acts must

7    not have been the product of a mistake or accident.

8           The indictment alleges that the defendant conspired

9    to commit particular crimes under federal and state laws.

10   First, I will instruct you on the federal law of conspiracy,

11   and then on conspiracy under New York State law.  Later, I

12   will give you instructions on the federal and state laws that,

13   according to the government, the defendant conspired to

14   violate.  In order to find the defendant guilty under the

15   state or federal conspiracy laws, you must find that the

16   government has proven each and every element-- each and every

17   one of the elements of conspiracy beyond a reasonable doubt.

18          A conspiracy is an agreement by two or more persons

19   to cooperate in accomplishing some unlawful objective.  The

20   crime of conspiracy is separate from the crime the alleged

21   conspirators agreed to commit.  A conspiracy is a crime in and

22   of itself, even if it fails to achieve its purpose.

23          In Counts 1 and 2 of the indictment and in six

24   racketeering acts, the government has charged the defendant

25   with conspiracies under federal law.  Under federal law, the

- Charge -                                                    3783

1    government must prove two elements beyond a reasonable doubt,

2    in order to prove the defendant guilty.

3           First:  That two or more persons entered into the

4    particular unlawful agreement charged in the racketeering act

5    or count that you are considering; and

6           Second, that the defendant knowingly and

7    intentionally became a member of that conspiracy.

8           First, as to the existence of a charged conspiracy,

9    the government must prove, beyond a reasonable doubt, that two

10   or more persons agreed to cooperate in achieving the unlawful

11   objective charged in the count of racketeering act that you

12   are considering.  The government does not have to prove that

13   there was an explicit or formal agreement.  It also does not

14   have to prove that the conspirators stated in words or in

15   writing what the plan was, its object or purpose, or the means

16   by which it was to be accomplished.  For this element, it is

17   sufficient if the proof establishes, beyond a reasonable

18   doubt, that at least two people tacitly came to a mutual

19   understanding to accomplish the unlawful act.

20           (Transcript continues on next page.)

21

22

23

24

25

Charge of the Jury                    3784

1    (Continuing)

2         THE COURT:  You may find that the existence of

3    conspiratorial agreement has been established by direct

4    evidence.  You may also infer from indirect evidence, such as

5    the actions and statements of the people involved, that they

6    had come to an agreement to achieve an unlawful purpose and

7    therefore, brought a conspiracy into existence.

8         Second, as to whether the defendant joined the

9    conspiracy, the Government must prove beyond a reasonable

10   doubt that the defendant knowingly and intentionally became a

11   participant in, or a member of, the charged conspiracy.

12        Remember that, as I instructed you earlier, a person

13   acts knowingly and intentionally if he acts voluntarily,

14   deliberately, and not because of ignorance, mistake, accident

15   or carelessness.  In determining whether a defendant

16   intentionally joined a conspiracy, you must find, based on all

17   of the evidence, that he participated in it with knowledge of

18   its unlawful purpose and with the specific intention of

19   furthering one or more of its objectives.

20        To become a member of a conspiracy, a defendant need

21   not have known the identities of each member, nor their

22   number, nor all of their activities.  A defendant need not

23   have been fully informed of all of the details, or the scope

24   of a conspiracy.  A defendant need not have joined in all of

25   the conspiracy's unlawful objectives.  Proof that a defendant

Charge of the Jury                    3785

1    had a financial interest in the outcome of the scheme is not

2    essential.

3         The extent or duration of his participation does not

4    matter, so long as he participated.  Each member may perform

5    separate and distinct actions and may perform them at

6    different times.  Some conspirators may play major roles,

7    while others may play minor ones.  Even a single act may be

8    sufficient to show knowledge and intent to join the

9    conspiracy.  A person who willfully joins an existing

10   conspiracy is charged with the same responsibility as if he

11   had been one of the two or more original founders of the

12   conspiracy.

13        I want to caution you, however, that a defendant's

14   mere presence at the scene of an alleged crime does not, by

15   itself, make him a member of the conspiracy, even if the

16   defendant knows that a crime is being committed or acquiesces

17   in the criminal conduct of others.

18        Mere association with one or more members of a

19   conspiracy does not automatically make the defendant a member.

20   A person may know or be friendly with a criminal, without

21   being a criminal himself.

22        Mere knowledge or acquiescence without participating

23   in the unlawful plan is not sufficient.  The fact that the

24   acts of a defendant, without knowledge, merely happen to

25   further purposes or objectives of the conspiracy, does not

Charge of the Jury                    3786

1    make the defendant a member.  The defendant, with an

2    understanding of the unlawful character of the conspiracy,

3    must have intentionally engaged, advised or assisted in it for

4    the purpose of furthering the illegal undertaking.

5            In conclusion, under the Federal law of conspiracy,

6    if you find that the Government has failed to prove, beyond a

7    reasonable doubt, that a particular conspiracy existed, or

8    that Mr. Asaro knowingly and intentionally became a member of

9    the charged conspiracy, then you must acquit him of the

10   criminal conspiracy you are considering.

11           The Government has also charged the defendant in

12   certain of the charged Racketeering Acts with a conspiracy

13   under New York State law.

14           In order to prove that the defendant committed the

15   crime of conspiracy under New York State law, the Government

16   must prove each of the following three elements beyond a

17   reasonable doubt:

18           First:  That the defendant agreed with one or more

19   persons to engage in conduct that would constitute a crime;

20           Second:  That the defendant did so with the intent

21   that such conduct be performed; and

22           Third:  That at least one conspirator committed at

23   least one overt act in furtherance of the conspiracy.

24           The New York State law definition of conspiracy is

25   essentially the same as the Federal law definition, requiring

VB        OCR        CRR

Charge of the Jury                          3787

1   both an agreement and a knowing, intentional decision to

2   participate, except that New York State law also requires one

3   extra element:  An overt act.

4            An overt act is any step, action or conduct that is

5   taken to achieve or further the objective of the conspiracy.

6   An overt act itself need not be criminal, nor need it be the

7   crime that is the purpose of the conspiracy.

8            If the Government establishes the first two elements

9   of conspiracy under New York State law, then proof of any one

10  overt act is enough to prove the existence of the conspiracy.

11  It is not necessary that each member of the conspiracy

12  committed or participated in that overt act.  Rather, in the

13  eyes of the law, the act of one member of a conspiracy becomes

14  the act of all members.  Thus, proof of an overt act by only

15  one of the conspirators is sufficient.  You must all agree

16  that the same overt act was committed.

17           The indictment alleges that the defendant aided and

18  abetted the commission of particular crime.  I will instruct

19  you on the law of aiding and abetting under both Federal and

20  New York State law before addressing the specific crime

21  charged in the indictment.

22           The Federal aiding and abetting statute states as

23  follows:

24           Whoever commits an offense against the United States

25  or aids, abets, counsels, commands, induces or procures its

Charge of the Jury                    3788

1    commission, is punishable as a principal.

2         Under the aiding and abetting statute, it is not

3    necessary for the Government to prove that a defendant himself

4    physically committed the act or crime in order to find the

5    defendant guilty.  If you find that a defendant knowingly and

6    intentionally helped another person in the commission of a

7    crime, he is as guilty as if he personally committed it.

8         To convict the defendant on the ground that he aided

9    and abetted the commission of a crime charged, the Government

10   must first prove that another person committed that crime.  No

11   one can be convicted of aiding and abetting the criminal act

12   of another if no crime was committed by the other person in

13   the first place.

14        If you do find that a crime was committed, then you

15   must determine whether the defendant aided and abetted the

16   commission of the crime by knowing of the crime and

17   participating in the crime by doing some act with the intent

18   to have the crime succeed.

19        In order for the defendant to be convicted under an

20   aiding and abetting theory, he must have had more than mere

21   knowledge that a crime was being committed and acquiescence in

22   the commission of the crime.  Merely being present at the

23   scene of a crime is not enough, and being the best friend of

24   the person who actually committed the crime -- even coupled

25   with knowledge that a crime was committed -- is not enough.

Charge of the Jury                     3789

1    The defendant must participate, by knowingly and intentionally

2    seeking by some act to make the criminal venture succeed.

3         The relevant New York State statute regarding aiding

4    and abetting is as follows:

5         When one person engages in conduct which constitutes

6    an offense, another person is criminally liable for such

7    conduct when, acting with the mental culpability required for

8    the commission thereof, he solicits, requests, commands,

9    importunes, or intentionally aids such person to engage in

10   such conduct.

11        As with the Federal law, presence at a crime scene,

12   even when coupled with knowledge that a crime has taken place

13   and friendship with the criminal, is not sufficient to make

14   the defendant criminally liable for the crime.

15        In order for the defendant to be held criminally

16   liable for the criminal conduct of another under New York

17   State law, you must find beyond a reasonable doubt:

18        First:  That he solicited, requested, commanded,

19   importuned, or intentionally aided that person or persons to

20   engage in that conduct; and

21        Second:  That he did so with the state of mind

22   required for the commission of the crime.

23        This state of mind requirement is essentially the

24   same as knowing and intentional requirements in the Federal

25   law, but the specific New York crimes that the defendant is

Charge of the Jury                    3790

1    alleged to have aided and abetted might use different terms or

2    require different degrees of knowledge and intent.  I will

3    explain those when I instruct you on those specific crimes.

4            Here too, if it is proven beyond a reasonable doubt

5    that the defendant is criminally liable for the conduct of

6    another, the extent or degree of the defendant's participation

7    in the crime does not matter -- he is just as guilty of that

8    offense as if he committed it himself.

9            Now that I have discussed some general principles of

10   law, I will instruct you in detail on the law regarding each

11   count of the indictment and each Racketeering Act.  Because I

12   believe it will assist your understanding of the relevant law,

13   I am going discuss some of the counts and Racketeering Acts in

14   an order different from the way that they appear in the

15   indictment.  Of course, you may deliberate about the counts

16   and Racketeering Acts in any order that you choose.

17           There are three counts in the indictment.  The first

18   count alleges that the defendant joined a conspiracy to

19   violate a section of the racketeering and corrupt

20   organizations act, also known as the RICO Act.  I will read

21   you the indictment and then explain the elements of proof.

22           Count 1 of the indictment alleges:

23           On or about and between January 1, 1968 and June 30,

24   2013, both dates being approximate and inclusive, within the

25   Eastern District of New York and elsewhere, the defendant

Charge of the Jury                                    3791

1   Vincent Asaro, together with others, being a person employed

2   by and associated with the Bonanno crime family, an enterprise

3   engaged in, and the activities of which affected interstate

4   and foreign commerce, did knowingly and intentionally conspire

5   to conduct and participate, directly and indirectly, in the

6   conduct of the affairs of that enterprise through a pattern of

7   racketeering activity, in violation of Federal law.

8           You should not take the use of the word racketeering

9   in this statute and in my instructions as indicating anything

10  either in favor of the defendant or in favor of the

11  Government.  Congress simply used the word to define this

12  crime.

13          I have already instructed you on conspiracy, so you

14  know that a conspiracy requires some underlying unlawful

15  objective.  In this case, the indictment alleges that the

16  conspiracy's underlying objective was to conduct the affairs

17  of the Bonanno family enterprise through a pattern of

18  racketeering activity.  I will explain those terms in more

19  detail in a moment.  I will now read you the part of the

20  indictment that alleges that the enterprise in this case was

21  the Bonanno crime family.  And I quote:

22          The members and associates of the Bonanno organized

23  crime family of La Cosa Nostra constituted an enterprise as

24  defined in Federal law that is a group of individuals

25  associated, in fact, hereinafter the Bonanno crime family and

1    the enterprise.  The enterprise constituted an ongoing

2    organization whose members functioned as a continuing unit for

3    a common purpose of achieving the objectives of the

4    enterprise.  The Bonanno crime family engaged in, and its

5    activities affected interstate and foreign commerce.  The

6    Bonanno crime family was an organized criminal group that

7    operated in the Eastern District of New York and elsewhere.

8         La Cosa Nostra operated through the organized crime

9    families.  Five of these crime families -- the Bonanno,

10   Colombo, Gambino, Genovese and Lucchese crime families -- were

11   headquartered in New York City, and supervised criminal

12   activity in New York, in other areas of the United States and,

13   in some instances, in other countries.  Another crime family,

14   the DeCavalcante crime family, operated principally in

15   New Jersey, but from time to time also in New York City.

16        The ruling body of La Cosa Nostra known as The

17   Commission consisted of leaders from each of the crime

18   families.  The Commission convened from time to time to decide

19   certain issues affecting all of the crime families such as

20   rules governing crime family membership.

21        The Bonanno crime family had hierarchy and

22   structure.  The head of the Bonanno crime family was known as

23   the boss.  The Bonanno crime family boss was assisted by an

24   underboss and a counselor known as a consigliere.  Together,

25   the boss, underboss and consigliere were the crime family's

1    administration.  With the assistance of the underboss and the

2    consigliere, the boss was responsible for, among other things,

3    setting policy and resolving disputes within and between

4    La Cosa Nostra crime families and other criminal groups.  The

5    administration further supervised, supported, protected and

6    disciplined the lower-ranking participants in the crime

7    family.  In return for their supervision and protection, the

8    administration received part of the illegal earnings generated

9    by the crime family.  Members of the Bonanno crime family

10   served in an acting rather than official capacity in the

11   administration on occasion due to another administration

12   member's incarceration or ill health, or for the purpose of

13   seeking to insulate another administration member from law

14   enforcement scrutiny.  Further, on occasion, the Bonanno crime

15   family was overseen by a panel of crime family members that

16   did not include the boss, underboss and/or consigliere.

17          Below the administration of the Bonanno crime family

18   were numerous crews, also known as regimes and decinas.  Each

19   crew was headed by a captain, also known as a skipper,

20   caporegime and capodecina.  Each captain's crew consisted of

21   soldiers and associates.  The captain was responsible for

22   supervising the criminal activities of his crew and providing

23   the crew with support and protection.  In return, the

24   captain often received a share of the crew's earnings.

25          Only members of the Bonanno crime family could serve

Charge of the Jury                      3794

1    as a boss, underboss, consigliere, captain or soldier.

2    Members of the crime family were referred to on occasion as

3    goodfellas or wiseguys or as persons who had been straightened

4    out or who had their button.  Associates were individuals who

5    were not members of the crime family, but who nonetheless

6    engaged in criminal activity for, and under the protection of,

7    the crime family.

8            Many requirements existed before an associate could

9    become a member of the Bonanno crime family.  The Commission

10   of La Cosa Nostra from time to time limited the number of new

11   members that could be added to a crime family.  An associate

12   was also required to be proposed for membership by an existing

13   crime family member.

14           When the crime family's administration considered

15   the associate worthy of membership, the administration then

16   circulated the proposed associate's name on a list given to

17   other La Cosa Nostra crime families, which the other crime

18   families reviewed and either approved or disapproved.  Unless

19   there was an objection to the associate's membership, the

20   crime family then inducted, or straightened out, the associate

21   as a member of the crime family in a secret ceremony.

22           During the ceremony the associate, among other

23   things, swore allegiance for life to the crime family above

24   all else, even the associate's own family; swore, on penalty

25   of death, never to reveal the crime family's existence,

Charge of the Jury                    3795

1   criminal activities or other secrets; and swore to follow all

2   orders issued by the crime family boss, including swearing to

3   commit murder if the boss directed it, close quote.

4          The Government has charged the purposes, methods and

5   means of the enterprise as follows:

6          Quote, the principal purpose of the Bonanno crime

7   family was to generate money for its members and associates.

8   This purpose was implemented by members and associates of the

9   Bonanno crime family through various criminal activities,

10  including robbery, extortion, illegal gambling and

11  loansharking.  The members and associates of the Bonanno crime

12  family also furthered the enterprise's criminal activities by

13  threatening economic injury and using and threatening to use

14  physical violence, including murder.

15         Although the primary purpose of the Bonanno crime

16  family was to generate money for its members and associates,

17  the members and associates at times used the resources of the

18  family to settle personal grievances and vendettas, sometimes

19  with the approval of higher-ranking members of the family.

20  For those purposes, members and associates of the enterprise

21  were asked and expected to carry out, among other crimes, acts

22  of violence, including murder, extortion, robbery and assault.

23         The members and associates of the Bonanno crime

24  family engaged in conduct designed to prevent Government

25  detection of their identities, their illegal activities and

1   the location of proceeds or evidence of those activities.

2   That conduct included a commitment to murdering persons,

3   particularly members or associates of organized crime

4   families, who were perceived as potential witnesses against

5   members and associates of the enterprise.

6            Members and associates of the Bonanno crime family

7   often coordinated criminal activity with members and

8   associates of other organized crime families, close quote.

9            Finally, the Government has charge the defendant's

10  role in the enterprise as follows:

11           Quote, at various times the defendant Vincent Asaro

12  was a member of the administration, a captain, a soldier and

13  an associate within the Bonanno crime family, close quote.

14           In order to explain Count 1, I will begin by

15  explaining the underlying crime, which I will refer to as RICO

16  or racketeering.  Remember that the defendant is not charged

17  with actually committing this RICO crime, which has five

18  elements.  He is charged with conspiring to commit this crime.

19  I am explaining the crime now only because, in order to

20  determine whether a conspiracy existed, as charged in Count 1,

21  and whether the defendant joined in it, you need to understand

22  the illegal objective of the conspiracy.

23           The underlying crime, racketeering, has five

24  elements:

25           First:  An enterprise existed;

1          Second:  The enterprise affected interstate or

2    foreign commerce;

3          Third:  A person was associated with or employed by

4    that enterprise;

5          Fourth:  The person engaged in a pattern of

6    racketeering activity; and

7          Fifth:  The person conducted or participated in the

8    conduct of the enterprise through a pattern of racketeering

9    activity.

10          Now I will instruct you in greater detail on each of

11    these elements.

12          The first element of the crime of racketeering is

13    that the enterprise existed as alleged in the indictment.  An

14    enterprise is a group of people associated together for a

15    common purpose of engaging in a course of conduct.  To qualify

16    as an enterprise, a group:

17          Must have a common purpose;

18          Must have an ongoing framework for making or

19    carrying out decisions; and

20          Must function as a continuing unit.

21          Although an enterprise must have a decision-making

22    framework, it's not necessary that the enterprise have any

23    particular or formal structure.  It must have sufficient

24    organization so that its members functioned and operated in a

25    coordinated manner in order to carry out the alleged common

Charge of the Jury                          3798

1    purpose or purposes of the enterprise.

2         In order for an enterprise to function as a

3    continuing unit, it must continue in an essentially unchanged

4    form during substantially the entire period charged in the

5    indictment.  This does not mean that the people involved must

6    remain the same.  The personnel of the enterprise may change

7    and need not be associated with the enterprise for the entire

8    period alleged in the indictment.  The core of the enterprise

9    has to be essentially the same throughout the period charged.

10        Finally, the enterprise must be the one charged in

11   the indictment, which I read to you earlier.

12        The second element of the crime of racketeering is

13   that the conduct of the enterprise affected interstate or

14   foreign commerce.  Interstate commerce is any trading or

15   business or travel across State lines, and foreign commerce is

16   between the United States and any other country.  To establish

17   the requisite effect of interstate or foreign commerce, the

18   Government is not required to prove a significant or a

19   substantial effect on interstate or foreign commerce.  Any

20   effect that the enterprise has on legal or illegal interstate

21   or foreign commerce is sufficient.  It does not matter whether

22   the effect is delayed or immediate; expected or unpredictable,

23   or negative or positive.

24        It is not necessary for the Government to prove that

25   the racketeering acts themselves affected interstate or

Charge of the Jury                                    3799

1    foreign commerce; it is the enterprise and it activities

2    considered in their entirety that must shown to have that

3    effect.

4

5              (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Charge of the Court                    3800

1   (Continuing)

2        THE COURT:  Effect on interstate or foreign commerce

3   may be proved through the effect caused by the individual

4   racketeering acts.  It's not necessary that the person knew

5   that the enterprise would affect interstate or foreign

6   commerce, that the person intended to affect interstate or

7   foreign commerce, or that the person engaged in or his

8   activities affected, interstate or foreign commerce.

9        The government need only prove that the activities

10  of the enterprise considered in their entirety had some

11  minimal effect on interstate and foreign commerce.

12       The third element of racketeering is that a person

13  was associated with the enterprise at the time he committed

14  the racketeering acts charged in the indictment.  To associate

15  means to join, often in a loose relationship as a partner,

16  fellow worker, colleague, friend, companion or ally.  A person

17  is associated with an enterprise when, for example, he joins

18  with other members of the enterprise and he knowingly aides or

19  furthers the activities of the enterprise, or he conducts

20  business or other activities with or through the enterprise.

21       It is not required that the person have been

22  associated with the enterprise for the entire time the

23  enterprise existed.  The person need not have had a formal

24  position in the enterprise, or participated in all the

25  activities of the enterprise, or known about the participation

1    of all the other members of the enterprise.  It is sufficient

2    that at some point during the existence of the enterprise as

3    alleged in the indictment, the person was associated with the

4    enterprise within the meaning of those terms as I have just

5    explained them, that he knew of the general nature of the

6    enterprise, and that the enterprise extended beyond his own

7    role in the enterprise.

8              The person must have knowingly associated with the

9    enterprise.  He must have had knowledge of the existence of

10   the enterprise through a general awareness of its existence

11   and some of its activities and personnel.

12             The fourth element of racketeering is that the

13   person engaged in a pattern of racketeering activity.  The

14   RICO law has a list of crimes that count as racketeering acts.

15   So, engaging in a pattern of racketeering activity has three

16   requirements.

17             First, the person intentionally committed, or

18   caused, or aided and abetted two or more of the racketeering

19   acts alleged in the indictment.  At least two racketeering

20   acts must have been committed within ten years of each other.

21   For purposes of calculating whether the two racketeering acts

22   racketeering acts were committed within ten years, please do

23   not count the time period from December 11, 1998 through

24   May 21, 2003, during which time the defendant was

25   incarcerated.  By statute, any term of imprisonment is not

Charge of the Court                    3802

1    counted toward this calculation.

2           Second, the racketeering acts are related.

3    Relatedness may be established in many ways, including by

4    proof that the racketeering acts had the same or similar

5    purposes, results, participants, victims, or methods of

6    commission, or otherwise are related by distinguishing

7    characteristics that are not isolated events or acts.

8           Third, the racketeering acts themselves extend over

9    a substantial period of time or they posed a threat of

10   continued criminal activity.

11          A threat of continued criminal activity may be

12   established when the evidence shows that the racketeering acts

13   are part of a long-term association that exists for criminal

14   purposes or when the racketeering acts are shown to be the

15   regular way of conducting the affairs of the enterprise.

16          In determining whether the government has proven the

17   threat of continued unlawful activity, you are not limited to

18   consideration of the specific racketeering acts charged

19   against the defendant.  Rather, in addition to considering

20   such acts you may also consider the nature of the enterprise,

21   and other unlawful activities of the enterprise and its

22   members viewed in their entirety, including both charged and

23   uncharged unlawful activities.

24          A series of disconnected acts does not constitute a

25   pattern, and a series of disconnected crimes does not

Charge of the Court                    3803

1    constitute a pattern of racketeering activity, nor does it

2    amount to or pose a threat of continued racketeering activity.

3        The fifth and final element of racketeering is that

4    the person knowingly participated, either directly or

5    indirectly, in the conduct of the affairs of the enterprise

6    through a pattern of racketeering activity.  This means that

7    there must have been a meaningful connection between the

8    person's racketeering acts and the affairs of the enterprise.

9    Such a meaningful connection exists if the racketeering acts

10   are related in some meaningful way with the affairs of the

11   enterprise, or if they benefit the enterprise, or if their

12   commission was facilitated by the enterprise or the person's

13   status within it.

14       Also, in order to have conducted or participated in

15   the affairs of the enterprise, the person must have played

16   some part in the operation or management of the enterprise.

17   The person need not have exercised significant control over or

18   within the enterprise, held a formal position in the

19   enterprise, shared in the profits of the enterprise, or have

20   had primary responsibility for the enterprise's affairs.  For

21   the purposes of this element, an enterprise's lowest-ranking

22   member conducts the affairs of the enterprise just as much as

23   its top chief.

24       Now that I explained the underlying crime of

25   racketeering, I will instruct you on the law as it pertains to

1  Count One of the indictment; that is, the racketeering

2  conspiracy.  I remind you that to prove a conspiracy, the

3  government must prove that the defendant knowingly and

4  intentionally agreed to commit a crime, here, the crime of

5  racketeering, but it does not matter whether the crime was

6  eventually committed.  In order to convict the defendant of

7  the RICO conspiracy offense charged in Count One, you must

8  find that the government has proved beyond a reasonable doubt

9  each of the four following elements:

10          First, that the enterprise affecting interstate or

11  foreign commerce existed, as alleged in the indictment, or

12  that such an enterprise would be established.

13          Second, that the defendant knowingly agreed to be

14  associated with the enterprise.

15          Third, that the defendant knowingly agreed with at

16  least one co-conspirator, that at least two racketeering acts

17  would be committed by one or more members of the conspiracy.

18          And fourth, that the defendant knowingly agreed to

19  conduct or participate directly or indirectly in the conduct

20  of the affairs of the enterprise through a pattern of

21  racketeering activity.

22          The meanings of the terms enterprise, affecting

23  interstate or foreign commerce, associated with the enterprise

24  and pattern of racketeering activity are as I instructed you a

25  moment ago in my explanation of the substantive crime of

Charge of the Court                              3805

1  racketeering, and you must apply those same definitions here.

2          The essential aspect of a racketeering conspiracy is

3  an agreement to commit the crime of racketeering.  Now I will

4  go into detail on each of the four elements.

5          The first element is that the enterprise charged in

6  the indictment existed, or would have existed had the

7  conspiracy achieved its goal.  Because this Count charges a

8  conspiracy, the government is not required to prove that the

9  enterprise was actually established.  Rather, the government

10 must prove that if the conspiracy were completed as

11 contemplated by the conspirators, the enterprise would be

12 established, and the enterprise would affect interstate or

13 foreign commerce.  Of course, if you find that the enterprise

14 charged in the indictment actually existed and that it

15 actually affected interstate commerce, this element is

16 satisfied.

17         For the second element, that the defendant agreed

18 that he would be associated with the enterprise; again, the

19 government does not need to prove the defendant was actually

20 associated with the enterprise.  Rather, the government must

21 prove that if the charged conspiracy were completed as

22 contemplated, the defendant would become associated with the

23 enterprise.  Obviously, if you find that the defendant was

24 actually associated with the enterprise, this element is

25 satisfied.

1           The third element is that the defendant knowingly

2   agreed with at least one other co-conspirator that at least

3   two racketeering acts would be committed by one or more

4   members of the conspiracy.  For this element, the government

5   is not required to prove that any racketeering acts were

6   actually committed.  It is also not required to prove that the

7   defendant personally committed two racketeering acts, or that

8   he agreed to personally commit two racketeering acts.  Rather,

9   the government must prove that the defendant agreed with a

10  co-conspirator that one or more members of the racketeering

11  conspiracy (which could be the defendant himself) would commit

12  at least two racketeering acts.  The two acts need not be

13  agreed to at the same time; they may have been agreed to at

14  any time during the course of the conspiracy.  Of course, if

15  you find that the defendant did agree to commit two

16  racketeering acts himself, then this element is satisfied.

17          Finally, to establish the fourth element, the

18  government must prove that the defendant agreed to participate

19  in the enterprise knowing and intending that the affairs of

20  the enterprise would be conducted through a pattern of

21  racketeering activity.

22          This means that the government must prove that if

23  the racketeering acts to which the defendant agreed were

24  actually committed, they would form a pattern of racketeering

25  activity.  As I previously instructed you, to prove a pattern

1   of racketeering activity, the government must prove that the

2   racketeering acts would be related in some way to each other,

3   and would extend over a substantial period of time or pose a

4   threat of continued illegal activity.  You must apply those

5   instructions here.  Of course, if you find that the two

6   racketeering acts were actually committed within ten years of

7   each other, were in fact related to one another by similar

8   methods, objectives, participants, or other relatedness

9   factors, and did, in fact, extend over a substantial period of

10  time or threaten to continue over time, you may find that the

11  government has met this burden.

12       The government must also prove that the defendant

13  knew and intended that there would be a meaningful connection

14  between the pattern of racketeering activity and the affairs

15  of the enterprise.  Such a meaningful connection exists if the

16  government proves that the racketeering acts would be related

17  in some meaningful way to the affairs of the enterprise, or

18  that the acts would benefit the enterprise, or that the

19  commission of the acts would be facilitated by the enterprise.

20  Of course, the government meets this burden if you find that

21  there existed a pattern of racketeering activity that in fact

22  had a meaningful connection to the Bonanno enterprise, as I

23  have defined those terms for you.

24       Finally, the government must also prove that the

25  defendant agreed to participate in the conduct of the affairs

1   of the enterprise through the pattern of racketeering

2   activity.  As I instructed you, to agree to participate means

3   that the defendant agreed to play some part in the operation

4   or management of the enterprise.  You must apply that

5   instruction here.  So, the government must prove that the

6   defendant agreed to play some part in the enterprise, knowing

7   and intending that its affairs would be conducted through a

8   pattern of racketeering activity, as that term has been

9   explained to you.

10          The elements of racketeering conspiracy, such as the

11  conspiratorial agreement, the defendant's knowledge of it, and

12  the defendant's participation in the conspiracy, may be

13  inferred from the various kinds of evidence before you.  For

14  example, if the evidence establishes that the defendant and at

15  least one other co-conspirator committed racketeering acts in

16  furtherance of the charged enterprise's affairs, you may infer

17  the existence of the requisite agreement to commit a

18  racketeering conspiracy.  Determine whether, based on the

19  entirety of the evidence, the government has proven that the

20  defendant entered into the requisite conspiratorial agreement.

21  When people enter into a conspiracy, they become agents of

22  each other, so that the act or statement of one conspirator

23  during the existence of, and in furtherance of, the conspiracy

24  is considered the act or statement of all the other

25  co-conspirators and is evidence against them all.

Charge of the Court                    3809

1          Mere association with a guilty person does not prove

2     guilt.  However, proof of continued association with persons

3     the defendant believes are members of the conspiracy may, but

4     need not, be evaluated by you as proof of the continuation or

5     non-continuation of the charged conspiracy and the defendant's

6     continued membership in that charged conspiracy.

7          Do you need a little break, do you want to stand up

8     and stretch?

9          Anyone want to stand up and stretch?

10     I think I do.

11     (Pause in the proceedings.)

12     THE COURT:  Please be seated.

13          Racketeering Act One alleges that four separate

14     federal crimes and two separate state crimes were committed on

15     or about and between January 1, 1968 and December 31, 1990.

16     If you unanimously find, beyond a reasonable doubt, that the

17     defendant agreed that he or another co-conspirator would

18     commit any of these crimes, you may find that the government

19     has proven Racketeering Act One.  But if you do not

20     unanimously find, beyond a reasonable doubt, that the

21     defendant made such an agreement, then you cannot find that

22     the government has proven Racketeering Act One.

23          For ease of analysis, I will instruct you first on

24     the substantive crimes, before instructing you on the

25     corresponding conspiracy crimes.

Charge of the Court                    3810

1          Racketeering Act One (B) charges the defendant with

2     extortionate extension of credit.  The indictment reads as

3     follows:

4          Between approximately January 1, 1968 and

5     December 31, 1990, in this district and elsewhere the

6     defendant, Vincent Asaro, together with others, did knowingly

7     and intentionally make one or more extortionate extensions of

8     credit, in violation of federal law.

9          The pertinent federal law states that:

10          Whoever makes any extortionate extensions of credit,

11     or conspires to do so, is guilty of a crime.

12          To prove a violation of this statute, two elements

13     must be established beyond a reasonable doubt.

14          First, that the defendant knowingly made an

15     extension of credit.

16          And second, that there was an understanding between

17     the defendant and the borrower, express or implied, tacit or

18     otherwise, that if the borrower delayed in making his

19     repayments or if there was a total failure to repay, violence

20     or other criminal means would be used to force repayment.

21          I will explain each of these elements in greater

22     detail.

23          The first element is the that the defendant

24     knowingly made an extension of credit.  To extend credit means

25     to make or renew any loan, or to enter into any agreement,

Charge of the Court                          3811

1  tacit or express, whereby the repayment of a debt may, or will

2  be deferred.  It makes no difference whether the debt in

3  question is valid or acknowledged, or how it may have arisen.

4       As I instructed you, to act knowingly is to act

5  voluntarily and purposely, not because of ignorance, mistake,

6  accident, carelessness or other innocent reason.

7       The second element is at the time of the extension

8  of credit the defendant and the borrower understood that delay

9  or failure to repay could result in the use of violence or

10  other criminal means to cause harm to the person, or to the

11  reputation or property of some person.

12       In this context, the word understanding means merely

13  comprehension or awareness.  It must be emphasized that it is

14  the awareness of the parties at the time of the loan which is

15  crucial.  The actual fear of the borrower is not relevant to

16  this determination, nor does the statute require proof of

17  express threats.  What is required is that the threat of

18  violence exists and that it be comprehended by the borrower

19  and the defendant.  If so, the second element is satisfied.

20       I will now turn to Racketeering Act One (A) which

21  alleges that the defendant conspired to make one or more

22  extortionate extensions of credit.  That reads:

23       Between approximately January 1st, of 1968 and

24  December 31st of 1990, the defendant, together with others,

25  did knowingly and intentionally conspire to make one or more

Charge of the Court                    3812

1   extortionate extensions of credit in violation of federal law.

2           As I explained when I instructed you on the law of

3   federal conspiracy, in order to find that this racketeering

4   act has been proven, you must find that two or more persons

5   agreed to make one or more extortionate extensions of credit,

6   as that crime has been explained to you.  You must then

7   determine whether the defendant knowingly and intentionally

8   became a member of that conspiracy.  In assessing whether this

9   conspiracy has been proven, you must apply my earlier

10  instructions on the federal law of conspiracy.

11          Racketeering Act One (D) reads as follows:

12          Between approximately January 1, 1968 and

13  December 31, 1990, defendant Vincent Asaro, together with

14  others, did knowingly and intentionally participate in the use

15  of extortionate means to collect and attempt to collect one or

16  more extensions of credit, in violation of federal law.

17          That law provides, in pertinent part that:  Whoever

18  knowingly participates in any way or conspires to do so in the

19  use of any extortionate means to collect or attempt to collect

20  any extension of credit violates federal law.

21          To prove a violation of this statute, the government

22  must establish each of the following three elements beyond a

23  reasonable doubt:

24          First, that the defendant collected attempted to

25  collect an extension of credit.

SAM      OCR      RMR      CRR      RPR

1           Second, the defendant used extortionate means to

2    collect or attempt to collect the extension of credit.

3           And third, that the defendant participated knowingly

4    in the use of extortionate means.

5           And I will now explain each of these elements in

6    greater detail.

7           The first element of the offense is that the

8    defendant collected or attempted to collect an extension of

9    credit.

10          To collect means simply to induce a person in any

11   way to make a payment of money.  It makes no difference

12   whether the debt or claim in question is valid or

13   acknowledged, or how it may have arisen.

14          The second element of the offense is that

15   extortionate means were used to collect or attempt to collect

16   the extension of credit.  Extortionate means are any means

17   which involve the use, or an express or implicit threat of

18   use, of violence or other criminal means to cause harm to the

19   person, reputation, or property of any person.  The second

20   element is directed at the conduct of the collector, not at

21   the state of mind of the borrower.  The collector's actions

22   need not generate actual fear, but must have been intended to

23   induce fear in an ordinary person.

24          The third element of the offense is knowing

25   participation in the use of extortionate means.  To act

1  knowingly, again, means to act voluntarily and purposely, not

2  because of ignorance, mistake, accident or carelessness or

3  other innocent reason.

4          I will now turn to Racketeering Act One (C), which

5  alleges that the defendant conspired to participate in the use

6  of extortionate means to collect or attempt to collect one or

7  more extensions of credit.

8          Racketeering Act One (C) reads:

9          On or about and between January 1, 1968 and

10  December 31, 1990 the defendant, Vincent Asaro, together with

11  others, knowingly and intentionally conspired to participate

12  in the use of extortionate means to collect and attempt to

13  collect one or more extensions of credit, in violation of

14  federal law.

15          As I explained when I instructed you on the law of

16  federal conspiracy, in order to find this racketeering act

17  proven, you must find that two or more persons agreed to use

18  extortionate means to collect one or more extensions of

19  credit, as that crime was explained to you in connection with

20  Racketeering Act One (D).  You must then determine whether the

21  defendant knowingly and intentionally became a member of that

22  conspiracy.  In assessing whether this conspiracy has been

23  proven, you must apply my earlier instructions on the law of

24  federal conspiracy.

25          Racketeering Act One (F) reads as follows:

Charge of the Court                    3815

1          Between approximately January 1, 1968 and

2     December 31, 1990, the defendant, together with others, did

3     knowingly and intentionally steal property by extortion, in

4     that the defendant and others obtained property, by compelling

5     and inducing one or more persons to deliver such property by

6     instilling in them a fear that if the property were not so

7     delivered, one or more persons would cause physical injury to

8     one or more persons in the future and cause damage to

9     property, in violation of New York state law.

10          Under New York State law a person is guilty of this

11     crime when he steals property and when that property,

12     regardless of its nature and value, is obtained by extortion

13     committed by instilling in the victim a fear that the actor or

14     another will cause physical injury to some person in the

15     future or cause damage to property.

16          A person steals property when, with intent to

17     deprive another of property or to appropriate the same to

18     himself or to a third person, he wrongfully takes, obtains, or

19     withholds the property from an owner of the property.

20     Property means any money, personal property, or thing of

21     value.  Owner means a person having a right to possession of

22     the property superior to that of the person who takes it.

23     Intent means conscious objective or purpose.  A person acts

24     with intent to deprive another of property or to appropriate

25     property to himself or to a third person when his conscious

Charge of the Court                     3816

1    objective is to withhold the property or cause it to be

2    withheld permanently, or to exercise control over the

3    property, or to aid a third person in exercising control over

4    it, permanently, or to dispose of the property either for the

5    benefit of himself or a third person, or under such

6    circumstances as to render it unlikely that an owner will

7    recover the property.

8               A person wrongfully takes, obtains, or withholds

9    property from an owner when he obtains such property,

10   regardless of its nature or value, by extortion.

11              A person obtains property by extortion when he

12   compels or induces another person to deliver the property to

13   himself or to a third person by instilling in that person a

14   fear that, if the property is not so delivered, he or another

15   will cause physical injury to some person or cause damage to

16   property.

17              This racketeering act is also charged under aiding

18   and abetting theory.  Thus, you may find Racketeering Act One

19   (F) proven if you find that the defendant aided and abetted

20   another person in committing the state law extortion.  I

21   previously instructed you on aiding and abetting under New

22   York State law, and you must apply that instruction here.

23              I will now turn to Racketeering Act One (E) which

24   alleges that the defendant conspired to commit the New York

25   State crime of extortion, on which I just instructed you.

Charge of the Court                    3817

1      Racketeering Act One (E) reads:

2          On or between January 1, 1968 and December 31, 1990,

3   the defendant, Vincent Asaro, together with others, did

4   knowingly and intentionally conspire to steal property by

5   extortion, in that the defendant and others agreed to obtain

6   property, to wit:  United States currency, by compelling and

7   inducing one or more persons to deliver such property by

8   instilling in them a fear that, if the property were not so

9   delivered, one or more persons would cause physical injury to

10  one or more persons in the future and cause damage to

11  property, in violation of New York State law.

12         This racketeering act alleges that the defendant

13  conspired to commit the extortion charged in Racketeering Act

14  One (F).  I have already instructed you on the law of

15  conspiracy and extortion under New York State law and you must

16  apply those instructions here.  I remind you that for you to

17  find that the defendant committed the New York State crime of

18  conspiracy, the government must prove beyond a reasonable

19  doubt each of the following three elements:

20         First, that the defendant agreed with one or more

21  persons to commit extortion.

22         Second, that the defendant did so with the intent to

23  commit extortion.

24         And third, that the defendant, or one of the persons

25  with whom he agreed, committed at least one overt act in

Charge of the Court                          3818

1    furtherance of the conspiracy.

2           I remind you that you must also apply here the

3    instructions that I gave you as to the definition of overt act

4    under New York State law.

5           (Continued on the following page.)

Charge of the Court                                    3819

1          THE COURT:  I will now instruct you on Racketeering

2     Act Two.

3          Racketeering Act Two alleges three separate crimes

4     under New York State law:  Conspiracy to murder Paul Katz;

5     murder of Paul Katz; and accessory after the fact to the

6     murder of Paul Katz.

7          Again, if you unanimously find, beyond a reasonable

8     doubt, that the defendant agreed that he or a co-conspirator

9     would commit any one of these three crimes, then you may find

10    that the government has proven Racketeering Act Two, but if

11    you do not unanimously find that the defendant made such an

12    agreement, then you cannot find that the government has proven

13    Racketeering Act Two.  For ease of analysis, I will instruct

14    you on the crime of murder first.

15         Racketeering Act Two (B) reads that between

16    approximately December 1 and December 7, 1969, the defendant

17    Vincent Asaro, together with others, with intent to cause the

18    death of Paul Katz, did knowingly and intentionally cause his

19    death, in violation of New York State law.

20         Under New York State law, a person is guilty of

21    murder when, with intent to cause the death of another person,

22    he causes the death of such person.  In order to prove the

23    defendant's guilt of the murder charged in Racketeering Act

24    Two (B), the government must prove beyond a reasonable doubt

25    each of the following two elements.

1          First, that defendant intended to cause the death of

2    Paul Katz and, second, that acting in accordance with that

3    intent, the defendant caused the death of Paul Katz.

4          I have already charged you on the meaning of

5    "intent" and "intentionally."  You must apply those

6    instructions here.  Remember, premeditation is not a

7    prerequisite in determining intent.  Intent may be formed in

8    seconds, actually in a brief instant before the commission of

9    an act.  However, it is necessary for the intent to be formed

10   prior to or during the commission of the act or acts resulting

11   in the commission of a crime.

12         Racketeering Act Two (B) is also charged under an

13   aiding and abetting theory.  Thus, you may find Racketeering

14   Act Two (B) proven if you find that the defendant aided and

15   abetted another person in committing the murder of Paul Katz.

16   I previously instructed you on the law of aiding and abetting

17   under New York State law and you must apply that instruction

18   here.

19         I will now turn to Racketeering Act Two (A) which

20   charges the defendant with conspiring to murder Paul Katz.

21         Racketeering Act Two (A) reads between approximately

22   December 1st and December 7, 1969, both dates being

23   approximate and inclusive, defendant Vincent Asaro, together

24   with others, did knowingly and intentionally conspire to cause

25   the death of another person, to wit, Paul Katz, in violation

Charge of the Court                     3821

1   of New York State law.

2          This racketeering act alleges that the defendant

3   conspired to commit the murder charged in Racketeering Act

4   Two (B).  I have already instructed you on the law of

5   conspiracy and murder under New York State law, and you must

6   apply those instructions here.  I remind you that for you to

7   find that the defendant committed the New York State crime of

8   conspiracy, the government must prove beyond a reasonable

9   doubt each of the following three elements:  First, that the

10  defendant agreed with one or more persons to commit the

11  murder; second, that the defendant did so with the intent to

12  commit the murder; and, third, that the defendant, or one or

13  more persons with whom he agreed, committed at least one overt

14  act in furtherance of the conspiracy.

15          I remind you that you must apply here the

16  instructions that I gave you as to the definition of overt act

17  under New York State law.

18          I will now turn to Racketeering Act Two (C) that

19  reads between approximately January of 1984 and December of

20  1986, the defendant, together with others, knowing that a

21  murder, contrary to New York State law had been committed, did

22  knowingly and intentionally assist the offender or offenders

23  in order to hinder and prevent the offender's prosecution in

24  violation of New York State law.

25          Under New York State state law, a person is guilty

Charge of the Court                    3822

1   of the crime of accessory after the fact to murder when he

2   renders criminal assistance to a person who committed the

3   murder.

4           To find this racketeering act proven, the government

5   must prove, beyond a reasonable doubt, each of the following

6   two elements:  First, that the defendant concealed, altered or

7   destroyed any physical evidence which might have aided in the

8   arrest or prosecution of a person he knew or believed had

9   committed a crime or was being sought for the commission of a

10  crime; and, second, when he committed those acts, he did so

11  with the intent to hinder that person's arrest or prosecution,

12  or to assist that person in benefiting from the crime.

13          I will now turn to Racketeering Act Three.

14  Racketeering Act Three alleges three separate crimes relating

15  to the robbery of the employees of Lufthansa Airlines:

16  Robbery and robbery conspiracy under federal law, and robbery

17  under New York State law.  If you unanimously find, beyond a

18  reasonable doubt, that the defendant agreed that he or another

19  co-conspirator would commit any one of these crimes, you may

20  find that the government has proven Racketeering Act Three.

21  But if you do not anonymously find that the defendant

22  knowingly and intentionally made such an agreement, then you

23  cannot find that the government has proven Racketeering Act

24  Three.

25          For ease of analysis, I will instruct you on federal

Charge of the Court                    3823

1    robbery first, before instructing you on federal conspiracy to

2    commit robbery.

3            Racketeering Act Three (B) reads that on or about

4    December 11th of 1978, the defendant, together with others,

5    did knowingly and intentionally obstruct, delay and affect

6    commerce and the movement of articles and commodities in

7    commerce, by robbery, that is the robbery of United States

8    currency and jewelry from one or more employees of Lufthansa

9    Airlines in violation of federal law.

10           The pertinent federal law states that whoever in any

11   way or degree obstructs, delays or affects commerce or the

12   movement of an article or commodity in commerce, by robbery,

13   or attempts or conspires to do so, or commits or threatens

14   physical violence to any person or property in furtherance of

15   a plan or purpose to do anything in violation of this section

16   violates federal law.

17           In order to prove the defendant committed robbery in

18   violation of federal law, the government must establish beyond

19   a reasonable doubt each of the following three elements:

20   First, that the defendant knowingly took personal property of

21   another, or from the presence of another; second, that the

22   defendant took this property against the victim's will, by

23   actual or threatened force, violence or fear of injury, either

24   immediately or in the future; and, third, that as a result of

25   defendant's actions, interstate commerce or an item moving in

1  interstate commerce was delayed, obstructed or affected in any

2  way or degree.

3         The first element of the crime of robbery involves

4  the obtaining or taking of the property of another.  In this

5  context, property includes money or other tangible and

6  intangible things of value.  The second element of the crime

7  of robbery is that the defendant took property wrongfully by

8  using actual or threatened force, violence, or fear of injury

9  or economic harm, whether immediately or in the future.

10        In considering whether property was taken with the

11  use of force, violence or fear, you should give those words

12  their common and ordinary meaning and understand them as you

13  normally would.  The use or threat of violence does not have

14  to be directed at the person whose property was taken.  The

15  use or threat of force or violence might be aimed at a third

16  person.  You must determine whether the defendant used or

17  threatened force, violence or fear, to unlawfully obtain the

18  property specified in the indictment.

19        As to the third element, I have already instructed

20  you on the meaning of interstate commerce and you must apply

21  those instructions here.  As I instructed, any effect at all

22  on interstate commerce is enough to satisfy this element.  For

23  example, that a successful robbery of money would prevent the

24  use of those funds to purchase articles that travel through

25  interstate commerce would be a sufficient effect on interstate

Charge of the Court                    3825

1   commerce.

2          Racketeering Act Three (B) is also charged under an

3   aiding and abetting theory.  Thus, you may find Racketeering

4   Act Three (B) proven if you find that the defendant aided and

5   abetted another person in committing robbery in violation of

6   federal law.  I previously instructed you on the federal law

7   of aiding and abetting and you must apply that instruction

8   here.

9          I will now turn to Racketeering Act Three (A) which

10  alleges that the defendant conspired to commit federal

11  robbery.

12         The charge reads as follows.  Between approximately

13  November 1st of 1978 and September 1st of 1979, the defendant,

14  together with others, did knowingly and intentionally conspire

15  to obstruct, delay and affect commerce and the movement of

16  articles and commodities in commerce by robbery, specifically

17  the robbery of United States currency and jewelry from one or

18  more employees of Lufthansa Airlines, in violation of federal

19  law.

20         As I explained when I instructed you on the law of

21  federal conspiracy, in order to find this Racketeering Act

22  proven, you must find that two or more persons agreed to

23  commit the robbery of the employees of Lufthansa Airlines, as

24  that crime has been explained to you in connection with

25  Racketeering Act Three (B).  You must then determine whether

Charge of the Court                                    3826

1   the defendant knowingly and intentionally became a member of

2   that conspiracy.  In assessing whether this conspiracy has

3   been proven, you must apply my earlier instructions on the law

4   of federal conspiracy.

5        Racketeering Act Three (C) reads as follows.  On

6   approximately December 11, 1978, the defendant and others

7   knowingly and intentionally stole property by robbery, in that

8   the defendant and others forcibly stole property, that is,

9   United States currency and jewelry from one or more employees

10  of Lufthansa Airlines in violation of New York State law.

11       Under New York State law, a person is guilty of

12  robbery if he forcibly steals property.  Again, property is

13  defined as including money or any other thing of value.  A

14  person steals property when, with the intent to deprive

15  another of property or to appropriate the property to himself

16  or to a third person, the defendant wrongfully takes property

17  from its owner.  A defendant forcibly steals property when he

18  uses or threatens the immediate use of physical force upon

19  another person for the purpose of compelling the owner of such

20  property or another person to deliver up the property.

21       Racketeering Act Three (C) is also charged under an

22  aiding and abetting theory.  Thus, you may find Racketeering

23  Act Three (C) proven if you find that the defendant aided and

24  abetted another person in committing the robbery of the

25  employees of Lufthansa Airlines in violation of the New York

Charge of the Court                    3827

1    State law.  I previously instructed you on aiding and abetting

2    under New York State law.  You must apply that instruction

3    here.

4            I will now -- would you like a break?

5            MS. MACEDONIO:  I would.

6            THE COURT:  Okay.

7            (Jury exits.)

8            (Recess taken.)

9            THE COURT:  Okay.  Are you ready?

10           MS. MACEDONIO:  Yes.  Thank you, Your Honor.

11           MS. ARGENTIERI:  Yes.

12           MS. MACEDONIO:  Judge, do you intend to send them

13   home after you finish the charge?

14           THE COURT:  It depends on when I finish.  I have

15   about 20 pages to go.

16           MS. MACEDONIO:  Okay.

17           THE COURT:  I have gone through about two-thirds of

18   it.  So I guess we will finish at about 5:00.  I might send

19   them in for a half hour.

20           MS. MACEDONIO:  Okay.

21           MS. ARGENTIERI:  And then are you dismissing all of

22   the alternates?

23           THE COURT:  Yes.

24           MS. ARGENTIERI:  Okay.

25           THE COURT:  Well, I have on occasion a long time ago

Charge of the Court                    3828

1  not done it.  I'm not sure it's worth it.  It's too

2  complicated.

3          MS. ARGENTIERI:  It is.

4          THE COURT:  Okay.  After today or when they go out,

5  we will talk about what I am going to say about Wednesday,

6  when you want me to say it.

7          MS. MACEDONIO:  Okay.

8          THE COURT:  It's a holiday.

9          (Jury enters.)

10          THE COURT:  Please be seated.

11          I will now instruct you on Racketeering Act Four.

12  Racketeering Act Four alleges two separate crimes under New

13  York State law:  Arson and conspiracy to commit arson.  If you

14  unanimously find, beyond a reasonable doubt, that the

15  defendant agreed that he or a co-conspirator would commit

16  either of these crimes, then you may find that the government

17  has proven Racketeering Act Four, but if you do not

18  unanimously find that the defendant made such an agreement,

19  then you cannot find that the government has proven

20  Racketeering Act Four.

21          I will instruct you on arson first before

22  instructing you on arson conspiracy.

23          Act Four (B) charges that between approximately

24  January of 1980 and January of 1981, the defendant, together

25  with others, did knowingly and intentionally damage a

1  building, specifically 8601 Rockaway Boulevard in Ozone Park,

2  New York, by starting a fire in violation of New York State

3  law.

4         New York State law makes it illegal to intentionally

5  damage a building by starting a fire.  Even the slightest

6  damage to the building is sufficient to prove this act.

7  Racketeering Act Four (B) is also charged under an aiding and

8  abetting theory.  Thus, you may find Racketeering Act Four (B)

9  proven if you find that the defendant identified and abetted

10 another person in committing the charged arson of the Afters

11 lounge.  I previously instructed you on aiding and abetting

12 under New York State law and you must apply that instruction

13 here.

14         Turning to Racketeering Act Four (A), that act

15 charges that between approximately January of 1980 and January

16 of 1981, the defendant and others knowingly and intentionally

17 conspired to damage a building, specifically 8601 Rockaway

18 Boulevard in Ozone Park, New York, by starting a fire in

19 violation of New York State law.

20         This Racketeering Act alleges that the defendant

21 conspired to commit the arson charged in Racketeering Act

22 Four (B).  I have already instructed you on the law of

23 conspiracy and arson under New York State law and you must

24 apply those instructions here.  I remind you that for you to

25 find that the defendant committed the New York State crime of

Charge of the Court                    3830

1   conspiracy, the government must prove agreement, intent and an

2   overt act.

3            I will now instruct you on Racketeering Act Five.

4   Racketeering Act Five alleges that the defendant solicited the

5   murder of Gasper Ferreri, Junior, identified in the indictment

6   as John Doe Number One, in violation of New York State law.

7   If you find beyond a reasonable doubt that the defendant

8   agreed that he or a co-conspirator would solicit Gasper

9   Ferreri, Junior's murder, then you may find that the

10  government has proven Racketeering Act Five, but if you do not

11  find that the defendant made such an agreement, then you

12  cannot find that the government has proven Racketeering Act

13  Five.

14            That act charges that between approximately

15  January 1, 1983 and December 31, 1985, the defendant Vincent

16  Asaro did knowingly and intentionally solicit, request,

17  importune and otherwise attempt to cause another person to

18  cause the death of John Doe Number One, Gasper Ferreri, Junior

19  in violation of New York State law.

20            Under New York State law, it is illegal for a person

21  with intent that another person engage in a murder, to

22  solicit, request, command, importune or otherwise attempt to

23  cause such person to engage in such conduct.

24            In order to prove that the defendant solicited the

25  murder of Gasper Ferreri, Junior, the government must

1   establish the following elements of the crime beyond a

2   reasonable doubt.  First, that the defendant solicited,

3   requested, commanded, importuned or otherwise attempted to

4   cause another person to murder Gasper Ferreri, Junior and,

5   second, that the defendant intended the other person to cause

6   the death of Gasper Ferreri, Junior.

7          It does not matter whether or not the murder was

8   actually committed, whether the defendant actually influenced

9   the other person to commit it or attempt to commit it or

10  whether the other person was incapable of committing the

11  murder because he was incompetent or lacked the required

12  mental state.

13         Racketeering Act Five is also charged under an

14  aiding and abetting theory.  Thus, you may find Racketeering

15  Act Five proven if you find that the defendant aided and

16  abetted another person in soliciting the murder of Gasper

17  Ferreri, Junior.  I previously instructed you on aiding and

18  abetting under New York State law and you must apply that

19  instruction here.

20         I will now instruct you on Racketeering Act Six.

21  That alleges that the defendant committed attempted robbery in

22  violation of New York State law.  If you find, beyond a

23  reasonable doubt, that the defendant agreed that he or a

24  co-conspirator would commit this crime, then you may find that

25  the government has proven Racketeering Act Six.  But if you do

Charge of the Court                    3832

1   not unanimously find that the government made such an

2   agreement, then you cannot find that the government has proven

3   Racketeering Act Six.

4           Racketeering Act Six reads as follows.  Between

5   approximately January of 1984 and December of 1986, the

6   defendant, together with others, did knowingly and

7   intentionally attempt to steal property by robbery in that the

8   defendant and others attempted to forcibly steal property,

9   specifically, United States currency, from one or more

10  employees of an armored car business in violation of New York

11  State law.

12          Attempted robbery is defined as knowingly and

13  intentionally attempting to commit robbery.  I have already

14  instructed you on the law of robbery under New York State law

15  and you must apply those instructions here.  I will now

16  explain "attempt" under New York State law.  Under New York

17  State law, a person is guilty of an attempt to commit a crime

18  when, with the intent to commit a crime, he engages in conduct

19  which tends to effect the commission of such crime.

20          Therefore, in order for you to find that the

21  defendant committed the crime of attempted robbery, the

22  government must prove beyond a reasonable doubt the following

23  two elements:  First, that the defendant intended that the

24  alleged robbery would be committed; and, second, that acting

25  with such intent, the defendant engaged in conduct which

Charge of the Court                    3833

1    tended to effect the commission of the robbery.

2            Intent means a conscious objective or purpose.

3    Thus, a person acts with intent to commit a crime when his

4    conscious objective or purpose is to commit that crime.

5            Conduct tends to effect the commission of a crime if

6    it comes dangerously close or very near to completion of the

7    intended crime.  This means doing an act or acts directed

8    toward the accomplishment of the robbery.  Such conduct does

9    not have to be the last act necessary to effect the commission

10   of the robbery, but must be conduct which constitutes a

11   substantial step toward the commission of the robbery.  The

12   required conduct must be related to and directed toward the

13   accomplishment of the robbery, conduct which goes beyond mere

14   preparation and planning, conduct so related to the commission

15   of the robbery that in all reasonable probability, the robbery

16   would have been committed but for some interference,

17   intervention or other circumstances.

18           Racketeering Act Six is also charged under an aiding

19   and abetting theory.  Thus, you may find Racketeering Act Six

20   proven if you find that the defendant aided and abetted

21   another person in attempting to commit the robbery of the

22   armored car.  I previously instructed you on aiding and

23   abetting under New York State law and you must apply that

24   instruction here.

25           I will now instruct you on Racketeering Act Seven.

1    That alleges three separate crimes:  Robbery and robbery

2    conspiracy under federal law and robbery under New York State

3    law.  If you unanimously find, beyond a reasonable doubt, that

4    the defendant agreed that he or a co-conspirator would commit

5    any one of these crimes, then you may find that the government

6    has proven Racketeering Act Seven.  But if you do not find

7    that the defendant knowingly and intentionally made such an

8    agreement, then you cannot find that the government has proven

9    Racketeering Act Seven.

10          Racketeering Act Seven (B) reads as follows.

11   Between approximately February 1, 1984 and February 27, 1984,

12   the defendant Vincent Asaro, together with others, did

13   knowingly and intentionally obstruct, delay and affect

14   commerce and the movement of articles and commodities in

15   commerce, by robbery, that is the robbery of gold salts from

16   an employee of Federal Express in violation of federal law.

17          Racketeering Act Seven (B) alleges that the

18   defendant committed robbery in violation of federal law, or

19   aided and abetted that robbery.  I have already instructed you

20   on the federal law of robbery in connection with Racketeering

21   Act Three (B), as well as the federal law of aiding and

22   abetting.  When considering Racketeering Act Seven (B), you

23   must apply those instructions here.

24          Racketeering Act Seven (A) reads that between

25   approximately February 1st and 27 of 1984, the defendant

Charge of the Court                    3835

1  Vincent Asaro, together with others, did knowingly and

2  intentionally conspire to obstruct, delay and affect commerce

3  and the movement of articles and commodities in commerce by

4  robbery, to wit, the robbery of gold salts from an employee of

5  Federal Express, in violation of federal law.

6          I previously instructed you on the federal law of

7  robbery and robbery conspiracy in connection with my

8  instructions on Racketeering Acts Three (A) and (B).  In

9  considering Racketeering Act Seven (A), you must apply those

10 same instructions here.

11         Racketeering Act Seven (C) reads as follows.

12 Between approximately February 1st and 27 of 1984, the

13 defendant Vincent Asaro, together with others, knowingly and

14 intentionally stole property by robbery, in that the defendant

15 and others forcibly stole property, that is gold salts, from

16 an employee of Federal Express in violation of New York State

17 law.

18         Again, I instructed you on New York State law of

19 robbery and aiding and abetting when I instructed you on

20 Racketeering Act Three (C), the Lufthansa heist.  When

21 considering Racketeering Act Seven (C), you must apply those

22 same instructions here.

23         I will now instruct you on Racketeering Act Eight.

24 Racketeering Act Eight alleges three separate crimes:  Two

25 under federal law, and one under New York State law, all

Charge of the Court                              3836

1   relating to John Zaffarano, identified in the indictment as

2   John Doe Number Two.  Racketeering Act Eight (A) alleges that

3   the defendant conspired to extort him in violation of federal

4   law, eight (B) alleges that the defendant extorted him under

5   federal law, and Eight (C) alleges that the defendant

6   conspired to extort him under New York State law.  If you

7   unanimously find, beyond a reasonable doubt that the defendant

8   agreed that he or a co-conspirator would commit any of these

9   crimes, then you may find that the government has proven

10  Racketeering Act Eight.  But if you do not find that the

11  defendant made such an agreement, then you cannot find that

12  the government has proven Racketeering Act Eight.

13          I instruct you that the crime of extortion in

14  violation of federal law that is charged in this racketeering

15  act is different from the crimes of extortionate extensions

16  and collections of credit under federal law charged in

17  Racketeering Act One.  Because the crime of extortion alleged

18  here violates a federal criminal law that is different from

19  those charged in Racketeering Act One, the crime has, as you

20  will learn, different elements.  Again, for each analysis, I

21  will first instruct you on the law of this type of federal

22  extortion.

23          Racketeering Act Eight (B) reads between

24  approximately January 1st of 1985 and January 1st of 1989, the

25  defendant Vincent Asaro together with others did knowingly and

Charge of the Court                     3837

1   intentionally obstruct, delay and affect commerce, and the

2   movement of articles and commodities in commerce by extortion,

3   in that the defendant and others obtained property,

4   specifically proceeds from the sale of a pornography business

5   and related properties from John Doe Number Two, John

6   Zaffarano, with his consent, which consent was induced by

7   wrongful use of actual and threatened force, violence and

8   fear, in violation of federal law.

9            (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- Charge -                                          3838

1          Extortion is the obtaining of property from another,

2    with his consent, induced by wrongful use of actual or

3    threatened force, violence or fear.  The federal law provides

4    that:

5          Whoever in any way or degree obstructs, delays, or

6    affects commerce or the movement of an article or commodity in

7    commerce, by... extortion or attempts or conspires to do so...

8    commits a crime.

9          In order to meet its burden of proof that the

10   defendant committed extortion in violation of federal law, the

11   government must establish beyond a reasonable doubt each of

12   the following three elements:

13         First:  That the defendant obtained the property of

14   another;

15         Second:  That the defendant obtained this property

16   with the alleged victim's consent, but that this consent was

17   compelled by the wrongful use or threat of force, violence, or

18   fear; and

19         Third:  That as a result of the defendant's actions,

20   interstate on foreign commerce or an item moving in interstate

21   or commerce, was delayed, obstructed or affected in any way or

22   degree.

23         I will now further explain these elements.

24         First, the person must have obtained the property of

25   another person for himself, or for another person or persons.

- Charge -                                                    3839

1          A "person" includes an organization, such as a

2    corporation or group of people acting together as a formal or

3    informal entity.

4          "Property" can be both tangible, such as money, and

5    intangible, such as ownership interest in a business or other

6    asset.

7          Second, the defendant must have obtained property by

8    using the unlawful means charged.  It is not necessary that

9    the government prove that force, violence and fear were all

10   used or threatened.  The government satisfies its burden of

11   proving an unlawful taking if it proves that any of these

12   means was used or threatened.

13         In considering whether a defendant, used or

14   threatened to use force, violence or fear, you should give

15   those words their common and ordinary meaning, and understand

16   them as you would in your everyday lives.

17         The use or threat of force, violence or fear is

18   unlawful, if it is aimed at causing economic or physical

19   injury, either to the person or entity at whom the extortion

20   is directed, or to a third party.  A threat may be made

21   verbally, directly or by implication.  Whether a statement or

22   physical gesture by a defendant actually was a threat, depends

23   on the surrounding facts.  A threat by implication means a

24   threat that is not directly stated, but is so understood from

25   the surrounding facts and circumstances.

- Charge -                                    3840

1        In the case of economic injury, the mere voluntary

2   payment of money, unaccompanied by any fear of economic

3   injury, would not constitute extortion.  Rather, you must find

4   that the victim reasonably believed that the defendant had the

5   power to harm the victim and that the defendant would use that

6   power to harm the victim financially.

7        A person may be extorted of an asset even if he

8   obtained the asset illegally.

9        Fear exists if a victim experiences anxiety,

10  concern, or worry over expected personal harm or business

11  loss, or over financial or job security, as a result of the

12  acts of the defendant.

13        The proof must establish that the victim reasonably

14  believed:

15        First, that the defendant had the power to harm the

16  victim; and second, that the defendant might exercise that

17  power to the victim's detriment.  The conduct or statements of

18  the defendant, must be such as would make a reasonable person

19  fearful.  It is not necessary that the fear be the consequence

20  of a direct threat.  It is sufficient that the surrounding

21  circumstances render the fear reasonable.

22        It is not necessary that the government prove that

23  the fear of physical or economic injury was the consequence of

24  a threat made by the defendant.  Nor is it necessary that the

25  defendant actually created the fear in the mind of the victim,

- Charge -                                                3841

1   or was responsible for creating that fear.  It is enough that

2   the defendant exploited or attempted to exploit fear that he

3   knew had been created by one or more persons or groups, and

4   thereby wrongfully obtained tangible or intangible property.

5          You may consider the relationship between the

6   defendant and the victim as well as all other circumstances in

7   deciding whether the element of fear exists.  A generally

8   friendly relationship between the parties does not necessarily

9   negate fear.

10         You may find that a victim yielded to extortionate

11  demands out of fear of physical or economic injury, even if

12  the victim stated that he was not in fear, but there must be

13  oath are evidence proving that, not withstanding the victim's

14  denial of fear, he acquiesced to the demand for payment of

15  money or delivery of property out of fear; and, the alleged

16  victim's denial of fear was itself the product of fear.

17         You may find that Racketeering Act Eight (B), has

18  been proven even if the defendant did not succeed in

19  instilling fear in the victim, provided that you find that the

20  defendant intended to instill fear and engaged in conduct that

21  he understood would be reasonably likely to have such an

22  effect on someone in the position of victim.

23         Third, I previously instructed you on the third

24  element, that the defendant's actions have an effect on

25  interstate commerce -- in connection with Racketeering Act

- Charge -                                    3842

1    3(B), you must apply those instructions here.

2           Racketeering Act Eight (B) is also charged under an

3    aiding and abetting theory.  Thus, you may find Racketeering

4    Act Eight (B) proven if you find that the defendant aided and

5    abetted another person in extorting property from John

6    Zaffarano.  I previously instructed you on the federal law of

7    aiding and abetting and you must apply that instruction here.

8           I will now turn to Racketeering Act Eight (A), which

9    alleges that the defendant conspired to commit extortion in

10   violation of federal law.

11          It reads as follows:  Between approximately

12   January 1, 1985, and January 1, 1989, the defendant together

13   with others did knowingly and intentionally conspire to

14   obstruct, delay and affect commerce and the movement of

15   articles and commodities in commerce, by extortion, in that

16   the defendant and others agreed to obtain property, to wit:

17   Proceeds from the sales of a pornography business and related

18   properties, from John Doe #2, John Zaffarano... with his

19   consent, which consent was to be induced by wrongful use of

20   actual and threatened force, violence, and fear, in violation

21   of federal law.

22          As I explained when I instructed you on the federal

23   conspiracy law, in order to find that this racketeering act

24   has been proven, you must find that two or more persons agreed

25   to extort property from John Zaffarano in violation of federal

- Charge -                                                         3843

1    law, as that has been explained to you in Racketeering Act

2    Eight (B).  You must then determine whether the defendant

3    knowingly and intentionally became a member of that

4    conspiracy.  In assessing whether this conspiracy has been

5    proven, you must apply my earlier instructions on the law of

6    federal conspiracy.

7              Racketeering Act Eight (C) reads as follows:

8              That between approximately January 1st of 1985 and

9    January 1, 1989, the defendant and others did knowingly and

10   intentionally conspire to steal property by extortion, in that

11   the defendant and others agreed to be obtain property,

12   specifically United States currency, by compelling and

13   inducing John Doe #2, John Zaffarano, to deliver such property

14   by instilling in him a fear that, if the property were not so

15   delivered, one or more persons would cause physical injury to

16   one or more persons in the future, and cause damage to

17   property, in violation of New York State law.

18             I previously instructed you on the law of extortion

19   and extortion conspiracy under New York State law in

20   connection with my charge of Racketeering Acts One (E) and

21   (F), and you must apply those instructions here.

22             I will now instruct you on Racketeering Act Nine.

23             That alleges that the defendant extorted Guy Gralto,

24   under both federal and state law.  If you find that the

25   defendant agreed that he or a coconspirator would commit any

1   of these crimes, then you may find that the government has

2   proven Racketeering Act Nine.  But if you do not unanimously

3   find that the defendant made such an agreement, then you

4   cannot find that the government has proven Racketeering Act

5   Nine.  I note that the type of federal extortion charged in

6   this racketeering act violates the same federal law as

7   extortion alleged in Racketeering Act Eight.  The crimes thus

8   have I den tie call elements.

9           Racketeering Act Nine (B) reads, that between

10  approximately January 1, 1993, and February 15, 1995, the

11  defendant, Vincent Asaro, together with others, did knowingly

12  and intentionally obstruct, delay and affect commerce and the

13  movement of articles and commodities in commerce by extortion,

14  in that the defendant and others obtained property,

15  specifically proceeds from an auto body business from John Doe

16  #3, Guy Gralto, with his consent, which consent was induced by

17  wrongful use of actual and threatened force, violence and

18  fear, in violation of federal law.

19          Racketeering Act Nine (B), alleges that the

20  defendant committed the crime of extortion in violation of

21  federal law.  I have already instructed you on the law of this

22  type of extortion under federal law in connection with my

23  charge on Racketeering Act Eight (B).  You must apply those

24  same instructions here.

25          Racketeering Act Nine (B) is also charged under an

- Charge -                                    3845

1   aiding and abetting theory.  Thus, you may find Racketeering

2   Act Nine (B) proven, if you find that the defendant aided and

3   abetted another person in committing the extortion of Guy

4   Gralto.  I previously instructed you on the federal law of

5   aiding and abetting and you must apply that instruction here.

6            Also, note that there is no Racketeering Act Nine

7   (A) and Nine (C), this is intentional and not a mistake in the

8   instructions.

9            Racketeering Act Nine (D) reads, between

10  approximately January 1, 1993, and February 15, 1995, the

11  defendant, together with others, did knowingly and

12  intentionally steal property by extortion, in that the

13  defendant and others, obtained property, that is United States

14  currency, by compelling and inducing John Doe #3, Guy Gralto,

15  to deliver such property by instilling in him a fear that, if

16  the property were not so delivered, one or more persons would

17  cause physical damage to one or more persons in the future,

18  and cause damage to property in violation of New York State

19  law.

20           I previously instructed you on the law of extortion

21  under New York State law and you must apply those instructions

22  here.

23           Racketeering Act Nine (D) is also charged under an

24  aiding and abetting theory.  Thus, you may find Racketeering

25  Act Nine (D) proven, if you find the defendant aided and

- Charge -                                          3846

1   abetted another person in the extortion of Guy Gralto.  I

2   previously instructed you on the law of aiding and abetting

3   under New York State law and you must apply that instruction

4   here.

5            I will now instruct you on Racketeering Act Ten.

6            Racketeering Act Ten alleges that the defendant

7   operated or participated in the operation of an illegal

8   gambling business, in violation of federal law.  It reads as

9   follows:

10           Between approximately April 1994 and December of

11  2002, the defendant and others did knowingly and intentionally

12  conduct, finance, manage, supervise, direct, and own all or

13  part of an illegal gambling business, that is a gambling

14  business involving bookmaking, which operated in violation of

15  New York State law, which involved five or more persons who

16  conducted, financed, managed, supervised, directed and owned

17  all or part of each business and which remained in

18  substantially continuous operation for a period in excess of

19  30 days, and had a gross revenue of at least $2,000 in any

20  single day, in violation of federal law.

21           The relevant federal law provides that, whoever

22  conducts, finances, manages, supervises, directs, or owns all

23  or part of an illegal gambling business shall be guilty of a

24  crime.

25           In order to prove that the defendant conducted an

- Charge -                                                3847

1    illegal gambling business under federal law, the government

2    must prove beyond a reasonable doubt each of the following

3    three elements:

4           First, that the gambling business charged in the

5    indictment violated the laws of the State of New York;

6           Second, that the gambling business was in

7    substantially continuous operation for a period in excess of

8    30 days, or had gross revenues of $2,000 or more in any one

9    day; and

10          Third, that five or more persons, including the

11   defendant, knowingly conducted, financed, managed, supervised,

12   directed or owned the gambling business.

13          I will now explain each of these elements in greater

14   detail.

15          The first element the government must prove beyond a

16   reasonable doubt is that the gambling business alleged in the

17   indictment violated the laws of the State of New York.  The

18   indictment alleges that the gambling business in question

19   involved the use of bookmaking.  "Bookmaking" under New York

20   law means "advancing gambling activity by unlawfully accepting

21   bets from members of the public as a business, rather than in

22   a casual or personal fashion, upon the outcomes of future

23   contingent events."

24          New York law makes it illegal to knowingly advance

25   or profit from unlawful gambling activity.  Some of these

- Charge -                                          3848

1   terms have a special meaning.

2         Under New York State law, "unlawful", means not

3   specifically authorized by law.  A person engages in gambling

4   activity when he stakes or risks something of value upon a

5   future contingent event not under his control or influence,

6   upon an agreement or understanding that he will receive

7   something of value in the event of a certain outcome.

8         A person "advances gambling activity", when, acting

9   other than as a player, he materially aids any form of

10  gambling activity.  Such conduct includes creating or

11  establishing the particular game or activity involved,

12  acquiring or maintaining premises or paraphernalia for it,

13  soliciting or inducing persons to participate, conducting the

14  playing phases, arranging any financial or recording phases,

15  or engaging in conduct supporting any other phase of its

16  operation.

17        A person also "advances gambling activity", when,

18  having substantial property or other authoritative control

19  over premises being used with his knowledge for purposes of

20  gambling activity, he permits such to occur or continue or

21  makes no effort to prevent its occurrence or continuation.

22        A person profits from gambling activity when, other

23  than as a player, he accepts or receives money or other

24  property pursuant to an agreement or understanding with any

25  person whereby he participants or is to participate in the

- Charge -                                                3849

1   proceeds of gambling activity.

2         "Player" means a person who engages in any form of

3   gambling solely as a contestant or bettor, without receiving

4   or becoming entitled to receive any profit therefrom, other

5   than personal gambling winnings, and without otherwise

6   rendering any material assistance to the establishment,

7   conduct or operation of the particular gambling activity.  A

8   person who gambles at a social game of chance on equal terms

9   with other participants therein does not otherwise render

10  material assistance to the establishment, conduct or operation

11  thereof by performing, without fee or remuneration, acts

12  directed toward the arrangement or facilitation of the game,

13  such as inviting persons to play, permitting the use of

14  premises therefor and supplying cards or other equipment used

15  therein.

16        The second element the government must prove beyond

17  a reasonable doubt is that the gambling business was in

18  substantially continuous operation for a period in excess of

19  30 days or had gross revenues of $2,000 or more in any one

20  day.

21        To establish that gambling business was in

22  substantially continuous operation for a period in excess of

23  30 days, the government is not required to prove that the

24  business operated on an everyday basis throughout the entire

25  period.  Instead, the government must prove that over some

- Charge -                                              3850

1    period in excess of thirty days, the gambling business was

2    conducted with sufficient regularity that it existed as an

3    ongoing business rather than as a casual non-business

4    activity.  The government is not required to prove that the

5    defendant knew that the business was in substantial continuous

6    operation.

7              (Transcript continues on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Charge of the Jury                              3851

1    (Continuing)

2              THE COURT:  It is for you to determine the specific

3    period when a business was in substantially continuous

4    operation.  If that period is longer than 30 days, then you

5    should go on to the next element.  If that period was 30 days

6    or less, then you should you consider the alternate theory by

7    which the second element may be proved, namely, by proving

8    beyond a reasonable doubt that the gambling business had gross

9    revenues of $2,000 or more in any one day.

10             For the purposes of this element, gross revenues

11   means the total amount wagered in one day regardless of how

12   much was paid out to bettors as winnings.  The Government is

13   not required to prove that the defendant knew that the

14   business had gross revenues of $2,000 or more in any one day.

15             The third element the Government must prove beyond a

16   reasonable doubt is that five or more persons, including the

17   defendant, knowingly conducted, financed, managed, supervised,

18   directed, or owned the gambling business during the period

19   when you found it was in substantially continuous operation.

20             The terms financed, managed, supervised, directed

21   and owned, should be given their everyday, ordinary meanings,

22   however, I would like to explain the term conducted in more

23   detail.  To conduct a gambling business means to form any act,

24   function or duty which is necessary or helpful in the regular

25   operation of the business.  You may find that a person

Charge of the Jury                    3852

1   conducted the gambling business even though he was a low-level

2   employee having no part in management or control of the

3   business and no share in its profits.  This includes any

4   employee who was directly involved in gambling activity, or

5   anyone who knowingly assisted in the operation of the gambling

6   business.  However, someone whose only involvement with the

7   business was as a customer or bettor is not conducting the

8   business and cannot be counted as one of the five.

9          Five or more people, including the defendant, must

10  have participated during the period you found that the

11  gambling business was in substantially continuous operation.

12  The Government does not have to prove that all five were

13  engaged at any particular time in conducting the business, as

14  long as it proves that all five participated in the business

15  during the period you identified.  It is not required that all

16  five be charged in the indictment.

17         Each of the five persons must have knowingly

18  participated in the business.  This means that they knew they

19  were involved in conducting a gambling business, and were not

20  involved by accident, negligence or mistake.  The Government

21  does not have to prove that the defendant knew that the

22  gambling business was illegal.

23         Racketeering Act Ten is also charged under an aiding

24  and abetting theory, which is that the defendant aided and

25  abetted the operation of the illegal gambling operation

Charge of the Jury                    3853

1   charged.  Thus, you may find Racketeering Act Ten proven if

2   you find that the defendant aided and abetted the operation of

3   the illegal gambling operation charged.  I previously

4   instructed you on the law of aiding and abetting and you must

5   apply those instructions here.

6              I will now instruct you on Racketeering Act Eleven.

7   It alleges two separate crimes under New York State law:

8   Conspiracy to extort a business associate of defendant's

9   daughter Tanya, identified in the indictment as John Doe #4

10  and extortion of this individual.  If you find, beyond a

11  reasonable doubt, that the defendant agreed that he or a

12  co-conspirator would commit either of these crimes, then you

13  may find the Government has proven Racketeering Act Eleven.

14  But if do you not unanimously find that the defendant made

15  such an agreement, you cannot find that the Government has

16  proven Racketeering Act Eleven.

17             Racketeering Act Eleven (A) charges that between

18  approximately January and December of 2006, the defendant

19  Vincent Asaro, together with others, did knowingly and

20  intentionally conspire to steal property by extortion, in that

21  the defendant and others agreed to obtain property, that is,

22  United States currency, by compelling and inducing

23  John Doe #4, a business associate of defendant's daughter

24  Tanya, to deliver such property by instilling in him a fear

25  that, if the property were not so delivered, one or more

Charge of the Jury                    3854

1   persons would cause physical injury to one or more persons in

2   the future and cause damage to property, in violation of

3   New York State law.

4           I previously instructed you on the law of extortion

5   conspiracy under New York State law in connection with

6   Racketeering Act One (E) and the law of conspiracy under

7   New York State law and you must apply those instructions here.

8           Racketeering Act Eleven (B) charges that between

9   approximately January and December of 2006, the defendant,

10  together with others, did knowingly and intentionally steal

11  property by extortion, in that defendant and others obtained

12  property, specifically United States currency, by compelling

13  and inducing John Doe #4, a business associate of defendant's

14  daughter Tanya, to deliver such property by instilling in him

15  a fear that, if the property were not so delivered, one or

16  more persons would cause physical injury to one or more

17  persons in the future and cause damage to property, in

18  violation of New York State law.

19          I previously instructed you as to the law of

20  extortion under New York State law, in connection with my

21  charge on Racketeering Act One (F) and you must apply those

22  instructions here.

23          Attempted extortion is a lesser included offense

24  within extortion.  This means that you may find Racketeering

25  Act Eleven (B) proven if you find that the defendant attempted

Charge of the Jury                              3855

1   to steal property by extortion, in violation of Racketeering

2   Act Eleven (B), but did not actually complete the crime.  If

3   your verdict is that the crime of extortion charged in

4   Racketeering Act Eleven (B) is not proven, then you will

5   consider whether the defendant committed, or agreed to the

6   commission of, attempted extortion.  But if your verdict is

7   that Racketeering Act Eleven (B) has been proven, then you

8   will not consider attempted extortion.  I previously

9   instructed you on attempt under New York State law in

10  connection with Racketeering Act Six and you must apply those

11  instructions mere.

12          Racketeering Act Eleven (B) is also charged under an

13  aiding and abetting theory.  Thus, you may find Racketeering

14  Act Eleven (B) proven if you find that defendant aided and

15  abetted another person in extorting, or attempting to extort,

16  the business associate of defendant's daughter Tanya.  I

17  previously instructed you on aiding and abetting under

18  New York State law and you must apply that instruction here.

19          I will now instruct you on Racketeering Act Twelve.

20  It alleges that between approximately September of 2007 and

21  March of 2008, the defendant operated or participated in the

22  operation of an illegal gambling business, in violation of

23  Federal law.  It reads that:

24          Between approximately September 1st of 2007 and

25  March 1st of 2008 the defendant, together with others, did

Charge of the Jury                    3856

1  knowingly and intentionally conduct, finance, manage,

2  supervise, direct and own all or part of an illegal gambling

3  business, specifically a gambling business involving

4  book-making, which operated in violation of New York State

5  law, which involved five or more persons who conducted,

6  financed, managed, supervise, directed and owned all or part

7  of such business and which remained in substantially

8  continuous operation for a period in excess of 30 days and had

9  a gross revenue of at least $2,000 in any single day, in

10 violation of Federal law.

11          I have already instructed you on the law applicable

12 to conducting an illegal gambling business under Federal law

13 in my instructions pertaining to Racketeering Act Ten.  In

14 considering whether the Government has met its burden of

15 proving Racketeering Act Twelve, you must apply those same

16 instructions here.

17          Racketeering Act Twelve is also charged under an

18 aiding and abetting theory.  I previously instructed you on

19 the law of aiding and abetting the operation of an illegal

20 gambling operation in connection with my charge on

21 Racketeering Act Ten and you must apply those instructions

22 here.

23          I will now instruct you on Racketeering Act

24 Thirteen.  It alleges that the defendant, or a person he aided

25 and abetted, stole property by extortion from Carmine

Charge of the Jury                    3857

1   Muscarella, identified in the indictment as John Doe #5, in

2   violation of New York State law.  It charges specifically that

3   between October 1st and November 4th of 2010, the defendant

4   and others, knowingly and intentionally stole property by

5   extortion in that the defendant and others obtained property,

6   specifically currency, by compelling and inducing John Doe #5,

7   Carmine Muscarella, to deliver such property by instilling in

8   him a fear that, if the property were not so delivered, one or

9   more persons would cause physical injury to one or more

10  persons in the future and cause damage to property, in

11  violation of New York State law.

12          I previously instructed you on the law of extortion

13  under New York State law in connection with my charge on

14  Racketeering Act One (F) and you must apply those instructions

15  here.

16          Racketeering Act Thirteen is also charged under an

17  aiding and abetting theory.  Now, you may find Racketeering

18  Act Thirteen proven if you find that the defendant aided and

19  abetted another person in extorting Carmine Muscarella.  I

20  previously instructed you on aiding and abetting under

21  New York State law and you must apply those instructions here.

22          I will now instruct you on Racketeering Act

23  Fourteen.  It alleges four different crimes against Robert

24  Cotrone, identified in the indictment at John Doe #6.  Acts

25  Fourteen (A) and (B) allege extortionate collection of credit

VB        OCR        CRR

Charge of the Jury                    3858

1   conspiracy and extortionate collection of credit under Federal

2   law, and acts (C) and (D) allege extortion conspiracy and

3   extortion under New York State law.  If you find that the

4   defendant agreed that he or a co-conspirator would commit any

5   of these crimes, then you may find that the Government has

6   proven Racketeering Act Fourteen.  But if do you not

7   unanimously find that the defendant made such an agreement,

8   then you cannot find that the Government has proven

9   Racketeering Act Fourteen.

10          Racketeering Act Fourteen (A) charges that between

11  approximately March 1st and June 30th of 2013, the defendant,

12  Vincent Asaro, together with others, did knowingly and

13  intentionally conspire to participate in the use of

14  extortionate means to collect and attempt to collect one or

15  more extensions of credit from one or more individuals,

16  specifically John Doe #4, Robert Cotrone, in violation of

17  Federal law.

18          I previously instructed you on the law of

19  extortionate collection of credit conspiracy under Federal law

20  as part of my instructions regarding Racketeering Act One (C)

21  and you must apply those instructions again mere.

22          Racketeering Act Fourteen (B) charges that between

23  approximately March 1 and June 30th of 2013, both dates being

24  approximate and inclusive, defendant, together with others,

25  did knowingly and intentionally participate in the use of

Charge of the Jury                    3859

1    extortionate means to collect and attempt to collect one or

2    more extensions of credit from one or more individuals, to

3    wit:  John Doe #6, Robert Cotrone, in violation of Federal

4    law.

5         I previously instructed you on the law of

6    extortionate collection of credit in connection with my charge

7    on Racketeering Act One (D), you must apply those instructions

8    here.

9         Racketeering Act Fourteen (B) also charges under an

10   aiding and abetting theory.  You may find Racketeering Act

11   Fourteen (B) proven if you find that the defendant aided and

12   abetted another person in committing extortionate collection

13   of credit.  I previously instructed you on the law of aiding

14   and abetting under Federal law and you must apply those

15   instructions here.

16        Fourteen (C) charges that between approximately

17   March 1st and June 30th of 2013, the defendant and others did

18   knowingly and intentionally conspire to steal property by

19   extortion in that the defendant and others agreed to obtain

20   property, that is United States currency, by compelling and

21   inducing John Doe #6, Robert Cotrone, to deliver such property

22   by instilling in him a fear that, if property were not so

23   delivered, one or more persons would cause physical injury to

24   one or more persons in the future and cause damage to

25   property, in violation of New York State law.

Charge of the Jury                    3860

1          I have already instructed you on the law of

2     conspiracy to extort in connection with my instructions

3     concerning Racketeering Act One (E), you must apply those

4     instructions here.

5          Racketeering Act Fourteen (D) charges that between

6     approximately March 1st and June 30th of 2013, the defendant

7     and others, knowingly and intentionally stole property by

8     extortion, in that the defendant and others obtained property,

9     specifically United States currency, by compelling and

10    inducing John Doe #6, Robert Cotrone, to deliver such property

11    by instilling in him a fear that, if property were not so

12    delivered, one or more persons would cause physical damage to

13    one or more persons in the near future and cause damage to

14    property, in violation of New York State law.

15         I previously instructed you on the crime of

16    extortion under New York State law, in connection with my

17    instructions concerning Racketeering Act One (D), you must

18    apply though instructions here.

19         Racketeering Act Fourteen (D) is also charged under

20    an aiding and abetting theory.  Thus, you may find

21    Racketeering Act Fourteen (D) proven if you find that the

22    defendant aided and abetted another person in this extortion.

23    I previously instructed you on aiding and abetting under

24    New York State law and you must apply that instruction here.

25         The indictment charges the defendant with two

VB        OCR        CRR

Charge of the Jury                    3861

1   substantive counts in addition to the racketeering conspiracy

2   charged in Count One.  These two counts, involving

3   extortionate collection of credit conspiracy and extortionate

4   collection of credit, respectively, of Robert Cotrone,

5   identified in the indictment as John Doe #6, are nearly

6   identical to the Federal crimes charged in racketeering acts

7   Fourteen (A) and (B).  There is one important distinction,

8   however:  Each of the Racketeering Acts alleges that the

9   defendant agreed that he or a co-conspirator would commit a

10  particular crime, while Counts Two and Three allege that the

11  defendant actually committed the charged crime himself or, in

12  the case of Count three, aided and abetted one or more others

13  to commit that crime.

14          Count two reads that on approximately March 1st to

15  June 30th of 2013, the defendant, together with others, did

16  knowingly and intentionally conspire to participate in the use

17  of extortionate means to collect and attempt to collect one or

18  more extensions of credit from one or more individuals,

19  specifically John Doe #6, Robert Cotrone, in violation of

20  Federal law.

21          I previously instructed you on the law of

22  extortionate collection of credit conspiracy under Federal law

23  as part of my instructions regarding Racketeering Act One (C)

24  and you must apply those instructions again here.

25              (Continued on following page.)

VB        OCR        CRR

Charge of the Court                    3862

1          THE COURT:  Count Three reads that between

2   approximately March 1st and June 30, 2013, the defendant,

3   together with others, knowingly and intentionally participated

4   in the use of extortionate means to collect and attempt to

5   collect one or more extensions of credit from one or more

6   individuals, to wit, John Cotrone in violation of federal law.

7          I previously instructed on the law of extortionate

8   collection of credit under federal law as part of my

9   instructions regarding Racketeering Act One (D) and you must

10  apply those instructions.

11         Count Three is also charged under an aiding and

12  abetting theory.  Thus, you may find the defendant guilty of

13  Count Three if you find the defendant aided and abetted

14  another person in committing extortionate collection of

15  credit.  I previously instructed you on the law of aiding and

16  abetting under federal law and you must apply that instruction

17  here.

18         I have now outlined for you the rules of law

19  applicable to the charges in this case and the processes by

20  which you should weigh the evidence and determine the facts.

21  In a few minutes, you will retire to the jury room for your

22  deliberations.

23         Traditionally, juror number one acts as foreperson.

24  In order that your deliberations may proceed in an orderly

25  fashion, you must have a foreperson but, of course, the

Charge of the Court                    3863

1  foreperson's vote is not entitled to greater weight than that

2  of any other juror.

3        Your function, to reach a fair conclusion from the

4  law and the evidence, is an important one.  Your verdict must

5  be unanimous.

6        When you are in the jury room, you may now discuss

7  the case.  It is, in fact, the duty of each of you to consult

8  with your fellow jurors and to deliberate with a view toward

9  reaching agreement on a verdict, if you can do so without

10  violating your individual judgment and your conscience.  In

11  the course of your deliberations, no one should surrender

12  conscientious beliefs of what the truth is and what the weight

13  and effect of the evidence is.  Moreover, each of you must

14  decide the case for yourself and not merely acquiesce in the

15  conclusion of your fellow jurors.  Nevertheless, I do ask you

16  to examine the issue and the evidence before you with candor

17  and frankness and proper deference to and regard for the

18  opinions of one another.  Remember that the parties and the

19  Court are relying upon you to give full and conscientious

20  deliberation and consideration to the issues and evidence

21  before you.  By so doing, you carry out to the fullest your

22  oaths as jurors:  Well and truly to try the issues of this

23  case and a true verdict render.

24        If it becomes necessary during your deliberations to

25  communicate with me for any reason, simply send me a note

Charge of the Court                    3864

1   signed by your foreperson or by one or more other members of

2   the jury.  No member of the jury should ever attempt to

3   communicate with me or with any court personnel by any means

4   other than in writing.  I will not communicate with any member

5   of the jury on any subject touching on the merits of this case

6   other than in writing or orally here in open court.

7           If you wish to have some part of the testimony

8   repeated, or to see any of the exhibits, you may make that

9   request.  If you request to see all or some of the exhibits,

10   we will send them into the jury room for you or make them

11   available to you here in open court.  If you request to hear

12   certain testimony or see trial transcripts regarding any

13   matter, I will call you into court and have the court reporter

14   read those portions of the testimony to you or send responsive

15   portions of the trial transcript into the jury room.  You can

16   have any of the testimony read back to you or made available

17   to you in transcript form.  I suggest, however, that you be

18   specific in your requests so as to avoid hearing testimony or

19   receiving portions of the trial transcript that you do not

20   need to assist in your deliberations.

21           If, in the course of your deliberations, you wish

22   further help as to the law, or if you would like to hear any

23   further explanation as to the law, you may send me a note

24   telling me what you would like.

25           Bear in mind also that you are not to reveal to any

Charge of the Court                    3865

1   person, not even in open court, how the jury stands,

2   numerically or otherwise, on the question of whether the

3   defendant is guilty or not guilty, until after you have

4   reached a unanimous verdict on each count.  Any verdict you

5   reach must be unanimous as to each count.

6           When you have reached a verdict, simply send me a

7   note signed by your foreperson that you have reached a

8   verdict.  Do not indicate in the note what the verdict is.

9           You must be prepared to render a verdict as to all

10  of the counts and racketeering acts charged.  The verdict form

11  I have prepared indicates the charges as listed in the

12  indictment.  Although I will provide each of you with a copy

13  of the verdict form, please recall that your unanimous verdict

14  must be recorded on the foreperson's verdict form.  I will

15  also provide each of you with a copy of these instructions.

16  Please remember that you must follow these instructions as a

17  whole, and should not rely on any one portion in disregard of

18  remaining portions.

19          Before now asking you to retire to begin your

20  deliberations, let me first consult with counsel to be certain

21  that I have not overlooked anything.

22          (The following occurred at side bar.)

23          MS. ARGENTIERI:  No problem.

24          THE COURT:  I didn't miss anything?

25          MS. MACEDONIO:  No.

Side Bar                                    3866

1      THE COURT:  Would you prefer that I let them go
2  tonight and have them come in tomorrow morning to start
3  deliberating?  That way, we can let the alternates go tonight?
4      MR. MACEDONIO:  I think it makes more sense to do it
5  that way.  I mean, they have to be exhausted.
6      MS. ARGENTIERI:  I was actually thinking they would
7  just start.  I mean I, kind of just want this to be over.
8      MS. MACEDONIO:  I don't think they're going to
9  finish in half an hour.
10      MS. ARGENTIERI:  I don't think so.  If they have
11  things they want to do, elect a foreperson, they can, but if
12  you don't want to do this --
13      THE COURT:  No.  I am a little torn because I would
14  just like to keep going.
15      MS. ARGENTIERI:  Well, I mean, it's not even
16  5 o'clock.
17      THE COURT:  Yes.  And they have a good half hour
18  that they can organize themselves.
19      MS. ARGENTIERI:  Just get organized, what do you
20  need and we can start working on it tonight and then when they
21  come in in the morning, we can have it ready.
22      MS. MACEDONIO:  I don't know if they're going to go
23  that far.  Do you want to inquire of the jury?
24      MS. ARGENTIERI:  No, I don't think so.
25      THE COURT:  I don't think we ought to ask them.  I

Side Bar                                    3867

1   think we ought to decide.

2            MS. MACEDONIO:  My vote would be after this

3   extensive day and listening to the charge, with all due

4   respect, they must be exhausted.

5            MS. ARGENTIERI:  I just feel -- I didn't realize

6   they were going to have Wednesday off.

7            THE COURT:  They are going to have Wednesday off.

8            MS. ARGENTIERI:  Right, that's what I mean.  So it

9   is our preference --

10           THE COURT:  Which concerns what's going to happen

11  over the next day and the next day and the next day, I

12  suppose, which makes me worry a little bit more about the

13  alternates.

14           MS. ARGENTIERI:  Right.  I mean, I know it does make

15  me worry.  Is there any way we keep one of them or two?

16           THE COURT:  Well, what we have to do is we have to

17  stick them in a room all by themselves and tell them not to

18  talk about the case and then if we should need one, we have to

19  instruct them to start deliberating again.

20           MS. ARGENTIERI:  I just think if we kept one or two

21  until Thursday and made sure everybody made it back after

22  Wednesday, I would have some peace of mind about that.

23           MS. MACEDONIO:  To the extent we're going to do

24  that, then we should let them go.

25           THE COURT:  Yes.  If we're going to keep any, then

Side Bar                          3868

1    we are going to keep them all.

2                MS. ARGENTIERI:  Okay.

3                THE COURT:  Do you want me to keep them?

4                MS. ARGENTIERI:  I kind of do.  It's just such a

5    long trial.  I mean, I don't want that to be the thing --

6                MS. MACEDONIO:  I guess.  I mean, they're here.  I

7    mean, if we're keeping them, keeping them, does it make sense

8    then to put them in a room tonight?

9                MS. ARGENTIERI:  Right.  I don't know why that

10   matters.  They're here until 5:30.  It's not even 5 o'clock.

11               THE COURT:  Okay.  I'm going to tell the jurors to

12   deliberate.

13               MS. ARGENTIERI:  Okay.

14               THE COURT:  And then I will talk to the alternates.

15   Have you got a place to put them?

16               THE CLERK:  I don't.

17               THE COURT:  You don't have a place to put them?

18               MS. MACEDONIO:  They can sit with us.

19               THE CLERK:  I don't know what's available.

20               MS. ARGENTIERI:  Well, I think the alternates could

21   go and just come back tomorrow.  They're not deliberating

22   anyway.  They could -- I guess they have to get on the bus.

23               THE COURT:  They could go and come back tomorrow.

24               MS. ARGENTIERI:  That's fine with me.

25               MS. MACEDONIO:  I'm just not sure about their

Side Bar                                      3869

1   transportation issues.

2           THE COURT:  It is the transportation problem.

3           MS. ARGENTIERI:  There's also a spare witness room

4   over here where we've been storing witnesses.

5           THE CLERK:  We can't put them there.

6           MS. MACEDONIO:  You can have somebody guard them.  I

7   mean, I think logistically, I think we're coming up with

8   issues as to why we should break.

9           THE COURT:  Well, if everybody wants, we can keep

10  them, I think we're going to have to wait until tomorrow to do

11  that.  We don't have a place to put them.

12          MS. ARGENTIERI:  Can't they just stay here?

13          MS. MACEDONIO:  And we all sit in silence for the

14  next half an hour?

15          MS. ARGENTIERI:  We can go out in the hallway.

16          MS. MACEDONIO:  They're going to watch who comes in

17  and out of the door?

18          THE COURT:  Okay.  Dennis is going to try to find a

19  place.

20          MS. ARGENTIERI:  I really appreciate it.

21          (Pause.)

22          THE COURT:  All right.  So I am going to have just

23  the jury sworn.  And send them out and then talk to the

24  alternates.  Okay?

25          MS. ARGENTIERI:  Okay.  Sounds good.

3870

1           (In open court; side bar ends.)

2           THE COURT:  Please swear the marshal.

3           THE CLERK:  Please raise your right hand.

4           (Marshal sworn.)

5           THE COURT:  Okay.  Ladies and gentlemen, I am going

6   to ask the twelve of you who are jurors to retire to the jury

7   room to deliberate at this time.  I'm going to ask the

8   alternates to stay so I can talk to them.

9           (Jurors exit; alternate jurors present.)

10          THE COURT:  Please be seated.

11          What I am going to do in this case is ask you,

12  obviously a jury is a jury of twelve persons, but I have

13  spoken with the lawyers and we would very much like to have

14  you available in the event we should lose a juror.  What this

15  means, obviously, is you continue not to talk about the case,

16  not to talk about the case with each other, not to talk about

17  the case on the way home with the other jurors, they shouldn't

18  be doing that anyway, stay to the end of the day and come back

19  in tomorrow.  I appreciate that we are a drain on your time

20  but as you can tell, the trial has been lengthy and

21  complicated.

22          You have heard every single bit of evidence.  Had

23  you been called upon to replace one of the jurors, you would

24  be in the jury room right now and we are concerned.  You never

25  know what's going to happen.

Side Bar                                    3871

1          All right.  So just do not talk about the case with

2    anybody.  Dennis has found a place for you to wait.  When I

3    call the jurors back in at the end of the trial day, I will

4    call you back in too.  Okay.  I thank you so much.

5          (Alternate jurors exit.)

6          Could I see the counsel at side bar just for a

7    moment?



CMH        OCR        RMR        CRR        FCRR





3874

1          (Court resumes at 5:35 p.m.)

2          (In open court.  Jury present.  Alternate jurors not

3    present.)

4          THE COURT:  Please be seated.

5          Ladies and gentlemen, it's the end of the day.  I

6    know you have just barely begun so we are going to ask you to

7    return tomorrow morning at the regular time.

8          (Alternate jurors enter.)

9          THE COURT:  I was just saying it's obviously the end

10   of the trial day.  I am going to ask everyone to return

11   tomorrow at the regular time.

12          As to the jurors, when you are all in, you do not

13   have to wait to come into the courtroom.  When you are all in

14   the jury room with each other and no one else, you may resume

15   your deliberations.

16          I know the alternates understand that I am asking

17   that they return and Dennis will collect you tomorrow.  Okay.

18          Don't talk about the case at all.  Thank you so

19   much.

20          (Jury exits.)

21          MS. MACEDONIO:  Your Honor, do you want us here at

22   9:30 or is 10 o'clock okay?  How would you like us --

23          THE COURT:  I prefer you being here at 9:30.  I

24   don't know what's going to happen.

25          MS. MACEDONIO:  No problem.  See you then.

3875

1            THE COURT:  Thank you.

2            MS. ARGENTIERI:  Good night, Judge.  Thank you very

3    much.

4            (Matter adjourned to November 10, 2015 at 9:30 a.m.)

5

6

7                    *      *      *      *      *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25